# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

Melanie Moore,                                  Case No. 8 :20-CV-02184MSS-SPF

    Plaintiff,

V.

Luis Marquez, Individually and as

Owner of Pooches of Largo, Inc.,

and Pooches of Largo, Inc.,

    Defendants,

_____/

## First Amended Complaint and Demand for Jury Trial

**1.** Plaintiff, Melanie Moore, hereby files this First Amended Complaint pursuant Fed. R. Civ. P. 15 and 8(f)against Defendants Luis Marquez and Pooches of Largo, Inc. d/b/a Petland, collectively the "Defendants." Plaintiff states as follows:

**2.** This is an action for FLSA retaliation and failure to pay minimum wage, and further states claims for civil theft, conversion, interference with contract, fraudulent inducement and misrepresentation, malicious prosecution, and civil conspiracy.

**3.** Plaintiff seeks to recover unpaid wages, damages, and other equitable relief. Plaintiff demands a jury trial for all counts so triable.

## Jurisdiction and Venue

**4.** Jurisdiction is proper in the Florida Middle District Court pursuant 28 U.S. Code § 1331, and this court has subject-matter jurisdiction over this action that pertains to a question of federal law pursuant the Fair Labor Standards Act.

**5.** This court also has personal jurisdiction because the Defendants maintain a principal place of business in this judicial district and have availed themselves of the business opportunities available within the state of Florida. The Plaintiff resides in this district and was employed by Defendants at their principal place of business in this district.

**6.** This Court also has supplemental jurisdiction over the related state law claims pursuant 28 U.S. Code §1367, because Plaintiff's Florida common law claims form part of the same case or controversy under Article III of the U.S Constitution and arise from a common nucleus of operative facts as her federal law claims, and the parties are identical.

**7**. Resolving all claims in a single action serves the interests of judicial economy, convenience, and fairness to the parties.

**8.** This Court also has jurisdiction because Pinellas County is part of the Middle District of Florida and Defendants have availed themselves to the jurisdiction of this court because they own and operate a business in Pinellas County. Defendants are also

subject to the laws and ordinances of Pinellas County because they operate a business in Pinellas County.

**9.** Venue is proper In the Middle District of Florida pursuant 28 U.S. Code §1391 because the Defendants maintain a principal place of business in this district and all or most of the unlawful conduct giving rise to this action occurred in this district.

## The Parties

**10.** Plaintiff, Melanie Moore, resides in Pinellas County, Florida, where she has worked as a veterinary technician for approximately fifteen years. Plaintiff was employed by Defendants in August of 2018 at Petland Largo, a retail pet store located at 10289 Ulmerton Road Largo, Florida 33771. At all times material, Plaintiff was an "employee" under the Fair Labor Standards Act.

**11.** Defendant, Luis Marquez, is the owner and President of Petland Largo, located in Pinellas County, Florida. Luis Marquez was an "employer" under the FLSA and Plaintiff's employer at all times material. Defendant operates under the business name *Pooches of Largo, Inc*. which maintains its corporate office at 8181 NW 154th Street, Suite 270 Miami Lakes, Florida 33016.

**12.** Whenever in this Complaint an act or omission of a corporation or business entity is alleged, the said allegation shall be deemed to mean and include an allegation that the

corporation or business entity acted or omitted to act through its authorized officers, directors, agents, servants, and/or employees.

**13.** Defendants engage in interstate commerce through the purchase, transportation, and sale of live animals from large-scale commercial breeders in the Midwest for sale in his Petland stores throughout Florida and Texas.

## Facts

**14**. Plaintiff was employed at Defendants' Largo Petland store from August 13, 2018, through August 31, 2018. Plaintiff obtained the job by submitting her resume using the link in an employment offer on Indeed.com created and posted by Defendants. The offer was for a "Full-time Certified Veterinary Technician." The offer indicated that the compensation for the job was an annual salary of $35,000. **(Exhibit 1)**

**15**. Plaintiff received confirmation that her resume was received, first on August 6, 2018, and again on August 8, 2018, when she received voicemails from two of Defendants agents, Leanne, and Lynette, respectively. Both agents requested that Plaintiff return the call to schedule an interview for the "Certified Veterinary Technician" position at Petland Largo. **(Exhibit 2)**

**16.** On August 12, 2018, Plaintiff received a text message from manager "Yessi" offering the job and requested that the Plaintiff be at Petland at 7am the following morning to begin training. Plaintiff accepted the job and began working at Petland the following

morning on August 13, 2018. Plaintiff inquired about the compensation in her reply message and was not informed that it was any other than stated by the Defendants in their offer. **(Exhibit 3)**

**17.** The weekly employee work schedule at Petland is posted on Friday of the preceding week, thus Plaintiff was not on the previously posted work schedule her first week of employment. Plaintiff worked as directed by manager Yessi her first week of employment. Yessi stated that she would enter Plaintiff's hours into Petland's electronic time-keeping system manually until she was able to assign Plaintiff a pin code to clock in and out for her shifts. **(Exhibit 4)**

**18.** Yessi also stated that Plaintiff would not receive a paycheck at the end of her first week, which was payday for the other workers, but that Plaintiff would receive a paycheck on the next pay date in two weeks on August 31, 2018.

**19.** Plaintiff worked full-time for three weeks according to the direction of Yessi her first week and then according to the weekly employee work schedule created and posted by Defendants for Plaintiff's subsequent weeks.

**20**. Plaintiff was scheduled a minimum of 37 hours per each week of employment. However, Plaintiff was often asked to stay later than the time she was scheduled to be off work at the direction of her supervisor to complete any additional work assigned.

**21**. Plaintiff submits her work schedules for weeks two and three, showing that she was scheduled five shifts per week at a minimum of 37 hours per week. **(Exhibits 5, 6)**

**22.** Plaintiff worked approximately one hundred hours in total over the three weeks. Plaintiff used the electronic time-keeping system to clock in and out for her shifts. The records of which are in the sole custody and control of the Defendants.

**23**. Plaintiff was an excellent employee and had no documented disciplinary, attendance, or performance issues during her employment at Petland Largo.

**24**. On August 30, 2018, Plaintiff was informed by her supervisor, Allison, that if she did not set up direct deposit, the Plaintiff would not be paid the following day. Allison gave Plaintiff a direct deposit authorization form which Plaintiff completed with her banking information and returned the form to Allison.

**25**. The following day, Friday August 31, 2018, was pay day. Despite being scheduled to work every Friday, Plaintiff was scheduled off work on this Friday. Contrary to Allison's statement the previous day that Plaintiff's would be paid by direct deposit, Plaintiff received a text message from Allison notifying the Plaintiff that her paycheck was at Petland. **(Exhibit 7)**

**26.** Plaintiff arrived at Petland to pick up her check approximately one hour later. While Allison retrieved Plaintiff's check, Allison said that Plaintiff "was lucky" and that Allison's check was short, and she would have to get it "straightened out."

**27.** After Plaintiff left for the bank, she discovered that her check was for only $205 and was short by approximately $2000. According to the check stub, the pay period ended the previous day, August 30, 2018. Thus, Plaintiff's check dated August 31, 2018, should have compensated the Plaintiff for all three weeks of employment in the amount of $2019. Plaintiff submits her pay stub as **(Exhibit 8).**

**28**. Immediately upon discovering the shortage, Plaintiff text Allison to notify her that there was a problem with her paycheck. Plaintiff asked with whom she should speak about the shortage. **(Exhibit 7)**

**29**. Plaintiff complained that her wage rate had been reduced from an annual salary of $35,000 to an hourly rate of $8.45 an hour **(Exhibit 9)** and that Defendants' pay practice was "illegal as hell" because they had applied the reduced wage to her paycheck retroactively after Plaintiff had already "put in the hours" at the higher wage.

**(Exhibit 10)**

**30.** Allison advised Plaintiff "to call corporate to figure it out." Plaintiff informed Allison that she would be responding with counsel who would be calling corporate on Plaintiff's behalf regarding the wages Plaintiff was owed. **(Exhibit 11)**

**31.** Allison confirmed her understanding that Plaintiff had lodged a grievance about her pay and complained of unlawful pay practices by the Defendants when stated, "we will have our legal team look into the wage disagreement."

**32.** Allison then terminated Plaintiff's employment "immediately." She also said, "it was a pleasure working with you.," suggesting that Plaintiff's termination was not the result of any misconduct by the Plaintiff. **(Exhibit 11)**

**33**. Plaintiff retained employment attorney Richard Celler on October 10, 2018, who undertook the case on a contingency fee basis. Mr. Celler was enthusiastic and optimistic that he would obtain a favorable outcome based on the merits of the case. Attorney Celler also told the Plaintiff that time was of the essence and that he was eager to begin working on her case.

**34.** Attorney Celler sent Defendants a letter of demand on December 6, 2018, notifying Defendants of their unlawful employment actions against the Plaintiff, to include breach of contract, retaliation in violation of Private Whistleblower Act (PWA), and failure to pay minimum wage. The letter stated that Mr. Celler was confident that any judge or jury hearing the case would find Defendants' actions intolerable and find in favor of the Plaintiff. The letter indicated a deadline of December 20, 2018, for Defendants to respond with a satisfactory offer of resolution without which Mr. Celler would file Plaintiff's case in court. **(Exhibit 12)**

**35.** Defendants responded, through counsel, on December 11, 2018. **(Exhibit 13)** Defendants misrepresented material facts pertaining to Plaintiff's employment. Defendants alleged, falsely, that Plaintiff was a kennel technician at Petland for $8.45

an hour, rather than a veterinary technician with a corresponding salary of $35,000 per year. The Defendants' misrepresentations were contrary to the offer created and posted on Indeed.com by the Defendants themselves through which Plaintiff obtained the job at Petland. Defendants' offer stated the position was for "Full-time Certified Veterinary Technician" for an annual salary of $35,000. *see* Exhibit 1

**36.** Defendants also falsely alleged that Plaintiff never worked a full-time schedule and only worked 20 hours per week. The Defendants representations were contrary to the weekly work schedules created and posted by the Defendants themselves showing that Plaintiff worked a schedule of five days a week and a minimum of 37 hours each week. *see* Exhibits 5,6

**37**. Defendants also misrepresented the dates of Plaintiff's employment, alleging that Plaintiff worked from August 17, 2018, through September 13, 2018. Exhibit three shows that Plaintiff was offered the job on August 12, 2018, and Plaintiff agreeing to be at Petland the following morning, August 13, 2018, to begin training per Yessi's request. Exhibit four is a screenshot of a text conversation with Yessi showing that Plaintiff was working at Petland on August 16, 2018. Plaintiff also submits her Google timeline showing that she was present at Petland on August 13, 2018, and August 16, 2018. **(Exhibits 14, 15)**

**38.** Given the fact that Defendants have sole custody and control of Plaintiff's employment file and time clock records, there is no reason Defendants should not know material facts of Plaintiff's employment unless Defendants failed to maintain the employment records required under the FLSA. However, Defendants pointed to no evidence to support their allegations.

**39.** In addition to the misrepresentations about Plaintiff's employment, counsel for the Defendants claimed to be in possession of a "Petland Wage Agreement for Kennel." Counsel alleged that the agreement originally stated a wage of $35,000 *an hour* and accused the Plaintiff of altering the terms of the agreement by crossing out the word "hour" and writing the word "year" in its place. The allegation is absurd and false.

**40.** Plaintiff denies altering any documents related to her employment at Petland. The allegation that a wage agreement for $35,000 an *hour* even existed for Plaintiff to have altered to begin with is persuasive evidence that the allegation by Defendants' counsel was false.

**41**. Adding to the false and bizarre allegations by Defendants' counsel, he further alleged that it was Plaintiff's counsel, Mr. Celler, who provided him with this "altered' wage agreement. These allegations were made despite knowledge of their falsity by the Defendants, Defendants' counsel, the Plaintiff, and Plaintiff's counsel.

**42.** These misrepresentations of fact and false allegations against the Plaintiff and her counsel were made without any legitimate purpose or basis in fact.

**43.** Attached to Defendants' response was a screenshot of an employment offer on Indeed.com for "kennel technician" at Petland Largo. The job description for kennel technician was identical to the job description in Defendants' offer for "certified veterinary technician" through which Plaintiff obtained employment at Petland. The screenshot showed that the pay for the "kennel technician" position was a salary of $8.25 to $11.00 a *year*. It *appears* that Defendants sent the screenshot to imply that it somehow applied to Plaintiff in her role at Petland. However, the screenshot shows that the job offer was created and posted on November 23, 2018, which was three months after Plaintiff was terminated and thus, had no relevance to the Plaintiff whatsoever. **(Exhibit 16)**

**44.** Counsel for the Defendants also sent a pay stub for an alleged direct deposit to Plaintiff's bank for $320.89. Plaintiff has no record of the alleged deposit and denies receiving any direct deposit from Petland. Plaintiff disputes the authenticity of the pay stub/check. Unlike the pay stub for the check Plaintiff received on August 31, 2018, the check/stub for the alleged direct deposit indicates no bank name from which the funds would have been drawn. Also, it was allegedly for a pay period from August 31, 2018, through September 13, 2018. However, Plaintiff was terminated on August 31, 2018,

and thus, could not have worked or earned wages during the pay period stated on the pay stub. **(Exhibit 17)**

**45.** Plaintiff emailed her attorney on at least three different dates to ask about the alleged altered wage agreement opposing counsel claimed to have received from Mr. Celler. Although Mr. Celler replied to the Plaintiff's emails, he did not respond to her inquiries about the alleged altered wage agreement he was accused of sending to the other side.

**46**. Mr. Celler's failure to deny the allegations or even acknowledge that they had been made, much less explain the allegations is persuasive evidence suggesting Mr. Celler had been induced into silence. Moreover, the enthusiasm Mr. Celler had when he undertook the case was substantially diminished after he received the Defendants' response to the demand letter. Mr. Celler did not file Plaintiff's case on December 20, 2018, in accordance with his demand letter. Nor did Mr. Celler maintain adequate communication with the Plaintiff after receiving the Defendants' reply from counsel. Plaintiff was not provided with any updates as to the progress of her case and in fact, was told that the firm did not provide clients with updates.

**47.** Mr. Celler's behavior was not that of an attorney whose compensation was dependent on a successful resolution of the case, given that he undertook the case on contingency.

**48**. Plaintiff was advised that Mr. Celler was negotiating a settlement with Defendants and instructed to be patient, that it was not an overnight process. **(Exhibit 18)**

**49**. After four months of radio silence from Mr. Celler, Plaintiff contacted Mr. Celler by telephone to inquire about the status of her case. Mr. Celler indicated that the Defendants were not interested in resolution. Plaintiff restated her interest in filing her case, but Mr. Celler told her that he wanted to spend another month attempting to reach a settlement pre-suit. By this time, it had been nine months since Mr. Celler undertook the case with no meaningful progress toward resolution.

**50**. Mr. Celler notified opposing counsel that he intended to file Plaintiff's case on April 6, 2019, and again on May 6, 2019. However, Mr. Celler did not file the case on either date and instead abruptly withdrew from representing the Plaintiff on May 20, 2019, without cause and with less than one day's notice and without giving the Plaintiff an opportunity to transition to a new attorney before removing himself from the case. **(Exhibits 19, 20, 21)**

**51.** Mr. Celler's conduct was not only contrary to the Plaintiff's interests, but also contrary to his own contractual and financial interests by his failure to advance Plaintiff's case toward resolution. Mr. Celler's abrupt withdrawal compromised his ability to be compensated for nine months of time and expenses spent on Plaintiff's case, given that he undertook the case on contingency.

**52**. One week later after Mr. Celler's abrupt withdrawal, Defendants sent the Plaintiff a cease-and-desist letter accusing the Plaintiff of being responsible for the cover photo of a Facebook page, one of dozens that exposes Petland's association with the puppy mills from which they source puppies. **(Exhibit 22)**

**53.** In their letter, sent through counsel**,** Defendants threatened to sue the Plaintiff for defamation and alleged, "We have already been in touch with Facebook to confirm the computer used to create the page, etc." However, this allegation was false. Per Facebook's privacy policy, a court order is required for Facebook to disclose information about its users. Had Defendants obtained the requisite court order, they would have known the Plaintiff was not the administrator of the page.

**54**. By their threats and false allegations, together with the suspicious timing just one week after MR. Celler's abrupt withdrawal, it *appears* that Defendants intended the letter to intimidate and further retaliate against the Plaintiff to deter her from obtaining new counsel to further pursue her claims against the Defendants. **(Exhibit 23)** shows that Plaintiff did not administrate the Facebook page at issue and supports Plaintiff's claim that the Defendants intended to threaten and retaliate further against the Plaintiff to deter continued pursuit of legal action against the Defendants.

**55.** Moreover, the picture that was the subject of the cease and desist letter is found on two websites in connection with Petland, [www.change.org](www.change.org) and

https://www.thepetitionsite.com/1/stop-petlands-cruelty/. **(Exhibits 25, 25)** However,

Defendants have not filed any defamation action against either of the websites, further

supporting Plaintiff's contention that the Defendants did not assert a legitimate claim

seeking to obtain redress for some perceived defamatory act, but rather sought to

further harass and retaliate against the Plaintiff by the threat of a lawsuit for an act for

which Plaintiff was not responsible.

**56**. Plaintiff emailed Defendants' counsel on July 19, 2019, to inquire about the alleged

wage agreement she was accused of altering. However, rather than acknowledge

Plaintiff's request and respond accordingly, counsel instead responded by attaching a

defamation complaint and summons to the email. **(Exhibit 26)** The action was filed a

month earlier in Miami-Dade County Court, in the wrong venue. It defies belief that

Defendants' counsel, with more than fifteen years of litigation experience, was unable

to determine the correct venue in which to file an action against the Plaintiff.

**57.** Despite its filing a month earlier, no attempt had been made to serve the Plaintiff,

according to court records. **(Exhibit 27)** Nor did Defendants utilize of any of several

alternative means by which to commence an action if a Defendant cannot be served. see

*Pooches of Largo, Inc. v. Melanie Moore,* Miami-Dade 2019-018268-CA-01

**58.** The defamation action against the Plaintiff was frivolous, without probable cause,

and filed for an improper and retaliatory purpose. The action named Plaintiff as

Defendant by "process of elimination." Defendants filed the action with ill will toward the Plaintiff and the design and intention to injure the Plaintiff, Plaintiffs good name and reputation, employment, and employability. Defendants filed the action not with an intent to protect any interest intended to be protected by any privilege but with recklessness and an intent to injure the Plaintiff. Therefore, no privilege existed to protect Defendants from liability for any of these aforementioned statements and unsupported allegations. Defendants continued the action for sixteen months which was terminated in Plaintiff's favor and dismissed for lack of prosecution on October 16, 2020. **(Exhibit 27)**

**59.** Defendants made several misrepresentations in their defamation complaint. For example, Defendants alleged that Plaintiff was paid $1500 for her work at Petland. Not only was this false and easily disproven by the payroll records in custody of the Defendants demonstrating otherwise, but also irrelevant to an action for defamation. Defendants also made disparaging and false statements against the Plaintiff, such as accusing the Plaintiff of extortion, aided by her counsel, for acting to recover unpaid wages. Once, again, completely irrelevant to an action for defamation. In fact, not only did defendants have no reasonable basis to believe the statements that they also had no belief in the truth of the statement in fact knew the statements to be false.

**60.** Additionally, Defendants were informed and had knowledge that Plaintiff was evicted from her home and lost all her belongings as a result just three weeks after Defendants terminated her employment and unlawfully retained the money that was to be used to pay her housing expenses. Given the circumstances, it defies belief that Defendants, or their counsel, had any legitimate belief in obtaining a judgement against the Plaintiff, a homeless woman with no income or assets, for an act she did not do.

**61.** More likely than not is the case that, as Plaintiff contends, the lawsuit was a means of further retaliation against the Plaintiff to discourage further pursuit of legal action against the Defendants and to cause the Plaintiff mental distress.

**62.** Setting aside the lack of probable cause for the action, it is nonetheless worth noting that in their Complaint, Defendants stated that Plaintiff "was a veterinary technician for the store." Defendants made this statement in direct conflict with Defendants' previous claim that Plaintiff was a kennel technician at Petland, *not* a veterinary technician.

**63.** By the inconsistency of Defendants statements, it *appears* that Defendants made one representation when attempting to justify under paying the Plaintiff's wages, and another representation when they sought to injure Plaintiff's personal and professional reputation by alleging acts of extortion and defamation against her former employer.

**64.** All actions of the Defendants, its agents, and employees, herein alleged were known, ratified, and approved by the Defendants. By the foregoing facts and the conduct described below, Plaintiff alleges that Defendants engaged in ongoing acts of retaliation and other unlawful conduct and states the following claims against the Defendants:

**Count One**
**Retaliation in Violation of FLSA 215(a)**

**65.** As a separate and distinct cause of action, Plaintiff complains and realleges paragraphs 12 through 30 and paragraphs 33 through 60 and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

**66.** At all times material, section 215(a) of the FLSA was in effect and binding on the Defendants. It prohibits employers such as the Defendants from discharging, demoting, threatening, harassing, or in any other manner discriminating or retaliating against any employee because she provided, or threatened to provide, information, or assisted in an investigation by a regulatory agency or an internal investigation by the company relating to wage violations and/or complaints of conduct by the company that is unlawful.

**67.** To establish a cause of action for retaliation under the FLSA, an employee must prove three elements: (1) the employee engaged in protected activity under the FLSA,

(2) the employee subsequently suffered adverse action by the employer, and (3) a

causal connection existed between the protected activity and the adverse action.

**68**. Section 215(a)(3) of the FLSA states that "it is a violation for *any person* to 'discharge

or in any other manner discriminate against any employee because such employee has

filed any complaint or instituted or caused any proceeding under or related to this Act

or has testified or is about to testify in any such proceeding, or has served or is about to

serve in an industry committee.'" ([https://www.dol.gov/agencies/whd/fact-sheets/77a-flsa-prohibiting-retaliation](https://www.dol.gov/agencies/whd/fact-sheets/77a-flsa-prohibiting-retaliation))

**69.** "Because section 215(a)(3) prohibits "any person" from retaliating against "any

employee", the protection applies to all employees of an employer even in those

instances in which the employee's work and the employer are not covered by the

FLSA." ([Fact Sheet # 77A: Prohibiting Retaliation Under the Fair Labor Standards Act (FLSA) | U.S. Department of Labor (dol.gov)](#))

### Plaintiff Engaged in Multiple Acts of Protected Activity Under the FLSA

**70**. Plaintiff engaged in protected activity on August 31, 2018, when she complained to

her supervisor that there was a problem with her paycheck upon discovering a

substantial shortage of approximately $2000 in the amount of her check. Complaints

about wage issues are protected under the FLSA

**71.** Plaintiff engaged in protected activity for a second time on August 31, 2018, when she complained to her supervisor that her rate of pay had been reduced to $8.45 an hour and the reduction was unlawfully applied retroactively to her paycheck for work already performed after she had "put in the hours" at the higher wage rate. Reductions and/or deductions from an employee's paycheck that reduce their compensation to less than minimum wage are prohibited by the FLSA. The FLSA which also prohibits retroactive reductions in pay. Only prospective reductions are allowed under the FLSA.

**72.** Plaintiff engaged in protected activity for a third time on August 31, 2018, when she opposed Defendants' unlawful activity and explicitly stated that their conduct was "illegal as hell." The FLSA prohibits employer retaliation against employees who oppose unlawful activity by their employers.

**73**. Plaintiff engaged in protected activity for a fourth time on August 31, 2018, when she stated she would be responding with counsel when she disclosed information about Defendants unlawful activity by participating in an inquiry into Defendants' unlawful activity. The FLSA prohibits retaliation for disclosing, or *threatening* to disclose, information about unlawful activity by an employer.

**74**. As the direct and proximate result of Plaintiff's protected conduct as described above, Plaintiff suffered an adverse employment action when her employment was terminated just thirty minutes later in response to Plaintiff's text stating she would

respond with an attorney. The text terminating the Plaintiff is direct evidence showing that Plaintiff's complaint was the cause of her termination.

75. The short temporal proximity between Plaintiff's protected activity and her termination just thirty minutes later supports a causal connection between the two events.

76. Compelling circumstantial evidence exists to support a cause of action for retaliation as follows:

- Plaintiff had no documented disciplinary, attendance, or performance issues during her employment at Petland, demonstrating that her termination was not motivated by other nonretaliatory reasons
- Plaintiff was terminated on her day off, via text message, and was not on workplace property at the time she was terminated
- Plaintiff worked the day before she was terminated without incident.
- Plaintiff was scheduled five shifts for the upcoming week, which was just posted a few hours earlier on the day Plaintiff was terminated, demonstrating that Plaintiff was terminated for her complaint. Plaintiff submits the schedule for the upcoming week that was posted just a few hours earlier on the day she was terminated. **(Exhibit 28)** The schedule shows that Plaintiff was scheduled to work five shifts and a minimum of 37 hours that week. The fact that Plaintiff was scheduled to work the following week supports the claim that Plaintiff was terminated for her complaint and that she would not have been terminated but for her complaint. Plaintiff could have accepted the $205 she was paid for one hundred hours of work and not complained and continued working at Petland under these substandard and unlawful conditions.

- Rather than conduct an inquiry into the wage issues raised by the Plaintiff in her complaint, Defendants chose instead to terminate the Plaintiff, which is persuasive evidence that Defendants were already aware of the shortage of Plaintiff's wages.

- Defendants offered no non-retaliatory reason when terminating the Plaintiff, nor did they explain the basis for termination when Plaintiff alleged retaliatory discharge claims against the Defendants. The lack of a nonretaliatory motive supports the claim that termination was retaliatory.

- Supervisor Allison's notice of Plaintiff's termination was immediately followed with "It was a pleasure working with you." which supports Plaintiff's claim that her termination was retaliatory and not the result of any wrongdoing by the Plaintiff.

**77**. The law does not require that the Plaintiff's complaint be lodged with absolute formality, clarity, or precision. Plaintiff effectively communicated her grievance with so that her supervisor understood that her complaint pertained to wages and opposed unlawful activity, and/or activity reasonably believed by the Plaintiff to be unlawful, by the Defendants. Evidence that Allison understood that Plaintiff lodged a grievance about wages and opposed unlawful activity is supported by confirmation of that understanding by Allison when she responded to say Allison that their "legal department look into the wage issue." Allison's confirmation leaves no room for doubt that she understood that the matter concerned wages and unlawful conduct by the Defendants.

**78**. Defendants violated the FLSA when, despite understanding that Plaintiff lodged a grievance about her pay and opposed unlawful conduct, Defendants took an adverse action against the Plaintiff by unlawfully terminating her employment in reckless disregard for the Plaintiff's rights or the FLSA. Defendants put the Plaintiff in the

precarious position of having to choose between coming forward with a grievance, or quietly accepting substandard conditions and wage theft.

**79**. Plaintiff states a claim for relief because Defendants violated the FLSA when they took adverse action against the Plaintiff by terminating her employment for complaining about a shortage of wages and Defendants' unlawful pay practices. The FLSA prohibits retaliation against employees for complaining about their wages or unlawful activity by their employer.

### Defendants Continued to Retaliate After Plaintiff's Employment Ended

**80**. "Section 15(a)(3) also applies in situations where there is no current employment relationship between the parties; for example, it protects an employee from retaliation by a former employer." [Fact Sheet # 77A: Prohibiting Retaliation Under the Fair Labor Standards Act (FLSA) | U.S. Department of Labor (dol.gov)](Fact Sheet # 77A: Prohibiting Retaliation Under the Fair Labor Standards Act (FLSA) | U.S. Department of Labor (dol.gov))

**81.** Defendants already demonstrated their capacity for retaliation when they unlawfully terminated the Plaintiff in retaliation for her complaint. Plaintiff alleges that Defendants engaged in an ongoing pattern of retaliation, threats, intimidation, and harassment that continued for more than two years after her employment ended as described below.

**82.** Plaintiff alleges that Defendants further retaliated against the Plaintiff when she disclosed information to her attorney about Defendants' unlawful activity and wage theft. Defendants retaliated against the Plaintiff when they falsely accused Plaintiff of altering a wage agreement pertaining to her employment at Petland and falsely

accused Plaintiff's counsel of providing the other side with the allegedly altered wage agreement. The allegation was false and retaliatory because no such altered wage agreement existed.

**83.** Defendants further violated the FLSA when they retaliated against the Plaintiff by making false accusations against Plaintiff and her counsel in what appears to have been an attempt to interfere with the relationship between Plaintiff and her counsel.

**84.** Defendants also retaliated against the Plaintiff for pursuing her claims of Defendants' unlawful activity when, through their counsel, Defendants threatened to sue the Plaintiff for defamation for a picture on a Facebook page not administrated by the Plaintiff and demanded that she take the page down immediately. The threat was retaliatory because Plaintiff was not responsible for the Facebook page, or the content contained therein.

**85.** Defendants' counsel furthered Defendants' retaliatory conduct toward the Plaintiff in response to Plaintiff's email inquiry about the alleged wage agreement she was accused of altering. Counsel responded by attaching a defamation complaint and summons The complaint was frivolous and without probable cause, and was filed a month earlier. As court records demonstrate, no attempt was made to effectuate service of the complaint on the Plaintiff. *see Exhibit 27*

**86**. Given that the action was without probable cause and plagued by disparaging and false statements throughout the complaint, the action is persuasive evidence that it was motivated by retaliation rather than any legitimate purpose in seeking redress for some perceived wrong by the Plaintiff. By filing the frivolous action, it makes clear the role of Defendants' counsel in furthering Defendants' retaliatory acts by drafting and filing a baseless defamation Complaint against the Plaintiff, knowing the allegations were false and lacked any basis in law or fact, and made intentional misrepresentations about Plaintiff's wages and disparaging and false statements about the Plaintiff to retaliate, chill, intimidate, and otherwise discourage further pursuit of her claims against Defendants and the recovery of wages owed.

**87**. When Defendants did not hear from Plaintiff again after emailing the defamation action to her, the retaliatory actions of the Defendants ceased, presumably because they believed they had succeeded in discouraging further pursuit of the claims against the Defendants by harassing and bullying the Plaintiff by filing a malicious defamation action against her.

**88**. Plaintiff states a claim for relief because the Defendants retaliated against the Plaintiff making false accusations against the Plaintiff and her counsel, by claiming the existence of evidence that did not exist, by harassing and threatening Plaintiff with a lawsuit for an act she did not do, and by filing a frivolous lawsuit against Plaintiff as a

means of further retaliation against the Plaintiff for her complaint and for pursuing legal action against the Defendants for their unlawful activity and wage theft. The FLSA prohibits retaliation in all forms and employees are protected from retaliation after the employment relationship is terminated for disclosing information or participating in an investigation of unlawful activity by an employer.

### Plaintiff was Harmed by Defendants' Retaliation

**89.** The FLSA prohibits retaliatory action against an employee for engaging in any of the protected activities described above. Defendants discharged, threatened, harassed, and otherwise retaliated against the Plaintiff after she made a written complaint to Defendants, through Defendants' supervisory employee regarding what she reasonably believed to be illegal or unlawful conduct in violation of state and federal statutes rules, and regulations, and because she sought to recover the wages she is owed by retaining counsel to represent her in her claims against Defendants.

**90**. As a direct and proximate result of Defendants' actions, Plaintiff has suffered and continues to suffer substantial losses of earnings and other employment benefits and has suffered and continues to suffer severe emotional distress, humiliation, and mental anguish, all to her damage in an amount to be determined at trial.

**91.** Moreover, Defendants actions constituted a willful violation of the FLSA, and the conduct described herein was outrageous and executed with malice, fraud, and

oppression, and with conscious disregard for the Plaintiff's rights or the provisions of the FLSA.

**92**. Defendants retaliatory conduct was made with the intent, design, and purpose of injuring the Plaintiff. Thus, Plaintiff is entitled to recover damages in accordance with the remedies set forth in the FLSA including, but not limited to, back pay from the time Plaintiff was terminated through such time as final disposition of all claims, compensation for lost benefits, front pay in lieu of reinstatement, damages for mental distress, and general compensatory damages in an amount to be determined at trial.

**93**. The FLSA also provides for the recovery of attorney's fees and costs. In this case, Plaintiff is proceeding pro se and thus attorney's fees are not appropriate or applicable. However, the Plaintiff has invested substantial time and incurred substantial expenses to hold Defendants accountable for their unlawful conduct and should be compensated accordingly at a reasonable rate through such time as the final disposition of this case.

**94**. Plaintiff also seeks any other remedies and damages allowable under the FLSA and to the full extent allowable by law.

### Count Two
### Whistleblower Retaliation in Violation of Florida Statute 448.102

**95**. As a separate and distinct cause of action, Plaintiff complains and realleges paragraphs 26 through 31, 33 through 40, and 49 through 60, and incorporates them by

reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

**96**. Fl. St. 448.102 prohibits an employer from taking any retaliatory personnel action against an employee because the employee has:

1) Disclosed, or threatened to disclose, to any appropriate governmental agency, under oath, in writing, an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation. However, this subsection does not apply unless the employee has, in writing, brought the activity, policy, or practice to the attention of a supervisor or the employer and has afforded the employer a reasonable opportunity to correct the activity, policy, or practice.

(2)   Provided information to, or testified before, any appropriate governmental agency, person, or entity conducting an investigation, hearing, or inquiry into an alleged violation of a law, rule, or regulation by the employer.

(3)   Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation.

**97**. The Florida PWA prohibits an employer from taking any "retaliatory personnel action" against an employee who engages in three specific "statutorily protected activities."

## Plaintiff Threatened to Disclose Unlawful Activity by Defendants

**98**. The **PWA's first clause** prohibits retaliation against an employee who discloses his or her employer's activity, practice, or policy that violates a law, rule, or regulation. Fla. Stat. § 448.102(1).

**99**. As explained in the FLSA claim, Plaintiff has already established that she engaged in multiple acts of protected conduct to include complaining and opposing unlawful

activity by the Defendants to Plaintiff's supervisor, threatening to disclose unlawful activity by the Defendants to an attorney, disclosing unlawful activity by the Defendants to her attorney, and participating in an investigation of the foregoing unlawful conduct by disclosing information about Defendants' activities.

**100.** Plaintiff's first protected activity was on the day of her complaint to her supervisor, August 31, 2018. The Defendants retaliation stemming from Plaintiff's protected activity was continued for more than two years until the frivolous defamation action filed against the Plaintiff and continued for more than one year was dismissed in Plaintiff's favor on October 16, 2020. *see Exhibit 27*

**101**. Florida law requires that an employer be notified of an unlawful practice or activity and given a reasonable time  to correct the unlawful conduct before a claim is actionable and states: "[a]n employee may not recover in any action brought pursuant to [the FWA] if he or she failed to notify the employer about the illegal activity, policy, or practice … or if the retaliatory personnel action was predicated upon a ground other than the employee's exercise of a right protected by this act." Fla. Stat. § 448.103(c).

**102.** Plaintiff acted in compliance with the statutory "notice" requirement when she complained of Defendants unlawful pay practices to her supervisor on August 31, 2018, and again on December 6, 2018, when Plaintiff's attorney sent Defendants a letter of demand claiming unpaid wages and retaliatory discharge in violation of the Florida

Private Whistleblower Act. Defendants had many opportunities after notice to correct their unlawful conduct but failed to do so within a "reasonable time." A reasonable time is defined under the statute as fifteen days. Plaintiff was terminated on August 31, 2018, thus giving Defendants through September 15, 2018, to correct their unlawful activity. When Defendants failed to do so, the unlawful activity became actionable on September 16, 2018.

**103.** Not only did Defendants fail to correct their unlawful conduct within the "reasonable time" allotted by the statute, but Defendants have failed to do in more than three years since the unlawful acts took place. This long-standing refusal to correct the shortage of Plaintiff's wages is compelling evidence that Defendants knowingly and intentionally retained and deprived, and continue to knowingly retain and deprive, Plaintiff of her wages  and that Defendants had, and have,  no intention of correcting the unlawful activity of which Plaintiff threatened to disclose at the time she complained to her supervisor on August 31, 2018, in accordance with the statute.

### Plaintiff Disclosed Information About Defendants' Unlawful Activity to her Counsel

**104.** The **PWA's second clause** prohibits retaliation against an employee who participates in an investigation, hearing, or inquiry into an alleged violation of a rule, law, or regulation.

**105**. Plaintiff participated in an inquiry into Defendants' unlawful pay practices when she disclosed information and provided documentation of Defendants' unlawful activities to her attorney, who then contacted the Defendants through a letter of demand.

**106**. Defendants violated Fla. St. 448.102(2) when they retaliated against the Plaintiff for the second time after terminating the Plaintiff's employment in response to the letter of demand notifying Defendants Plaintiff had obtained representation. Defendants retaliated against the Plaintiff by misrepresenting all facts material to Plaintiff's employment and pay and by responding with false accusations against the Plaintiff and her counsel about an allegedly altered wage agreement, for "kennel technician," of which the Plaintiff was falsely accused of altering.

### Plaintiff Opposed Defendants' Unlawful Pay Practices

**107**. The **PWA's third clause** prohibits retaliation against an employee who "[o]objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." Fla. Stat. § 448.102(3)

**108**. **Exhibits 7 through 11** are screenshots of the text conversation between Plaintiff and supervisor Allison in which Plaintiff complained that there was a problem with her paycheck and objected to the shortage of money on her paycheck. 109. Plaintiff further objected to and opposed Defendants' unlawful retroactive application of a pay

reduction for work already performed by the Plaintiff at the higher wage. Plaintiff explicitly stated that Defendants' pay practice was "illegal as hell." Plaintiff's supervisor confirmed that she understood Plaintiff opposed Defendants' unlawful pay practices when she stated their "legal department" would "look into the wage disagreement."

**108**. As described under Count One, Plaintiff engaged in several acts of protected conduct under federal and Florida law and provided detailed facts which described how Defendants responded by retaliating, and continuing to retaliate, against the Plaintiff for her protected activity of complaining, disclosing, opposing, and participating in an investigation to seek legal redress and recover her wages.

**109**. The foregoing facts and conduct supports a cause of action for retaliation under the PWA because Defendants took adverse action against the Plaintiff for complaining, disclosing, opposing, participating in an investigation, and otherwise engaging in protected activity and Plaintiff was, and continues to, be harmed by Defendants unlawful conduct.

**110.** Defendants were the direct and proximate cause of harm to the Plaintiff. Plaintiff seeks damages pursuant Fl. St. 448.103(2) which states,

In any action brought pursuant to subsection (1), the court may order relief as follows:

    (a) An injunction restraining continued violation of this act.
    (b) Reinstatement of the employee to the same position held before the

retaliatory personnel action, or to an equivalent position.

(c) Reinstatement of full fringe benefits and seniority rights.

(d)    Compensation for lost wages, benefits, and other remuneration.

(e)    Because reinstatement would not be an appropriate or equitable resolution, Plaintiff seeks an award of front pay in lieu of reinstatement in an amount to be determined at trial

(e)    Any other compensatory damages allowable at law.

**111**. Plaintiff seeks all remedies available under the Florida Whistleblower Act, to include an award of damages for mental distress which was directly and proximately caused by Defendants' retaliatory discharge of the Plaintiff.

**112.** Plaintiff also seeks damages in an amount to be determined at trial for Defendants' additional retaliatory acts committed after Plaintiff was terminated and continued for more than two years.

## Count Three
### Failure to Pay Minimum Wage in Violation of
### § 29 U.S.C. 206

**113.** As a separate and distinct cause of action, Plaintiff complains and realleges paragraphs 25 through 29, 41, and 67, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

**114**. Plaintiff was an "employee" and Defendants were "employers" under the FLSA at all times material.

**115**. Plaintiff's employment began on August 13, 2018. Plaintiff was scheduled a minimum of 37 hours per week and often remained later than her scheduled time off work to complete tasks as instructed by her supervisor. Plaintiff alleges she worked approximately one hundred hours in total during her employment. Plaintiff's work hours and dates worked are documented, or should be documented, by her time clock records, which are in the sole custody and control of the Defendants.

**116**. Plaintiff's weekly work schedules, created and posted by the Defendants themselves, show Plaintiff's schedule for weeks two and three. *see* Exhibits 5, 6. Thus, Defendants were fully aware of the number of hours Plaintiff worked each week.

**117.** Defendants reduced Plaintiff's pay to $8.45 an hour and applied the reduction retroactively. While a pay rate of $8.45 may be at or above the minimum wage rate in effect during the relevant time, given the approximately one hundred total hours worked by the Plaintiff over the three weeks of her employment, Defendants did not pay Plaintiff for all hours worked, thus reducing her compensation to $2.05 for each hour of Plaintiff's work. Plaintiff's pay stub confirms that Plaintiff was paid $205 in total wages before taxes and deductions.

**118**. Plaintiff and Defendants disagree as to an alleged direct deposit on September 15, 2018, for $320. Plaintiff has no knowledge or record of the alleged deposit and Defendants have offered no verifiable record of the transaction from the banking

institution. The pay period for alleged the direct deposit was August 31, 2018 - September 14, 2018. Given the fact that Plaintiff was terminated on August 31, 2018, she could not have worked or earned wages during that pay period. Plaintiff disputes the authenticity of the direct deposit paystub from the Defendants and argues that the pay stub was fraudulent and created after the fact as an attempt to appear as if Plaintiff had been paid all wages owed.

**119**. Nonetheless, setting aside the absence of any verifiable record of the deposit and the authenticity of the pay stub, pay stub submitted by the Defendants for the alleged direct deposit indicates a year-to-date wage of $577.47. Going by the pay stub and according to the Defendants accounting, had the direct deposit in fact, been made, Plaintiff was paid $5.77 per hour, given the approximately one hundred hours worked.

**120.** Whether by the Plaintiff's accounting or that of the Defendants, the pay stub for the alleged direct deposit is evidence that supports the claim that Plaintiff was not paid minimum wage. In fact, giving the Defendants the benefit of the doubt as to the legitimacy of their payroll records, those records indicate that Defendants allegedly paid $577 in year-to-date wages, which is substantially less than the Florida or federal minimum wages in effect during the relevant time.

**121.** Given that Defendants were informed and have had knowledge that Plaintiff was owed money but failed to correct the deficiency in almost four years that Defendants

have owed Plaintiff wages, Defendants have left no room for doubt that their unlawful conduct was, and continues to be, a knowing and willful and violation of the FLSA and was made with reckless disregard for the Plaintiff's rights.

122. To show a willful violation, the evidence must show not only that the FLSA was violated, but also that the employer either knew or showed reckless disregard for whether its conduct violated the FLSA. This finding requires more than just evidence that the employer was negligent or inattentive to its pay practices. Instead, the evidence must show that the employer knew its pay practices violated the FLSA or had some reason to suspect its pay practices violated the FLSA and failed to take any action to investigate or address that belief.

123. Plaintiff's supervisor promised an investigation into the Plaintiff's wage dispute when she terminated the Plaintiff as the result of Plaintiff's complaint when she discovered a substantial shortage of wages in her paycheck. However, no investigation was conducted because Defendants acted with reckless disregard for whether their actions were in compliance with the FLSA. Not only did Defendants fail to investigate when Plaintiff complained about her wages, but Defendants terminated the Plaintiff rather than investigate the wage issue. Likewise, Defendants did not investigate the wage issue when they were notified of their failure to pay minimum wage by Plaintiff's attorney in December 2018.

**124**. By their failure to investigate and/or correct the wage shortage, Defendants have demonstrated willful and reckless disregard for the provisions of FLSA. Moreover, Defendants stated that Plaintiff would have to sue and prevail in court for Defendants to surrender Plaintiff's wages. Thus, the Defendants' have proven their willful disregard for the FLSA many times over.

**125**. Plaintiff seeks an order from the Court requiring the Defendants to pay Plaintiff all back wages owed to the Plaintiff and an equal amount in liquidated damages mandated by the FLSA.

**126**. Plaintiff has incurred substantial time and expense to compel Defendants to pay the wages she was due to receive nearly four years ago. In lieu of attorney fees and costs, Plaintiff seeks a reasonable compensation for time and expense incurred by this litigation and for any fees and court costs incurred by this action.

**<u>Count Four</u>**
**Failure to Pay Minimum Wage**
**Fla. St. 448.110 and S. 24 Article X**

**127.** As a separate and distinct cause of action, Plaintiff complains and realleges paragraphs 25-29, 41, and 67 and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

**128**. Defendants failed to pay Plaintiff minimum wage for all hours worked in violation of public policy 448.110(a) which states:

> " All working Floridians are entitled to be paid a minimum wage that is sufficient to provide a decent and healthy life for them and their families, that protects their employers from unfair low-wage competition, and that does not force them to rely on taxpayer-funded public services in order to avoid economic hardship."

**129**. Defendants, by their failure to pay Plaintiff a minimum wage, forced the Plaintiff to rely on welfare to avoid economic hardship, and to rely on food stamps each month to be able to sustain her existence. Plaintiff has relied, and will continue to rely, on food stamps since the time of Defendants unlawful employment actions in 2018.

**130**. By their failure to pay Plaintiff a minimum wage, Defendants violated 448.110 (c) which states:

> "Employers shall pay Employees Wages no less than the Minimum Wage for all hours worked in Florida."

**131**. Defendants paid Plaintiff $ 205 in wages after she performed approximately one hundred hours of work for the Defendants. Defendants refuse to produce Plaintiff's time clock records to determine the precise number of hours Plaintiff worked because they will demonstrate she was paid less than minimum wage for all hours worked.

**132.** However, Plaintiff submits her weekly work schedules for weeks two and three of her employment which show that Plaintiff worked full time hours each week.

**133.** Defendants paid Plaintiff $205 and, given the one hundred hours Plaintiff estimates she worked in total for three weeks, Plaintiff was paid $2.05 for each hour of work. ($205/100 = $2.05)

**134**. Defendants allege to have made a direct deposit to Plaintiff's bank in the amount of $320 on September 15, 2018. However, Plaintiff disputes the claim and has no knowledge or record of any deposit to her account by Petland. However, the pay stub for the alleged deposit states a year-to-date wage of $577.47. Therefore, whether by Defendants accounting or that of the Defendants, Plaintiff did not receive a minimum wage for all hours worked, given approximately one hundred hours she worked during the course of her employment at Petland.

**135**. Pursuant Section 24(e) of the Florida Minimum Wage Act:

> "Persons aggrieved by a violation of this amendment may bring a civil action in a court of competent jurisdiction against an Employer or person violating this amendment and, upon prevailing, shall recover the full amount of any back wages unlawfully withheld plus the same amount as liquidated damages, and shall be awarded reasonable attorney's fees and costs."

> "In addition, they shall be entitled to such legal or equitable relief as may be appropriate to remedy the violation including, without limitation, reinstatement in employment and/or injunctive relief. Any Employer or other person found liable for willfully violating this amendment shall also be subject to a fine payable to the state in the amount of $1000.00 for each violation."

**136.** The Florida Minimum Wage Act requires that an employee give an employer notice and 15 days to pay the full amount of unpaid wages or otherwise resole the

claim to the satisfaction of the employee before the violation becomes actionable. The

statute of limitations for bringing an action pursuant to this section shall be tolled

during this 15-day period. In addition to notice by the Plaintiff when she complained to

her supervisor, Defendants were given further notice in accordance with the statute on

December 6, 2018, in a letter of demand from Plaintiff's counsel. Defendants had until

December 21, 2018, to correct the violation but failed to do so.

**137.** Plaintiff alleges that her whistleblowing, opposition of illegal activity, disclosure of

Defendants unlawful acts, participation in an investigation of Defendants' activities by

Plaintiff's counsel, and otherwise protected conduct was or were a motivating factor in

Defendants' conduct as alleged herein above, including termination of Plaintiff's

employment.

**138**. Defendants' failure to pay minimum wage was willful and knowing and in

reckless disregard for the Plaintiff's rights and Florida minimum wage laws and made

with wrongful intent to injure the Plaintiff.

**139.** As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has

sustained and continues to sustain emotional distress, mental anguish, and Plaintiff has

suffered and will continue to suffer a loss of earnings and other employment benefits.

**140**. Pursuant to Fla. Stat. 448.102(c), Plaintiff is thereby entitled to the following relief:

1. Upon prevailing in an action brought pursuant to this section, aggrieved persons
shall recover the full amount of any unpaid back wages unlawfully withheld plus the

same amount as liquidated damages and shall be awarded reasonable attorney's fees and costs…

2. Upon prevailing in an action brought pursuant to this section, aggrieved persons shall also be entitled to such legal or equitable relief as may be appropriate to remedy the violation, including, without limitation, reinstatement in employment and injunctive relief.

**141**. Plaintiff seeks relief in accordance with the remedies set forth in Fla. St. 448.110 to include back wages, liquidated damages, front pay in lieu of reinstatement, damages for mental distress, a reasonable amount in lieu of attorney's fees and costs of this action required to compel Defendants' compliance with Florida minimum wage laws, and any other damages available under law.

**142**. Plaintiff also seeks any other relief allowable under law and to the fullest extent of the law, including but not limited to, assessment of fines and/or penalties against Defendants for their unlawful conduct.

<u>**Count Five**</u>
**Civil Theft in Violation of Florida Stat. § 812.014**

**143**. As a separate and distinct cause of action, Plaintiff complains and realleges paragraphs 25 through 34 and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

**144.** Florida Stat. § 812.014 provides a cause of action for the crime of civil theft and states in relevant part:

(1) a person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently:

> (A) Deprive the other person of a right to the property or a benefit from the property.
>
> (B) Appropriate the property to his or her own use or to the use of any person not entitled to the use of the property.
>
> (C) It is grand theft of the third degree and a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084, if the property stolen is valued at $300 or more, but less than $5,000.

**145**. To state a claim for civil theft, a plaintiff must prove the statutory elements of theft, as well as criminal intent.

## Defendants Knowingly Retained Plaintiff's Property by Failing to Pay Plaintiff the Wages She is Owed

**146**. On August 31, 2018, Defendants knowingly and unlawfully retained Plaintiff's property in the amount of $1,835 f or services performed by the Plaintiff in August 2018 at Defendants' Petland Largo retail store. Defendants' retention of Plaintiff's property was made with the intention of permanently depriving Plaintiff of her property.

**147**. Defendants refused, and continue to refuse, to surrender that property since August 31, 2018.

## Defendants Appropriated Plaintiff's Property for Their Own Use

**148.** Defendants deprived Plaintiff of the benefit of her property and appropriated, and continue to appropriate, Plaintiff's money for their own use since August 31, 2018.

**149**. Defendants represented that the Plaintiff's pay was an annual salary of $35,000 a as compensation for her services as a veterinary technician at Defendants Petland store.

**150**. Plaintiff performed work in accordance with the terms and conditions set forth by the Defendants in the agreement. However, when it was time for Defendants to pay Plaintiff after she performed work for the Defendants for three weeks, Defendants only paid the Plaintiff $205, which was $1835 less than the amount Plaintiff was supposed to receive from the Defendants.

**151**. Plaintiff notified Defendants through her supervisor, Allison, that she was owed money. However, rather than pay the Plaintiff the money she was owed, at the time Plaintiff was due to receive her money, Defendants instead terminated the employment relationship.

**152**. Defendants were notified that Plaintiff was owed money for a second time on December 6, 2018, in a letter of demand from Plaintiff's attorney. However, despite two notifications and Defendants' knowledge Plaintiff was owed money, and even though Defendants' own records supported the claim, Defendants retained and continued to retain Plaintiff's property despite being informed and fully aware that the property belonged to the Plaintiff, not the Defendants, Defendants refused to surrender Plaintiff's property and continue to refuse to surrender Plaintiff's property. Not only did Defendants knowingly and intentionally deprive Plaintiff of the benefit of her

property, but Defendants also appropriated, and have continued to appropriate, Plaintiff's property for the Defendants own use and benefit for more than three years.

153. Defendants retention and refusal to surrender Plaintiff's property is compelling evidence that the Defendants deprivation of Plaintiff's money was a knowing intentional act of theft made with criminal intent to unlawfully retain property belonging to the Plaintiff.

154. To conceal and avoid liability for theft, Defendants misrepresented facts and alleged the existence of false evidence against the Plaintiff and acted to intimidate and threaten the Plaintiff and otherwise acted to obstruct justice by interfering with Plaintiff's ability to continue legal action against Defendants. Similar to Defendants other conduct supporting a claim for theft as described above, these actions were likewise made to retaliate against the Plaintiff and to deter Plaintiff from further pursuit of her wages and claims of unlawful activities by the Defendants.

155. By the retaliatory, threatening, and intimidation tactics described herein, Defendants have left little room for doubt that Defendants acted, and continue to act, with extreme, unjustified, and unlawful conduct to continue Defendants' retention of Plaintiff's property, Defendants' refusal to surrender Plaintiff's property, and to conceal Defendants' theft to avoid surrendering Plaintiff's property and avoid liability for their unlawful retention of Plaintiff's property.

156. Plaintiff Fl. Sta. 812.014, Defendants unlawfully retained Plaintiff's property in the amount of $1835 and refused to surrender Plaintiff's property with the intention of permanently depriving the Plaintiff of her property.

### Pursuant Florida Stat. § 812.014(1)(c) Defendants Committed Grand Theft

157. Defendants' misconduct constitutes grand theft because the property stolen is valued at more than $1000 pursuant Fla. St. 812.014(2).

### Defendants Acted with Criminal Intent

158. Evidence of criminal intent that motivated Defendants' theft is established is established in several ways as described below:

159. First, Defendants posted an offer in Indeed.com for a wage Defendants had no intention of paying to induce Plaintiff to apply and accept employment at Petland.

160. However, immediately upon hiring the Plaintiff and without cause or notice Defendants reduced Plaintiff's wage to $8.45 an hour.

161. Defendants obtained full time work from the Plaintiff, approximately one hundred hours over three weeks in accordance with the terms and compensation set forth by the Defendants.

162. However, when it was time to pay the Plaintiff, Defendants did not pay Plaintiff as promised or even minimum wage. Defendants did not investigate the pay shortage and instead terminated Plaintiff thirty minutes after she brought the wage discrepancy to

the attention of her supervisor. This conduct by the Defendants was unlawful and exceeded the inherent risks of employment and was not the sort of conduct normally expected from an employer.

163. After terminating the Plaintiff, Defendants acted to conceal their wage theft by alleging a direct deposit that was not in fact, made, misrepresented every material fact of Plaintiff's employment contrary to Defendants own time clock and payroll records, and engaged in retaliatory conduct and intimidation tactics as described herein to interfere with and discourage further action by the Plaintiff to recover her property so that Defendants could escape liability and commit theft with impunity.

164. Defendants accused Plaintiff of extortion in a malicious retaliatory defamation action against the Plaintiff to intimidate and discourage Plaintiff from further action to recover her property and to cause her mental distress.

165. Defendants' refusal to surrender Plaintiff's property for almost four years, despite knowledge that the property belongs to the Plaintiff, not the Defendants, is compelling evidence to establish the criminal intent with which Defendants acted and continue to act.

166. Furthermore, criminal intent can be reasonably inferred by evidence of Defendants history of wage theft and similar conduct toward other Petland Florida employees.

**167**. History demonstrates a pattern and practice of improper and unlawful conduct by the Defendants made to deprive employees of their money. This pattern of similar conduct by the Defendants is evidence that this is not an isolated incident, but rather *another* instance as part of a pattern and practice of improper and unlawful practices pertaining to the payment of wages occurring in the Defendants' usual course of business.

**168**. Substantial evidence of Defendants improper conduct relating to the payment of wages can be seen by statements made by other current and/or former employees of the Defendants. For example, employees state that Defendants shorted their paychecks, paid less than minimum wage, did not pay on time, unlawfully forced employees to split their commissions with the Defendants, failed to provide a way for employees to document their hours, required employees to sign a document agreeing to allow Defendants to retain their commission wages at any time at the Defendants' discretion or if they quit or are terminated, did not pay employees for overtime hours, made employees clock out and work only for commissions when they reached forty hours, promised raises to obtain more work from employees but did not give those raises accordingly, and use payment of commissions/wages as leverage to threaten employees with termination or as a means of constructive discharge. **(Exhibits 29-43)**

**169**. Defendants' history and this pattern of misconduct related to the payment of wages is compelling evidence of the criminal intent with which Defendant's act in matters of wages and supports the conclusion that the case is the same here, as well.

**170.** Plaintiff has suffered, and continues to suffer, substantial injury for more than three years as the direct and proximate result of Defendants' theft.

**171.** Fla. Stat. § 772.11 provides the civil remedy for theft and states in relevant part:

> (1) Any person who proves by clear and convincing evidence that he or she has been injured in any fashion by reason of any violation of ss. 812.012-812.037 or s. 825.103(1) has a cause of action for threefold the actual damages sustained and, in any such action, is entitled to minimum damages in the amount of $200, and reasonable attorney's fees and court costs in the trial and appellate courts.

**172**. Accordingly, seeks treble damages and, in lieu of attorney's fees, a reasonable amount to compensate Plaintiff for the time and expenses incurred by having to file this action for civil theft to seek redress for Defendants unlawful acts.

<u>**Count Six**</u>
**Conversion**

**173**. Under Florida law, to state a cause of action for conversion, a plaintiff must prove (1) that the plaintiff owns or has the right to possess the personal property in question at the time of the interference; (2) that the defendant intentionally interfered with plaintiff's personal property; (3) that the interference deprived the plaintiff of possession or use of the personal property in question; and; (4) that the interference caused damages to the plaintiff.

## Plaintiff Has the Right to Her Property Because it is Plaintiff's Compensation for Work Performed By the Plaintiff

**174**. Plaintiff has already established that she performed work for the Defendants for which she has not been compensated and attaches evidentiary documentation showing Plaintiff was paid less than minimum wage for approximately one hundred hours of work performed for the Defendants.

## Defendants' Acted with the Intent to Deprive Plaintiff of Her Property

**175.** Defendants exercised, and continue to exercise, dominion and control over Plaintiff's property and intentionally interfered with Plaintiff's right to her property by unlawfully retaining Plaintiff's money knowing that it belonged to the Plaintiff and not the Defendants. Defendants knowingly and intentionally unlawfully retained and refused to surrender Plaintiff's property and deprived, and continue to deprive, the Plaintiff of the benefit of her property for more than three years as of this filing, all while they appropriated Plaintiff's property for Defendants' use and benefit.

## Plaintiff was Damaged by Defendants' Interference

**176.** Defendants were, and continue to be, the direct and proximate cause of harm to the Plaintiff. Defendants actions were willful, malicious, and oppressive, and committed with the wrongful intent to injure the Plaintiff and in conscious disregard

for the Plaintiff's rights. Thus, Plaintiff seeks an award of damages in an amount to be determined at trial.

**177**. Punitive damages are also appropriate in this case in an amount to be determined at trial due the particularly egregious conduct by the Defendants that has continued for more than three years and to deter similar conduct going forward.

**Count Seven**
**Fraud in the Inducement**

**178**. As a separate and distinct cause of action, Plaintiff complains and realleges paragraphs 12 through 30 and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

**179.** To state a claim for fraud in the inducement, Plaintiff must show proof of 1) a false statement of material fact; 2) that the defendant knew or should have known was false; 3) that was made to induce the plaintiff to enter into a contract; and 4) that proximately caused injury to the plaintiff when acting in reliance on the misrepresentation.

**Defendants Made a False Statement of Material Fact**

**180**. Defendant created and posted, or was responsible for the creation and posting, of an employment offer on Indeed.com in or about August 2018 for the position of "full-time certified veterinary technician" at Largo Petland. Defendants stated in their offer that compensation for the position was an "annual salary of $35,000." *see Exhibit 1*

181. The compensation stated by Defendants was material because it influenced Plaintiff's decision to apply and accept employment at Petland. Plaintiff would not have applied for the job were it not for Defendants' representation. An annual salary of $35,000 was comparable to Plaintiff's wages at her previous employment.

182. At no time during Plaintiff's brief three-week employment did Defendants pay the Plaintiff at the wage represented by the Defendants in their offer.

## Defendants Knew, or Should Have Known, That Their Statement Was False

183. To include a compensation is optional when creating and posting a job offer on Indeed.com. Defendants availed themselves of the option and executed a minimum of five additional steps to add compensation in their offer.

184. The misrepresentation was knowing and intentional because Defendant Luis Marquez makes decisions regarding employee wages and is the party responsible for paying those wages accordingly.

## Defendants Made the Statement with the Intention of Inducing Plaintiff to Accept Employment

185. The representation was meant to induce the Plaintiff to apply for and take employment at Petland because the statement was made on an employment platform for the purpose of connecting job seekers with employers seeking to fill open positions, and because $35,000 a year was comparable to the average pay for a certified veterinary technician at the relevant time.

**186.** Plaintiff relied on the representations of the Defendants and was justified in her reliance on those representation. Plaintiff's reliance was to her detriment and Plaintiff has been, and continues, to be injured by Defendants unlawful conduct.

**187**. To provide perspective and a frame of reference, the wage range for Petland employees in the United States in 2018 was $15,000 to $22,500 in 2018. **(Exhibit 44)**

**188**. It defies belief that Defendants had no knowledge that the compensation represented in their employment offer was approximately $12,000 more than any Petland employee in the United States was paid at the relevant time, much less for an entry level nonmanagement position at Petland. Defendants knew, or should have known, that the representation was false. This is especially true because Defendants are responsible for payroll functions for Petland Largo and thus, are fully informed and have knowledge of compensation for Petland Largo employees.

**189.** In contrast, an annual salary of $35,000 was approximately $2000 more than the average pay for certified veterinary technicians in the United States in 2018. Thus, $35,000 a year was an attractive compensation that would have persuaded any job-seeking veterinary technician to apply, but not so high that that the representation appeared inconceivable or false.

**190**. Plaintiff alleges that Defendants made the representation without any intention of paying according to their representation and in fact, did not pay accordingly.

**191.** Defendants' conduct exceeded the inherent risks of employment and was not the sort of conduct normally expected from an employer.

**192**. Plaintiff's ability to make an informed decision to accept employment at Petland was undermined by Defendants' misrepresentations. Defendants made the statements with the intention of inducing the Plaintiff to perform work for the Defendants' under the terms and conditions set forth by the Defendants when acting in reliance on the representation about the compensation for the position. Defendants' misrepresentation was intentional, fraudulent, and made in bad faith with the intention of injuring the Plaintiff.

**193.** At no time did Defendants pay the Plaintiff in accordance with their representation. As the evidence demonstrates, Defendants showed no interest and took no action to investigate, much less correct, the deficiency in Plaintiff's paycheck so that it was in accordance with their representation. Defendants' indifference, failure to investigate, failure to correct the pay issue, and termination of the Plaintiff for raising the issue is compelling evidence of Defendants' intention of fraudulent inducement when making the representation about salary.

**194.** Defendants' subsequent conduct further supports a conclusion of fraudulent inducement because after Plaintiff relied on Defendants' statements and lodged a grievance with her supervisor when she was shorted wages and complained of

unlawful activity,  Defendants simply chose not to acknowledge their representation about the $35,000 salary, much less offer any explanation as to the misrepresentation, despite the evidence of their misrepresentation which was made in writing. *Apparently*, Defendants' intention is to avoid being accountable for their misrepresentation by simply refusing to acknowledge the statement or the evidentiary documentation of the misrepresentation. By their failure to acknowledge their own statements, it is persuasive evidence to support the claim that Defendants acted fraudulently with the intention of inducing the Plaintiff to perform work in reliance on Defendants statements to her detriment because Defendants had no intention of making good on their representations.

### Defendants were the Proximate Cause of Plaintiff's Injuries When Acting in Reliance on the Misrepresentation

195. Plaintiff justifiably relied on Defendants' misrepresentation to her detriment. Plaintiff performed all conditions required on her part to be performed in accordance with the terms and conditions set forth by the Defendants in their offer.

Plaintiff alleges that the De

196. As the direct and proximate result of Defendants' fraudulent conduct and acting reliance on Defendants' misrepresentations, Plaintiff has been damaged and will continue to be damaged by Defendants' fraudulent conduct, and thus is entitled to compensation for her injuries in an amount to be determined at trial.

**197**. Plaintiff seeks treble damages pursuant Florida Statute 772.11(1).

In addition, punitive damages are appropriate in this case and should be awarded in an amount to be determined at trial to punish Defendants for their fraudulent conduct and deter like conduct going forward.

**Count Eight**
**Fraudulent Misrepresentation**

**198.** As a separate and distinct cause of action, Plaintiff complains and realleges paragraphs 12 through 13 and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

**199.** Under Florida law, to state a claim for fraudulent misrepresentation, a plaintiff must show 1) a defendant intentionally made a false statement concerning a material fact; 2) knowing the statement was false when it was made or made the statement knowing he did not know whether it was true or false; 3) with the intention that another would rely on the false statement; 4) the plaintiff justifiably relied on the false statement to their detriment.

**Defendants Made an Intentional False Statement of Fact**

**200**. On or about August 2018, Defendants created and posted an offer of employment on indeed.com for a "Full-time Certified Veterinary Technician" at Defendants' Largo Petland store. Defendants stated the compensation was an annual salary of $35,000.

**201.** The compensation was material to the employment offer because it induced action by the Plaintiff in reliance of the representation by the Defendants.

## Defendants Made the Representation Knowing it was False

**202**. The statement about the compensation, which was optional and not required to create and post a job offer on Indeed.com, was knowingly and intentionally misrepresented. Defendants knew the statement was false at the time it was made because Defendants had no intention of paying accordingly and did not pay accordingly.

## Defendants Intended to Induce Reliance on their Misrepresentations

**203**. Defendants made the misrepresentation on Indeed.com, an online employment platform for which its purpose is to connect job seekers with employers seeking to fill open positions. Defendants made the misrepresentations with the intention of inducing reliance on those statements and did, in fact, induce Plaintiff's reliance on Defendants' misrepresentations.

## Plaintiff's Reliance was Justified

**204**. Defendants made these misrepresentations on an online employment platform whose function is to connect job seekers with employers. Thus, Plaintiff was justified in her reliance on the statements made by Defendants when they created and posted the employment offer on the employment platform because the conduct by the Defendants

exceeded the inherent risks of employment and was not the sort of conduct normally expected from an employer.

**Plaintiff was Injured Her Reliance on Defendants' Statements**

205. Plaintiff's reliance on the Defendants' misrepresentations was the direct and proximate cause of Plaintiff's injuries.

206. Plaintiff seeks treble damages in an amount to be determined at trial pursuant Florida Statute 772.11(1)

207. Punitive damages are also appropriate in this case to deter like conduct by Defendants and other going forward.

**Count Nine**
**Interference with Contract**

208. As a separate and distinct cause of action, Plaintiff complains and realleges paragraphs 31 through 48 and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

209. Under Florida law, to state a claim for tortious interference with contract the claimant must plead four elements: (1) the existence of a business relationship under which plaintiff has legal rights, not necessarily evidenced by an enforceable contract; (2) proof of defendant's knowledge; (3) intentional and unjustified interference with relationship by defendant; and (4) damage to plaintiff as a result of interference.

## Plaintiff Had a Business Relationship with Her Attorney

**210**. Plaintiff formed a business and contractual relationship with attorney Richard

Celler when he undertook Plaintiff's employment case, on contingency, on October 10,

2018.

## Defendants Were Informed and Had Knowledge of the Relationship with Counsel

**211**. On October 4, 2018, Defendants had knowledge and were informed that Mr. Celler

represented the Plaintiff. Defendants responded to Mr. Celler's correspondence,

through counsel on December 11, 2018.

## Defendants' Interference was Intentional and Without Justification

**212.** Plaintiff **alleges** that Defendants intentionally interfered with the relationship

between Plaintiff and her counsel. Defendants acted with malice and in bad faith and

accused Mr. Celler of providing the Defendants with a "kennel wage agreement" for

$35,000 an *hour*. Defendants accused Plaintiff of altering the agreement by crossing out

the word "hour" and writing the word "year" in its place. The allegations were made

by Defendants despite the fact that the Plaintiff, her counsel, the Defendants, and their

counsel all know that the allegation was false and that no such wage agreement

existed.

**213**. By their allegations of a wage agreement that did not exist and the implication that

Mr. Celler provided the other side with evidence was a false and intentional

interference with Plaintiff's relationship with her counsel. Defendants intentionally interfered with the contractual relationship between Plaintiff and her counsel. There can be no legitimate purpose for making accusations of providing evidence to the other side against his own client's interests.

**214**. The 180-degree shift in the enthusiasm and diligence with which Mr. Celler acted at the outset of his representation was undeniable. Mr. Celler did not file the case on December 20, 2018, in accordance with his demand letter. He did not demonstrate the same interest in the case, he failed to maintain communication with the Plaintiff, he did not advance the Plaintiff's case toward resolution for nine months.

**215**. Plaintiff alleges that Mr. Celler's change in demeanor was the direct result of unjust and intentional interference by the Defendants when they responded to his letter in the manner they did.

**216**. Mr. Celler did not deny the accusations, nor did he offer Plaintiff any explanation for the implications. In fact, Mr., Celler refused to acknowledge the allegations altogether and refused to answer any of at least three email inquiries by the Plaintiff about the alleged agreement.

**217**. Plaintiff alleges that Defendants intentionally interfered in Plaintiff's relationship without justification and caused, coerced, and influenced Mr. Celler not to deny the allegations by Defendants and not to acknowledge them.

**218**. Further evidence of unjustified interference is seen when, after nine months, Mr. Celler stated his intention of filing Plaintiff's case, twice. However, rather than file, Mr. Celler abruptly withdrew from the case with less than 24-hours' notice to the Plaintiff.

**219**. Plaintiff requested a copy of her case file when Mr. Celler terminated his representation, which consisted of six email messages between himself and opposing counsel in the two weeks before his withdrawal, with nothing between then and Defendants reply to the demand letter nine months earlier.

**220**. The lack of any other papers or notes in the interim demonstrated that Mr. Celler discontinued action to advance the case towards resolution when he received Defendants' response to his demand letter. This is persuasive evidence that Mr. Celler was influenced by the Defendants' allegations to an extent that it interfered with the diligent pursuit of Plaintiff's case. From that time, Mr. Celler took no further action to advance the case toward resolution for nine months, until he restated his intent to file Plaintiff's case in May and June of 2019, but instead abruptly, mysteriously, withdrew from the case a week later without filing the case accordingly.

**221.** Plaintiff alleges that the absence of a case file is compelling evidence suggesting that Mr. Celler's intention of filing on December 20, 2018, on May 3, 2018 , and May 6, 2018, in accordance with his claim, and his failure to file accordingly on all three of those dates is persuasive evidence to support a claim the Mr. Celler's actions were

influenced by the Defendants false allegations, false accusations, and otherwise inappropriate response to the claims alleged in his demand letter.

**222**. Plaintiff further alleges that, were it not for Defendants' interference and influence over Mr. Celler's actions, Plaintiff's case file would have contained a drafted Complaint to be filed on December 20, 2018, as Mr. Celler intended. Plaintiff alleges that the Defendants' vexatious response to Mr. Celler's letter, and the false allegations and accusations therein, were the turning point in Mr. Celler's business conduct and marked the undermining of Plaintiff's case by Mr. Celler's failure to act to advance the case toward resolution.

**223**. Given Mr. Celler's disciplinary history and sanction by the Florida Bar for improper communication with counsel of an opposing party in an unrelated case, it can be reasonably inferred that accusations of similar misconduct by Defendants and/or their counsel, would be sufficient to interfere with Mr. Celler's zealous representation of the Plaintiff.

**224**. Mr. Celler's withdrawal was contrary to his contractual and economic interest because he undertook the case on contingency, invested nine months of time and expense on the case, only to compromise his own compensation by not seeing the case through to a favorable outcome.

**225**. Under Florida law, so long as improper means are not employed, activities taken to safeguard or promote one's own financial, and contractual interests are entirely non-actionable. In this case, Mr. Celler's "activities" neither safeguarded, nor promoted, his financial or contractual interests.

**226**. Moreover, Mr. Celler's handling of Plaintiff's case was directly counter to his own representations. For example, Mr. Celler stated,

- "Our firm prides itself on staying in constant communication with our clients."
- "We pride ourselves on being responsive to our clients and proactive on their cases."
- "If they want to settle, great. If they don't, we remain ready and committed to go to trial and court."
- "We believe in being straightforward and up front with our clients from day one so that we are on the same page in terms of expectations and how the case will proceed."
- "We don't get paid unless our client gets paid. So, we share the same incentive in pushing these cases as quickly and efficiently as we can."
- "Keeping clients informed and up to date on their cases is a benchmark for our practice."

**227**. Not only did Mr. Celler not keep Plaintiff "informed" or respond in a "timely fashion," but he told the Plaintiff the firm does not "provide clients with updates".

**228**. Mr. Celler also represents that he is "straightforward with clients from day one so they are on the same page as far as expectations and how the case will proceed" Thus, according to Mr. Celler, he and the Plaintiff shared the same "expectations" of the case from the outset. Moreover, the manner in which Mr. Celler handled the Plaintiff's case

was so contrary to his own representations that is strongly suggests that Mr. Celler was persuaded or coerced to pursue the Plaintiff's case with the same degree of professionalism applied to other cases.

229. Plaintiff alleges that Defendants exercised influence or otherwise interfered with Plaintiff's contractual relationship with Mr. Celler and were the direct and proximate cause of Mr. Celler's failure to file, failure to advance the case, and his ultimate withdrawal. Defendants were the only parties that stood to gain an advantage from Mr. Celler's failures to act by not filing the case, by not advancing the case toward resolution for nine months, and by not seeing the case through to resolution.

230. Applying logic and common sense, it can be reasonably inferred that Mr. Celler's conduct, which was so contrary to his own interests and his own representations, was caused affected by interference and/or influenced or coerced, by the Defendants to gain an advantage in the case by avoiding liability in a legal action filed against the Defendants, both to the detriment of Mr. Celler's interests, as well as those of the Plaintiff.

231. Additional evidence to support a cause of action for interference will be obtained and further developed through discovery.

**Plaintiff Has Been Injured by Defendants' Interference**

**232.** Plaintiff alleges that the Defendants unlawfully interfered with the contractual relationship between Plaintiff and the interference was intentional, unjust, and the direct and proximate cause of damage to the Plaintiff in an amount to be determined at trial.

**233.** In addition, Defendants interference was motivated by conduct made to conceal and avoid liability for their unlawful acts and with the intention of injuring the Plaintiff. Defendants acted with an improper and evil motive amounting to malice and oppression and in conscious disregard for the Plaintiff's rights. Thus, punitive damages are appropriate in this case and should be awarded as punishment for Defendants' unlawful acts and to deter like conduct by the Defendants and others going forward.

## Count Ten
### Malicious Prosecution

**234.** As a separate and distinct cause of action, Plaintiff complains and realleges paragraphs 49 through 60 and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

**235.** To state a cause of action for malicious prosecution, Plaintiff must prove six elements: '1) the commencement of a judicial proceeding; 2) its legal causation by the present defendant against the plaintiff; 3) its bona fide termination in favor of the

plaintiff; 4) the absence of probable cause for the prosecution; 5) malice; [and] 6) damages."

### Defendants were the Legal Cause and Commenced a Judicial Proceeding Against Plaintiff

**236**. Defendants were the legal cause and commenced a judicial proceeding and filed a defamation action against the Plaintiff with malice and without probable cause.

**237**. Plaintiff has already established that she did not engage in any defamatory act toward Pooches of Largo, Inc. and that the defamation action was frivolous and unsupported.

### The Action Terminated in Favor of the Plaintiff

**238**. Defendants continued the action for more than one year, at which time it was resolved in favor of the Plaintiff and dismissed for lack of prosecution.

**239.** In their defamation action, Defendants used the opportunity to make misrepresentations of fact disparaging remarks about the Plaintiff.

**240.** Defendants accused the Plaintiff posting a defamatory cover photo of a Facebook page she did not administrate.

**241.** Defendants accused Plaintiff of acting with revenge toward her former employer.

**242**. Defendants accused the Plaintiff of extortion for lawfully acting to recover unpaid wages.

**243**. Defendants misrepresented that Plaintiff was paid $1500 in wages, which was false and unrelated to an action for defamation.

**Defendants Acted with Malice**

**244.** Plaintiff alleges that Defendants acted with malice and abused the legal system when they filed the action and used it as both a sword and a shield to retaliate, intimidate, and otherwise injure the Plaintiff, and conceal unlawful conduct, and to deter further pursuit of her claims to avoid liability for their misconduct.

**245**. As the court records indicate, no attempt was ever made to serve the Plaintiff, nor did Defendants utilize any of several other ways by which to commence an action rather than to complete service on the defendant. Plaintiff attaches the case docket as (**Exhibit 17)** as evidence showing that no attempt was made
 to serve the Plaintiff and that the case terminated in Plaintiff's favor.

**246.** Defendants' failure to take any action to obtain the correct identity of the page's administrator, or to file any defamation action against the correct administrator or the two websites that use the same allegedly defamatory picture in reference to Petland further supports the frivolous, retaliatory, and malicious motive for the action against the Plaintiff.

**247.** Moreover, the action was filed despite Defendants and their counsel being informed and having knowledge that the Plaintiff had lost her home as the direct

consequence of Defendants' wage theft. Thus, it defies belief that the Defendants or their counsel had any realistic expectation of obtaining a judgement for $15,000 for an unsupported cause of action against a homeless woman with no income or assets.

## The Action Was Without Probable Cause

**248.** The action was an abuse of the legal system and filed for improper purpose with the intention of intimidating and harassing the Plaintiff to deter her from continued pursuit of her claims against Defendants for their unlawful conduct. Furthermore, the action caused Plaintiff to be unable to secure new employment for a considerable amount of time after it was filed, despite reasonable efforts by the Plaintiff to do so.

**249**. Defendants' also caused harm and injury to Plaintiff's occupational, professional, and personal reputation, and did so recklessly and maliciously with the wrongful intention of injuring the Plaintiff, for an improper and evil motive amounting to malice as described above, which abused and/or prevented the existence of any conditional privilege of the Defendants or their counsel in filing and continuing the action against the Plaintiff.

**250.** Not only did Defendants have no reasonable basis for filing the action or for the statements made therein, but Defendants also filed the action with no belief in the truth of the claims in the defamation action and in fact knew the statements to be false.

**251.** Defendants filed the action with hatred and ill will towards the Plaintiff and the design and intention to injure the Plaintiff, her reputation, and her employability, not with any intent to protect any interest intended to be protected by any privilege, but with reckless malicious intent to injure the Plaintiff. Therefore, no privilege existed to protect the Defendants, nor their counsel, from liability for the baseless malicious defamation action filed against the Plaintiff.

**252**. Defendants were the direct and proximate cause of injury to the Plaintiff, including but not limited to, occupational and reputational harm, and mental distress.

**253**. Plaintiff seeks an award of damages to compensate for her injuries.

**254**. Punitive damages in an amount to be determined at trial are also appropriate for Defendants' misuse of the legal system and the malice that motivated the action against the Plaintiff.

**Count Eleven**
**Civil Conspiracy in Violation of 42 U.S.C. 1985 and Fla. St. 777.04**

**255.** As a separate and distinct cause of action, Plaintiff complains and realleges the foregoing facts and claims and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

**256.** 42 U.S.C. § 1985 grants a civil cause of action for damages caused by various types of conspiracies aimed at injuring a person in his/her person or property or denying

him/her a federal right or privilege**.** § 1985 mainly deals with three instances of conspiracy: those aimed at preventing an officer from performing his/her duties; those aimed at obstructing justice by intimidating a party, witness, or juror; and those aimed at depriving a person's rights or privileges.

**257.** Pursuant Florida Statute 876.41**, "**if two or more persons conspire to commit any crime defined by this law, each of such persons is guilty of conspiracy and subject to the same punishment as if he or she had committed the crime which he or she conspired to commit, whether or not any act be done in furtherance of the conspiracy."

**258.** The offense of conspiracy is codified under <u>Section 777.04(3)</u> of the Florida Statutes and mirrors federal conspiracy laws and the elements of federal and statutory conspiracy are the same.

**259.** The elements of a cause of action for civil conspiracy under Florida law and 42 U.S.C. §1985 require that the Plaintiff show: (1) an agreement between two or more parties, (2) to do an unlawful act or to do a lawful act by unlawful means, (3) the doing of some overt act in pursuance of the conspiracy, and (4) damage to plaintiff as a result of the acts done under the conspiracy.

**260**. Conspiracy under Florida law is defined as an agreement by two or more persons to commit a criminal offense, with the intent that the offense will actually be committed. Thus, A person who agrees, conspires, combines, or confederates with

another person or persons to commit any offense commits the offense of criminal conspiracy.

**261.** As the 11th Circuit has explained, when one conspirator engages in tortious behavior, the plaintiff can then hold all other conspirators liable without alleging that they each proximately caused the harm. Thus, the plaintiff must allege that each Defendant acted in furtherance of the conspiracy and at least one Defendant succeeded in doing so.

**262.** Moreover, the Court's recognize that no formal agreement is necessary to constitute an unlawful conspiracy, and that business behavior is admissible circumstantial evidence from which the fact finder may infer agreement.

## Defendants, Acting Together and With Others, Formed an Agreement to Do Unlawful Acts

**263.** When considering the "business behaviors" of Defendants, their counsel, their agents and/or employees, and the "business behavior" of Mr. Celler, individually and collectively, these behaviors as described above are consistent with a fraudulent scheme to induce the Plaintiff to accept employment at Petland premised on what Defendants knew were misrepresentations about the compensation. Defendants did so with the intention of obtaining work from the Plaintiff without paying for it, and did in fact, obtain work from the Plaintiff without paying accordingly.

**264.** Plaintiff further alleges that Defendants recruited the Plaintiff with the preconceived intention of terminating her employment rather than pay her wages. Evidence of the Defendants contrived plan to terminate the Plaintiff without cause, on her day off, is seen by the fact that Defendants terminated the Plaintiff immediately following her wage complaint without even conducted an inquiry into whether Plaintiff was paid correctly or not.

**265**. Defendants acted together and with others in furtherance of a preconceived plan to commit fraud, theft of service, and wage theft, and then unlawfully terminate the Plaintiff to avoid paying the money she is owed. Given that Defendants have refused to pay Plaintiff her money in nearly four years of attempts to recover her wages, is compelling evidence demonstrating that Defendants never had, and continue to have no intention of surrendering Plaintiff's money, absent a court order to do so. In fact, counsel for the Defendants stated that Plaintiff would have to "sue and prevail in court" to recover her money. There can be no more clear indication that Defendants had and have no intention of surrendering Plaintiff's money and demonstrates the condition of the mind and criminal intent motivating Defendants conduct and that of their coconspirators.

**266.** Defendants acted together and with others to conceal the Defendants fraud and theft to not only avoid surrendering Plaintiff's money, but to avoid liability for their unlawful acts when Plaintiff initiated legal action against the Defendants. Defendants attempted to accomplish this by misrepresenting material facts of Plaintiff's employment her position and title, dates of employment, number of hours worked, agreed wage, and wages paid.

**267.** Defendants, acted together and with others as described in the foregoing, made these misrepresentations to create the appearance that no fraudulent acts were made, that Plaintiff was not owed money, and that Plaintiff was so confused that she had no idea what job she applied for, what job she interviewed and was hired to perform, and what the compensation she was promised was for the position was. Defendants further attempted to make it appear as if Plaintiff did not know how many hours she worked, or when, or during what dates. Defendants made these allegations without any evidence to support their claims and contradict the heavily substantiated claims by the Plaintiff in support of all claims in this pleading.

**268**. Not only did Defendants act, together and with others, to conceal their unlawful acts, but also took additional steps to deter and/or interfere with Plaintiff's ability and inclination to pursue legal action against the Defendants for the unlawful conduct by falsely accusing her of tampering with a wage agreement for which all parties knew

did not exist, by interfering with Plaintiff's relationship with her attorney and the timely filing of Plaintiff's case, by making baseless threats to sue the Plaintiff for acts she did not do, and then actually filing and continuing a frivolous action for same. As the evidence filed with this case demonstrates, the defamation action was filed without probable cause because Plaintiff was not the party responsible for the misconduct alleged in the action.

**269.** In addition, Defendants attempted to use Plaintiff's wages as leverage, a bargaining tool, to coerce the Plaintiff into dropping her claims against the Defendants in exchange for partial payment of the wages she is owed. When Plaintiff did not accept the offer, Defendants did not pay Plaintiff any of the wages she is owed. Plaintiff suggests that the Defendants' "business behavior" is not consistent with that of an employer who has a genuine interest in resolving the issues but rather that of an employer who is knowingly and intentionally depriving an employee of their wages and the evidence supports that finding.

**270.** Plaintiff alleges that by inducing Plaintiff's counsel to breach his contractual obligations, Mr. Celler acted to his own detriment and that of the Plaintiff's, and instead acting to the advantage of the Defendants. Defendants obstructed justice when they interfered with Mr. Celler's intentions to file the case and caused Mr. Celler's ultimate and abrupt withdrawal, again, to the benefit of the Defendants. Defendants

further acted to intimidate, threaten, harass, and retaliate against the Plaintiff to further violate Plaintiff's rights and obstruct justice. Defendants' unlawful conduct was made to conceal and avoid liability for their previous unlawful acts.

271. Plaintiff alleges that Defendants acted together and in a concerted effort with others to commit fraud, theft, and retaliation, and to conceal Defendants' unlawful acts with misrepresentations, false allegations, failures to disclose, and by threatening, harassing, intimidating and otherwise retaliating against the Plaintiff, all acts made to interfere with and deter pursuit of her claims and thus to conceal and avoid liability for their unlawful conduct. History has already demonstrated the Defendants propensity for wage theft and Defendants have shown their propensity for retaliation many times over as described above.

272. Plaintiff further alleges that the Defendants acted together and with others in furtherance of an unlawful agreement and that each coconspirator played a critical role in pursuance of a conspiracy as described below:

**The Defendants' Role**

273. The premise of this conspiracy stems from a fraudulent act by the Defendants when they posted an employment offer on Indeed.com the terms of which were intentionally misrepresented to induce the Plaintiff to apply for and subsequently

accept employment at Petland based on her reliance on the representations made by the Defendants in their offer.

**274.** Defendants stated that the compensation for the position offered was an annual salary of $35,000. The salary was material to the offer because it influenced Plaintiff's behavior by inducing her to apply for the job and subsequently accept the offer of employment in reliance of the terms and conditions set forth by the Defendants in their offer. Plaintiff worked for three weeks in accordance with the Defendants terms and conditions and with the expectation that Defendants would likewise act in accordance with their terms and conditions.

**275**. Defendants misrepresented the salary of $35,000 a year and had no intention of paying, nor did they pay, the Plaintiff in accordance with their representations. In fact, Plaintiff worked approximately one hundred hours over three weeks, and was paid $205 which resulted in Plaintiff being paid less than minimum wage for all hours worked. The disparity between an annual salary of $35,000 and compensation that is less than minimum wage is substantial and the two cannot be inadvertently confused.

**276**. Plaintiff alleges that the Defendants engaged in a fraudulent scheme by posting an employment offer on Indeed.com in which they misrepresented the terms and conditions to recruit a "certified veterinary technician" who would have at minimum,

an associate degree in veterinary technology and thus have the advanced skills and experience required to become credentialed as a certified veterinary technician.

277. Plaintiff alleges that although Defendants sought a credentialed veterinary technician, they did not intend to pay a wage that would have been appropriate for the position they sought to fill.

278. Immediately after Plaintiff was hired, Defendants reduced her wage to an hourly rate of $8.45. At no time was Plaintiff compensated according to the $35,000 annual salary promised by the Defendants. Plaintiff was not informed at the time she inquired or at any other time during her employment that her pay was any other than that which Defendants stated and thus, Plaintiff reasonably relied on the Defendants representations about the compensation which was to her detriment.

279. This set of facts is compelling evidence in support of Plaintiff's allegation that the employment offer was fraudulent, and that Defendant's knowingly and willfully misrepresented the compensation to induce the Plaintiff to perform work for the Plaintiff on the premise of Defendants' misrepresentations of material fact. Plaintiff would not have applied for or accepted employment at Petland were it not for her reliance of the Defendants' representations in their employment offer.

280. Defendants' scheme to obtain work from the Plaintiff without paying as agreed became clear when, after three weeks of full-time employment, Plaintiff was paid $205,

despite having worked approximately one hundred hours over the three weeks. The difference between the $205 Plaintiff was paid and the promised annual salary of $35,000, adjusted accordingly for three weeks, was substantial. It became readily apparent that Defendants acted knowingly and willfully to induce Plaintiff's employment by offering a salary of $35,000 a year for which they had no intention of paying and thus, terminated the Plaintiff rather than conduct a meaningful investigation into the wage shortage of which Plaintiff complained and objected.

**281**. Defendants have owed Plaintiff wages for work already performed for almost four years which is persuasive evidence showing that Defendants have known all along but did not and do not intend to pay according to their promise but was in fact, misrepresented.

**282.** The subsequent conduct of the Defendants and their co-conspirators was to conceal their fraud, wage theft, and failure to pay minimum wage and avoid liability for their unlawful acts.

### Defendants' Agents Acted in Furtherance of the Conspiracy

**283.** After Plaintiff submitted her resume for the veterinary technician position at Petland, she received voice mail messages from two of Defendants' agents, Lynette, and Leanne, on August 6 and August 8, 2018, respectively. Both agents confirmed that

Plaintiff applied for the full-time certified veterinary technician position and requested Plaintiff schedule an interview for same.

284. Plaintiff alleges that Defendants' agents acted together and with the Defendants to support their fraudulent employment offer with the voice mails to further deceive and defraud the Plaintiff in her belief that the position she applied for was that of a certified veterinary technician with a compensation of $35,000 a year.

## Yessi Played a Critical Role in Furtherance of a Conspiracy

285. When Plaintiff was contacted by manager Yessi to offer Plaintiff the job, Plaintiff responded in the affirmative and inquired as to the compensation to make sure it was not any other than what was stated by Defendants in their employment offer.

286. However, Yessi did not respond to Plaintiff's text and the conversation terminated. Yessi was at Petland the following morning when Plaintiff arrived and did not notify the Plaintiff then or at any other time during Plaintiff's employment that the compensation was any other than $35,000 a year in accordance with Defendants' representation in their offer.

287. Given the fact that Yessi did not notify Plaintiff of any reduction in compensation at any time over the following three weeks, Plaintiff had no reason to suspect otherwise. Plaintiff performed work for the Defendants under the terms, conditions, and compensation set forth by the Defendants in their offer, through which Plaintiff obtained her employment at Petland.

**288**. Plaintiff alleges that manager Yessi was a party to the Defendants fraudulent scheme because she knew that Defendants did not intend to pay according to their representations. Yessi did not respond to Plaintiff's inquiry about the compensation for the position and acted in furtherance of Defendants fraudulent scheme by not responding to Plaintiff's inquiry knowing the salary was misrepresented and knowing Plaintiff would not accept employment if she knew the position only paid twenty cents over minimum wage. For the same reason, Plaintiff was never informed that the compensation was misrepresented and that she would not be paid according to the compensation stated by the Defendants.

**289.** Plaintiff alleges that she was induced to accept employment at Petland and performed work for the Defendants premised on the terms and conditions set forth by the Defendants employment offer. However, when it was time to pay Plaintiff three weeks later, Plaintiff was not paid a salary wage in accordance with the Defendants' offer. In fact, Plaintiff was paid at an hourly rate pf $8.45 and not compensated for all hours worked. Plaintiff's rate of pay was reduced to $8.45 an hour contrary to the annual salary of $35,000 Defendants stated was the compensation for the job.

**290**. Additionally, Plaintiff was not paid for all hours worked, and was paid less than minimum wage because was only paid $205 for approximately one hundred hours of

work over three weeks. At no time during Plaintiff's brief employment was the Plaintiff paid in accordance with Defendants' representations.

## Allison Played a Critical Role in the Conspiracy

291. The day before Plaintiff was to be paid, August 30, 2018, supervisor Allison acted in furtherance of Defendants' scheme to commit wage theft and obtain work from the Plaintiff without paying for it, and to subsequently conceal Defendants' unlawful acts.

292. Allison threatened not to pay the Plaintiff the following day if she did not complete the authorization for direct deposit. Plaintiff completed and returned the form.

293. Despite Allison's threat the previous day, Plaintiff was paid by paper check. Allison sent Plaintiff a text message to notify the Plaintiff that her paycheck was at Petland.

294. Plaintiff was always scheduled to work on Fridays. However, she was not scheduled to work on Friday pay day. While Allison retrieved Plaintiff's paycheck, she matter-of-factly commented that Plaintiff was "lucky" because her (Allison's) check was short and would have to be corrected.

295. Shortly after leaving Petland, Plaintiff discovered that her paycheck was substantially short. Plaintiff text Allison and informed her that her check, like Allison's check, was also shorted. Plaintiff's check was approximately $2000 short. Plaintiff also

complained that Defendants acted unlawfully when they applied a reduction in pay retroactively after she had "put in the hours" at the higher wage.

296. Just thirty minutes later, Allison responded to Plaintiff's text by terminating the Plaintiff for her complaint.

297. Plaintiff alleges that Allison acted in furtherance of Defendants unlawful scheme when she acted to obtain Plaintiff's bank information by threatening not to pay the Plaintiff in anticipation of the allegation of a direct deposit made to create the appearance that Plaintiff had been paid all wages.

298. Plaintiff alleges that Allison scheduled Plaintiff off work that Friday so that she would not be at Petland working a scheduled shift at the time she discovered the $2000 shortage on her check. For the same reason, Allison text Plaintiff that her check was at Petland so that Plaintiff would pick up her check that day, her day off.

299. Plaintiff further alleges that Allison acted in furtherance of Defendants scheme to commit wage theft when she matter-of -factly commented that her (Allison's) paycheck was short, suggesting that Plaintiff's check was not the only check that was short when Plaintiff discovered the discrepancy in the amount of her check.

300. Plaintiff also alleges that Allison acted in furtherance of the agreement when she terminated Plaintiff's employment without cause when Plaintiff notified her of the pay shortage, despite the fact that Allison was Plaintiff's immediate supervisor and familiar

with Plaintiff's work, and terminating the Plaintiff without justification in furtherance of an agreement to defraud the Plaintiff and steal her wages and her services by not paying her for her work as agreed or even as required by state and federal law.

301. Allison frequently asked the Plaintiff to work later than the time she was scheduled off work. Plaintiff alleges that Allison, having knowledge of Defendants scheme and that Plaintiff would not be paid for her time, sought to obtain as much uncompensated work from the Plaintiff as possible.

302. Plaintiff further alleges that Allison was aware of Defendants unlawful wage practices at the relevant time and that she acted in furtherance of the agreement when she terminated the Plaintiff without cause or justification in direct response to Plaintiff's complaint. Allison responded by saying their "legal team" would investigate the "wage issue" because she knew Defendants' conduct was unlawful and that it was, or soon would be, a legal matter.

### Defendants' Counsel Acted in Furtherance of the Agreement

303. When Plaintiff's attorney sent a demand letter, Defendants acted together and with counsel in furtherance of an unlawful agreement when Defendants responded, through counsel, with misrepresentations of material facts pertaining to Plaintiff's employment to conceal wage theft, retaliation, and fraudulent conduct by the Defendants.

**304**. Defendants' response, through counsel, was made in furtherance of an agreement to commit fraud, wage theft, and unlawful retaliation, and avoid liability for their misconduct. Defendants, through their counsel, misrepresented every material fact of Plaintiff's employment, the dates, compensation, title and position, and the number of hours worked by the Plaintiff.

**305**. Defendants made these misrepresentations despite having sole custody and control of records to the contrary, such as Plaintiff's employment file and time clock records and having ample time to review them.

**306**. Defendants made these misrepresentations knowingly and with the intention of concealing fraud, wage theft, and retaliation and to avoid liability for their unlawful employment actions.

**307**. Defendants further responded, through counsel, alleging to be in possession of a wage agreement, for "kennel," for a wage of $35,000 an *hour* and falsely accused Plaintiff of altering the alleged agreement by crossing out the word "hour" and writing the word "year" in its place.

**308**. Defendants, through counsel, also falsely accused Plaintiff's counsel of providing them with this allegedly altered wage agreement that did not exist.

**309**. Plaintiff alleges that the foregoing false claims and misrepresented allegations by the Defendants, by and through their counsel, were made to retaliate, intimidate, threaten, conceal, and otherwise avoid liability for Defendants' misconduct.

**Plaintiff's Counsel Also Played a Critical Role in Furtherance of an Agreement**

**310**. Mr. Celler never denied Defendants' false allegations that he provided them with an altered wage agreement Plaintiff knows not to exist. In fact, he was silent about the allegations and refused to acknowledge or answer Plaintiff's questions about Defendants' claims. Plaintiff alleges that by Mr. Celler's failure to deny or recognize the Defendants' false accusations, and by his abrupt withdrawal and failure to file the case these facts are persuasive evidence of Mr. Celler's participation in Defendants' scheme.

**311**. Plaintiff further alleges that Defendants, together and with counsel, acted in furtherance of an agreement when counsel sent Plaintiff a letter on behalf of the Defendants in which they falsely accused her of being responsible for something she did not do and threatening to sue her for defamation, and demanding that she take down a Facebook page she does not administrate.

**312**. Much like Defendants misrepresentations of fact, there can be no legitimate purpose for threatening to sue someone for an act they did not do. Plaintiff alleges the

purpose of the threatening letter was retaliatory and meant to intimidate and discourage her from seeking new counsel and to cause her mental distress, given the timing of the letter just one week after her counsel abruptly withdrew from her case.

313. Plaintiff alleges that Mr. Celler acted in concert with Defendants and their counsel, by mutual agreement or otherwise, and acted in furtherance of Defendants' scheme to avoid liability for their misconduct and to obstruct justice by interfering with the hearing of her case.

314. Prior to Defendants' response, Mr. Celler indicated he intended to file Plaintiff's case on December 20, 2018. However, after receiving Defendants' letter, Mr. Celler did not file accordance with his statement that he intended to do so, with the only event between claiming he would file and failing to file was Defendants' letter and the false allegations therein.

315. Instead, Mr. Celler spent a ridiculous amount of time, nine months in fact, allegedly trying to negotiate a settlement with Defendants. Mr. Celler indicated his intention to file on two other dates but again failed to do so and withdrew from the caseless than a weeks after he intended to file the case. Mr. Celler's "business conduct' leaves little room for doubt that he was acting in the Defendants' interests and not those of the Plaintiff or his own.

**316.** By his failure and refusal to file Plaintiff's case, Mr. Celler acted contrary to his contractual and economic interest because, given that he undertook the case on contingency, Mr. Celler compromised his ability to be compensated for nine months of time and money spent working on Plaintiff's case. In fact, Mr. Celler's unconventional conduct was so contrary to the Professional Model Rules of Conduct, so contrary to his fiduciary duty to the Plaintiff, so contrary to Mr. Celler's own statements, and so contrary to his own economic and professional interests, all while acting to the benefit and advantage of the Defendants, that a reasonable finder of fact could easily infer that Mr. Celler's "business conduct" was more aligned with the goals of the Defendants than those of the Plaintiff's or even his own.

**317.** This "business conduct" is compelling evidence to support Plaintiff's claim that Mr. Celler was acting on behalf of the Defendants rather than in the interests of his client-the Plaintiff and that he was a party to the agreement. By his failure to advance the case, failure to file the case, and failure to see the case through to resolution, all while the clock continued to run for nine months during which Mr. Celler continued to represent the Plaintiff to her detriment and to his own.

**318.** Mr. Celler's "business conduct" furthered the interests of the Defendants so effectively and to such extent that it appeared to be the case that Mr. Celler was counsel for the Defendants, not the Plaintiff.

**319.** In light of the foregoing, it leaves little doubt that Mr. Celler's "business conduct" was not that of a reasonable and competent attorney acting in his client's interests, or even those of his own.

**320**. In addition, Defendants' conduct in furtherance of a conspiracy to avoid liability for their misconduct is established by the frivolous defamation action filed against the Plaintiff, naming her as Defendant by "process of elimination."

**321**. Defendants had no legitimate purpose for filing a frivolous and unsupported defamation action against the Plaintiff. Moreover, Defendants at no time took action to obtain the correct identity of the page administrator to seek redress for some perceived defamatory picture on a Facebook page, much less file a defamation action against the responsible party.

**322**. Defendants "business conduct" of falsely accusing the Plaintiff of defamation premised on "process of elimination" while taking no action whatsoever to determine the true identity of the party responsible for the alleged defamatory conduct supports Plaintiff's claim that the action was filed with malice and retaliatory motive.

**323.** Plaintiff alleges that it was no coincidence that Defendants filed the baseless defamation action against her, a former employee who sought to recover unpaid wages and disclosed unlawful activity of the Defendants. Plaintiff further alleges that Defendants intended to punish, threaten, intimidate, chill, and retaliate, and to

discourage further action by the Plaintiff and that Defendants accomplished this common goal together and in concert with others.

**324**. Plaintiff alleges that Defendants' counsel acted in furtherance of the agreement by drafting and filing the frivolous defamation action against the Plaintiff without probable cause. **Exhibit 23** was obtained through Facebook and proves that Plaintiff did not administrate the Facebook page as alleged by Defendants in the action. Defendants' counsel drafted and filed the baseless complaint in Miami-Dade County Court, having knowledge that the allegations were false and were made without any investigation made to obtain the true and correct facts. Filing a frivolous action against the Plaintiff, acting in the Defendants interests, is compelling evidence of concerted acts in furtherance of an unlawful agreement to conceal and avoid liability for the Defendants for their misconduct.

**325**. Counsel abused his position as an attorney and further abused the legal system by acting in furtherance of the agreement to conceal Defendants' unlawful conduct amounting to grand theft, fraud, and retaliation.

**326.** Moreover, the Supreme Court is well settled that the protections of "litigation privilege" and "immunity" do not extend to actions filed without probable cause and/or for an improper purpose. Thus, the filing of this frivolous action against the Plaintiff constitutes an unlawful act in furtherance of an unlawful agreement rather

than protected conduct made withing the scope of counsel's zealous representation of the Defendants.

**327**. The foregoing explains the critical role of the Defendants and others acting in furtherance of a concerted act to induce work from the Plaintiff by fraud with no intention of paying for the work accordingly, and then unlawfully terminating the Plaintiff for asking for her wages and opposing unlawful pay practices to avoid paying her.

**328.** By the conduct described above, Defendants acted together and with others to injure the Plaintiff and did injure the Plaintiff. Plaintiff is still without her wages nearly four years later. Defendants intentionally injured Plaintiff's professional and personal reputation, and damaged Plaintiff's employability. In addition, by acting together and in concert with others in furtherance of an unlawful agreement, Defendants caused, continue to cause, and will continue to cause the Plaintiff significant mental distress, and economic losses, and substantial time and expenses incurred over nearly four years by requiring the Plaintiff to compel Defendants' compliance with the law and to recover wages owed since 2018.

**329**. Given the "business conduct" of the Defendants and that of their coconspirators as described herein, and in consideration of the totality of the circumstances, Plaintiff has provided facts together with direct and circumstantial evidence in support of a cause of

action for civil conspiracy. Additional facts and evidence supporting a cause of action for conspiracy will be obtained and further developed through discovery.

**330**. Defendants committed the acts alleged herein recklessly, maliciously, fraudulently, and oppressively with the wrongful intention of injuring the Plaintiff, and for an improper and evil motive amounting to malice as described above and with a conscious disregard for Plaintiff's rights or the law. In doing so, Defendants abused and/or prevented the existence of any conditional privilege and thus are not entitled to those protections when acting unlawfully.

**331.** All actions of the Defendants, its agents, and employees, herein alleged were known, ratified, and approved by the Defendants. This conduct exceeded the inherent risks of employment and was not the sort of conduct normally expected from an employer. Plaintiff further alleges that the Defendants and their managing agents, manager, officers, and/or directors committed the acts alleged herein maliciously, fraudulently, and oppressively with the wrongful intention of injuring the Plaintiff and acted with an improper and evil motive amounting to malice and oppression, and in conscious disregard of the Plaintiff's rights or the law.

**332.** Thus, Plaintiff is entitled to compensatory damages for her injuries and for the mental anguish and emotional distress she was caused by Defendants' conspiracy and the unlawful acts made in furtherance of the conspiracy as described herein.

**333.** In addition, Defendants' conduct was so reckless, malicious, and made with the preconceived intention of injuring the Plaintiff that punitive damages are in order and should be awarded as a punishment to deter similar unlawful conduct by the Defendants or others going forward in an amount to be determined at trial.

## Prayer for Relief

*Wherefore,* Plaintiff has been damaged and prays for judgement against the Defendants and relief as follows:

**1.** All unpaid wages due calculated and adjusted accordingly at $35,000 a year minus wages already paid to the Plaintiff in the amount of $184.00

**2.** Back pay and lost wages in an amount to be determined at trial

**3.** Front pay, in lieu of reinstatement

**4.** Prejudgment and post judgment interest calculated at the current rate

**5.** Compensation in a reasonable amount, in lieu of attorney's fees and costs, to compensate Plaintiff for substantial time and expenses incurred by filing and continuing this action to compel Defendants' compliance with the law

**6.** Liquidated damages pursuant 29 U.S.C. 216(b) and Section 24(e) of the Florida Minimum Wage Act

**7.** Treble damages pursuant Fla. Stat. § 772.11, and such other relief as is available under the statute to the fullest extent of the law

**8.** Compensatory damages to include mental anguish and emotional distress

**9.** Compensation for the loss of health care benefits provided through her employment and reimbursement for actual medical expenses incurred since Plaintiff's termination

**10**. Damages for injury to Plaintiff's professional and personal reputation, employability

**11.** Reimbursement for actual costs incurred for storage expenses for Plaintiff's belongings incurred as a direct consequence of Defendants' failure to timely pay the Plaintiff wages owed

**12.** Compensation for property loss in an amount to be determined at trial

**13.** Punitive damages for all claims allowable at law in an amount to be determined at trial

**14**. An injunction ordering Defendants to cease and desist from posting fraudulent employment offers, and from further acts of wage theft and retaliation

**15**. Any other damages allowable at law and to the fullest extent of the law

**Plaintiff demands a trial by jury on all counts so triable.**

> **Respectfully submitted,**
> **s/** <u>Melanie Moore</u>
> Plaintiff
> 15519 Darien Way
> Clearwater, Florida 33764
> (Mailing address only)
> vettechmnm@gmail.com
> (727) 692-0143

**Certificate of Service**

Plaintiff, Melanie Moore, hereby certifies that on May 2, 2022, a copy of the foregoing

will be served on counsel for the Defendants using the court's CM/ECF filing system

and counsel will be notified of the foregoing by email through the CM/ECF system.

Matthew Sarelson
(305) 773-1952
2100 Ponce de Leon, Suite 1290
Coral Gables, Florida 33134
msarelson@sarelson.com