# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

Melanie Moore,                                              Case No. 8 :20-CV-02184MSS-SPF

    Plaintiff,

V.

Luis Marquez, Individually and as

Owner of Pooches of Largo, Inc.,

and Pooches of Largo, Inc.,

    Defendants,

_____/

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

**1.** Pursuant Fed. R. Civ. P. 15 and 8(f), Plaintiff, Melanie Moore, hereby files this

SECOND AMENDED COMPLAINT against Defendants Luis Marquez and Pooches of

Largo, Inc., d/b/a "Petland Largo".

**2.** At the heart of this matter is Defendants' wage theft and failure to pay minimum

wage for work performed by the Plaintiff in August 2018. The Defendants unlawfully

retained, and continue to retain, Plaintiff's wages and refuse to surrender those wages

and converted Plaintiff's wages for their own use since the time Plaintiff's employment

was terminated four and a half years ago. Additional counts in the Complaint include

civil theft, conversion, interference with contract, malicious prosecution, and fraudulent misrepresentation.

**3.** Plaintiff seeks to recover unpaid wages, damages, and other equitable relief.

<u>**Jurisdiction and Venue**</u>

**4.** Jurisdiction is proper in the Florida Middle District Court pursuant 28 U.S. Code § 1331, and this court has subject-matter jurisdiction over this action that pertains to a question of federal law pursuant the Fair Labor Standards Act.

**5.** This court also has personal jurisdiction because the Defendants maintain a principal place of business in this judicial district and have availed themselves of the business opportunities available within the state of Florida. The Plaintiff resides in this district and was employed by Defendants at their principal place of business in this district.

**6.** This Court also has supplemental jurisdiction over the related state law claims pursuant 28 U.S. Code §1367, because Plaintiff's Florida common law claims form part of the same case or controversy under Article III of the U.S Constitution and arise from a common nucleus of operative facts as her federal law claims, and the parties are identical.

**7**. Resolving state and federal claims in a single action serves the interests of judicial economy, convenience, and fairness to the parties.

**8.** This Court also has jurisdiction because Pinellas County is part of the Middle District of Florida and Defendants have availed themselves to the jurisdiction of this court because they own and operate a business in Pinellas County. Defendants are also subject to the laws and ordinances of Pinellas County because they operate a business in Pinellas County.

**9.** Venue is proper In the Middle District of Florida pursuant 28 U.S. Code §1391 because the Defendants maintain a principal place of business in this district and all or most of the unlawful conduct giving rise to this action occurred in this district.

<u>**The Parties**</u>

**10.** Plaintiff, Melanie Moore, of Pinellas County, Florida, has worked as a veterinary technician for approximately fifteen years. Plaintiff was employed by Defendants in August of 2018 at Petland Largo, a retail pet store located at 10289 Ulmerton Road Largo, Florida 33771. At all times material, Plaintiff was an "employee" under the Fair Labor Standards Act.

**11.** Defendant, Luis Marquez, is the owner and President of Petland Largo and was an "employer" under the FLSA at all times material to this case. Defendant operates Petland Largo under the business name *Pooches of Largo, Inc.* which maintains its corporate office at 8181 NW 154th Street, Suite 270 Miami Lakes, Florida 33016.

**12.** Whenever in this Complaint an act or omission of a corporation or business entity is alleged, the said allegation shall be deemed to mean and include an allegation that the corporation or business entity acted or omitted to act through its authorized officers, directors, agents, servants, and/or employees.

**13.** Defendants engage in interstate commerce through the purchase, transportation, and sale of live animals from large-scale commercial breeders in the Midwest for sale in his Petland stores throughout Florida and Texas.

### Facts

**14**. Plaintiff was employed at Defendants' Largo Petland store from August 13, 2018, through August 31, 2018. Plaintiff obtained the job by submitting her resume using the link in an employment offer created and posted by Defendants on Indeed.com, an online employment platform that operates to connect job seekers with employers seeking to fill available positions. The position offered was for a "Full-time Certified Veterinary Technician" for which the compensation was an annual salary of $35,000. The Defendants' employment post is attached as **Exhibit 1.**

**15**. Plaintiff received confirmation that her resume was received from two of Defendants' agents, Leanne and Lynette, on August 6, 2018, and August 8, 2018, respectively, when they left voicemail messages requesting that the Plaintiff call back to

schedule an interview for the *veterinary technician* position at Petland Largo. The visual voicemails of these messages are attached as **Exhibit 2.**

**16.** On the evening of August 12, 2018, Plaintiff received a text message from Petland manager Yessi, offering Plaintiff the job and asked that she report to Petland the following morning at 7am to begin training. Plaintiff accepted and agreed to be at Petland at 7a. The Plaintiff also inquired about the compensation in her reply message. However, Yessi did not respond to inform the Plaintiff that the compensation was any other than that stated by the Defendants in their offer. **(Exhibit 3)** Moreover, Plaintiff was never told in any subsequent communications that her pay was any other than that which was indicated by the Defendants in their employment post.

**17.** The weekly employee work schedule at Petland is posted on Friday of the preceding week. Thus, the Plaintiff was not on the previously posted schedule for her first week of employment. Plaintiff worked as directed by manager Yessi her first week of employment. Yessi told the Plaintiff that she would manually enter Plaintiff's hours into Petland's electronic time-keeping system until she was able to assign Plaintiff a pin code to clock in and out for her shifts using the electronic time keeping system.

**(Exhibit 4)**

**18.** Plaintiff worked full-time for three weeks according to the direction of Yessi her first week and then according to the weekly employee work schedule created and posted by Defendants for Plaintiff's subsequent weeks.

**19.** Yessi also told the Plaintiff that she would not be receiving a paycheck at the end of her first week, which was the regular payday for the other workers, and that Plaintiff would receive a paycheck on the next pay date in two weeks on August 31, 2018, which would pay Plaintiff all wages for work performed through that pay date, accordingly.

**20**. Plaintiff was scheduled a minimum of 37 hours per each week of employment. However, Plaintiff was frequently required to stay later than her scheduled time off work at the direction of her supervisor to complete additional work assigned to the Plaintiff.

**21**. Plaintiff's work schedules for weeks two and three created and posted by the Defendants, show that the Plaintiff was scheduled five shifts per week at a minimum of 37 hours for each week of employment. **(Exhibits 5, 6)**

**22.** Plaintiff worked approximately one hundred hours in total during three weeks of employment. Plaintiff used the electronic time-keeping system to clock in and out for her shifts. The Plaintiff's time clock records are in the sole custody and control of the Defendants, who were advised to preserve any records pertaining to Plaintiff's employment by Plaintiff's counsel in 2018.

**23**. Plaintiff was an excellent employee and had no documented disciplinary, attendance, or performance issues during her employment at Petland Largo.

**24**. On August 30, 2018, Plaintiff was informed by her supervisor, Allison, told the Plaintiff that if she did not have direct deposit, she would not be paid the following day. Allison gave Plaintiff a direct deposit authorization form which the Plaintiff completed and returned to Allison.

**25**. The following day, Friday August 31, 2018, was pay day. Despite being scheduled to work every Friday, Plaintiff was scheduled off work on this Friday. Despite Allison's statement the previous day that Plaintiff's would be paid by direct deposit, the Plaintiff received a text message from Allison notifying the Plaintiff that her paycheck was at Petland. **(Exhibit 7)**

**26.** Plaintiff retrieved her paycheck approximately one hour later. While Allison looked for Plaintiff's check, she commented that the Plaintiff "was lucky" and that her [Allison's] check was short, and she would have to get it "straightened out."

**27.** After Plaintiff left for the bank, she discovered that her check was short by approximately $2000. According to the check stub, the pay period ended the previous day, August 30, 2018. Thus, Plaintiff's check dated August 31, 2018, should have compensated the Plaintiff for all three weeks of employment in the amount of $2019. Plaintiff files her pay stub as **Exhibit 8.**

**28**. Immediately upon discovering the shortage, Plaintiff text Allison to notify her that there was a problem with her paycheck and asked with whom she should speak about the shortage. **(Exhibit 7)** Plaintiff complained that her wage rate had been incorrectly reduced from an annual salary of $35,000 to an hourly rate of $8.45 an hour **(Exhibit 9)**.

**29**. After Allison stated for the second time that Plaintiff's pay was correct, Plaintiff complained that Defendants' pay practice was "illegal as hell" because they had applied the reduced wage to her paycheck retroactively after Plaintiff had already "put in the hours" at the higher wage. **(Exhibit 10)**

**30.** Allison advised Plaintiff "to call corporate to figure it out." Plaintiff replied to say that she would respond with counsel who would be calling corporate on Plaintiff's behalf regarding the wages Plaintiff was owed. **(Exhibit 11)**

**31.** Allison confirmed her understanding that Plaintiff had lodged a grievance about her pay and complained of Defendants' unlawful pay practices and stated, "we will have our legal team look into the wage disagreement."

**32.** Allison then terminated Plaintiff's employment "immediately" and told the Plaintiff that "it was a pleasure" working with her, suggesting that Plaintiff's termination was not the result of any misconduct or performance issues of the Plaintiff. **(Exhibit 11)**

**33**. Plaintiff retained employment attorney Richard Celler on October 10, 2018, who undertook the case on contingency. Mr. Celler was enthusiastic when he took the case

and was optimistic that he would obtain a favorable outcome premised on the merits of the case. Attorney Celler also told the Plaintiff that time was of the essence and that he was eager to begin working on her case.

**34.** Attorney Celler sent Defendants a letter of demand on December 6, 2018, notifying Defendants of their unlawful employment actions against the Plaintiff, to include breach of contract, retaliation in violation of Private Whistleblower Act (PWA), and failure to pay minimum wage. The letter stated that Mr. Celler was confident that any judge or jury hearing the case would find Defendants' actions intolerable and find in favor of the Plaintiff. The letter indicated a deadline of December 20, 2018, for Defendants to respond with a satisfactory offer of resolution without which Mr. Celler would file Plaintiff's case in court. **(Exhibit 12)**

**35.** Defendants responded, through counsel, on December 11, 2018. **(Exhibit 13)** Defendants misrepresented material facts pertaining to Plaintiff's employment. Defendants alleged, falsely, that Plaintiff was a kennel technician at Petland for $8.45 an hour, rather than a veterinary technician with a corresponding salary of $35,000 per year. The Defendants' misrepresentations were contrary to the offer created and posted on Indeed.com by the Defendants themselves through which Plaintiff obtained the job at Petland. Defendants' offer stated the position was for "Full-time Certified Veterinary Technician" for an annual salary of $35,000. *see* Exhibit 1

**36.** Defendants also falsely alleged that Plaintiff never worked a full-time schedule and only worked 20 hours per week. The Defendants representations were contrary to the weekly work schedules created and posted by the Defendants themselves showing that Plaintiff worked a schedule of five days a week and a minimum of 37 hours each week. *see* Exhibits 5,6

**37**. Defendants also misrepresented the dates of Plaintiff's employment, alleging that Plaintiff worked from August 17, 2018, through September 13, 2018. Exhibit three shows that Plaintiff was offered the job on August 12, 2018, and Plaintiff agreeing to be at Petland the following morning, August 13, 2018, to begin training per Yessi's request. Exhibit four is a screenshot of a text conversation with Yessi showing that Plaintiff was working at Petland on August 16, 2018. Plaintiff also submits her Google timeline showing that she was present at Petland on August 13, 2018, and August 16, 2018. **(Exhibits 14, 15)**

**38.** Given the fact that Defendants have sole custody and control of Plaintiff's employment file and time clock records, to the extent that they exist, there should be no reason why the Defendants would not know material facts of Plaintiff's employment. Moreover, in the more than four years that the Plaintiff has been owed wages, the Defendants have offered no evidence to support their contentions regarding Plaintiff's title, position, agreed compensation, dates and hours of employment. Conversely, the

Plaintiff has provided well-documented evidence that controverts the Defendants

misrepresentations and supports the Plaintiff's version of the facts of her employment.

This evidence is difficult to dispute because all of it came from the Defendants

themselves, or their agents, such as pay stub, work schedules, voice mail and text

messages, and other documentation, all of which is filed with this Complaint to

support Plaintiff's claims.

**39.** In addition to the misrepresentations about Plaintiff's employment, counsel for the

Defendants claimed to be in possession of a "Petland Wage Agreement for Kennel."

Counsel further alleged that the agreement was for a wage of $35,000 *an hour* and

accused the Plaintiff of altering the terms by crossing out the word "hour" and writing

the word "year" in its place. Clearly, the allegation is absurd and false. Plaintiff denies

altering any documents related to her employment at Petland. The proposition that a

wage agreement for $35,000 an *hour* even existed for Plaintiff to have altered to begin

with is so preposterous that it proves its own falsity. This is also compelling evidence

suggesting an attempt to intimidate, harass, and discourage the Plaintiff from

continued pursuit of her claims and wages.

**40**. Adding to the false and bizarre allegations by Defendants' counsel, he further

alleged that it was Plaintiff's counsel, Mr. Celler, who provided him with this "altered'

wage agreement. These allegations were made despite knowledge of their falsity by the Defendants, Defendants' counsel, the Plaintiff, and Plaintiff's counsel.

41. These misrepresentations of fact and false allegations against the Plaintiff and her counsel were made without any legitimate purpose or basis in fact.

42. Attached to Defendants' response was a screenshot of an employment offer on Indeed.com for "kennel technician" at Petland Largo. The job description for kennel technician was identical to the job description in Defendants' offer for "certified veterinary technician" through which Plaintiff obtained employment at Petland. The screenshot showed that the pay for the "kennel technician" position was a salary of $8.25 to $11.00 a *year*. It *appears* that Defendants sent the screenshot to imply that it somehow applied to Plaintiff in her role at Petland. However, the screenshot shows that the job offer was created and posted on November 23, 2018, which was three months after Plaintiff was terminated and thus, had no relevance to the Plaintiff whatsoever. **(Exhibit 16)**

43. Counsel for the Defendants also sent a pay stub for an alleged direct deposit to Plaintiff's bank for $320.89. Plaintiff has no record of the alleged deposit and denies receiving any direct deposit from Petland. Plaintiff disputes the authenticity of the pay stub/check. Unlike the pay stub for the check Plaintiff received on August 31, 2018, the check/stub for the alleged direct deposit indicates no bank name from which the funds

would have been drawn. Also, it was allegedly for a pay period from August 31, 2018, through September 13, 2018. However, Plaintiff was terminated on August 31, 2018, and thus, could not have worked or earned wages during the pay period stated on the pay stub. **(Exhibit 17)**

**44.** Plaintiff emailed her attorney on at least three different dates to ask about the alleged altered wage agreement opposing counsel claimed to have received from Mr. Celler. Although Mr. Celler replied to the Plaintiff's emails, he did not respond to her inquiries about the alleged altered wage agreement he was accused of sending to the other side. Mr. Celler's failure to deny the allegations and consistent evasion of the question is compelling evidence that Mr. Celler was in accord with the false allegations and false accusations by defense counsel against himself and the Plaintiff.

**45**. In addition, the enthusiasm with which Mr. Celler undertook the Plaintiff's case was significantly diminished after he received the Defendants' response to his demand letter. In fact, Mr. Celler did not file Plaintiff's case on December 20, 2018, in accordance with his statement in the demand letter. Communications from Mr. Celler dwindled, and when the Plaintiff reached out for an update after months of silence, the Plaintiff was told that the firm did not provide clients with updates.

**46**. Plaintiff was advised that Mr. Celler was negotiating a settlement with Defendants and instructed to be patient, that it was not an overnight process. **(Exhibit 18)** After

four months of radio silence, Plaintiff contacted Mr. Celler by telephone to inquire

about the status of her case. Mr. Celler indicated that the Defendants were not

interested in resolution. When the Plaintiff restated her interest in filing her case, Mr.

Celler told her that he wanted to spend another month attempting to reach a settlement

pre-suit. By this time, it had been nine months since Mr. Celler undertook the case with

no meaningful progress toward resolution. Mr. Celler told the Plaintiff that she could

either do what he wanted or find another attorney to represent her.

**47**. Mr. Celler notified opposing counsel that he intended to file Plaintiff's case on April

6, 2019, and again on May 6, 2019. However, Mr. Celler did not file the case on either

date and instead abruptly withdrew from representing the Plaintiff on May 20, 2019,

without cause and with less than one day's notice and without giving the Plaintiff an

opportunity to transition to a new attorney before removing himself from the case.

**(Exhibits 19, 20, 21)**

**48.** Mr. Celler's behavior was not that of an attorney whose compensation was

dependent on a successful resolution of the case, given that he undertook the case on

contingency. In fact, Mr. Celler's conduct was not only contrary to the Plaintiff's

interests, but contrary to his own contractual and financial interests when he undertook

a case on contingency and subsequently spent the next nine months undermining his

own compensation by not filing or furthering the case only to abruptly withdraw from

the case. Moreover, Mr. Celler withdrew so abruptly that he did not give the Plaintiff time to transition to new counsel as required by the *Rules of Professional Conduct* when withdrawing from representation of a client. Mr. Celler's conduct is suspicious, given that he took the case on the merits but dropped the ball entirely to his own detriment after Defendants and their counsel became involved in the dispute.

**49.** The Plaintiff believes that Mr. Celler, or any attorney for that matter, would not choose to work for free by taking a meritless case on contingency any more than the Plaintiff would choose to work at Petland for free. Mr. Celler's conduct defies reason and common sense.

**50**. On xxx, 2019, just one week later after Mr. Celler's abrupt withdrawal, Defendants sent the Plaintiff a cease-and-desist letter threatening to sue the Plaintiff for defamation and falsely accusing her of being responsible for the cover photo of a Facebook page, one of dozens, that exposes Petland's association with the puppy mills from which they source puppies. **(Exhibit 22)**

**51.** The letter stated, "We have already been in touch with Facebook to confirm the computer used to create the page, etc." However, this allegation was false for two reasons. First, the Plaintiff is not the page administrator and therefore, has no control over its contents. Second, per Facebook's privacy policy, a court order is required for Facebook to disclose information about its users. Had Defendants obtained the

requisite court order, they would have known the Plaintiff was not the administrator of the page.

**52**. By their threats and false allegations, together with the suspicious timing just one week after MR. Celler's abrupt withdrawal, it *appears* that Defendants intended the letter to intimidate and further retaliate against the Plaintiff to deter her from obtaining new counsel to further pursue her claims against the Defendants. **(Exhibit 23)** shows that Plaintiff did not administrate the Facebook page at issue and supports Plaintiff's claim that the Defendants intended to threaten and retaliate further against the Plaintiff to deter continued pursuit of legal action against the Defendants.

**53.** Moreover, the picture that was the subject of the cease and desist letter is found on two websites in connection with Petland, www.change.org and https://www.thepetitionsite.com/1/stop-petlands-cruelty/. **(Exhibits 25, 25)** However, Defendants have not filed any defamation action against either of the websites, further supporting Plaintiff's contention that the Defendants did not assert a legitimate claim seeking to obtain redress for some perceived defamatory act, rather it was intended to harass, intimidate, bully, and retaliate against the Plaintiff by threatening a lawsuit for an act for which Plaintiff was not responsible so deter further pursuit of unpaid wages and claims against Defendants for their unlawful conduct.

**54**. Plaintiff emailed Defendants' counsel on July 19, 2019, to inquire about the alleged wage agreement she was accused of altering. However, rather than acknowledge Plaintiff's request and respond accordingly, counsel instead responded by attaching a defamation complaint and summons to the email. **(Exhibit 26)** The action was filed a month earlier in Miami-Dade County Court, in the wrong venue. It defies belief that Defendants' counsel, with more than fifteen years of litigation experience, was unable to determine the correct venue in which to file an action against the Plaintiff.

**55.** Despite its filing a month earlier, no attempt had been made to serve the Plaintiff, according to court records. **(Exhibit 27)** Nor did Defendants utilize of any of several alternative means by which to commence an action if a Defendant cannot be served. see *Pooches of Largo, Inc. v. Melanie Moore,* Miami-Dade 2019-018268-CA-01

**56.** The defamation action against the Plaintiff was frivolous, without probable cause, and filed for an improper and retaliatory purpose. The action named Plaintiff as Defendant by "process of elimination." Defendants filed the action with ill will toward the Plaintiff and the design and intention to injure the Plaintiff, Plaintiffs good name and reputation, employment, and employability. Defendants filed the action not with an intent to protect any interest intended to be protected by any privilege but with recklessness and an intent to injure the Plaintiff. Therefore, no privilege existed to protect Defendants from liability for any of these statements and unsupported

allegations. Defendants continued the action for sixteen months which was terminated in Plaintiff's favor and dismissed for lack of prosecution on October 16, 2020. **(Exhibit 27)**

**57.** Defendants made several misrepresentations in their defamation complaint. For example, Defendants alleged that Plaintiff was paid $1500 for her work at Petland. Not only was this false and easily disproven by the payroll records in custody of the Defendants demonstrating otherwise, but also irrelevant to an action for defamation.

**58**. Defendants also made disparaging and false statements against the Plaintiff, such as accusing the Plaintiff of extortion, aided by her counsel, for acting to recover unpaid wages. Once, again, completely irrelevant to an action for defamation. In fact, not only did defendants have no reasonable basis to believe the statements that they also had no belief in the truth of the statement in fact knew the statements to be false.

**59.** Additionally, Defendants were informed and had knowledge that Plaintiff was evicted from her home and lost all her belongings as a result just three weeks after Defendants terminated her employment and unlawfully retained the money that was to be used to pay her housing expenses. Given the circumstances, it defies belief that Defendants, or their counsel, had any legitimate belief in obtaining a judgement against the Plaintiff, a homeless woman with no income or assets as the result of Defendants' unlawful actions, much less for an act she did not do.

**60.** More likely is it than not, that the lawsuit was a meant to retaliate against the Plaintiff for acting to recover her wages and to bully, intimidate, and otherwise discourage the Plaintiff from continued pursuit of her claims and wages and was intended to cause, and did cause, the Plaintiff mental distress.

**61.** Setting aside the lack of probable cause for the action, it is nonetheless worth noting that in their Complaint, Defendants stated that Plaintiff "was a veterinary technician for the store." Defendants made this statement in direct conflict with Defendants' previous claim that Plaintiff was a kennel technician at Petland, *not* a veterinary technician.

**62.** By the inconsistency of Defendants statements, it *appears* that Defendants made one representation when attempting to justify under paying the Plaintiff's wages, and another representation when they sought to injure Plaintiff's personal and professional reputation by alleging acts of extortion and defamation against her former employer.

**63.** All actions of the Defendants, its agents, and employees, herein alleged were known, ratified, and approved by the Defendants. By the foregoing facts, Plaintiff alleges that Defendants committed wage theft, and engaged in retaliatory conduct and other unlawful acts to conceal Defendants' wage theft and unlawful termination of Plaintiff's employment, and to avoid prosecution and paying Plaintiff the wages she is owed.

## Count One
### Failure to Pay Minimum Wage
### FLSA § 29 U.S.C. 206

**64.** As a separate and distinct cause of action, Plaintiff complains and realleges

paragraphs 18 through 29 and incorporates them by reference into this cause of action

as though fully set forth herein, excepting those allegations which are inconsistent with

this cause of action.

**65**. The Plaintiff was an "employee" and Defendants were "employers" under the

FLSA at all times material.

**66**. Plaintiff's employment began on August 13, 2018. Plaintiff was scheduled a

minimum of 37 hours per week and often remained later than her scheduled time off

work to complete tasks as instructed by her supervisor. Plaintiff alleges she worked

approximately one hundred hours in total during her employment. Plaintiff's work

hours and dates worked are documented, or should be documented, by her time clock

records, which are in the sole custody and control of the Defendants.

**67**. Plaintiff's weekly work schedules, created and posted by the Defendants

themselves, show Plaintiff's schedule for weeks two and three. *see* Exhibits 5, 6. Thus,

Defendants were fully aware of the number of hours Plaintiff worked each week.

**68.** Defendants reduced Plaintiff's pay to $8.45 an hour and applied the reduction

retroactively. While a pay rate of $8.45 may be at or above the minimum wage rate in

effect during the relevant time, given the approximately one hundred total hours

worked by the Plaintiff over the three weeks of her employment, Defendants did not

pay Plaintiff for all hours worked, thus reducing her compensation to $2.05 for each

hour of Plaintiff's work. Plaintiff's pay stub confirms that Plaintiff was paid $205 in

total wages before taxes and deductions.

**69**. Plaintiff and Defendants disagree as to an alleged direct deposit on September 15,

2018, for $320. Plaintiff has no knowledge or record of the alleged deposit and

Defendants have offered no verifiable record of the transaction from the banking

institution. The pay period for alleged the direct deposit was August 31, 2018 -

September 14, 2018. Given the fact that Plaintiff was terminated on August 31, 2018, she

could not have worked or earned wages during that pay period. Plaintiff disputes the

authenticity of the direct deposit paystub from the Defendants and argues that the pay

stub was fraudulent and created after the fact as an attempt to appear as if Plaintiff had

been paid all wages owed.

**70**. Nonetheless, setting aside the absence of any verifiable record of the deposit and the

authenticity of the pay stub, pay stub submitted by the Defendants for the alleged

direct deposit indicates a year-to-date wage of $577.47. Going by the pay stub and

according to the Defendants accounting, had the direct deposit in fact, been made,

Plaintiff was paid $5.77 per hour, given the approximately one hundred hours worked.

**71.** Whether by the Plaintiff's accounting or that of the Defendants, the pay stub for the alleged direct deposit is evidence that supports the claim that Plaintiff was not paid minimum wage. In fact, giving the Defendants the benefit of the doubt as to the legitimacy of their payroll records, those records indicate that Defendants allegedly paid $577 in year-to-date wages, which is substantially less than the Florida or federal minimum wages in effect during the relevant time.

**72.** Given that Defendants were informed and have had knowledge that Plaintiff was owed money but failed to correct the deficiency in almost four years that Defendants have owed Plaintiff wages, Defendants have left no room for doubt that their unlawful conduct was, and continues to be, a knowing and willful and violation of the FLSA and was made with reckless disregard for the Plaintiff's rights.

**73**. To show a willful violation, the evidence must show not only that the FLSA was violated, but also that the employer either knew or showed reckless disregard for whether its conduct violated the FLSA. This finding requires more than just evidence that the employer was negligent or inattentive to its pay practices. Instead, the evidence must show that the employer knew its pay practices violated the FLSA or had some reason to suspect its pay practices violated the FLSA and failed to take any action to investigate or address that belief.

**74**. Plaintiff's supervisor promised an investigation into the Plaintiff's wage dispute when she terminated the Plaintiff as the result of Plaintiff's complaint when she discovered a substantial shortage of wages in her paycheck. However, no investigation was made. Moreover, the Defendants acted with reckless disregard for whether their actions complied with the requirements of the FLSA. Not only did Defendants fail to investigate when Plaintiff complained about her wages, but Defendants terminated the Plaintiff rather than investigate the wage issue. Likewise, Defendants did not investigate the wage issue when they were notified of their failure to pay minimum wage by Plaintiff's attorney in December 2018.

**75**. By their failure to investigate and/or correct the wage shortage, Defendants have demonstrated willful and reckless disregard for the provisions of FLSA. Moreover, Defendants stated that Plaintiff would have to sue and prevail in court for Defendants to surrender Plaintiff's wages. Thus, the Defendants' have proven their willful disregard for the FLSA many times over.

**76**. Plaintiff seeks an order from the Court requiring the Defendants to pay Plaintiff all back wages owed to the Plaintiff and an equal amount in mandatory liquidated damages under the FLSA, and damages to compensate for losses to the Plaintiff caused by the Defendants failure to timely pay Plaintiff in full and as agreed

**77**. Plaintiff has incurred substantial time and expense to compel Defendants to pay the wages she was due to receive nearly four years ago. In lieu of attorney fees and costs, Plaintiff seeks a reasonable compensation for time and expense incurred by this litigation and for any fees and court costs incurred by this action.

**Count Two**
**Failure to Pay Minimum Wage**
**Fla. St. 448.110 and Section 24 Article X of the**
**Florida Constitution**

**78.** As a separate and distinct cause of action, Plaintiff complains and realleges paragraphs 18-29 and 68-71 and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

**79**. Defendants failed to pay Plaintiff minimum wage for all hours worked in violation of public policy 448.110(a) which states:

> " All working Floridians are entitled to be paid a minimum wage that is sufficient to provide a decent and healthy life for them and their families, that protects their employers from unfair low-wage competition, and that does not force them to rely on taxpayer-funded public services in order to avoid economic hardship."

**80**. Defendants, by their failure to pay Plaintiff a minimum wage, forced the Plaintiff to rely on welfare to avoid economic hardship, and to rely on food stamps each month to be able to sustain her existence. Plaintiff has relied, and will continue to rely, on food stamps since the time of Defendants unlawful employment actions in 2018.

**81**. By their failure to pay Plaintiff a minimum wage, Defendants violated 448.110 (c) which states:

> "Employers shall pay Employees Wages no less than the Minimum Wage for all hours worked in Florida."

**82**. Defendants paid Plaintiff $ 205 in wages after she performed approximately one hundred hours of work for the Defendants. Defendants refuse to produce Plaintiff's time clock records to determine the precise number of hours Plaintiff worked because they will demonstrate she was paid less than minimum wage for all hours worked.

**83.** However, Plaintiff submits her weekly work schedules for weeks two and three of her employment which show that Plaintiff worked full time hours each week.

**84.** Defendants paid Plaintiff $205 and, given the one hundred hours Plaintiff estimates she worked in total for three weeks, Plaintiff was paid $2.05 for each hour of work. ($205/100 = $2.05)

**85**. Defendants allege to have made a direct deposit to Plaintiff's bank in the amount of $320 on September 15, 2018. However, Plaintiff disputes the claim and has no knowledge or record of any deposit to her account by Petland. However, the pay stub for the alleged deposit states a year-to-date wage of $577.47. Therefore, whether by Defendants accounting or that of the Defendants, Plaintiff did not receive a minimum wage for all hours worked, given approximately one hundred hours she worked during her employment at Petland.

**86**. Pursuant Section 24(e) of the Florida Minimum Wage Act:

> "Persons aggrieved by a violation of this amendment may bring a civil action in a court of competent jurisdiction against an Employer or person violating this amendment and, upon prevailing, shall recover the full amount of any back wages unlawfully withheld plus the same amount as liquidated damages, and shall be awarded reasonable attorney's fees and costs."

> "In addition, they shall be entitled to such legal or equitable relief as may be appropriate to remedy the violation including, without limitation, reinstatement in employment and/or injunctive relief. Any Employer or other person found liable for willfully violating this amendment shall also be subject to a fine payable to the state in the amount of $1000.00 for each violation."

**87.** The Florida Minimum Wage Act requires that an employee give an employer notice and 15 days to pay the full amount of unpaid wages or otherwise resole the claim to the satisfaction of the employee before the violation becomes actionable. The statute of limitations for bringing an action pursuant to this section shall be tolled during this 15-day period. In addition to notice by the Plaintiff when she complained to her supervisor, Defendants were given further notice in accordance with the statute on December 6, 2018, in a letter of demand from Plaintiff's counsel. Defendants had until December 21, 2018, to correct the violation but failed to do so.

**88**. Defendants' failure to pay minimum wage was willful and knowing and in reckless disregard for the Plaintiff's rights and Florida minimum wage laws and made with wrongful intent to injure the Plaintiff.

**89.** As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has

sustained and continues to sustain emotional distress, mental anguish, and Plaintiff has

suffered and will continue to suffer a loss of earnings and other employment benefits.

**90**. Pursuant to Fla. Stat. 448.102(c), Plaintiff is thereby entitled to the following relief:

1. Upon prevailing in an action brought pursuant to this section, aggrieved persons
shall recover the full amount of any unpaid back wages unlawfully withheld plus the
same amount as liquidated damages and shall be awarded reasonable attorney's fees
and costs…

2. Upon prevailing in an action brought pursuant to this section, aggrieved persons
shall also be entitled to such legal or equitable relief as may be appropriate to remedy
the violation, including, without limitation, reinstatement in employment and
injunctive relief.

**91.** Defendants have continued to refuse to pay the Plaintiff the wages she is owed for

nearly five years. Plaintiff seeks relief in accordance with the remedies set forth in Fla.

St. 448.110 to include back wages, liquidated damages, front pay in lieu of

reinstatement, damages for mental distress, for property and intangible losses incurred

by the Plaintiff as the direct and indirect result of Defendants' willful failure and

refusal to pay Plaintiff's wages continuing for nearly five years as of the filing date of

this Complaint.

**92.** Plaintiff should also be compensated a reasonable amount in lieu of attorney's fees

for the time and expenses incurred by Plaintiff to recover unpaid wages, to include

filing fees and any other related expenses incurred by this action to compel Defendants'

compliance with Florida minimum wage laws. Plaintiff should be compensated from the time this action was filed until such time as the final disposition of this action is entered.

93. In addition, the Plaintiff seeks any other relief allowable under law and to the fullest extent of the law, including but not limited to, assessment of fines and/or penalties against Defendants for their unlawful conduct.

**Count Three**
**Civil Theft**
**Florida Stat. § 812.014**

94. Florida Stat. § 812.014 provides a cause of action for the crime of civil theft and states in relevant part:

> **(1)** a person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently:
>> **(A)** Deprive the other person of a right to the property or a benefit from the property.
>> **(B)** Appropriate the property to his or her own use or to the use of any person not entitled to the use of the property.
>> **(C)** It is grand theft of the third degree and a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084, if the property stolen is valued at $300 or more, but less than $5,000.

95. To state a claim for civil theft, a plaintiff must prove the statutory elements of theft, as well as criminal intent.

## Defendants Knowingly Retained Plaintiff's Property by Failing to Pay Plaintiff the Wages She is Owed

**96**. On August 31, 2018, Defendants knowingly and unlawfully retained Plaintiff's property in the amount of $1,835 f or services performed by the Plaintiff in August 2018 at Defendants' Petland Largo retail store. Defendants' retention of Plaintiff's property was made with the intention of permanently depriving Plaintiff of her property.

**97**. Defendants refused, and continue to refuse, to surrender that property since August 31, 2018.

## Defendants Appropriated Plaintiff's Property for Their Own Use

**98.** Defendants deprived Plaintiff of the benefit of her property and appropriated, and continue to appropriate, Plaintiff's money for their own use since August 31, 2018.

**99**. Defendants represented that the Plaintiff's pay was an annual salary of $35,000 a as compensation for her services as a veterinary technician at Defendants Petland store.

**100**. Plaintiff performed work in accordance with the terms and conditions set forth by the Defendants in the agreement. However, when it was time for Defendants to pay Plaintiff after she performed work for the Defendants for three weeks, Defendants only paid the Plaintiff $205, which was $1835 less than the amount Plaintiff was supposed to receive from the Defendants.

**101**. Plaintiff notified Defendants through her supervisor, Allison, that she was owed money. However, rather than pay the Plaintiff the money she was owed, at the time

Plaintiff was due to receive her money, Defendants instead terminated the employment

relationship.

**102**. Defendants were notified that Plaintiff was owed money for a second time on

December 6, 2018, in a letter of demand from Plaintiff's attorney. However, despite two

notifications and Defendants' knowledge Plaintiff was owed money, and even though

Defendants' own records supported the claim, Defendants retained and continued to

retain Plaintiff's property despite being informed and fully aware that the property

belonged to the Plaintiff, not the Defendants, Defendants refused to surrender

Plaintiff's property and continue to refuse to surrender Plaintiff's property. Not only

did Defendants knowingly and intentionally deprive Plaintiff of the benefit of her

property, but Defendants also appropriated, and have continued to appropriate,

Plaintiff's property for the Defendants own use and benefit for more than three years.

**103**. Defendants retention and refusal to surrender Plaintiff's property is compelling

evidence that the Defendants deprivation of Plaintiff's money was a knowing

intentional act of theft made with criminal intent to unlawfully retain property

belonging to the Plaintiff.

**104**. To conceal and avoid liability for theft, Defendants misrepresented facts and

alleged the existence of false evidence against the Plaintiff and acted to intimidate and

threaten the Plaintiff and otherwise acted to obstruct justice by interfering with

Plaintiff's ability to continue legal action against Defendants. Much like the

Defendants' conduct described in the previous count for theft, these actions were

retaliatory and made with the intent to injure the Plaintiff and discourage continued

pursuit of her wages and legal claims.

**105**. By the retaliatory, threatening, and intimidation tactics described herein,

Defendants have left little room for doubt that Defendants acted, and continue to act,

with extreme, unjustified, and unlawful conduct to continue Defendants' retention of

Plaintiff's property, Defendants' refusal to surrender Plaintiff's property, and to

conceal Defendants' theft to avoid surrendering Plaintiff's property and avoid liability

for their unlawful retention of Plaintiff's property.

**106**. Plaintiff Fl. Sta. 812.014, Defendants unlawfully retained Plaintiff's property in the

amount of $1835 and refused to surrender Plaintiff's property with the intention of

permanently depriving the Plaintiff of her property.

### Pursuant Florida Stat. § 812.014(1)(c) Defendants Committed Grand Theft

**107**. Defendants' misconduct constitutes grand theft because the property stolen is

valued at more than $1000 pursuant Fla. St. 812.014(2).

### Defendants Acted with Criminal Intent

**108**. Evidence of criminal intent that motivated Defendants' theft is established is

established in several ways as described below:

**109.** First, Defendants posted an offer in Indeed.com for a wage Defendants had no intention of paying to induce Plaintiff to apply and accept employment at Petland.

**110**. However, immediately upon hiring the Plaintiff and without cause or notice Defendants reduced Plaintiff's wage to $8.45 an hour.

**111**. Defendants obtained full time work from the Plaintiff, approximately one hundred hours over three weeks in accordance with the terms and compensation set forth by the Defendants.

**112**. However, when it was time to pay the Plaintiff, Defendants did not pay Plaintiff as promised or even minimum wage. Defendants did not investigate the pay shortage and instead terminated Plaintiff thirty minutes after she brought the wage discrepancy to the attention of her supervisor. This conduct by the Defendants was unlawful and exceeded the inherent risks of employment and was not the sort of conduct normally expected from an employer.

**113**. After terminating the Plaintiff, Defendants acted to conceal their wage theft by alleging a direct deposit that was not in fact, made, misrepresented every material fact of Plaintiff's employment contrary to Defendants own time clock and payroll records, and engaged in retaliatory conduct and intimidation tactics as described herein to interfere with and discourage further action by the Plaintiff to recover her property so that Defendants could escape liability and commit theft with impunity.

**114**. Defendants accused Plaintiff of extortion in a malicious retaliatory defamation action against the Plaintiff to intimidate and discourage Plaintiff from further action to recover her property and to cause her mental distress.

**115**. Defendants' refusal to surrender Plaintiff's property for almost four years, despite knowledge that the property belongs to the Plaintiff, not the Defendants, is compelling evidence to establish the criminal intent with which Defendants acted and continue to act.

**116**. Furthermore, criminal intent can be reasonably inferred by evidence of Defendants history of wage theft and similar conduct toward other Petland Florida employees.

**117**. History demonstrates a pattern and practice of improper and unlawful conduct by the Defendants made to deprive employees of their money. This pattern of similar conduct by the Defendants is evidence that this is not an isolated incident, but rather *another* instance as part of a pattern and practice of improper and unlawful practices pertaining to the payment of wages occurring in the Defendants' usual course of business.

**118**. Substantial evidence of Defendants improper conduct relating to the payment of wages can be seen by statements made by other current and/or former employees of the Defendants. For example, employees state that Defendants shorted their paychecks, paid less than minimum wage, did not pay on time, unlawfully forced employees to

split their commissions with the Defendants, failed to provide a way for employees to document their hours, required employees to sign a document agreeing to allow Defendants to retain their commission wages at any time at the Defendants' discretion or if they quit or are terminated, did not pay employees for overtime hours, made employees clock out and work only for commissions when they reached forty hours, promised raises to obtain more work from employees but did not give those raises accordingly, and use payment of commissions/wages as leverage to threaten employees with termination or as a means of constructive discharge. **(Exhibits 29-43)**

**119**. Defendants' history and this pattern of misconduct related to the payment of wages is compelling evidence of the criminal intent with which Defendant's act in matters of wages and supports the conclusion that the case is the same here, as well.

**120.** Plaintiff has suffered, and continues to suffer, substantial injury for more than three years as the direct and proximate result of Defendants' theft.

**121.** Fla. Stat. § 772.11 provides the civil remedy for theft and states in relevant part:

> (1) Any person who proves by clear and convincing evidence that he or she has been injured in any fashion by reason of any violation of ss. 812.012-812.037 or s. 825.103(1) has a cause of action for threefold the actual damages sustained and, in any such action, is entitled to minimum damages in the amount of $200, and reasonable attorney's fees and court costs in the trial and appellate courts.

**122**. Accordingly, seeks treble damages and, in lieu of attorney's fees, a reasonable amount to compensate Plaintiff for the time and expenses incurred by having to file this action for civil theft to seek redress for Defendants unlawful acts.

<u>Count Four</u>
**Conversion**

**123**. Under Florida law, to state a cause of action for conversion, a plaintiff must prove **1)** that the plaintiff owns or has the right to possess the personal property in question at the time of the interference; **2)** that the defendant intentionally interfered with plaintiff's personal property; **3)** that the interference deprived the plaintiff of possession or use of the personal property in question; and; **4)** that the interference caused damages to the plaintiff.

**Plaintiff Has a Legal Right to the Unlawfully Retained Property**

**124**. Plaintiff has already established that she performed work for the Defendants for which she has not been compensated and attaches evidentiary documentation showing Plaintiff was paid less than minimum wage for approximately one hundred hours of work performed for the Defendants. The Plaintiff has a lawful right to the money unlawfully retained by the Defendants because it is unpaid wages owed to the Plaintiff for work already performed for the Defendants.

**Defendants' Acted with the Intent to Deprive Plaintiff of Her Property**

**125.** Defendants exercised, and continue to exercise, dominion and control over Plaintiff's property and intentionally interfered with Plaintiff's right to her property by unlawfully retaining Plaintiff's money knowing that it belonged to the Plaintiff and not the Defendants. Defendants knowingly and intentionally unlawfully retained and refused to surrender Plaintiff's property and deprived, and continue to deprive, the Plaintiff of the benefit of her property for more than three years as of this filing, all while they appropriated Plaintiff's property for Defendants' use and benefit.

**Plaintiff was Damaged by Defendants' Interference**

**126.** Defendants were, and continue to be, the direct and proximate cause of harm to the Plaintiff. Defendants' actions were willful, malicious, and oppressive, and committed with the wrongful intent to injure the Plaintiff and in conscious disregard for the Plaintiff's rights. Thus, Plaintiff seeks an award of damages in an amount to be determined at trial.

**127**. Punitive damages are also appropriate in this case in an amount to be determined at trial due the particularly egregious conduct by the Defendants that has continued for more than three years and to deter similar conduct going forward.

## Count Five
### Fraudulent Misrepresentation

**128.** To state a claim for fraudulent misrepresentation, a plaintiff must show **1)** a

defendant  intentionally made a false statement concerning a material fact; **2)** knowing

the statement was false when it was made or made the statement knowing he did not

know whether it was true or false; **3)** with the intention that another would rely on the

false statement; **4)** the plaintiff justifiably relied on the false statement  to their

detriment.

### Defendants Made an Intentional False Statement of Fact

**129**. On or about August 2018, Defendants created and posted an offer of employment

on indeed.com for a "Full-time Certified Veterinary Technician" at Defendants' Largo

Petland store. Defendants stated the compensation was an annual salary of $35,000.

**130.** The compensation was material to the employment offer because it induced action

by the Plaintiff in reliance of the representation by the Defendants.

### Defendants Made the Representation Knowing it was False

**131**. The statement about the compensation, which was optional and not required to

create and post a job offer on Indeed.com, was knowingly and intentionally

misrepresented. Defendants knew the statement was false at the time it was made

because Defendants had no intention of paying accordingly and did not pay accordingly.

## Defendants Intended to Induce Reliance on their Misrepresentations

132. Defendants made the misrepresentation on Indeed.com, an online employment platform for which its purpose is to connect job seekers with employers seeking to fill open positions. Defendants made the misrepresentations with intent to induce reliance and did induce reliance on those misrepresentations by the Plaintiff, causing the Plaintiff to apply for and accept employment at Petland in reliance of the Defendants' material representations.

## Plaintiff's Reliance was Justified

133. Defendants made these misrepresentations on an online employment platform whose function is to connect job seekers with employers. Thus, Plaintiff was justified in her reliance on the statements made by Defendants when they created and posted the employment offer on the employment platform because the conduct by the Defendants exceeded the inherent risks of employment and was not the sort of conduct normally expected from an employer.

## Plaintiff was Injured Her Reliance on Defendants' Statements

134. Plaintiff's reliance on the Defendants' misrepresentations was the direct and proximate cause of Plaintiff's injuries.

**135**. Plaintiff seeks treble damages in an amount to be determined at trial pursuant

Florida Statute 772.11(1)

**136**. Punitive damages are also appropriate in this case to deter like conduct by

Defendants and other going forward.

<u>Count Six</u>
**Tortious Interference with Contract**

**137.** To state a claim for tortious interference with contract, the claimant must plead

four elements: **1)** the existence of a business relationship under which plaintiff has legal

rights, not necessarily evidenced by an enforceable contract; **2)** proof of defendant's

knowledge; **3)** intentional and unjustified interference with relationship by defendant;

and **4)** damage to plaintiff as a result of interference.

**Plaintiff Had a Business Relationship with Her Attorney**

**138**. Plaintiff formed a business and contractual relationship with attorney Richard

Celler when he undertook Plaintiff's employment case, on contingency, on October 10,

2018.

**Defendants Were Informed and Had Knowledge of the Relationship with Counsel**

**139**. On October 4, 2018, Defendants had knowledge and were informed that Mr. Celler

represented the Plaintiff. Defendants responded to Mr. Celler's correspondence,

through counsel on December 11, 2018.

**Defendants' Interference was Intentional and Without Justification**

**140.** Plaintiff **alleges** that Defendants intentionally interfered with the relationship between Plaintiff and her counsel. Defendants acted with malice and in bad faith and accused Mr. Celler of providing the Defendants with a "kennel wage agreement" for $35,000 an *hour*. Defendants accused Plaintiff of altering the agreement by crossing out the word "hour" and writing the word "year" in its place. Counsel made this allegation, falsely accusing the Plaintiff of tampering with this agreement he claimed to have in his personal possession even though the Plaintiff and her counsel, the Defendants and their counsel, all knew of its falsity and that no such wage agreement existed.

**141**. By their allegations of a wage agreement that did not exist and the implication that Mr. Celler provided the other side with evidence was a false and intentional interference with Plaintiff's relationship with her counsel. Defendants intentionally interfered with the contractual relationship between Plaintiff and her counsel. There can be no legitimate purpose for making accusations of providing evidence to the other side against his own client's interests.

**142**. The 180-degree shift in the enthusiasm and diligence with which Mr. Celler acted at the outset of his representation was undeniable. Mr. Celler did not file the case on December 20, 2018, in accordance with his demand letter. He did not demonstrate the

same interest in the case, he failed to maintain communication with the Plaintiff, he did not advance the Plaintiff's case toward resolution for nine months.

143. Plaintiff alleges that Mr. Celler's change in demeanor was the direct result of unjust and intentional interference by the Defendants when they responded to his letter in the manner they did.

144. Mr. Celler did not deny the accusations, nor did he offer Plaintiff any explanation for the implications. In fact, Mr., Celler refused to acknowledge the allegations altogether and refused to answer any of at least three email inquiries by the Plaintiff about the alleged agreement.

145. Plaintiff alleges that Defendants intentionally interfered in Plaintiff's relationship without justification and caused, coerced, and influenced Mr. Celler not to deny the allegations by Defendants and not to acknowledge them.

146. Further evidence of unjustified interference is seen when, after nine months, Mr. Celler stated his intention of filing Plaintiff's case, twice. However, rather than file, Mr. Celler abruptly withdrew from the case with less than 24-hours' notice to the Plaintiff.

147. Plaintiff requested a copy of her case file when Mr. Celler terminated his representation, which consisted of six email messages between himself and opposing counsel in the two weeks before his withdrawal, with nothing between then and Defendants reply to the demand letter nine months earlier.

**148**. The lack of any other papers or notes in the interim demonstrated that Mr. Celler discontinued action to advance the case towards resolution when he received Defendants' response to his demand letter. This is persuasive evidence that Mr. Celler was influenced by the Defendants' allegations to an extent that it interfered with the diligent pursuit of Plaintiff's case. From that time, Mr. Celler took no further action to advance the case toward resolution for nine months, until he restated his intent to file Plaintiff's case in May and June of 2019, but instead abruptly, mysteriously, withdrew from the case a week later without filing the case accordingly.

**149.** Plaintiff alleges that the absence of a case file is compelling evidence suggesting that Mr. Celler's intention of filing on December 20, 2018, on May 3, 2018 , and May 6, 2018, in accordance with his claim, and his failure to file accordingly on all three of those dates is persuasive evidence to support a claim the Mr. Celler's actions were influenced by the Defendants false allegations, false accusations, and otherwise inappropriate response to the claims alleged in his demand letter.

**150**. Plaintiff further alleges that, were it not for Defendants' interference and influence over Mr. Celler's actions, Plaintiff's case file would have contained a drafted Complaint to be filed on December 20, 2018, as Mr. Celler intended. Plaintiff alleges that the Defendants' vexatious response to Mr. Celler's letter, and the false allegations and accusations therein, were the turning point in Mr. Celler's business conduct and

marked the undermining of Plaintiff's case by Mr. Celler's failure to act to advance the case toward resolution.

151. Given Mr. Celler's disciplinary history and sanction by the Florida Bar for improper communication with counsel of an opposing party in an unrelated case, it can be reasonably inferred that accusations of similar misconduct by Defendants and/or their counsel, would be sufficient to interfere with Mr. Celler's zealous representation of the Plaintiff.

152. Mr. Celler's withdrawal was contrary to his contractual and economic interest because he undertook the case on contingency, invested nine months of time and expense on the case, only to compromise his own compensation by not seeing the case through to a favorable outcome.

153. Under Florida law, so long as improper means are not employed, activities taken to safeguard or promote one's own financial, and contractual interests are entirely non-actionable. In this case, Mr. Celler's "activities" neither safeguarded, nor promoted, his financial or contractual interests.

154. Moreover, Mr. Celler's handling of Plaintiff's case was directly counter to his own representations. For example, Mr. Celler stated,

- "Our firm prides itself on staying in constant communication with our clients."
- "We pride ourselves on being responsive to our clients and proactive on their cases."

- "If they want to settle, great. If they don't, we remain ready and committed to go to trial and court."
- "We believe in being straightforward and up front with our clients from day one so that we are on the same page in terms of expectations and how the case will proceed."
- "We don't get paid unless our client gets paid. So, we share the same incentive in pushing these cases as quickly and efficiently as we can."
- "Keeping clients informed and up to date on their cases is a benchmark for our practice."

155. Not only did Mr. Celler not keep Plaintiff "informed" or respond in a "timely fashion," but he told the Plaintiff the firm does not "provide clients with updates".

156. Mr. Celler also represents that he is "straightforward with clients from day one so they are on the same page as far as expectations and how the case will proceed" Thus, according to Mr. Celler, he and the Plaintiff shared the same "expectations" of the case from the outset. Moreover, Mr. Celler's management of the Plaintiff's case was so contrary to his own representations that is strongly suggests that Mr. Celler was persuaded or coerced to pursue the Plaintiff's case with the same degree of professionalism applied to other cases.

157. Plaintiff alleges that Defendants exercised influence or otherwise interfered with Plaintiff's contractual relationship with Mr. Celler and were the direct and proximate cause of Mr. Celler's failure to file, failure to advance the case, and his ultimate withdrawal. Defendants were the only parties that stood to gain an advantage from Mr.

Celler's failures to act by not filing the case, by not advancing the case toward

resolution for nine months, and by not seeing the case through to resolution.

**158**. Applying logic and common sense, it can be reasonably inferred that Mr. Celler's

conduct, which was so contrary to his own interests and his own representations, was

caused affected by interference and/or influenced or coerced, by the Defendants to gain

an advantage in the case by avoiding liability in a legal action filed against the

Defendants, both to the detriment of Mr. Celler's interests, as well as those of the

Plaintiff.

**159.** Additional evidence to support a cause of action for interference will be obtained

and further developed through discovery.

### Plaintiff Has Been Injured by Defendants' Interference

**160.** Plaintiff alleges that the Defendants unlawfully interfered with the contractual

relationship between Plaintiff and the interference was intentional, unjust, and the

direct and proximate cause of damage to the Plaintiff in an amount to be determined at

trial.

**161.** In addition, Defendants interference was motivated by conduct made to conceal

and avoid liability for their unlawful acts and with the intention of injuring the

Plaintiff. Defendants acted with an improper and evil motive amounting to malice and

oppression and in conscious disregard for the Plaintiff's rights. Thus, punitive damages

are appropriate in this case and should be awarded as punishment for Defendants'

unlawful acts and to deter like conduct by the Defendants and others going forward.

## Count Seven
## Malicious Prosecution

**162.** To state a cause of action for malicious prosecution, Plaintiff must prove six

elements: **1)** the commencement of a judicial proceeding; **2)** its legal causation by the

present defendant against the plaintiff; **3)** its bona fide termination in favor of the

plaintiff; **4)** the absence of probable cause for the prosecution; **5)** malice; [and] **6)**

damages."

### Defendants were the Legal Cause and Commenced a Judicial Proceeding Against Plaintiff

**163**. Defendants were the legal cause and commenced a judicial proceeding and filed a

defamation action against the Plaintiff with malice and without probable cause. The

action was filed on June 18, 2019, in Miami-Dade County Court. *Pooches of Largo v.*

*Moore*, 018268-CA-01. https://www2.miami-dadeclerk.com/ocs/Search.aspx

**164**. Plaintiff has already established that she did not engage in any defamatory act

toward Pooches of Largo, Inc. and that the defamation action was frivolous, malicious,

and filed for improper purpose without basis in law or fact.

### The Action Terminated in Favor of the Plaintiff

46

**165**. The Defendants continued the action for one and a half years until it was terminated in favor of the Plaintiff on October 16, 2020, when it was dismissed for lack of prosecution.

**166.** Defendants used the defamation action as an opportunity to disparage the Plaintiff and misrepresent material facts pertaining to Plaintiff's employment, Plaintiff's former attorney, and the Plaintiff.

**167.** Defendants falsely accused the Plaintiff posting an allegedly defamatory picture as the cover photo of a Facebook page not administrated by the Plaintiff.

**168.** Defendants falsely accused Plaintiff of acting in revenge against the Defendants and further, wrongly accused the Plaintiff of extortion for lawfully acting to recover unpaid wages.

**169**. Defendants' complaint alleged, falsely, that Plaintiff was paid $1500 in wages to conceal Defendants' wage theft and conceal their failure to pay minimum wage, and to avoid having to pay the Plaintiff the wages owed to her.

## Defendants Acted with Malice

**170.** Plaintiff alleges that Defendants acted with malice and abused the legal system when they filed the action and used it as both a sword and a shield to retaliate, intimidate, and otherwise injure the Plaintiff, and conceal unlawful conduct, and to deter further pursuit of her claims to avoid liability for their misconduct.

**171**. As the court records indicate, no attempt was ever made to serve the Plaintiff, nor did Defendants utilize any of several other ways by which to commence an action rather than to complete service on the defendant. Plaintiff attaches the case docket as (**Exhibit 17)** as evidence showing that no attempt was made

 to serve the Plaintiff and that the case terminated in Plaintiff's favor.

**172.** Defendants' failure to take any action to obtain the correct identity of the page's administrator, or to file any defamation action against the correct administrator or the two websites that use the same allegedly defamatory picture in reference to Petland further supports the frivolous, retaliatory, and malicious motive for the action against the Plaintiff.

**173.** Moreover, the action was filed despite Defendants and their counsel being informed and having knowledge that the Plaintiff had lost her home as the direct consequence of Defendants' wage theft. Thus, it defies belief that the Defendants or their counsel had any realistic expectation of obtaining a judgement for $15,000 for an unsupported cause of action against a homeless woman with no income or assets.

### The Action Was Without Probable Cause

**174.** The action was an abuse of the legal system and filed for improper purpose with the intention of intimidating and harassing the Plaintiff to deter her from continued pursuit of her claims against Defendants for their unlawful conduct. Furthermore, the

action caused Plaintiff to be unable to secure new employment for a considerable amount of time after it was filed, despite reasonable efforts by the Plaintiff to do so.

175. Defendants' also caused harm and injury to Plaintiff's occupational, professional, and personal reputation, and did so recklessly and maliciously with the wrongful intention of injuring the Plaintiff, for an improper and evil motive amounting to malice as described above, which abused and/or prevented the existence of any conditional privilege of the Defendants or their counsel in filing and continuing the action against the Plaintiff.

176. Not only did Defendants have no reasonable basis for filing the action or for the statements made therein, but Defendants also filed the action with no belief in the truth of the claims in the defamation action and in fact knew the statements to be false.

177. Defendants filed the action with hatred and ill will towards the Plaintiff and the design and intention to injure the Plaintiff, her reputation, and her employability, not with any intent to protect any interest intended to be protected by any privilege, but with reckless malicious intent to injure the Plaintiff. Therefore, no privilege existed to protect the Defendants, nor their counsel, from liability for the baseless malicious defamation action filed against the Plaintiff.

178. Defendants were the direct and proximate cause of injury to the Plaintiff, including but not limited to, occupational and reputational harm, and mental distress.

**179**. Plaintiff seeks an award of damages to compensate for her injuries.

**180**. Punitive damages in an amount to be determined at trial are also appropriate in this case because of the Defendants' malice and intent to injure the Plaintiff.

## <u>Prayer for Relief</u>

*Wherefore*, Plaintiff has been damaged by the Defendants and prays for judgement against the Defendants and relief as follows:

**1.** All unpaid wages owed to the Plaintiff calculated and adjusted accordingly, at $35,000 and deducting wages already paid to the Plaintiff in the amount of $205.08

**2.** Back pay, front pay, and lost wages in an amount to be determined at trial

**3.** Prejudgment and post judgment interest calculated at the current rate

**4.** In lieu of attorney's fees and costs, compensation in a reasonable amount for time and expense incurred by the Plaintiff in filing and continuing this action to compel Defendants' compliance with the law, to include filing fees, court costs, and any additional costs incurred by the Plaintiff related to this action

**5.** Liquidated damages pursuant 29 U.S.C. 216(b) and Section 24(e) of the Florida Minimum Wage Act

**6.** An award of treble damages, pursuant Fla. Stat. § 772.11

**7.** Compensatory damages to include awards for mental anguish, emotional distress, psychological, and physical harm to the Plaintiff as a direct and indirect consequence

of Defendants' unlawful acts to include the loss of Plaintiff's home of four years, loss

of personal property, and causing the Plaintiff to become homeless. The Plaintiff's

livelihood was, and continues to be, substantially injured by the Defendants.

**8**. Damages for injury to Plaintiff's professional and personal reputation,

employability in an amount to be determined at trial

**9.** Reimbursement for actual costs incurred for storage expenses for Plaintiff's

belongings incurred as a direct consequence of Defendants' unlawful retention of

Plaintiff's wages and eviction three weeks later

**10.** Punitive damages for all claims allowable at law, in an amount to be determined at

trial

**11**. Any other damages allowable at law and to the fullest extent of the law

**Plaintiff demands a trial by jury on all counts so triable.**

**Respectfully submitted,**

**s/** Melanie Moore

Plaintiff,
15519 Darien Way
Clearwater, Florida 33764
(Mailing address only)
vettechmnm@gmail.com
(727) 692-0143

**Certificate of Service**

Plaintiff, Melanie Moore, hereby certifies that on November 24, 2022, a copy of the foregoing will be served on counsel for the Defendants using the court's CM/ECF filing system and counsel will be notified of the foregoing by email through the CM/ECF system.

Matthew Sarelson
(305) 773-1952
2100 Ponce de Leon, Suite 1290
Coral Gables, Florida 33134
msarelson@sarelson.com