IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MELANIE NICOLE MOORE,            )
                                 )
            Plaintiff,           )
                                 )
                                 ) Case No.
        vs.                      ) 8:20-CV-02184-MSS-SPF
                                 )
                                 )
POOCHES OF LARGO, INC., et al., )
                                 )
            Defendants.          )

_____

PRELIMINARY PRETRIAL CONFERENCE
*taken via Zoom videoconference*

BEFORE THE HONORABLE MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

JULY 26, 2023
1:33 P.M.
TAMPA, FLORIDA
_____

Proceedings recorded by mechanical stenography,
transcript produced using computer-aided transcription.
_____

**DAVID J. COLLIER, RMR, CRR**
FEDERAL OFFICIAL COURT REPORTER
801 NORTH FLORIDA AVENUE, 7TH FLOOR
TAMPA, FLORIDA  33602

1    **APPEARANCES:**

2

3    **FOR THE PLAINTIFF:**

4

5              *Melanie Nicole Moore, Pro Se*

6              15519 Darien Way

7              Clearwater, Florida  33764

8              (727) 241-9199

9

10

11   **FOR THE DEFENDANTS:**

12             *Matthew Seth Sarelson*

13             *Zachary Allen Stoner*

14             Dhillon Law Group, Inc.

15             1601 Forum Place, Suite 403

16             West Palm Beach, Florida  33401

17             (305) 773-1952

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2                    - - - o0o - - -
 3          THE COURT:  Good afternoon.  Call the case, please.
 4          COURTROOM DEPUTY:  Court calls Case Number
 5   8:20-CV-184-MSS-SPF, Moore versus Pooches of Largo, Inc.,
 6   et al.
 7          Counsel, please state your name for the record,
 8   starting with counsel for plaintiffs.
 9          THE COURT:  Ms. Moore, state your name for the
10   record.
11          MS. MOORE:  Melanie Moore.
12          THE COURT:  Are you alone, Ms. Moore, or do you have
13   counsel or an assistant with you?
14          MS. MOORE:  I do not.  I am pro se.
15          THE COURT:  But are you alone?
16          MS. MOORE:  I am alone, yes.
17          THE COURT:  All right.  And for the defense?
18          MR. SARELSON:  Good afternoon, Your Honor.
19   Matthew Sarelson for defendants.
20          THE COURT:  And are you alone or are you with someone
21   as well?
22          MR. SARELSON:  I believe my colleague, Zach Stoner,
23   is supposed to be on, but he's in the office and I don't -- I'm
24   not, so --
25          THE COURT:  What is the name?
```

```
 1              MR. SARELSON:  Zachary Stoner, Your Honor.

 2              THE COURT:  Mr. Stoner, are you on the phone?

 3              MR. STONER:  Yes, I am.

 4              THE COURT:  And who just entered the call?

 5              MR. JACKSON:  Hi, Judge Scriven.  This is your law

 6     clerk, Elliott Jackson.

 7              THE COURT:  Thank you.

 8              All right.  Ms. Moore, we're here for the purpose of

 9     conducting sort of a preliminary pretrial conference because

10     the parties for some reason have not submitted any of their

11     pretrial materials.  The Court has resolved the summary

12     judgment motion, the case will have to be tried, and so I am

13     trying to get a sense of how long this trial will last.  So the

14     first question toward that determination is how many witnesses

15     the parties anticipate calling.

16              Ms. Moore, how many witnesses will you be calling?

17              MS. MOORE:  Um, one additional besides Mr. Marquez.

18              THE COURT:  One additional besides whom?

19              MS. MOORE:  Besides Mr. Marquez.

20              THE COURT:  Who is that person?

21              MS. MOORE:  A defendant.

22              THE COURT:  No.  Who is the one additional?

23              MS. MOORE:  Oh, I'm sorry.  Richard Celler.

24              THE COURT:  And how long do you anticipate their

25     testimony to be?
```

1          MS. MOORE:  Probably about 30 minutes.

2          THE COURT:  30 minutes each?

3          MS. MOORE:  Yes, ma'am.

4          THE COURT:  And Mr. Celler is coming voluntarily, or

5     you are having to issue a summons to him?

6          MS. MOORE:  Um, I'm going to have to obtain another

7     subpoena, because I'm trying to get his testimony at a

8     deposition but he refused to -- he opposed the subpoena and

9     refused to appear, so -- he wouldn't tell me why, he wouldn't

10    tell me what his objection was, so I couldn't fix it, because

11    I didn't know what it was, you know, so -- and I couldn't,

12    you know, just guess what he was talking about, so I was going

13    to ask the Court actually for help with that, getting a

14    subpoena.

15         THE COURT:  Counsel, are you whispering across the

16    call?

17         What do you believe he has relevant testimony about?

18         MS. MOORE:  Well, he can attest to -- he represented

19    me initially back in 2018, so he's aware of the facts of my

20    case, and some of it pertains to the fraud count.

21         THE COURT:  What about the fraud count do you believe

22    he will testify about?  The whole business about them

23    threatening to grieve him if he pursued the claim and the basis

24    for the assertion that they asserted that you modified their

25    document?

```
 1            MS. MOORE:  Yes.  I mean, that's part of it.  I mean,
 2    Mr. Sarelson stated in his correspondence when he replied to
 3    the demand letter that Mr. Celler had sent him an altered wage
 4    agreement, which doesn't exist, you know, it wasn't even for my
 5    position, and I didn't alter anything, so -- and when I asked
 6    Mr. Celler about it, he didn't deny it, and he didn't -- he
 7    refused to even acknowledge the question or much less answer
 8    it, you know, so, I mean, apparently the two attorneys were in
 9    some sort of agreement to say that, you know, and that speaks
10    to the fraud count, because, I mean, it wasn't just a fraud in
11    the job that got posted, it was perpetuated and perpetuated in
12    the last five years, you know, in an effort to conceal the wage
13    theft and the retaliation.
14            THE COURT:  Are you working now, Ms. Moore?
15            MS. MOORE:  No, I'm not.
16            THE COURT:  Have you worked since you were
17    terminated?
18            MS. MOORE:  No, I haven't.  I mean, I'm homeless.
19    I don't have transportation.  I don't have clothes.  I don't
20    have anything.  I don't have a computer, you know.  I lost
21    everything that was in my storage unit, you know, so I lost
22    everything but my clothes that I was wearing.  I lost my birth
23    certificate, my Social Security card, I mean, everything, and
24    nobody wants to -- nobody wants to hire somebody with -- a
25    homeless person with no transportation, you know, so --
```

```
 1              THE COURT:  What computer do you use to --

 2              MS. MOORE:  I use my friend's parents' computer.

 3    That's why actually my opposition was filed like a week late,

 4    because it's a desktop computer and they went out of town and I

 5    didn't know they were going out of town, and so when I went

 6    over there to use the computer they weren't there, and they

 7    were gone for a whole week, so I couldn't -- I couldn't get on

 8    any sooner than that.

 9              THE COURT:  And how many witnesses does defense

10    intend to call?

11              MR. SARELSON:  Your Honor, we actually don't -- we

12    almost certainly will not call any witnesses.  We will

13    cross-examine the plaintiff's witness --

14              THE COURT:  Mr. Marquez?

15              MR. SARELSON:  -- if he appears.  We weren't planning

16    on calling him or bringing him, so, you know, we weren't going

17    to use him, frankly.

18              THE COURT:  What is his position?

19              MR. SARELSON:  He is the owner -- one of the owners

20    of the company.

21              THE COURT:  He will be at trial, won't he?  He's a

22    party?

23              MR. SARELSON:  We were not planning -- we were not

24    planning on bringing him.  He has no firsthand knowledge of

25    anything, so we were not planning on bringing him to the trial.
```

1  He wasn't deposed or anything.  He doesn't know anything, so we

2  weren't going to bring him.

3        MS. MOORE:  His discovery responses said that he --

4  you know, that Allison conveyed to me that I was terminated,

5  you know, obviously through him, because he's her supervisor,

6  so, I mean, he does know something about the case, because he

7  told her to fire me, so, you know --

8        THE COURT:  So he's going to be tried in absentia,

9  because he is a defendant; is that what you're suggesting?

10        MR. SARELSON:  Well, Your Honor, I -- we don't

11  believe there's any claims against him, so we simply were not

12  going to affirmatively use his testimony.

13        MS. MOORE:  Yeah.  I would like to.

14        THE COURT:  That's not my question.

15        MS. MOORE:  I would like to.

16        THE COURT:  Ms. Moore --

17        MS. MOORE:  Yes.

18        THE COURT:  -- you're not being -- the Court is not

19  asking you anything right now.

20        MS. MOORE:  Okay.  I'm sorry.

21        THE COURT:  Mr. Marquez is a defendant.  I think the

22  defense sought to dismiss him and the Court denied the motion,

23  so he is a defendant, he's a principal, and so he needs to be

24  at trial, unless he is willing to have the jury know he has

25  decided to absent himself from trial of his own volition, and,

1  of course, the plaintiff is entitled to issue him a summons to

2  have him come to trial to testify.

3           Where does he live?

4           MR. SARELSON:  He lives in Broward County, Florida.

5           THE COURT:  And that's outside of the 100-mile radius

6  of the courthouse, I assume.

7           MR. SARELSON:  It is, Your Honor.  It's probably

8  200 miles or so, 220 miles.

9           THE COURT:  So he agrees to be tried in absentia?

10          MR. SARELSON:  He will, Your Honor.  At this point

11  we're not planning on bringing him.

12          THE COURT:  You said he may or he will?

13          MR. SARELSON:  At this point we have not definitively

14  determined whether we're going to bring him or not.  We are

15  leaning towards not bringing him.  I'm going to call my client

16  later today to discuss, but given the nature of the claims and

17  the witnesses and evidence that we're aware of, we don't

18  believe there's any actual reason to bring him to the trial.

19          THE COURT:  Well, if he doesn't come to the trial,

20  the jury will be made aware of the fact that he has chosen not

21  to be at trial.  Do you understand that?

22          MR. SARELSON:  Yes.  That's fine.  We have no problem

23  with that, Your Honor.

24          THE COURT:  Ms. Moore, if the defendant Marquez does

25  not appear at trial, as he can choose to do, do you intend to

1  call anyone else other than Mr. Celler?

2          MS. MOORE:  No, ma'am.

3          THE COURT:  And where does Mr. Celler live?

4          MS. MOORE:  He's in Davie, Florida, which is I think

5  down there near the defendant, but, I mean, I was going to see

6  about a remote deposition.

7          THE COURT:  What do you mean, a remote deposition?

8          MS. MOORE:  Um, well, to my understanding, the

9  courtroom has some kind of, you know, setup where you can have

10  a videoconferencing or whatever, and I, you know, thought that

11  we could just -- you know, even with Marquez, just do the

12  videoconferencing, because I know it's a far drive and stuff

13  like that, you know, the videoconferencing would be much easier

14  and -- for everybody, you know.

15          THE COURT:  The Court does not permit witnesses to

16  appear by videoconference except in extraordinary

17  circumstances.

18          MS. MOORE:  I understand, um, but, um, see, the

19  problem is that the -- the responsive discovery that

20  I received, there's no answers on it.  I mean, I didn't get a

21  single document that I asked for, not one, nothing, you know,

22  nothing.  I have no evidence whatsoever except what I had when

23  I filed the case three years ago, and then, you know, because

24  um -- and the questions that I asked in the interrogatories,

25  their response was -- I mean, the defendants, I guess, took it

1    upon themselves to decide that it wasn't relevant and it wasn't

2    going to lead to admissible evidence, and so they just didn't

3    answer them, you know what I mean?  So I have no answers,

4    I have no evidence, I have no nothing, so I would have at least

5    liked to have been able to ask him some questions to get the

6    information then, you know.

7            THE COURT:  Did you move to compel answers?

8            MS. MOORE:  No, I did not, because actually the --

9    the discovery window was only eight weeks, and Christmas and

10   New Year's and a mediation conference right in the middle of

11   it, and by the time -- by the time, you know, I -- because

12   I had to get the subpoena, I had to send it in to the clerk and

13   then wait for them to sign it and send it back to me in the

14   mail, so that process took over a week, and then by the time he

15   said that he wasn't -- he refused to attend the deposition, the

16   window closed for discovery and it was too late, so --

17           THE COURT:  Mr. Sarelson, what was the discovery

18   period?  I don't have the CMSO in front of me.

19           MR. SARELSON:  I'm looking.  I do remember it was

20   fairly short, Your Honor.  I think it went February to -- let

21   me find it on my calendar as quickly as I can.  It was very

22   short.

23           MS. MOORE:  I think it was the beginning of January

24   to February, or middle of February, I think, around the 15th.

25   I mean, I -- you know, if I could have, you know, maybe done

1    something, you know -- you know, because I e-mailed back and

2    forth with Mr. Celler trying to -- you know, because he just,

3    you know, responded -- because I e-mailed him the subpoena and

4    I was going to send the hard copy and the check in the mail,

5    but he responded right away and said that he objected and he

6    wasn't going to attend a deposition, and I asked him if he

7    would mind elaborating on why he's objecting, you know, and he

8    said he didn't have to tell me, you know, I could figure it out

9    myself and, you know, I had to follow the rules like everybody

10   else if I choose to go pro se, so he was very -- he was very

11   hostile and very like defensive, obviously disturbed by my

12   asking him to come and give testimony, which, I mean, he

13   represented me, so I don't know why he would be so adverse to

14   giving his testimony, because he knows just as well as I do

15   that I -- you know, the circumstances.  He knows that I'm owed

16   wages and everything, so -- but he's being difficult about it,

17   and unfortunately when you're pro se nobody wants to listen to

18   you or help you or do anything for you, and I'm not asking for

19   any special treatment, but I would at least like the same

20   treatment that everybody else gets.  You know what I mean?

21          THE COURT:  So if Mr. Celler is outside the Court's

22   subpoena power and Mr. Marquez is outside the Court's subpoena

23   power and he does not intend to appear to defend himself in

24   person, what is the plaintiff going to offer in the way of the

25   evidence at this trial?

```
 1              MS. MOORE:  Well, I'm -- all I have is the evidence
 2     that I had when I filed the case, most of which was included
 3     with the Complaint.  I mean, I -- you know, I -- it's kind of
 4     unrealistic to expect somebody to have all the evidence to
 5     prove their case before they even file it, you know what I'm
 6     saying?  It's not -- I thought that discovery would be like an
 7     exchange.  I spent like a week just getting my discovery stuff
 8     together for them, you know, having to get my records from four
 9     different hospitals and medical, you know, things from doctors.
10     I mean, you know, I sent them probably a couple hundred pages
11     of stuff that he asked for, you know, so I spent a week just
12     getting the stuff together to send him, but I didn't get the
13     same back, and I didn't -- you know, I -- as far as I know, my
14     understanding is it's not for the defendant to decide whether
15     what I asked for is relevant or not, you know, it's not
16     relevant to their position, it's relevant to me, you know, and
17     my position is that I needed it to get, you know, discovery,
18     you know.
19              THE COURT:  Well --
20              MS. MOORE:  I mean, if the Court -- you know, if the
21     Court could, you know, maybe issue a subpoena for Mr. Celler to
22     answer, you know, some questions and like interrogatories or
23     some sort of -- you know, like in writing, give a written
24     deposition or something instead of, you know, virtual or
25     in person, I mean, we could do it that way too.  I just --
```

```
 1    I can't prove my case when I don't have any evidence, I don't
 2    have any answers, I don't have any witnesses, I don't have
 3    anything, you know what I mean?  What am I supposed to do but
 4    nothing, you know.
 5            THE COURT:  Well, the problem, among many, is that
 6    you did not move to compel any additional discovery between the
 7    time discovery responses were given to you, or even after,
 8    except that you did move to compel a subpoena to Indeed for
 9    electronically-stored information concerning the job listing,
10    and that subpoena was defective, and you didn't move, that
11    I can see, to compel any other discovery in the case after you
12    received responses.
13            MS. MOORE:  Right.  There wasn't enough time.
14    I mean, it was just a few days before the discovery window
15    closed, so, I mean, I wouldn't have had time to draft something
16    and --
17            THE COURT:  Well, you drafted a motion to compel the
18    Indeed discovery.
19            MS. MOORE:  Yeah, because I sent that one first.
20            THE COURT:  And you drafted a motion for extension of
21    time.
22            MS. MOORE:  Yeah, I sent that.
23            THE COURT:  The first I'm hearing about this is at
24    the pretrial conference a week or so before trial.
25            MS. MOORE:  Um, I am -- actually, I requested --
```

```
1   I sent the subpoena to Indeed and then I sent another subpoena
2   to the Clerk's Office to be signed, and then -- and I never got
3   it and I never got it, I waited about a week or so, and then
4   I got a ride to Tampa and I had to get another one to send,
5   because I didn't know what happened to the one I sent.  I guess
6   it got lost in transit.
7            THE COURT:  What was the form?
8            MS. MOORE:  For a deposition for Mr. Celler.  I mean,
9   it took a week and a half before I had it in my hand, before I
10  could send it to him.
11           THE COURT:  And then did you send it to him?
12           MS. MOORE:  Yes, I did.  I sent it to him
13  electronically.
14           THE COURT:  And then what did he do?
15           MS. MOORE:  He just said that he objected and that he
16  wouldn't be attending, and then, you know, when I said, well,
17  can you elaborate on what the basis is for your objection, he
18  said no, he said he didn't have to tell me, you know, and --
19           THE COURT:  Did you move to compel him to appear at
20  his deposition?
21           MS. MOORE:  I didn't because the deadline had -- the
22  deadline came and went.  It was too late then.
23           THE COURT:  Did you move to extend the deadline?
24           MS. MOORE:  No, I didn't, but, I mean, the scheduling
25  order said that, you know, the schedule was firm, so, you know,
```

```
 1   I didn't feel like I -- it would be appropriate for me trying

 2   to change the scheduling around, you know.

 3           THE COURT:  I'm not really sure what to tell you,

 4   Ms. Celler.  If you don't have any witnesses to call, what

 5   do you intend to do on the first day of -- on the first day of

 6   trial?

 7           MS. MOORE:  I'm sorry.  Are you talking to me?

 8           THE COURT:  Yes.  I'm sorry.  Ms. Moore.

 9           MS. MOORE:  Sorry.  That's okay.

10           I guess I will just have to explain the circumstances

11   of the case and present the evidence that I had, I guess,

12   three years ago when I filed, and --

13           THE COURT:  Well, what evidence is that?

14           MS. MOORE:  Um, well, I have the job posting, I have

15   the two voicemail messages from two different people, Petland

16   employees, that they received my resumé for the vet tech

17   position at Pooches of Largo, I have the screenshot of the text

18   message where the manager texted me and offered me the job, and

19   showing that, you know, I asked about the compensation and he

20   didn't -- he didn't say it was any other than what they said

21   there in the job post, and then I have -- I have -- I have some

22   communications with Mr. Celler -- I mean --

23           THE COURT:  Well, do you intend to testify yourself?

24           MS. MOORE:  I mean, I don't mind being questioned,

25   you know, if -- if the defense wants to, um, you know, put me
```

1    on the stand and question me and -- that's fine, you know, I'm

2    fine with that.

3         THE COURT:  That's not how it works on the

4    plaintiff's side of the case, Ms. Moore.  If you want to call

5    yourself as a witness, you have to call yourself as a witness

6    and sit on the witness stand and, as odd as it sounds, ask

7    yourself questions and answer those questions, unless the

8    defense agrees you can just tell your story, and then you ask

9    yourself questions, you answer those questions subject to

10   objections, the Court rules on the objections, and you can

11   either answer or not answer, and then that becomes your

12   testimony, and whatever evidence you're competent to introduce

13   over whatever objection the defense may have is the evidence

14   that comes into evidence in your case, and it appears that the

15   only person who you could call to do that would be yourself,

16   absent some subpoena power to bring some other competent,

17   knowledgeable witness who has been previously disclosed here to

18   court to testify.

19        MS. MOORE:  I understand.  I mean, I -- that's

20   all right, I will do that then, if I have to put myself

21   between, you know, representative and witness, then I guess,

22   you know, I can do that.

23        THE COURT:  And then how many witnesses does the

24   defense intend to call?  You said no witnesses?

25        MR. SARELSON:  We don't intend to call any witness.

```
 1   We just intend to cross-examine the plaintiff's witnesses.
 2            THE COURT:  And the plaintiff's witness in this case
 3   it appears being the plaintiff only.
 4            MR. SARELSON:  That's correct, Your Honor.
 5            THE COURT:  I assume then the parties agree we would
 6   only need six to seven jurors; is that right?
 7            MR. SARELSON:  That's fine with defense, Your Honor.
 8            MS. MOORE:  I'm fine with that.
 9            THE COURT:  There are typically six jurors in a civil
10   case, Ms. Moore.
11            MS. MOORE:  Yes, I'm fine with that.
12            THE COURT:  Have the parties attempted to exchange
13   exhibit lists?
14            MS. MOORE:  Um, I believe that I sent --
15   Mr. Sarelson, did I send you the exhibits list, the discovery
16   stuff, or no?  I can't remember.
17            MR. SARELSON:  No, you did not exchange exhibit
18   lists, but you told me you were doing it this week before the
19   Friday deadline.
20            MS. MOORE:  Yeah, I'm actually --
21            THE COURT:  Your microphone is some sort of muffled.
22   Can you either take it off speaker or put it on speaker?  I can
23   barely hear you.
24            MR. SARELSON:  Oh, I'm sorry, Your Honor.  I think
25   I -- I mentioned to your JA, I actually have COVID, so my voice
```

```
 1   is kind of bad right now.  I'm sorry.  I'll speak up a little.
 2            THE COURT:  All right.
 3            So no exhibit lists have been exchanged.  When do you
 4   intend to do that?
 5            MS. MOORE:  Um, I'm actually working on the pretrial
 6   statement, I'm about halfway through it, I'll probably have it
 7   done by tomorrow night at the latest, and then that will be
 8   included and I'll send everything together over to
 9   Mr. Sarelson.
10            THE COURT:  Well, it has to be a joint pretrial
11   statement, so you'll need to send it to the defense, and then
12   you all have to coordinate getting one single pretrial
13   statement submitted to the Court.
14            MS. MOORE:  All right.  Yeah, I mean that's how we've
15   been doing it, you know, one of us will start it and then send
16   it to the other to make their edits and then we communicate
17   after that to figure out, you know, whatever needs to be
18   addressed.  I just figured it, you know, would be better if
19   I started -- if I did the bulk of the pretrial statement,
20   because Mr. Sarelson indicated that he didn't have -- he's not
21   submitting any exhibits or anything like that, so -- you know,
22   and I have several, so I figured it just made sense for me to
23   start the report and then send it over to him to put in his,
24   you know, input.
25            THE COURT:  All right.  Well, I will --
```

```
 1              MS. MOORE:  I'm sorry.

 2              THE COURT:  When do the parties believe they will

 3      have the final pretrial documents prepared?

 4              MS. MOORE:  I should be able to get it over to

 5      Mr. Sarelson by tomorrow night at the latest.

 6              MR. SARELSON:  I'm sure we can file it by Friday,

 7      Your Honor.

 8              THE COURT: All right.  Well, I will hope to get it

 9      by Friday, I'll set the deadline as next Monday, just to be on

10      the safe side, and the trial is going to be set for August 7th

11      to give defense counsel a chance to finish his quarantine and

12      hopefully be showing a negative test and be asymptomatic.

13              MS. MOORE:  Um, I understand.

14              MR. SARELSON:  Of course.

15              MS. MOORE:  It's cutting it close.  If that's cutting

16      it too close also, you know, I'm fine with the next week also.

17              THE COURT:  I have another trial the next week, so --

18              MS. MOORE:  Oh.

19              THE COURT:  -- August 7th is the trial date.

20              MS. MOORE:  Okay.

21              THE COURT:  No motions in limine were filed and the

22      deadline has run, so I'll just look to see what you all offer

23      up in the way of evidence on Monday the 7th.  Based on what I'm

24      hearing, this is going to be a very short trial.

25              Now, there is the ability -- I'm not making a
```

1    recommendation one way or the another.  There is the ability

2    for the parties to stipulate to a bench trial instead of a jury

3    trial, and that way the Court would decide both the factual

4    issues and the legal issues in the case.  Is there any interest

5    by the parties in the Court setting this as a bench trial

6    instead of a jury trial?  From the plaintiff.

7          MS. MOORE:  Um, I would be opposed to that, for the

8    jury trial.

9          THE COURT:  All right.  Both parties have to agree in

10   order for the Court to do that, and so the matter will be set

11   for a jury trial.

12         Do you know anything about selecting a jury,

13   Ms. Moore?

14         MS. MOORE:  Um, no, I don't.  I mean, I've been

15   researching what the -- what the procedure is.  I have never

16   done it myself, obviously, but, I mean, I -- I've prepared,

17   you know, the questions, you know, for the jury and I'm

18   learning how the procedure works, so I have some -- I have a

19   basic idea of how it works.

20         THE COURT:  Well, the questions the jury will be

21   asked are relatively limited.  I don't know what you're using

22   to prepare, but if you're following any kind of State Court

23   template, that's not the right one.  You should follow --

24   I will have my courtroom deputy docket the Court's standard

25   jury inquiry or voir dire on the docket so each of you will

1  have access to it, and the Court usually only adds a few more

2  questions to those questions based upon the specifics of the

3  case, for example, you know, have you ever purchased a pet from

4  Pooches of Florida, or, you know, some other sort of pet name,

5  have you ever worked there, have you ever --

6              MS. MOORE:  (Inaudible.)

7              THE COURT:  I'm sorry.  I'm talking, Ms. Moore.

8              MS. MOORE:  I'm sorry.  You cut out.  I'm sorry.

9  You cut out.

10             THE COURT:  Can you hear me?

11             MS. MOORE:  Yes, I can hear you now.  Sorry about

12  that.

13             THE COURT:  Have you ever been an HR Director of a

14  business?  What was your role in that?  Those type of very

15  specific limited questions to the issues presented here.  And

16  the Court asks all those questions once the parties agree on a

17  set of questions.  If somebody wants a question asked and the

18  other party doesn't, you'll need to submit it and I'll need to

19  review it to see whether it's going to be asked, and then after

20  the Court asks all the questions that have been approved, then

21  the parties may have a follow-up question or two for individual

22  jurors, and that will be decided, and then that will be the end

23  of voir dire and then the parties will select their -- well,

24  they'll make their objections on a cause basis and then they'll

25  exercise their preemptory objections, which is three per side,

1    and then the Court will at that point have the leftover venire

2    and that first six or seven people will be the jury.

3              MS. MOORE:  I understand that.

4              THE COURT:  Any questions about that procedure?

5              MS. MOORE:  Actually, is that something that would

6    take place just like right before the trial starts, or is that

7    something that happens in advance of the trial?

8              THE COURT:  That's going to happen Monday morning,

9    the 7th.

10             MS. MOORE:  Okay.

11             THE COURT:  Probably will take about an hour and a

12   half, maybe two hours.  And then as soon as it's done I'll

13   swear the jury and the trial will begin.

14             MS. MOORE:  Okay.  Do you know what time I would need

15   to be there on the 7th yet, or no?

16             THE COURT:  I would suggest that you get here no

17   later than 8:30 and we'll bring up the jury at 9:00.

18             MS. MOORE:  Okay.

19             THE COURT:  Any questions about jury selection from

20   the plaintiff, Ms. Moore?

21             MS. MOORE:  No, ma'am.

22             THE COURT:  From the defense?

23             MR. SARELSON:  No, Your Honor.

24             THE COURT:  Are there any issues the Court needs to

25   be aware of in advance of this trial that I would have no way

```
 1   to know about?

 2              MR. SARELSON:  Not from the defendants.

 3              MS. MOORE:  Not from me either, that I think of.

 4              THE COURT:  And, Ms. Moore, the Court will issue a

 5   telephone order for you to bring your telephone -- and I'm

 6   assuming you don't have a laptop -- to court with you.  Do you

 7   need any other permission?

 8              MS. MOORE:  Um, I was going to -- actually, I was

 9   going to see if I could borrow my friend's laptop for the trial

10   and then transfer my documents over to there.

11              THE COURT:  Well, the Court will typically allow the

12   parties to bring a computer and a telephone and allow the

13   lawyers, because they have special permission, to bring their

14   electronic devices in the building.  So I will do an order for

15   you for those pieces of equipment, one phone and one laptop.

16              MS. MOORE:  Thank you.

17              THE COURT:  The parties will need to not only file

18   their proposed jury instructions and verdict form, but also

19   e-mail those to chambers so that the Court can have a Word

20   version document that it can modify for the final.

21              MS. MOORE:  Okay.  That would -- jury questions, and

22   what was the other thing?

23              THE COURT:  The jury instructions and the verdict

24   form.

25              MS. MOORE:  Okay.  All right.
```

1    THE COURT:  I assume there is no chance that this

2    case could settle at this point?

3    MS. MOORE:  I mean, no, not that I can see.  We're

4    pretty far off on that.  I don't see us coming to an agreement.

5    THE COURT:  Well, keep in mind, Ms. Moore, that you

6    don't have any evidence, that's what you've been telling me all

7    morning, you don't have any witnesses and you don't have any

8    evidence, and even if you think you have a right, if you don't

9    have any witnesses and you don't have any evidence then you may

10   very well lose the case, and if there has been some proposal

11   for resolution, if that is the case, that you don't have any

12   evidence and witnesses, you should certainly consider any such

13   proposal.

14   MS. MOORE:  I understand.  I didn't say that I don't

15   have any evidence, I just said that I wasn't -- I wasn't given

16   any of the evidence that I asked for in discovery.  All I have

17   is the evidence that I had initially.

18   THE COURT:  All right.

19   MR. SARELSON:  And from the defendant's perspective,

20   you know, I say this with such utter sincerity, I wish nothing

21   more than that this case would settle.  As the Court knows,

22   Count One is an FLSA claim for minimum wage.  Those cases are,

23   even if Ms. Moore prevails, worth hundreds, literally hundreds

24   of dollars, not even thousands of dollars, so -- and the fraud

25   case, which we find to be problematic at best.

1          So I'd like nothing more than to settle the case,

2    and it would be very weird if we had a trial on that after

3    three years and plaintiff gets a verdict potentially of,

4    you know, $250 or something.  We would -- we would gladly

5    resolve this case.

6          MS. MOORE:  I know.  I've been trying to get paid for

7    five years.  That's what I'm saying.  Nobody should have to

8    spend five years of their life for free just trying to get paid

9    for their work.  You know what I mean?  And I'm not accepting

10   less than what I'm owed to drop everything.  You know what

11   I mean?  I don't see any reason to do that.

12         MR. SARELSON:  But, Your Honor, we will gladly pay --

13   I don't even have to talk to my client, I will gladly pay

14   whatever the difference is between what she thought she was

15   supposed to be paid and what she was paid.  It comes out to

16   about $1500.  And that claim was actually dismissed, so the

17   only economic damages left is minimum wage, which is a couple

18   hundred dollars.  But I will gladly pay her -- I have no

19   problem saying this to the Court, I will gladly pay her the

20   difference, which is about $1500, no questions asked, I'll pay

21   it right now, to make this go away.

22         MS. MOORE:  But the damages for failure to pay

23   minimum wage for willfulness, obviously it's willfulness

24   because I've been trying to get paid for five years now, is

25   liquidated damages as well.  I spent -- I mean, there's no

```
1    compensation for having to spend five years, I mean, just
2    trying to get paid while the defendant has known all along he
3    owes me the money and just refused to give it to me.  You know,
4    he's the one that dragged this out.  You know what I mean?
5            The Court -- when I filed the case, you know, the
6    Court ordered the parties to participate in case management and
7    to file corporate disclosure statements, and Mr. Sarelson
8    wouldn't -- you wouldn't meet with me, you said not until the
9    Judge ruled on the motion to dismiss, which took eight months,
10   and so, you know, for the first year after I filed this nothing
11   happened, nothing happened.  You wouldn't cooperate.  Discovery
12   was not allowed to continue until after case management, which
13   we didn't have because you weren't cooperating, even though
14   there was no stay in place, you know, you weren't cooperating,
15   so that the case, you know, just sat there and didn't go
16   forward.  And then when the -- when the Judge ordered you to
17   produce my time clock and payroll records, I waited over a year
18   for those, and I still don't have them.  You know, I waited
19   over a year and you didn't do anything or say anything, and the
20   Judge didn't hinder me whatsoever during those 14 months or
21   whatever it was that I waited, and I didn't file anything
22   because, you know, you were ordered to produce those documents,
23   so I didn't think that I needed to file a motion asking the
24   Court to tell you to comply with the order.  You know what
25   I mean?  I thought that not complying with court orders was not
```

1    an option.  So I just waited, you know, and I waited, for

2    almost a year and a half, and, you know, here it is another

3    year and a half after that and I don't even have it.  You know

4    what I mean?

5         MR. SARELSON:  Your Honor, if we may, because

6    I really would like to not waste the Court's time with this

7    issue, okay, we have a motion to dismiss partially granted,

8    partially denied, the Court indicated I believe in a footnote,

9    which is Footnote 1, that the Plaintiff's damages, even if

10   she's right, are around -- I think the Court said it was $1800.

11   We think that calculation was based off of the net of the

12   gross, we thought it was more like $1400, but the Court

13   two years ago indicated this is a dispute over 15 to $1800, the

14   minimum wage claim is simple math, she claims she worked

15   full-time for three weeks but she was paid less than full-time,

16   you take the number of hours that she was not compensated for,

17   which is probably about 50 or 60 hours, maybe 70 hours,

18   multiply that by minimum wage, which is 8.50 an hour, multiple

19   that by two, that is still about $500.  So I don't -- we are

20   litigating two cases, from our perspective, we're litigating a

21   dispute over a pay discrepancy, there may be a pay discrepancy,

22   and we will gladly make up the difference of that pay

23   discrepancy.  We've said that for four years now.

24         MS. MOORE:  I understand.

25         MR. SARELSON:  There's nothing about -- hold on.  Let

```
 1   me finish.
 2           And so we're -- the plaintiff has overwhelmingly said
 3   to the Court there's a pay discrepancy.  We'll pay the pay
 4   discrepancy.  It was like $1500.  The minimum wage claim is
 5   actually less than the pay discrepancy, because there is no pay
 6   discrepancy claim, it's just a minimum wage claim, which is
 7   worth less than $500, even if it's liquidated damages.  We'll
 8   pay all of this.  I have no problem paying all of this.  We'll
 9   pay it right now.  I have full authority from my client, I can
10   pay the payment right now.
11           MS. MOORE:  Wait a minute.  What's the reason for why
12   I'm not entitled to liquidated damages?
13           THE COURT:  That is liquidated damages, Ms. Moore,
14   it's double the minimum wage you weren't paid, that's what
15   liquidated damages are, you get your unpaid minimum wage and
16   you get it times two, because it wasn't paid, and that number
17   is a very low number against the number of weeks that you claim
18   you weren't fully compensated, so I'm not sure if you
19   understand what liquidated damages are.
20           MS. MOORE:  I do.
21           THE COURT:  Because it's twice the amount that you
22   claim you're entitled to.
23           MS. MOORE:  I understand.
24           THE COURT:  What do you think your liquidated damages
25   are?
```

```
 1              MS. MOORE:  It would be -- it would be double --
 2    double the 1800.
 3              THE COURT:  What is double the 1800?
 4              MS. MOORE:  Well, because when you do the math, it's
 5    1800 that I'm owed, and you double that, so, you know, it's
 6    equal amount, 1800 plus 1800.
 7              THE COURT:  But that double the 1800 number is based
 8    upon the pay discrepancy broadly defined from the job that you
 9    had thought you had and the job that you actually had, and that
10    claim you have now dropped.
11              MS. MOORE:  But that's where the fraud comes in.
12    That's where the fraud count comes in, because, I mean, I was
13    hired for the job that I applied for, you know, I applied for
14    the -- I interviewed for the job that I applied for, which
15    I have documentation of, and then I was hired for the job that
16    I interviewed for, and I worked in that capacity during that
17    time, and then all of a sudden when it come time to pay me, all
18    of a sudden, you know, I'm just a kennel tech, a part-time
19    kennel tech, even though I worked full-time every week, all of
20    a sudden I'm a part-time kennel tech for 8.45 an hour.
21              THE COURT:  Ms. Moore, if they pay you for the job
22    that you believe that you were supposed to get, how much money
23    do you think that would be for the weeks that you worked the
24    job before you were terminated?
25              MS. MOORE:  I'm sorry.  What was the question again?
```

```
 1  How many weeks, or how many -- what would the amount be?
 2       THE COURT:  What do you believe that -- how much do
 3  you believe they didn't compensate you for this job that you
 4  believe you were hired to do?  What do you think you lost, and
 5  what is the basis for that?
 6       MS. MOORE:  Well, my tech would have been $2,019
 7  before taxes, because at $35,000 a year that works out --
 8  you know, divided by 52, that works out to -- I think it's 678
 9  or 679 a week, times three weeks, comes out to 2,019 before
10  tax, and I got $200, so, you know, that's $1800 there.
11       MR. SARELSON:  Your Honor, we'll pay $1800 right now.
12  Your Honor, if Ms. Moore is saying she's owed $1800, I won't
13  even go back to my client, we'll settle for $1800 right now.
14  Done.
15       MS. MOORE:  I mean, the thing is that you cannot
16  tell -- you cannot hire somebody and tell them you're going to
17  pay them this much and then wait until after they put in the
18  work and then retroactively reduce their pay after they've
19  already done the work.  I mean, you can't do that, otherwise
20  everybody would say I'll pay you $50,000 a year and when it
21  comes payday, say, oh, didn't I tell you, I changed it down to
22  minimum wage, you're down to 200 bucks, you know, after they've
23  already worked at the higher rate, you know.
24       THE COURT:  Ms. Moore.
25       MS. MOORE:  Why did it say 35,000 if that's not what
```

```
 1    they were going to pay, you know.

 2              THE COURT:  Ms. Moore.

 3              MS. MOORE:  That's fraud, you know.

 4              THE COURT:  Ms. Moore.

 5              MS. MOORE:  Yes.

 6              THE COURT:  If it is your claim that they defrauded

 7    you and they should have paid you what they agreed to pay you,

 8    if your damages are $1800 for that failure, they're saying

 9    they'll pay you the $1800, and so what is your claim for more

10    than the $1800 that they're willing to pay you?

11              MS. MOORE:  Well, it would be whatever the damages

12    are for the fraud, because obviously it was fraudulent,

13    you know, because from the time that -- that my attorney sent

14    the demand letter Mr. Sarelson responded with lies, you know

15    what I mean, and he's been lying for five years.  He didn't

16    tell the truth until the motion for summary judgment, you know,

17    five years of lies, five years of saying I was a part-time

18    kennel tech, that I never worked more than 20 hours a week, and

19    that my pay was 8.45, when we obviously know that they knew all

20    along that that was not the truth, because they posted

21    screenshots in with their -- with their summary judgment

22    motion, screenshots showing that they know very well that

23    I applied for that job and what the job post said, you know.

24              THE COURT:  What do you believe the fraud damages

25    are?  How much do you believe you're entitled to for fraud
```

1  damages for that failure to be truthful to you when they paid

2  you the $200?  How much do you think you're entitled to for the

3  fraud damages above the $1800?

4       MS. MOORE:  Well, I mean, you know, okay, the fraud,

5  you know, but, I mean, you know, I -- you know, I was evicted

6  three weeks -- that money they stole from me, that $2,000, that

7  was my rent, you know?  I got evicted three weeks later because

8  I was supposed to pay my rent the next day, on the 1st.

9  I couldn't pay it.  The police came and made me leave my house.

10 I had nowhere to go.  I've been homeless since then.  I lost

11 every single thing I had besides the clothes on my back and my

12 dog, because I couldn't pay my rent when they stole my rent

13 money.

14      THE COURT:  How much do you think they owe you for

15 that?  That's a number, Ms. Moore.

16      MS. MOORE:  You know, I couldn't even tell you right

17 off the top of my head.  I mean, it's not really something I've

18 thought about because I was just going to leave it to the jury,

19 you know.  I trust the jury that they'll come up with a fair,

20 you know, amount.

21      THE COURT:  Well, the jury is not going to be able to

22 compensate you for everything bad that happened to you in your

23 life after you didn't get the $2,000, because in addition to

24 that the defendant has a failure to mitigate defense, and

25 that --

1          MS. MOORE:  I --

2          THE COURT:  -- means you had an obligation to get

3    another job.

4          MS. MOORE:  Yes.  I have tried.  I filed several --

5    I filed about a dozen communications with other, you know,

6    employers rejecting me, not hiring me, you know.  So I did --

7    I did make the -- I've been trying to get a job all along.

8    I mean, I could show you a dozen more or two dozen more

9    attempts that I've made over these five years.

10         THE COURT:  The problem is in order to introduce that

11   evidence of what those people did and why they did it, you

12   would need a witness.  You can't just come into court with

13   papers from some company somewhere saying we didn't hire this

14   person, because you don't have any way to admit those records,

15   you don't have any way to authenticate them, and so those

16   letters of your efforts to mitigate will not be admissible

17   because you don't have a witness through whom to admit them.

18         MS. MOORE:  Well, I mean, you know, that's not --

19   there's not a big market for homeless vet techs with no

20   transportation.  You know what I mean?  I mean, I don't have

21   clothes, I don't have scrubs, I don't have anything, nothing,

22   you know.  I don't have my birth certificate or a Social

23   Security card, even if I did get offered a job, I mean, I don't

24   have any of that.

25         THE COURT:  So you're not going to settle your case

1    for $1800; that's what you're saying?

2          MS. MOORE:  Correct.

3          THE COURT:  All right.  Well, I will see you all on

4    August the 7th.  File your materials in a timely fashion and

5    the Court will do what I need to do with whatever you file, get

6    back with you if there are any issues that I foresee.  You'll

7    need to exchange your exhibits, that's very important.

8          Ms. Moore, if there's any paper you intend to try to

9    introduce at trial, you need to list it on the exhibit list and

10   then the parties need to, if they don't know what each other is

11   talking about, actually see the papers through some means, I'm

12   not sure how, and then you will come back to the Court at

13   trial, and if there are objections, they need to be listed on

14   the exhibit list in the final pretrial material --

15         MS. MOORE:  Right.

16         THE COURT:  -- what the objection is and then the

17   Court will resolve any objections at trial.

18         MS. MOORE:  I understand.  I've already started

19   working on my exhibit list.  It's about halfway through.

20         THE COURT:  All right.  Well, think about as you're

21   working on it, Ms. Moore, how you're going to get those

22   exhibits admitted into evidence, because if they are not the

23   defendant's exhibits and they're not your own communications to

24   the defendant in the course of the case or some other

25   self-authenticating document, then it's going to be difficult

1    for you to get them admitted, but we'll see what you have when

2    you get your list put together.

3            And I'm assuming the defense would have exhibits, or

4    do you not intend to introduce exhibits either?

5            MR. SARELSON:  Your Honor, we suspect every one of

6    our exhibits will be on the plaintiff's exhibit list and

7    I don't believe we will independently have exhibits.  There's

8    very -- there's really -- there's really not a lot in terms of

9    exhibits in this case, just some paystubs and a job posting and

10   a text message exchange, so I'm sure this will be on

11   Ms. Moore's exhibit list and we will probably use those as

12   well, so --

13           THE COURT:  And, Mr. Sarelson, can you tell the Court

14   why it is that it wasn't until your summary judgment filings

15   that the defense admitted that it had goofed at least in the

16   way it hired Ms. Moore?

17           MR. SARELSON:  The answer is simple, Your Honor.  We

18   actually don't know -- we don't have -- we don't have the

19   onboarding materials, and so we don't -- it's not like -- we

20   actually tried to figure out how this happened and we don't

21   have a good answer.  We think -- this is a speculation, we

22   think she actually did apply for the full-time job but she was

23   onboarded accidentally for the part-time job, and that's

24   about -- I mean, that's speculation on our part, but that was

25   it, she -- and, unfortunately, because of the time -- the time

```
 1   gap that the Court knows, she sent the text message on

 2   August 31st, 2018, Allison Nieves says call corporate to get to

 3   the bottom of it, she doesn't call corporate, and then we don't

 4   hear from her.

 5           MS. MOORE:  She fired me.

 6           THE COURT:  Ms. Moore.

 7           MS. MOORE:  She fired me, and then your discovery

 8   said you didn't allow her to investigate my complaint.

 9           THE COURT:  Ms. Moore.

10           MS. MOORE:  Yes.

11           THE COURT:  Mr. Sarelson was talking and you're not

12   going to do that and you're not going to do it in the

13   courtroom.  Do you understand?

14           MS. MOORE:  Yes.  I understand.  Sorry.

15           THE COURT:  Now continue, Mr. Sarelson.

16           MR. SARELSON:  Thank you, Your Honor.

17           THE COURT:  I don't think you answered the question

18   though.  I understand what happened.  My question is why

19   haven't you admitted what happened until the summary judgment

20   motion was filed, because, frankly, reviewing the papers,

21   I thought Ms. Moore -- what's wrong with this lady, why doesn't

22   she know that she wasn't hired for this job, this makes no

23   sense to me, et cetera, and then I got the summary judgment

24   papers and then I see that the defense admits that it hired

25   her, allowed her to interview for a job, and then she worked
```

```
 1   what she thought was that job, and then she was paid for a tech
 2   job, and then -- well, not paid for her tech job, and then when
 3   she complained and raised issues she was fired, and I don't
 4   know why it took this many years and two lawsuits for the
 5   defense to figure out it had made a mistake.
 6           MR. SARELSON:  Well, Your Honor, we -- we only
 7   acknowledge that we think this is a mistake.  The answer is we
 8   don't actually know how the mistake occurred, is the problem,
 9   because we don't have the actual like onboarding material that
10   shows specifically what she applied for and specifically like
11   how much she was offered and what her rate of pay was.  We
12   don't -- I don't know why, but for some reason we don't have a
13   good answer for how it is that this came to happen.  We have
14   stipulated to certain facts now for purposes of summary
15   judgment, but the short answer is we still -- we don't know how
16   this happened, that somehow -- somehow she apparently applied
17   for one job and was paid for a different one.
18           THE COURT:  That's not my question.  My question is
19   why didn't you figure that out before the summary judgment was
20   filed and just admit it and deal with it on that basis instead
21   of making it seem as if Ms. Moore was not -- why didn't you
22   just say when you figured this out, we figured it out, we made
23   a mistake and we're sorry, instead of saying we never did that,
24   that didn't happen, that's not true, that's not right?  Why did
25   it take until the summary judgment motion for you to
```

1  acknowledge it rather than at the beginning of the case?

2          MR. SARELSON:  Your Honor, because we -- the only way

3  I can answer that is we don't know for a fact exactly what

4  happened, so I don't know if the --

5          THE COURT:  When did you discover what happened?

6          MR. SARELSON:  We still don't know.  She -- I use the

7  word "apparently" because she apparently applied for a job but

8  we don't have -- like there's no -- for example, there's no

9  formal written like job offer that says we're here to offer you

10  this job at this rate of pay starting tomorrow.  I've never

11  seen one, and my client doesn't know -- you know, we don't know

12  how this happened, that's the short answer.  We don't know --

13          MS. MOORE:  (Inaudible.)  Sorry.  Sorry.

14          THE COURT:  When did you discover what happened,

15  Mr. Sarelson?

16          MR. SARELSON:  I'm not sure we've since discovered

17  what happened.  We think we know what happened, but I don't

18  think we actually do know what happened.  There's no clear

19  answer as to what actually happened.  I have a feeling, I can

20  speculate, I think I know what happened, but I don't have a

21  good -- still to this day don't have a good answer, I don't

22  have any real documentation from the client that shows exactly,

23  you know, how it is that you could apply to one job and somehow

24  get onboarded and get paid your payroll for a different job.

25  I think -- and I -- I honestly don't know, and my client

1   doesn't know.  I think they hired her for this job at 35,000 a

2   year, but when they put her into the payroll system somehow she

3   got coded as a part-time employee making 8.45 an hour, I think,

4   I don't know that for a fact, but I think that's what occurred,

5   that somehow she applied for one -- we just don't know.

6        MS. MOORE:  If you don't know, then why have you been

7   so adamant about saying that I was a kennel tech for 8.45 if

8   you have nothing to base it on?  Why have you been so

9   insistent, if I interviewed, if I responded to a job post for a

10  veterinary technician by sending my resumé for a veterinary

11  technician through the link and the post and then I was called

12  for an interview and -- which I have the visual voicemail of

13  two different people saying we received your resumé and we'd

14  like to schedule an interview for the veterinary technician

15  position at Pooches of Largo, two different people on two

16  different dates said that, and I have the visual voicemails in

17  the record, and then I went and I had my interview and then

18  two days later I asked got a text asking if I could come in at

19  7:00 in the morning for training.

20        I mean, if I was anything but what I -- what I

21  applied for and what I was hired for, then, I mean, don't you

22  think I would have known, if I was going to take a job that was

23  20 cents over minimum wage compared to -- you know what I mean?

24  35,000 a year is like the typical range of pay in that area for

25  that time for a vet tech, you know, so I had no reason to think

1    that I was applying to, you know, scoop poop and clean cages

2    all day, you know, because you wanted a certified -- you wanted

3    a certified veterinary technician, not just a vet tech, but

4    certified, which means you wanted somebody that was

5    credentialed, that had a college degree in veterinary

6    technology, you know, you specified that in the job post.

7            And you're saying that you don't have anything -- you

8    don't have any of the paperwork, which, I mean, Mr. Celler in

9    his demand letter asked you to preserve those documents pretty

10   much after I was fired, to preserve them in anticipation of a

11   lawsuit, and I know that there was records because I used a

12   time clock every day to clock in and out, so apparently the

13   records were destroyed or he just doesn't want to produce them

14   or something.

15           I mean, you said in discovery -- Mr. Marquez said

16   that no investigation into my complaint was made because it was

17   unnecessary.  Why was it unnecessary, you know?  Don't you

18   think that you should look into it when I'm saying I got

19   shorted -- I mean, he should have looked into it, because it

20   was a legitimate complaint, but instead he just fired me,

21   you know, for nothing, for no reason, you know, just because he

22   didn't want to pay me, you know, and it's not -- you know, this

23   is not an isolated incident, because I see plenty of reviews

24   from other employees of Petland, of specifically Mr. Marquez,

25   complaining about the same thing, not getting paid, getting

1    paid late, getting shorted pay, you know, this is like a

2    pattern and a practice with him, this is not just an isolated

3    incident, you know, it happens regularly.  I didn't know that

4    at the time, but I did find out, you know.

5            I mean, I could have -- you know, if he said it was

6    unnecessary to look into my complaint, well, then, I guess,

7    you know, so why should -- why should I -- I don't know what

8    your basis is for saying that I was something that I wasn't

9    when you don't have any records and you didn't even bother to

10   investigate, you know.  I mean --

11           THE COURT:  Well, you'll have to introduce --

12           MS. MOORE:  -- he just said that in discovery.

13           THE COURT:  You'll have to rely on the evidence that

14   you can rely on at trial.  Mr. Marquez's affidavit, of course,

15   is admissible in trial.  And we'll just -- we'll just have to

16   see how it shakes out.  If the parties aren't able to resolve

17   the case, I can't make anybody settle a case, we'll just have

18   to take it up on the day of trial.

19           MS. MOORE:  Okay.  Yes, Your Honor.

20           THE COURT:  And I will look to see, Mr. Sarelson,

21   whether I can compel Mr. Marquez to appear at trial as a

22   defendant.  If I can, I will.  If I cannot then he will just be

23   tried in absentia.  Do you understand that?

24           MS. MOORE:  Yes.

25           MR. SARELSON:  I -- I --

```
 1              MS. MOORE:  What would happen as far as like if
 2    I wanted to, you know, ask, you know, questions, you know, of
 3    him?  How would I -- I just -- I'm just not going to be given
 4    that opportunity, or -- I mean, how --
 5              THE COURT:  If he can't be compelled to be here then
 6    you won't be able to call him, you'll just have to rely on his
 7    affidavit that he submitted in support of summary judgment, you
 8    won't be able to call him as a witness.
 9              MS. MOORE:  But his affidavit said that he has no
10    personal knowledge of the facts, you know, which is not true,
11    you know, it is all lies.  He knows very well.  He's -- he's
12    met me and he's communicated with me directly through the group
13    chats, you know.  I'm sure I could refresh his memory, he'd
14    remember the conversation that we had.  He said -- you know, he
15    started out the affidavit with I'm writing this affidavit based
16    on personal knowledge and company records, which I don't know
17    what those records are, and then he ended it, the last
18    paragraph, I have no knowledge of the plaintiff or anything
19    about this case, I've never met her, I don't know anything
20    about it, I don't know about her pay, I don't know anything,
21    I didn't fire her, nothing.  So, I mean, in a page and a half
22    he went from based on personal knowledge to having no
23    knowledge, you know.  I mean, I can't -- it's kind of hard to
24    work with something like that.
25              MR. SARELSON:  Your Honor, if Ms. Moore has group
```

1    chats that I'm not aware of or they had some meet -- I mean,

2    this is the first I've ever heard of there being a meeting

3    between my client and the plaintiff.  I mean, I have -- I have

4    concerns about the potential truthfulness of any testimony.

5    There's --

6                THE COURT:  You'll have to address that at trial.

7                MS. MOORE:  Can I ask one more question?

8                THE COURT:  Yes.

9                MS. MOORE:  Why -- what was the basis for the

10   accusation that I altered a wage agreement that didn't exist?

11   I mean, we all know that that didn't exist.  I mean, why was he

12   saying that?  I mean, you said you had it, you said my attorney

13   sent it to you, so where is it?  I mean, why -- what was --

14   where did that even come from?

15               THE COURT:  Well, if there's a person to ask about

16   that, you'll have to raise that at trial.  I don't know that

17   there will be.

18               How long do you all need, by the way, for opening

19   statements?

20               MS. MOORE:  Um, I'm going to say probably 30 to

21   45 minutes at the most.

22               THE COURT:  For the defense?

23               MR. SARELSON:  Your Honor, probably 20 minutes.

24   I don't -- I don't -- I don't have much to say.  Probably just

25   20 minutes is more than fine.

```
1          MS. MOORE:  Does the opening statement include
2   presenting whatever evidence, whatever documents I have to you,
3   or is that separate?  Is that after the opening statement?
4          THE COURT:  No, the opening statement is just a
5   general statement to the jury about what you believe the
6   evidence will show.  You don't actually introduce evidence
7   during the opening statement.
8          MS. MOORE:  Okay.  Gotcha.
9          THE COURT:  And you have to be careful to curtail
10  your opening statement to admissible facts, not just anything
11  you want to talk about in general.
12         MS. MOORE:  Yes.
13         THE COURT:  For example, you can't tell the jury that
14  other people told you that Mr. Marquez treated other people
15  this way, because that's hearsay --
16         MS. MOORE:  Right.  I understand.
17         THE COURT:  -- and you won't be able to say that kind
18  of stuff in your opening statement, it has to be limited to
19  things that are admissible in this trial.
20         MS. MOORE:  Exactly.  Yes.  I understand.  I know
21  that.  I understand.
22         THE COURT:  And I'll just then set aside 30 minutes
23  for the plaintiff and 20 minutes for the defense, since the
24  plaintiff bears the burden of proof.
25         MS. MOORE:  Sounds good.
```

1           THE COURT:  Anything else?

2           MS. MOORE:  Not that I can think of.

3           MR. SARELSON:  Nothing for defense.

4           THE COURT:  Let me read one thing before I let you

5    all go.  Give me one second.

6           All right.  I will excuse you all now.  I will see

7    you on the 7th of August.

8           MS. MOORE:  Okay.  Thank you.

9           MR. SARELSON:  Thank you, Your Honor.

10          THE COURT:  Thank you.  We're dismissed.

11                        - - - - -

12          (Proceedings concluded at 2:40 p.m.)

13                        - - - - -

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript of

4    proceedings taken in a preliminary pretrial conference in the

5    United States District Court is a true and accurate transcript

6    of the proceedings taken by me in machine shorthand and

7    transcribed by computer under my supervision, this the 2nd day

8    of June, 2023.

9

10

11                                    /S/ DAVID J. COLLIER

12

13                              DAVID J. COLLIER

14                              OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25
```