IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MELANIE NICOLE MOORE,          )
                               )
              Plaintiff,       )
                               )
                               ) Case No.
        vs.                    ) 8:20-CV-02184-MSS-SPF
                               )
                               )
POOCHES OF LARGO, INC., et al., )
                               )
              Defendants.      )

_____

JURY TRIAL - DAY 1
BEFORE THE HONORABLE MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

SEPTEMBER 18, 2023
9:10 A.M.
TAMPA, FLORIDA

_____

Proceedings recorded by mechanical stenography,
transcript produced using computer-aided transcription.
_____

**DAVID J. COLLIER, RMR, CRR**
FEDERAL OFFICIAL COURT REPORTER
801 NORTH FLORIDA AVENUE, 7TH FLOOR
TAMPA, FLORIDA  33602

**APPEARANCES:**


**FOR THE PLAINTIFF:**


   *Melanie Nicole Moore, Pro Se*

   15519 Darien Way

   Clearwater, Florida  33764

   (727) 241-9199



**FOR THE DEFENDANTS:**

   *Matthew Seth Sarelson*

   *Zachary Allen Stoner*

   Dhillon Law Group, Inc.

   1601 Forum Place, Suite 403

   West Palm Beach, Florida  33401

   (305) 773-1952

1          **I N D E X**

2                                                                    **PAGE**

3    Court's initial instructions to the jury                        47

4    opening statement by Ms. Moore                                  56

5    opening statement by Mr. Sarelson                               60

6

7    **PLAINTIFF'S WITNESSES:**

8    **ALISON NIEVES**

9    Direct examination by Ms. Moore                                 83
     Cross-examination by Mr. Sarelson                               90
10   Redirect examination by Ms. Moore                               95

11

12   **YESSICA TELLO**

13   Direct examination by Ms. Moore                                 105
     Cross-examination by Mr. Sarelson                               107
14   Redirect examination by Ms. Moore                               109

15

16   **RICHARD CELLER**

17   Direct examination by Ms. Moore                                 116
     Cross-examination by Mr. Sarelson                               131
18

19   **LUIS MARQUEZ**

20   Direct examination by Ms. Moore                                 147

21

22   **MELANIE MOORE**

23   Direct examination by Ms. Moore                                 161
     Cross-examination by Mr. Sarelson                               173
24

25

1 | **PLAINTIFF'S EXHIBITS** | **PAGE**
---|---|---

| | | |
|---|---|---|
| 1-A | job posting | 77 |
| 1-B | voicemail text | 78 |
| 1-C | voicemail text | 78 |
| 1-D | text message | 79 |
| 1-E | text message | 79 |
| 1-F | direct deposit authorization form | 79 |
| 1-G | 8-31-2018 pay stub | 79 |
| 1-H | text messages | 79 |
| 3-A | demand letter | 115 |
| 3-B | response to demand letter | 115 |
| 3-E | Celler/Moore e-mails | 134 |
| 2-E | composite exhibit reflecting attempts to find employment | 159 |
| 4-A | cease and desist letter | 159 |
| 4-B | Moore/Sarelson e-mails | 159 |
| 4-C | Summons | 159 |
| 4-D | Complaint | 159 |
| 4-E | docket sheet | 159 |
| 4-F | Notice of Dismissal | 159 |

```
 1                    P R O C E E D I N G S
 2                    - - - o0o - - -
 3         THE COURT:  Good morning.  Call the case, please.
 4         COURTROOM DEPUTY:  Court calls Case Number
 5    8:20-CV-2184-MSS-SPF, Moore versus Pooches of Largo, Inc.,
 6    et al.
 7         Counsel, please state your name for the record,
 8    beginning with counsel for the plaintiff.
 9         Ms. Moore, please state your name for the record.
10         MS. MOORE:  Melanie Moore.
11         MR. SARELSON:  Good morning, Your Honor.
12    Matthew Sarelson for the defendant.
13         Can I introduce them real fast to you?
14         THE COURT:  You may.
15         MR. SARELSON:  To my left is Luis Marquez.  He's one
16    of the defendants in the case.  To his left is Alison Nieves.
17    She's our corporate representative.
18         THE COURT:  Good morning.
19         Are the parties prepared to proceed at this point?
20         MS. MOORE:  Yes, Your Honor.
21         THE COURT:  Ms. Moore, you have to stand when you
22    address the Court.
23         MS. MOORE:  Yes, Your Honor.
24         MR. SARELSON:  The defense is, Your Honor, but we
25    have some issues with some of the evidentiary -- some
```

```
 1    evidentiary concerns that may come up that we think should be
 2    addressed in advance, but otherwise we're prepared.
 3               THE COURT:  Let me hear from you.
 4               MR. SARELSON:  So the exhibit list for the plaintiff
 5    was produced to us -- should I stand here, Your Honor, or the
 6    podium?
 7               THE COURT:  That's fine.
 8               MR. SARELSON:  So we received an exhibit list on
 9    Friday, Your Honor, and obviously it was due a long time ago.
10    The exhibit list itself doesn't actually list out exhibits
11    one by one, it lists sort of composite exhibits, and the
12    problem with that is most of the exhibits, arguably every
13    single one of the exhibits, is an unauthenticated and
14    cannot-be-authenticated document, and all of the documents,
15    candidly, are just sort of totally irrelevant to the actual
16    very minor proceedings that we're here for today.  So we've
17    been asking for documents as well, and we received the
18    documents maybe 25 minutes ago, just a paper copy of them right
19    now, maybe 25 minutes ago.
20               THE COURT:  How many documents are there?
21               MR. SARELSON:  So, Your Honor, the documents -- so
22    they're listed as ten exhibits, but every exhibit has a
23    sub-exhibit.
24               THE COURT:  Pull the microphone in your direction.
25               MR. SARELSON:  Sorry about that, Your Honor.
```

1          So there's ten exhibits, but within every exhibit is

2     anywhere from three to ten sort of sub-exhibits that are,

3     frankly, different exhibits.

4          And the bigger reason I'm concerned about this is an

5     awful lot of this -- aside from being entirely irrelevant, some

6     of this is just sort of character attacks, or the documents

7     appear to just be sort of character attacks, and a lot of the

8     documents, Your Honor, are confidential settlement

9     communications under 408, and so my concern is simply that

10    Ms. Moore might, either in an opening statement or during her

11    question and answer of herself, perhaps -- that obviously

12    inadmissible testimony might either intentionally or

13    accidentally come in, and so we're just -- we're just sort of

14    concerned.

15         THE COURT:  Ms. Moore, you filed your exhibit list

16    very late, it was promised at the last pretrial conference that

17    the parties would be prepared to provide their exhibit list in

18    their pretrial statement, and so as I understand it, this list

19    was just exchanged on the 15th and the exhibits just exchanged

20    this morning.  Can you respond?

21         MS. MOORE:  Yes, Your Honor.

22         The defendants have had all of the exhibits since

23    January during the discovery period, and most of them are

24    already filed in the record before that, so, you know, they've

25    had the exhibits, you know, this whole time, and, you know,

```
 1   I wasn't sure about my exhibit list now because the defendants

 2   just filed a motion last week to submit some newly found

 3   evidence, I guess, and there was a pending motion to find out

 4   if you were going to allow it, and then you denied the motion

 5   but then they filed a motion for reconsideration, so I wasn't

 6   sure if -- you know, I kind of needed to know what exhibits

 7   they were going to, you know, present, so I --

 8            THE COURT:  Are any of the exhibits on your exhibit

 9   list -- what's wrong with my microphone, Ms. Heard?

10            Are any of the exhibits on your exhibit list

11   references to the parties' settlement discussions?

12            MS. MOORE:  I don't believe so.  There was some

13   between my former counsel and defense counsel, but, you know,

14   that was by my counsel on my behalf, so, I mean --

15            THE COURT:  So there's E, Moore e-mails; and F,

16   Celler/Sarelson e-mails.  Do those contain references to

17   settlement proposals?

18            MS. MOORE:  Some of them do, yes, but I'm not sure

19   how it would be a confidential settlement because it's my case,

20   so --

21            THE COURT:  Well, the settlement and the parties'

22   proposals for settlement can't be disclosed to the jury, so

23   there is typically no way to introduce in the course of a trial

24   the parties' settlement negotiations, and I'm not sure what you

25   think that's relevant to.
```

```
1              MS. MOORE:  I'm not sure that it would be considered
2    as settlement negotiations, because the defendants have pretty
3    much been adamant about not -- they had no interest in settling
4    from day one.
5              THE COURT:  So there's no document here that says
6    they only offered me $1800 or $1900, none of that is in this
7    material?
8              MS. MOORE:  That, I believe, is.
9              THE COURT:  Okay.  That can't come into court.
10   Whatever they offered you in settlement is typically not
11   disclosable to the jury, so you shouldn't raise any of that in
12   front of the jury.  Do you understand that?
13             MS. MOORE:  Yes, I do.
14             THE COURT:  Other than the settlement negotiation
15   material, is there any of that information that you were not
16   aware of before you saw the actual exhibits?
17             MR. SARELSON:  Your Honor, there's a number of them
18   that are -- they're not particularly well-described, but,
19   for example, number 5 is Marquez employee reviews.  I assume,
20   based on the title, that Ms. Moore found, you know, random
21   people on the internet who posted bad things about Petland.
22             THE COURT:  Well, we'll address that in objections to
23   relevance as they are offered up through whomever she tries to
24   offer them through.
25             MR. SARELSON:  I am perfectly fine with that,
```

```
 1   Your Honor.  My only concern is one of the things, for example,

 2   is just PPP loan.  I mean, if that comes up in an opening

 3   statement, I'm concerned that the opening statement is going to

 4   be a reflection of what the documents are, and the documents

 5   are going to be irrelevant, so that's my concern, is she's just

 6   going to say during the opening statement things that are

 7   totally inappropriate and irrelevant.

 8           THE COURT:  Which document is PPP loan?  I don't see

 9   that on my list.

10           MR. SARELSON:  It's number 7, Your Honor.

11           THE COURT:  What is the COVID Paycheck Protection

12   document, Ms. Moore?

13           MS. MOORE:  It's just a record of the -- some of the

14   paycheck protection loans that the defendants got for COVID

15   relief.

16           THE COURT:  What's that relevant to in this case?

17           MS. MOORE:  Well, I mean, it just -- it speaks to the

18   fraudulent nature of their behavior, because they seem to have

19   a habit of committing wage theft and then they're availing

20   themselves of tax dollars for their payroll purposes, but they

21   don't even pay their employees during --

22           THE COURT:  Well, this is not a referendum on Pooches

23   of Largo and all their behavior.  This case is about the fact

24   that you allege that they did not pay you what you were owed,

25   and when you complained, they terminated you, and that you
```

1  believe it was fraudulent that they hired you for the position

2  that they hired you for and then paid you for a different

3  position.

4          MS. MOORE:  Correct.

5          THE COURT:  That's what this case is relevant to.

6  So you have to tread very lightly on any kind of general

7  allegation of their behavior, and as I understand it, this

8  document concerning their payroll protection loan was not

9  referenced in any prior disclosure or discussed in advance of

10 the pretrial stipulation.  Is that accurate?

11         MS. MOORE:  That would be correct.

12         THE COURT:  Then that document is excluded.

13         MS. MOORE:  We didn't have any --

14         THE COURT:  You will not be able to use their payroll

15 protection loan as a document in the case, and you will not be

16 able to reference the settlement proposals in the case absent

17 some demonstration to the Court in advance of that use that

18 it's relevant to the case.  Do you understand that?

19         MS. MOORE:  I do.

20         THE COURT:  All right.  Anything else?

21         MR. SARELSON:  Not specifics, Your Honor, just that

22 there are sort of -- there are just other sort of --

23         THE COURT:  Mr. Sarelson, you're a lawyer.  You had

24 every opportunity to get information you needed to try this

25 case.  You decided that the case wasn't going to go to trial

1   and so no hard work had to be done, now you're where you are,

2   and you're going to have to live with that.  In the same way,

3   you're not going to introduce all these documents you just

4   added to the case at the last minute.  You're going to use the

5   exhibit list you proffered to the Court at the pretrial

6   conference, for the reasons the Court stated.

7           You made it clear to Ms. Moore that you weren't doing

8   a deep dive investigation because you didn't think the case was

9   going to go to court, go to trial, and your clients had every

10  opportunity to follow every lead up to get the discovery they

11  needed, and they didn't think to ask, I guess, the one person

12  who knew, Ms. Nieves, until you tried to interview her in

13  advance of the trial, and she said, oh, look at the Revel,

14  I can get to it and I can access it.

15          This case started in 2020 and it was not allegedly

16  discovered until three weeks ago that your client had documents

17  that would bear on their defense and there is just not time to

18  do this.  I looked back at the pretrial conference, even there

19  you said you don't intend to introduce any documents, you're

20  going to rely on Ms. Moore's documents to defend this case.

21  That's what you're going to have to do, other than the eight

22  that you listed in advance of the trial.  That's how that's

23  going to go, and we're going to proceed to try this case.

24          This is not going to be a long, drawn-out proceeding.

25  We're going to proceed in the way that the parties prepared the

1   case, not in the way that they wish they had prepared the case.

2   That's what's going to happen.  You're going to rely on the

3   documents you offered up as your eight exhibits, and she's

4   going to rely on the documents she disclosed to you that you

5   repeated would be some sets of texts, some sets of her

6   documents as to her payment -- hold on one second.

7            "Your Honor, we suspect every one of our exhibits

8   will be on the plaintiff's exhibit list, and I don't believe we

9   will independently have exhibits.  There's very -- there's

10  really -- there's really not a lot in terms of exhibits in this

11  case, just some paystubs, job postings, text message exchanges,

12  so I'm sure this will be on Ms. Moore's exhibit list and we'll

13  probably use those as well."

14           So that's what we're going to do, and your motion for

15  reconsideration is denied and your motion to strike is denied

16  without prejudice other than the ones that I just mentioned

17  that can't come in, and you'll have to raise them as they're

18  offered up in evidence.

19           Are there any preliminary issues to discuss before we

20  call the jury up?

21           MS. MOORE:  No, Your Honor.

22           THE COURT:  We had one person show up in the venire

23  who appeared to be under the influence of some sort of

24  medication and so that person was not permitted to come up in

25  the venire.  The rest of the people who reported for our venire

```
 1   are on their way up.

 2              Are they out there, Ms. Heard, or are they going to

 3   be brought up?

 4              MS. HEARD:  They're out here.  I'm going to line them

 5   up.

 6              THE COURT:  Please call in the jury.

 7              I have the parties' voir dire.  I will ask some of

 8   these questions.  You'll need to listen carefully to the

 9   questions that I ask, because I'm going to omit some of them.

10   If I omit some that the parties believe I should ask, there

11   will be an opportunity to do follow-up.

12              MR. SARELSON:  Your Honor, can I just ask one quick

13   question for clarification?

14              THE COURT:  Yes.

15              MR. SARELSON:  The time records and whatnot that were

16   recently discovered, are we permitted to use that for

17   impeachment purposes?

18              THE COURT:  No.

19              MR. SARELSON:  So we can't use that information for

20   any reason at all?

21              THE COURT:  That's correct.

22              MR. SARELSON:  Okay.

23              THE COURT:  Let me see counsel and Ms. Moore at

24   sidebar.

25                   (The following bench conference was held.)
```

1            THE COURT:  It's a comedy of errors.  I don't know

2    what's going on.  Three of our jurors were missing when they

3    came up here and now one more is missing.

4            MR. SARELSON:  They were missing on the way up?

5            THE COURT:  They went missing.  I don't know.  I've

6    never had that happen.  So we're waiting to see the status.

7    But I'll start with the ones that we have.  Number 7, 13, 14

8    and 16 are the ones that are missing.

9            MR. SARELSON:  Okay.

10            THE COURT:  So just mark those on your papers.

11            And then also is the Rule going to be invoked, the

12    Rule of Sequestration, to keep other witnesses from hearing

13    what other witnesses have to say?  And I understand you have a

14    witness in the courtroom, a potential witness in the courtroom.

15    Do you want to keep all witnesses out if they are not then

16    testifying?

17            MS. MOORE:  I have no preference either way.

18            THE COURT:  Do you have a witness in the courtroom?

19            MS. MOORE:  No.

20            THE COURT:  Counsel, who is the witness that you

21    intend to maybe call?

22            MR. SARELSON:  Yes.  The lady on the left.

23            THE COURT:  What is she relevant to?

24            MR. SARELSON:  She was identified as one of the

25    trainers for Ms. Moore.

1          MS. MOORE:  I did subpoena Mr. Celler.  I don't see

2     him here though.

3          THE COURT:  He's not due to be here until after 1:30

4     today.

5          MS. MOORE:  Okay.

6          THE COURT:  We're going to invoke the Rule because

7     she's a pro se litigant and I don't know that she understands

8     the significance of it.

9          You have a client representative, and that's

10    Ms. Nieves, and then the other person is a named defendant?

11         MR. SARELSON:  That's right.

12         THE COURT:  All right.  Thank you.

13         7, 13 and 14 are missing; is that right, Ms. Heard?

14         COURTROOM DEPUTY:  That's correct.

15         THE COURT:  7, 13 and 14 are not present.

16         Mr. Sarelson, are you going to advise your witness?

17         MR. SARELSON:  Okay, Your Honor.  Yes.

18              *(Venire enters proceedings.)*

19         THE COURT:  Welcome, ladies and gentlemen.  I've

20    never had escaped jurors before, so we will address that as

21    they are located, so we're going to move forward with jury

22    selection.

23         My name is Mary Scriven.  I am the Judge who is going

24    to be presiding over the case.  You've met Mr. Anderson,

25    Ms. Carreon and Ms. Heard.  These are the folks that work for

```
 1   the Court to assist the Court.  There's Mr. David Collier, he's
 2   my court reporter, and then in my far left over there is
 3   Elliott Jackson, he is my law clerk.  I introduce all of us to
 4   you so that you can know if you need something who you can
 5   reach out to.  If you see one of us, we're all available to you
 6   if you need anything.  But also to make sure that none of you
 7   know any of us through any other walk of life other than having
 8   just been introduced this morning.
 9           Do any of you know any of us?
10           All right.  And do any of you know each other?
11           JURORS:  No.
12           THE COURT:  Okay.  I'm going to now give the parties
13   an opportunity to introduce themselves to you, and then I'll
14   ask you whether you know them, beginning with the plaintiff.
15           MS. MOORE:  Good morning.  My name is Melanie Moore.
16           THE COURT:  Ms. Moore is the plaintiff in the case.
17   Do any of you know Ms. Moore?
18           And for the defense?
19           MR. SARELSON:  Good morning, everyone.  My name is
20   Matt Sarelson.  To my left is Luis Marquez.  To Luis' left is
21   Alison Nieves.
22           THE COURT:  Do any of you know these individuals?
23           JURORS:  No, ma'am.
24           THE COURT:  All right.  Wonderful.
25           What we're going to do now is what we call voir dire
```

1    or voir dire, depending on how Southern you are, but it just

2    really means to speak the truth, and we're going to ask you to

3    answer some questions for us so that we can determine who is

4    best suited to serve as a jury in this case.

5           There are a couple of preliminary things I need to

6    address to you before we proceed.

7           Is everything okay, Mr. Anderson?

8           A few things that I need to ask you before we proceed

9    in the case and to let you know a few things about the case.

10          This is an employment case.  Ms. Moore was previously

11   employed by the defendant and is no longer employed by the

12   defendant and she is now bringing an action associated with

13   that employment experience.

14          Is there anything about that that would cause any of

15   you to have any concerns about serving on a jury, just knowing

16   that limited information?

17          This case should take no longer than three days.

18   I don't expect it's going to take three days, but it will take

19   no longer than three days.  I know that all of you have other

20   things that you would prefer to be doing, other things that you

21   need to be doing, and so I'm going to ask a question in a

22   minute to ask if there are any conflicts.  I don't mean

23   day-to-day conflicts like you have a job and a life and kids

24   and so forth.  I mean do you have any immutable, immovable

25   commitments that would prevent you from serving on this jury

1  for that short period of time.

2          Is there anybody who believes he or she has such an

3  immovable, immutable commitment that keeps them from serving in

4  the trial of this case?  If so, raise your hand.

5          No hands are raised.  Excellent.

6          All right.  You each have a piece of paper in front

7  of you and it just asks some questions.  You don't have to

8  state the questions, you just have to state the answers.  Then

9  we'll have a few more follow-up questions and that will lead us

10  to our jury selection this morning.

11          We'll begin with Mr. Ritzke.  Is that right or wrong?

12          PROSPECTIVE JUROR 1:  That's right.

13          THE COURT:  All right.  Thank you, sir.  You don't

14  have to stand if you don't want to, as long as you speak into

15  the microphone.

16          PROSPECTIVE JUROR 1:  All right.  My name is

17  Gary Ritzke.  I reside in Largo, Florida, for 11 years.

18  Occupation, I retired from General Motors.  Married.  Spouse's

19  occupation, she's retired too.  No children.  No military

20  service.  I was on a civil case in Grand Rapids, Michigan, the

21  state that I originally was born in, on a slip and fall injury,

22  and another one, a car accident.  Other than that, that's

23  pretty much all that I have to say about it.

24          THE COURT:  I don't want you to tell me what the

25  verdict was, but did the jury reach a verdict?

```
 1              PROSPECTIVE JUROR 1:  Yes, we did.

 2              THE COURT:  And were you the foreperson?

 3              PROSPECTIVE JUROR 1:  No, but I pretty much ended up

 4    getting the jury to decide --

 5              THE COURT:  I don't want to know the jury

 6    deliberations.

 7              PROSPECTIVE JUROR 1:  I wasn't the foreperson.

 8              THE COURT:  All right.

 9              PROSPECTIVE JUROR 1:  I almost ended up being.

10              THE COURT:  Thank you, sir.

11              PROSPECTIVE JUROR 2:  Shelley Reinacher.  I live in

12    Lakeland, been there for 20 years.  Been in Florida for

13    31 years.  I'm an assistant principal at an elementary school.

14    I'm married and my spouse is an HR manager.  I have a child who

15    is 27 and she is an office manager.  No military service.

16    I served on a jury but it was stopped.  And my highest level is

17    Master's degree.

18              THE COURT:  And your spouse is an HR manager for what

19    type of business?

20              PROSPECTIVE JUROR 2:  It's a haircare company.

21              THE COURT:  And by HR manager, is he responsible for

22    hiring and firing?

23              PROSPECTIVE JUROR 2:  Yes.

24              THE COURT:  And do you discuss his work at home

25    sometimes?
```

1          PROSPECTIVE JUROR 2:  Sometimes.

2          THE COURT:  Do you think you would be able to set

3    aside any experience that he has as an HR manager and hear this

4    case and follow the law that the Court will give you in

5    reaching a verdict?

6          PROSPECTIVE JUROR 2:  Yes.

7          THE COURT:  Thank you.

8          PROSPECTIVE JUROR 3:  My name is Tara Cunningham.

9    I live in Seminole, Florida for the better part of forty-some

10   years.  I am a before and after school director.  I'm married.

11   My husband is a plant operator, I guess you would call it.

12   I have a 25-year-old son who is a mechanic.  No military and no

13   jury service, and I have some college credits.

14         THE COURT:  And your husband manages what type of

15   plant?

16         PROSPECTIVE JUROR 3:  Hit Promotions, they do

17   promotional products, like they print out bags and cups.  He

18   does the warehouse department though.

19         THE COURT:  And is he responsible for hiring and

20   firing people?

21         PROSPECTIVE JUROR 3:  No, ma'am.

22         THE COURT:  All right.  Thank you.

23         PROSPECTIVE JUROR 4:  My name is Matt Schwimer.

24   I live in Dunedin, Florida for the last four years.  I lived in

25   Clearwater for 13 years before that.  I am an IT manager, and

my wife -- I'm married, and my wife is a bookkeeper.  I have

four children, ranging from 7 to 22.  My oldest is a retail

manager for a grocery store.  No previous military service.

I have never been selected for a jury.  And I have a Master's

degree in business.

THE COURT:  Thank you.

PROSPECTIVE JUROR 5:  My name is Rosemary Walker.

I currently live in Seminole, Florida.  I've been there for

about 38 years.  My occupation, I work for Pinellas County

Schools.  I am married.  My husband is a retail store manager

for Wal-Mart.  I have two children, 18 and 19, they both work

for Publix.  No military experience, no jury service, and my

highest level is I completed 12th grade.

THE COURT:  Thank you.

PROSPECTIVE JUROR 6:  Good morning.  My name is

Jessica Tootle.  I currently reside in Dunedin, Florida.  We've

lived there four or five years.  I've lived in the State of

Florida for 30 years.  I am employed by BayCare Health System

as a supervisor for clinical applications.  I am married.  My

husband is disabled.  We have two children, two minor children,

ages 3 and 14.  I have no previous military service, and I have

no previous jury service, and I have -- my Bachelor's degree is

in management and organizational leadership.

THE COURT:  Thank you.

PROSPECTIVE JUROR 8:  Hi.  My name is Gennifer

1    Schimenti.  I'm not sure if I'm in the right chair, so I'm in

2    number 8.

3              THE COURT:  You are.  You are.

4              PROSPECTIVE JUROR 8:  I've lived in Florida for the

5    past six years.  I live in Bradenton, Florida.  I'm a

6    self-employed artist.  I am married.  My husband has dementia

7    and lives in a memory care facility up in Connecticut.  I have

8    five children, four adult children, 33-year-old is a software

9    engineer, 31-year-old is an animator at Disney, 29-year-old is

10   a veterinarian in a veterinary residency, 26-year-old is a

11   graphic designer, and I have a 15-year-old daughter who is

12   doing home school.  I don't have any military experience or

13   service, I've never served on a jury, and I have a Bachelor's

14   degree.

15             THE COURT:  In what field?

16             PROSPECTIVE JUROR 8:  Bachelor of Fine Arts.

17             THE COURT:  Thank you.

18             PROSPECTIVE JUROR 9:  My name is Thomas Boleska.

19   I live in Palmetto, Florida and I've lived there for 8 years.

20   I am a retired professional baseball player.  I am a teacher

21   and bartender.  I am married.  My wife is a teacher and server.

22   We have a three and a half-year-old son.  No military, no jury,

23   and I have a Master's degree.

24             THE COURT:  In what field?

25             PROSPECTIVE JUROR 9:  Educational leadership.

```
 1              THE COURT:  Thank you.
 2              PROSPECTIVE JUROR 10:  My name is Clyde Bloedel.
 3    I've been living in Clearwater for the last 15, 16 months.
 4    I just purchased a home.  I've been living in Pinellas County
 5    for over 41 years.  I'm a security officer for a hospital in
 6    Pinellas County.  I'm single.  I have no children that I know
 7    of.  I am a former U.S. Marine, I worked in communications
 8    while in the Marines, and the highest level of education I have
 9    is a B.S. is Information Sciences.
10              THE COURT:  Thank you.
11              PROSPECTIVE JUROR 11:  My name is Emmanuel Toro.
12    I live in North Port, Florida.  I've lived there for
13    five years.  I've lived in Florida for 42 years.  I am a
14    designer.  I am single.  I have three children, one is 33 years
15    old, he is a designer as well.  My 25-year-old is a broker.  My
16    24-year-old is an IT technician.  I have previous military in
17    the Navy.  I was a mechanic, spent 9 months in Desert Storm.
18    I have no previous jury duties, and high school.
19              THE COURT:  Thank you.
20              PROSPECTIVE JUROR 12:  My name is Keith Mefford.
21    I live in Belleair, Florida.  I've been in Florida for
22    13 years.  I'm single.  I have two sons, 26 and 23.  The
23    26-year-old is a mechanical engineer.  23-year-old works in IT.
24    No military service.  I did serve on one jury over 20 years
25    ago, it was a DUI case, and we did reach a verdict.  I have a
```

```
 1   Bachelor's degree in industrial technology and management.
 2             THE COURT:  And were you the foreperson in that
 3   trial?
 4             PROSPECTIVE JUROR 12:  No.
 5             THE COURT:  Thank you.
 6             PROSPECTIVE JUROR 14:  Good morning.  My name is
 7   Arun Ramaswamy.  I live in Tampa.  I've been there for
 8   23 years.  I've been in Florida for 30 years.  I'm a director
 9   of software engineering.  I'm married.  My wife, she's a
10   product manager in a media company.  I have two kids, 19 and
11   17.  I do not have military or jury experience, and I have a
12   Ph.D. in electrical engineering.
13             THE COURT:  And you're not running for President.
14             PROSPECTIVE JUROR 15:  No.  Not related.
15             PROSPECTIVE JUROR 16:  Good morning.  My name is
16   Lenore Daniels.  I've lived in Eagle Lake, Florida for the past
17   five years.  I am a retired deputy corrections officer from
18   Washtenaw County, State of Michigan.  I'm single.  I have no
19   children.  I've had no previous military experience.  I have
20   not been seated on a jury.  And I've completed a Bachelor's
21   degree in criminal justice.
22             THE COURT:  Thank you.
23             PROSPECTIVE JUROR 17:  Hi.  I'm John Iannone.  I've
24   lived in Polk City, Florida for 13 years.  I've lived in
25   Florida for 60 years.  I work at Lakeland Regional Medical
```

1    Center.  I work in the operating rooms as a sterile processing

2    tech.  I am married.  My wife worked for the School Board, but

3    she is now at home.  I have no military services.  I have been

4    in two other jury selections and was picked.  We did come up

5    with a verdict.  And my highest education is I'm a certified

6    tech, and I went to Polk Vo Tech for that.

7            THE COURT:  And were those juries criminal or civil

8    or one of each?

9            PROSPECTIVE JUROR 17:  One was criminal and one was a

10   malpractice, I think they call it.

11           THE COURT:  All right.  Thank you.

12           PROSPECTIVE JUROR 18:  Good morning.  My name is

13   Deborah Church.  I live in Holiday, Florida, been there for

14   about 15 years.  I've lived in Florida for a total of 50 years,

15   five-zero.  I am a project manager for a large health care

16   corporation.  I am widowed.  I have one son, age 29, and he is

17   a general manager with Domino's Pizza.  I have no military

18   background.  I did serve on one jury, it was a criminal case,

19   and we did return a verdict.  And I have a Master's degree in

20   business.

21           THE COURT:  Were you the foreperson in that jury?

22           PROSPECTIVE JUROR 18:  No.

23           THE COURT:  Now, here are a few more specific

24   questions.

25           Have any of you or someone who you live with ever

```
 1   been sued or have sued someone?  If so, raise your hand.
 2              Yes, sir.  State your name and your jury number and
 3   then I'll ask you the questions.
 4              PROSPECTIVE JUROR 9:  Thomas Boleska, juror number 9.
 5              THE COURT:  And you sued or were sued?
 6              PROSPECTIVE JUROR 9:  Currently getting sued for a
 7   car accident.
 8              THE COURT:  You're in a suit currently?
 9              PROSPECTIVE JUROR 9:  Getting sued, yes.
10              THE COURT:  You are getting sued, meaning there was
11   an accident, you expect to get sued, or you are in an actual
12   lawsuit?
13              PROSPECTIVE JUROR 9:  In an actual lawsuit.
14              THE COURT:  Have you testified in that suit?
15              PROSPECTIVE JUROR 9:  No.
16              THE COURT:  Deposition has not been taken?
17              PROSPECTIVE JUROR 9:  Nope.
18              THE COURT:  Are you the person who was driving that
19   car?
20              PROSPECTIVE JUROR 9:  No.
21              THE COURT:  Someone who owned a car -- you owned a
22   car someone else was driving?
23              PROSPECTIVE JUROR 9:  Yes.
24              THE COURT:  Anything about that situation keep you
25   from being a fair juror in this case?
```

```
1                 PROSPECTIVE JUROR 9:  No.

2                 THE COURT:  All right.  Anyone else?

3                 Yes, ma'am.  State your name and number.

4                 PROSPECTIVE JUROR 6:  Jessica Tootle, juror number 6.

5      My husband's family, when he was a child, brought a case

6      against I guess really like the U.S. Government.  He was born

7      at MacDill AFB and there was medical malpractice.

8                 THE COURT:  Was the case revolved?

9                 PROSPECTIVE JUROR 6:  It was.

10                THE COURT:  To your satisfaction or theirs?

11                PROSPECTIVE JUROR 6:  Yes.

12                THE COURT:  And is there anything about that

13     experience that would keep you from being a fair juror in this

14     case?

15                PROSPECTIVE JUROR 6:  No, ma'am.

16                THE COURT:  Were you married to him at the time of

17     this lawsuit?

18                PROSPECTIVE JUROR 6:  No, ma'am.

19                THE COURT:  Thank you.

20                Yes, sir.  State your name and number.

21                PROSPECTIVE JUROR 4:  Matt Schwimer, juror 4.  I was

22     in two suits.  One was a Workman's Comp injury, which was

23     resolved, and then one was a car accident where I was the

24     plaintiff.

25                THE COURT:  The Workers' Comp suit, were you also the
```

```
 1   plaintiff?

 2             PROSPECTIVE JUROR 4:  Yes.

 3             THE COURT:  And was the car accident also resolved?

 4             PROSPECTIVE JUROR 4:  Yes.

 5             THE COURT:  How long ago was the Workers' Comp case?

 6             PROSPECTIVE JUROR 4:  Workers' Comp was in 1999.

 7             THE COURT:  And the car accident?

 8             PROSPECTIVE JUROR 4:  Was in 2010, but the trial was

 9   in -- or it was resolved out of court, and it was 2011.

10             THE COURT:  Anything about those experiences keep you

11   from being a fair juror in this case?

12             PROSPECTIVE JUROR 4:  No.

13             THE COURT:  Thank you.

14             Pass the microphone down in front of you.

15             Yes, ma'am.  State your name and number.

16             PROSPECTIVE JUROR 8:  Gennifer Schimenti, number 8.

17             THE COURT:  Yes, ma'am.

18             PROSPECTIVE JUROR 8:  So my son right now is 31.

19   When he was seven we sued through the insurance company, the

20   car insurance company, he was -- my husband was in the car with

21   three of the kids and they were hit by a drunk driver, so we

22   sued the drunk driver, even though he didn't have insurance,

23   through our uninsured motorist coverage that we had, and

24   that --

25             THE COURT:  Was that case resolved?
```

```
 1                PROSPECTIVE JUROR 8:  It was.

 2                THE COURT:  Is there anything about that experience

 3    that would keep you from being a fair juror in this case?

 4                PROSPECTIVE JUROR 8:  No, I don't think so.  No.

 5                THE COURT:  You said "I don't think so."  Is there

 6    anything that's in the back of your mind that's causing you to

 7    say that, or can you be fair in this case?

 8                PROSPECTIVE JUROR 8:  Yes, I can be fair.

 9                THE COURT:  All right.  Was the case resolved to your

10    satisfaction?

11                PROSPECTIVE JUROR 8:  No.

12                THE COURT:  And do you hold any animus toward the

13    legal system as a result of the suit?

14                PROSPECTIVE JUROR 8:  No.

15                THE COURT:  And what about insurance companies?

16                PROSPECTIVE JUROR 8:  I think at the time, yes.  It

17    was a long time ago, but I think we weren't happy with the way

18    it was resolved, that's all I can remember.  It was a while

19    ago.

20                THE COURT:  And can you set aside that unhappiness

21    and hear this case fairly?

22                PROSPECTIVE JUROR 8:  Yes.

23                THE COURT:  And will you follow the law that the

24    Court gives you, even if you disagree with that law?

25                PROSPECTIVE JUROR 8:  Yes.
```

```
 1                THE COURT:  All right.  Thank you.

 2           Yes, sir.

 3                PROSPECTIVE JUROR 1:  Juror number 1, Gary Ritzke.

 4  I sued U-Haul because the person that rented the U-Haul truck

 5  handed the keys to somebody that was an uninsured driver, they

 6  flew backward with the U-Haul truck and smashed me into a

 7  building and I had to use my car insurance to settle a lot of

 8  the bills and sue U-Haul.

 9                THE COURT:  Was the case resolved to your

10  satisfaction?

11                PROSPECTIVE JUROR 1:  Yes, it was.

12                THE COURT:  Is there anything about that experience

13  that would keep you from being a fair juror in this case?

14                PROSPECTIVE JUROR 1:  Not at all, Your Honor.

15                THE COURT:  Thank you.  Anyone else?

16                PROSPECTIVE JUROR 10:  Question.

17                THE COURT:  Yes, sir.

18                PROSPECTIVE JUROR 10:  Do you consider an application

19  for V.A. benefits to be a legal suit?

20                THE COURT:  Well, you can tell us about it.  You had

21  to seek your V.A. benefits.  Tell me your name and number.

22                PROSPECTIVE JUROR 10:  Juror number 6, Clyde Bloedel.

23                THE COURT:  Yes, sir.

24                PROSPECTIVE JUROR 10:  I'm right in the middle of

25  issues with the V.A., trying to get V.A. benefits, and it's
```

```
 1   still unresolved.
 2           THE COURT:  And what did you say your number was?
 3           PROSPECTIVE JUROR 10:  6.  I'm sorry.  10.
 4   I'm sorry.
 5           THE COURT:  Anything about that experience keep you
 6   from being a fair juror in this case?
 7           PROSPECTIVE JUROR 10:  No, ma'am.
 8           THE COURT:  Okay.  Anyone else?
 9           Have you ever been fired?  If so, raise your hand.
10           Have you ever been fired, terminated from a job?
11   Just hold your hand up.  I don't want to know the
12   circumstances, just hold your hand up.
13           And so give me your juror number and name in the back
14   row.
15           PROSPECTIVE JUROR 4:  Juror 4, Matt Schwimer.
16           THE COURT:  Juror number 4.
17           PROSPECTIVE JUROR 4:  Matt Schwimer.
18           PROSPECTIVE JUROR 6:  Juror number 6, Jessica Tootle.
19           PROSPECTIVE JUROR 9:  Juror number 9, Thomas Boleska.
20           PROSPECTIVE JUROR 10:  Number 10, Clyde Bloedel.
21           PROSPECTIVE JUROR 11:  11, Emmanuel Toro.
22           THE COURT:  And on the front row?
23           PROSPECTIVE JUROR 15:  Number 15, Arun Ramaswamy.
24           THE COURT:  Anything about that experience keep you
25   from being a fair juror in this case?  If you have something
```

1    that would keep you from being fair, raise your hand.

2              If you were terminated from an employment and raised

3    your hand, did you pursue any remedy through your employer for

4    that termination?  If so, raise your hand.

5              No hands are raised.

6              Have you ever been evicted from your residence?

7    If so, raise your hand.

8              No hands are raised.

9              If you are paid hourly at your job, raise your hand.

10             And then if you could just give me your juror number,

11   starting on the back row.  Ma'am?

12             PROSPECTIVE JUROR 5:  Oh.  Juror number 5.

13             THE COURT:  Second row?

14             PROSPECTIVE JUROR 8:  Juror number 8.

15             PROSPECTIVE JUROR 9:  9.

16             PROSPECTIVE JUROR 10:  10.

17             PROSPECTIVE JUROR 12:  12.

18             PROSPECTIVE JUROR 17:  17.

19             THE COURT:  And I assume if your hand was not raised

20   you're on salary or you don't make money; is that right?

21   All right.

22             Have any of you ever worked for Petland at any of its

23   locations?  If so, raise your hand.

24             Have you ever applied for or posted a job through

25   indeed.com?  If so, raise your hand.

```
1              And, again, give me your numbers, starting on the
2   back row.
3              PROSPECTIVE JUROR 4:  4.
4              PROSPECTIVE JUROR 6:  6.
5              PROSPECTIVE JUROR 8:  8.
6              PROSPECTIVE JUROR 9:  9.
7              PROSPECTIVE JUROR 10:  10.
8              PROSPECTIVE JUROR 11:  11.
9              THE COURT:  Is there anything about that experience
10  that would keep you from being a fair juror?  If so, raise your
11  hand.
12             No hands are raised.
13             Have you ever owned a business through which your
14  employees were paid a minimum wage?  If so, raise your hand.
15             State your number.
16             PROSPECTIVE JUROR 11:  11.
17             THE COURT:  Is there anyone here who believes that
18  all lawsuits are frivolous?  If so, raise your hand.
19             No hands are raised.
20             Mr. Sarelson, if you could read the list of witnesses
21  you intend to call, or may call.
22             MR. SARELSON:  I can, Your Honor.
23             THE COURT:  Please listen to these names so that
24  I can see if any of you know these individuals or people by
25  that name.
```

```
1              MR. SARELSON:  Good morning again.  So you may hear

2    from three people today, Luis Marquez, who I already

3    introduced; Alison Nieves, who I also introduced; and another

4    young lady named Yessi Tello, T-E-L-L-O.  She's not in the room

5    right now.

6              THE COURT:  Thank you.

7              Do any of you know people by those names?

8              Ms. Moore, if you could identify any witnesses you

9    would intend to call beyond those witnesses.

10             MS. MOORE:  Yes.  Good morning.

11             I would be calling Richard Celler, Attorney Richard

12   Celler.

13             THE COURT:  Do any of you know an attorney by the

14   name of Richard Celler?

15             No one knows anyone by those names.

16             Counsel, I'm sorry, Ms. Moore, have I omitted to ask

17   any of the questions that you proposed that you wish the Court

18   to follow up on?

19             MS. MOORE:  No, that was all of them.  Thank you.

20             THE COURT:  And for the defense, did I omit to

21   inquire in any area or field of any juror?

22             MR. SARELSON:  No, Your Honor.

23             THE COURT:  Do either of you wish for me to inquire

24   further of any juror who answered a question about some matter?

25   If so, let me know.
```

1            MS. MOORE:  No, Your Honor.

2            MR. SARELSON:  No, Your Honor.

3            THE COURT:  All right.  Now, sometimes we don't know

4    what to ask you because we don't know you, so knowing what it

5    is you know about the case and knowing yourselves the way you

6    do, is there anything that you know we would want to know about

7    you had we thought to ask?  If so, raise your hand.

8            All right.  In the course of the trial there's going

9    to be evidence offered, witnesses will testify.  If you are

10   selected to serve on this jury, by your verdict you will decide

11   the disputed issues of fact.  Under our system of Civil

12   Procedure you are the sole judges of the facts.  If at any time

13   the Court should make any comment regarding the facts, you

14   would be at liberty to disregard my comments.

15           The Court will decide the questions of law that arise

16   during the trial, and before you retire to the jury room to

17   deliberate, I will instruct you on the law that you must follow

18   in reaching your verdict.  Regardless of any opinion you may

19   have as to what the law ought to be, it would be a violation of

20   your sworn duty to base a verdict upon any other view of the

21   law than that which will be given to you in the instructions of

22   the Court, just as it would be a violation of your sworn duty

23   as judges of the facts to base your verdict upon anything other

24   than the evidence in the case.

25           You will be required to calmly, fairly and

1  dispassionately consider all of the evidence in the case and

2  from this evidence and from the law that the Court will give

3  you arrive at your verdict.  You must not be swayed in the

4  performance of your duty by prejudice, by sympathy or any other

5  sentiment.

6          With this background in mind, if you're selected as a

7  juror in this case, is there anyone who does not feel he or she

8  could render a fair and impartial verdict based on the evidence

9  and the law that the Court will tell you must apply in this

10  case?  If you don't believe you could do that, please raise

11  your hand.

12          No hands are raised.

13      Do any of you have any medical or other issues that

14  would keep you from being a fair juror in this case, giving

15  this case the level of attention that it requires?

16          No hands are raised.

17      All right.  Mr. Anderson -- well, I'll let the lawyer

18  and the party stare at the jury venire one more time to make

19  sure your notes are consistent with what you have heard, and

20  then I'm going to excuse the jury and we will make our

21  selection and bring you back in a minute.

22          Mr. Anderson.

23                  *(Venire exits proceedings.)*

24      THE COURT:  Ms. Moore, Mr. Sarelson, the way that

25  this will work is each of you has three preemptory challenges,

```
 1    you will exercise them one at a time, and then we will select

 2    the jury from whom is remaining.  I anticipate that we will

 3    select eight jurors if we can.

 4             How many do we have to start with, Ms. Heard?

 5             COURTROOM DEPUTY:  We have 15.

 6             THE COURT:  15 minus 6 is 13, so we have enough to

 7    pick a jury from the pool that remains.  Are you prepared to

 8    proceed at this time?

 9             MS. MOORE:  Yes, Your Honor.

10             MR. SARELSON:  Yes, Your Honor.

11             THE COURT:  All right.  Then beginning with you,

12    Ms. Moore, if you will -- you have three people to strike.

13             As you know -- well, as you may or may not know, the

14    people who remain at the top of the list after all strikes are

15    done, the remaining first eight will serve as the jury, so you

16    can pick and cut wherever you want, but keep in mind that the

17    focus should be on who is going to be in the top eight when

18    it's all said and done.

19             So who is the person first -- you can remain seated

20    during this part of the proceedings.

21             Who is the first juror you would like to strike?

22             MS. MOORE:  That would be Edward -- I didn't catch

23    his number.  Edward.

24             THE COURT:  Edward?

25             MS. MOORE:  Yes.
```

```
 1              THE COURT:  What do you mean, you didn't catch the
 2    number?
 3              MS. MOORE:  I didn't catch his juror number.
 4              THE COURT:  Well, can you look at the sheet and tell
 5    us which one you're talking about.
 6              Do you know something about him?
 7              MS. MOORE:  Actually, I don't see him on here.
 8              THE COURT:  What is something about him that you can
 9    recall?
10              MS. MOORE:  Actually, Your Honor, I'm really --
11    I really don't have any issues with any of them specifically.
12              THE COURT:  Well, if you pass the jury and they
13    strike one, then I'm going to tell you you had a chance to
14    strike any that you wanted to strike, and you said there's an
15    Edward.  Do you know something about him that caused you to
16    want to strike him?  Because the court reporter can pull up
17    that information and tell us who it was.
18              MS. MOORE:  No, it's not -- it's not of any
19    significance to be worth doing all that.
20              THE COURT:  So there isn't anyone that you would
21    exercise a preemptory on?
22              MS. MOORE:  No.  No.
23              THE COURT:  Mr. Sarelson?
24              MR. SARELSON:  Your Honor, so for our first we'll
25    exercise a preemptory on number 5.
```

```
 1              THE COURT:  Any objection to that strike from the
 2   plaintiff?
 3              MS. MOORE:  No, Your Honor.
 4              THE COURT:  Does the plaintiff have a preemptory the
 5   plaintiff would like to exercise?
 6              MS. MOORE:  No, Your Honor.
 7              THE COURT:  Mr. Sarelson, does the defense have a
 8   second?
 9              MR. SARELSON:  Defense elects to strike number 6.
10              THE COURT:  Number 6, Jessica Tootle?
11              Yes, number 6, Jessica Tootle?
12              MR. SARELSON:  That's it for us, Your Honor.
13              THE COURT:  I was asking you and you never said yes.
14   That's what I meant.
15              MR. SARELSON:  Oh.  Yes, Your Honor, number 6,
16   Jessica Tootle.  I apologize.
17              THE COURT:  Any that the plaintiff would like to
18   strike?
19              MS. MOORE:  No, Your Honor.
20              THE COURT:  And the third for the defense?
21              MR. SARELSON:  So, Your Honor, I assume we're just
22   going to pretend number 7 is not there?
23              THE COURT:  Number 7 isn't there.  We don't have to
24   pretend.
25              MR. SARELSON:  That's fine, Your Honor.
```

1            We will strike number 8, Your Honor, Gennifer March

2     Schimenti.

3            THE COURT:  Any objection to that exercise from the

4     plaintiff?

5            MS. MOORE:  No, Your Honor.

6            THE COURT:  And, I'm sorry, I didn't ask if anybody

7     had any cause challenges.  I didn't hear any for cause reasons.

8            Did the plaintiff have any cause challenges?

9            MS. MOORE:  No.

10           THE COURT:  Did the defense have any cause

11    challenges?

12           MR. SARELSON:  No, Your Honor.

13           THE COURT:  With those challenges as raised by the

14    defense and no challenges by the plaintiff, my read would be

15    that jurors number 1, 2, 3, 4, 9, 10, 11 and 12 would be the

16    first eight jurors or persons in the venire who would wind up

17    being the jury.

18           Is that your understanding, Ms. Moore?

19           MS. MOORE:  Yes.

20           THE COURT:  And is that your understanding,

21    Mr. Sarelson?

22           MR. SARELSON:  Yes, Your Honor.

23           THE COURT:  And, Mr. Sarelson, you're representing

24    both the entity and the individual; is that right?

25           MR. SARELSON:  I am, Your Honor.

```
 1              THE COURT:  And, sir, tell me your name again.
 2              MR. MARQUEZ:  Mine?
 3              THE COURT:  Yes.
 4              MR. MARQUEZ:  Hello, Your Honor.  Luis Marquez.
 5              THE COURT:  Mr. Marquez, have you had an opportunity
 6    to participate in this jury selection?
 7              MR. MARQUEZ:  Yes, ma'am.
 8              THE COURT:  And are you satisfied with the way it was
 9    conducted?
10              MR. MARQUEZ:  Yes, ma'am, Your Honor.
11              MS. MOORE:  And were you able to confer with your
12    lawyer during the selection of this jury?
13              MR. MARQUEZ:  Yes, ma'am, Your Honor.
14              THE COURT:  Thank you.
15              Ms. Nieves, same questions to you.  Are you the
16    representative of the defendant company?
17              MS. NIEVES:  Yes, ma'am.
18              THE COURT:  And have you had an opportunity to hear
19    this jury selection?
20              MS. NIEVES:  Yes, ma'am.
21              THE COURT:  And did you participate as actively as
22    you wished?
23              MS. NIEVES:  Yes, ma'am.
24              THE COURT:  And are you satisfied with this jury as
25    proposed by the selection and rejections by your counsel?
```

1                MS. NIEVES:  Yes, ma'am.

2                THE COURT:  Thank you.

3                All right.  That is the jury then that we will select

4     in this case.  What I intend to do is call them back, swear

5     them, give them the preliminary instructions, and you'll begin

6     your opening statements.

7                Please re-call the jury.

8                I'm just reading quickly through the preliminary

9     instructions.  I see a couple of challenges and oddities.  I'm

10    not going to say anything about the plaintiff's proceeding

11    without an attorney, it's not a standard instruction.

12                The parties are proposing a description of the case.

13    I'm going to give the one that's proposed unless someone

14    objects.  I am not going to give the affirmative defense

15    instruction on a preliminary basis.  If it is pertinent, the

16    Court will give it on a substantive instruction basis.

17                And then there was some request to read some

18    interrogatories from the defense.

19                MR. SARELSON:  That's right, Your Honor.  I think we

20    can probably do that at the end as part of the -- part of the

21    closing instructions to the jury.

22                THE COURT:  I don't understand what you're asking

23    for.

24                MR. SARELSON:  One of the -- one of Ms. Moore's

25    interrogatory answers we think is relevant and should be read

```
 1   to the jury as part of the either the preliminary instructions

 2   or --

 3               THE COURT:  Are you going to call her as a witness?

 4               MR. SARELSON:  We are.

 5               THE COURT:  All right.  You can ask her the question,

 6   and if she gives a different answer, you can impeach her.

 7               MR. SARELSON:  Your Honor, can I ask what docket

 8   entry Your Honor is looking at when you say the description

 9   that was given?

10               THE COURT:  The parties' preliminary jury

11   instructions.

12               MR. SARELSON:  Is it docket entry number 108,

13   Your Honor?

14               THE COURT:  I don't have the docket number.  I pulled

15   it from the record.

16               This is a civil case.  To help you follow the

17   evidence, I will summarize the parties' position.  The

18   plaintiff, Melanie Moore, claims the defendants, Pooches of

19   Largo, Inc. and Luis Marquez, (1) failed to pay her minimum

20   wages during three weeks of employment in August of 2018, and

21   (2) made false statements in a job posting.  Both defendants

22   deny those claims.

23               MR. SARELSON:  That's fine, Your Honor.  That's fine.

24               THE COURT:  Is that fine, Ms. Moore?

25               MS. MOORE:  Yes, Your Honor.
```

```
1               THE COURT:  All right.  Call the jury.
2                    (Venire enters proceedings.)
3               THE COURT:  Thank you for your patience, ladies and
4     gentlemen.  We have selected the persons who will serve as the
5     jury in this case.
6               Let me tell you that not everybody is needed to serve
7     on this jury in jury service, but all of you were required to
8     appear today so that we could pick a jury for this case, and so
9     even though you weren't selected, please understand that we
10    appreciate your service, and don't go home and say, I went all
11    the way down there and spent my whole morning and they didn't
12    need me, because we need everyone to show up so that we will
13    have enough jurors to pick a fair jury for this case.
14              And then, Ms. Heard, will they need to go back to
15    jury?
16              COURTROOM DEPUTY:  Yes, they will.
17              THE COURT:  All right.  So once I tell you who has
18    been selected, the rest of the jurors can go back where you
19    started this morning.  You may be necessary for another jury
20    that is still being selected.
21              The following people have been selected to serve on
22    this jury:  Number 1, Mr. Ritzke.  Number 2, Ms. Reinacher.
23    Is that right?  Number 3, Ms. Cunningham.  Number 4,
24    Mr. Schwimer.  Number 8, Ms. Schimenti.  I'm sorry, not
25    Ms. Schimenti.  Number 9, Mr. Boleska.  Number 10, Mr. Bloedel.
```

```
 1   Number 11, Toro.  And number 12, Mefford.
 2              So numbers 1, 2, 3, 4, 9, 10, 11, 12.  The remaining
 3   of you can go back to Jury.  Thank you again for your service
 4   to this Court.  You are released.
 5                   (Remaining venire exits proceedings.)
 6              THE COURT:  All right.  Ladies and gentlemen, you
 7   have been selected to serve on this jury.  At this point
 8   Ms. Heard is going to swear you in as a jury and I'll give you
 9   some preliminary instructions, then I'll let you know how we're
10   going to proceed as the day goes on.
11              Ms. Heard, if you'll swear the jury.
12              COURTROOM DEPUTY:  Please rise and raise your right
13   hand.
14              Do each of you solemnly swear or affirm that you will
15   well and truly try the case now before the Court and render a
16   true verdict according to the law, evidence and instructions of
17   this Court?  If you do, please say "I do."
18              JURORS:  I do.
19              COURTROOM DEPUTY:  Thank you.  You may be seated.
20              THE COURT:  All right.  Ladies and gentlemen, now
21   that you have been sworn -- and you can sit how you are or you
22   can move into more comfortable seating.
23              Sir, if you'd like to just sit in one of the seats so
24   you're not over there out of the way.
25              You're fine?  Okay.
```

1          All right.  Now that you've been sworn, I need to

2     explain some basic principles about a civil trial and your duty

3     as jurors.  These are the preliminary instructions.  I will

4     give you more detailed instructions once the case is presented.

5          First of all, your duty.  It is your duty to listen

6     to the evidence, decide what happened, apply the law to the

7     facts.  It's the Court's duty to provide you with the law that

8     you must follow, and you must follow that law even if you

9     disagree with it.

10          You must decide the case only on the evidence

11     presented in the courtroom.  Evidence comes in in many forms,

12     it can be testimony about what someone saw, heard or smelled,

13     it can be an exhibit or a photograph, it can be someone's

14     opinion.  Some evidence proves a fact indirectly.  Let's say a

15     person saw wet grass outside and people walking into the

16     courtroom with wet umbrellas.  This may be indirect evidence

17     that it rained, even though the witness didn't personally see

18     it rain.  Indirect evidence is also called circumstantial

19     evidence, simply a chain of circumstances that likely proves a

20     fact.  As far as the law is concerned, it makes no difference

21     whether evidence is direct or indirect.  You may choose to

22     believe or disbelieve either kind.  Your job is to give each

23     piece of evidence whatever weight you think it deserves.

24          What is not evidence?  During the course of the trial

25     you will hear certain things that are not evidence and you must

1   not consider them as evidence.  First, the lawyers' statements

2   and arguments aren't evidence.  In their opening statement and

3   closing arguments, the lawyers, or in this case the party and

4   the lawyer, will discuss the case.  Their remarks may help you

5   follow each side of the case and the presentation of the

6   evidence, but the remarks themselves are not evidence and

7   should not play a role in your deliberation.

8         Second, the questions and objections aren't evidence,

9   only the witnesses' answers are evidence.  Do not decide that

10  something is true just because a question suggests that it is.

11  For example, a question may be asked:  "You saw Mr. Jones hit

12  his sister, didn't you?"  That question is not evidence of what

13  the witness saw or what Mr. Jones did unless the witness agrees

14  with it.

15        There are Rules of Evidence that control what the

16  Court can receive into evidence.  When a witness is asked a

17  question or presents an exhibit, the opposing person may object

18  if he or she thinks the Rules of Evidence do not permit it.  If

19  the Court overrules the objection then the witness will not be

20  allowed -- I'm sorry, then the witness will be allowed to

21  answer the question or the Court may receive the exhibit.  If

22  the Court sustains the objection then the witness will not be

23  allowed to answer the question and the Court will not receive

24  the exhibit.  When I sustain an objection to a question, you

25  must ignore the question and not try to guess what the answer

1    might have been.

2    Sometimes I may disallow evidence that somehow came

3    in, this is called striking evidence, and I will order you to

4    disregard or ignore it.  That means you must not consider that

5    evidence when you're deciding the case.

6    I may allow some evidence for only a limited purpose.

7    When you're instructed that you will only see an evidence for a

8    limited purpose, you must consider it only for that purpose and

9    no other.

10    To reach a verdict, you may have to decide which

11    testimony to believe and which testimony not to believe.  You

12    may believe everything a witness says, part of it, or none of

13    it.  When considering a witness's testimony, you may take into

14    account the witness's opportunity and ability to see, hear or

15    know the things the witness is testifying about, the witness's

16    memory, the witness's manner while testifying, any interest the

17    witness may have in the outcome of the case, any bias or

18    prejudice the witness may have, any other evidence that

19    contradicts the witness's testimony, the reasonableness of the

20    witness's testimony in light of all the evidence and any other

21    factors affecting believability.  At the end of the trial

22    I will give you additional guidelines for determining a

23    witness's credibility.

24    This is a civil case.  To help you follow the

25    evidence, I will summarize briefly the parties' position.

1           Plaintiff Melanie Moore claims Defendants Pooches of

2   Largo and Luis Marquez failed to pay her minimum wage during

3   three weeks of employment in August 2018 and made false

4   statements in a job posting.  Both defendants deny those

5   claims.

6           Ms. Moore, as a plaintiff, has a burden of proving

7   her case by what we call or the law calls a preponderance of

8   the evidence.  That means Ms. Moore must prove that in light of

9   all the evidence what she claims is more likely true than not

10  true.  So if you could put the evidence favoring Ms. Moore and

11  the evidence favoring Pooches of Largo and Luis Marquez on

12  opposite sides of balancing scales, Ms. Moore needs to make the

13  scales tip to her side.  If she fails to meet this burden, you

14  must find in favor of Pooches of Largo and Luis Marquez.  If

15  she meets this burden, you must find in favor of Melanie Moore.

16          To decide whether any fact has been proved by a

17  preponderance of the evidence, you may, unless the Court

18  instructs you otherwise, consider the testimony of all the

19  witnesses, regardless of who called them, and all of the

20  exhibits that the Court allowed, regardless of who produced

21  them.  After considering all the evidence, if you decide a

22  claim or fact is more likely true than not true, then the claim

23  or fact has been proved by a preponderance of the evidence.

24          While serving on the jury you may not talk with

25  anyone about anything related to this case.  You may tell

1    people that you're a juror and you may give them information

2    about when you must be in court, but you must not discuss

3    anything about the case itself with anyone.  You shouldn't even

4    talk about the case among each other until you begin your

5    deliberations.  You want to make sure you have heard

6    everything, all the evidence, the closing arguments and the

7    Court's instructions on the law, before you begin deliberating.

8    You must keep an open mind until the end of the case.

9    Premature discussions may lead to premature decisions.

10         In this age of technology, I need to emphasize that

11   in addition to not talking face-to-face with anyone about the

12   case, you must not communicate with anyone about the case by

13   any other means, this includes e-mails, text messages,

14   phone calls, internet, social networking websites and apps such

15   as Facebook, Instagram, Snapchat, YouTube, Twitter or X.  You

16   may not use any similar technology of social media, even if

17   I have not specifically mentioned it here.

18         You must not provide any information about the case

19   to anyone by any means whatsoever, and that includes posting

20   information about the case or what you're doing in the case on

21   any device or internet site, including blogs, chat rooms,

22   social websites, or any other means.

23         You must not use Google to search online or offline

24   for any information about the case, the parties or the law.

25   Do not read or listen to the news about the case, visit any

1    places related to the case, research any fact, issue or law

2    related to the case.  The law forbids jurors to talk with

3    anyone about the case and forbids anyone to talk to you about

4    it.  It is very important for you to understand why these rules

5    exist and why they are so important.

6            You must base your decision only on the evidence and

7    the testimony that is presented in the courtroom.  It is not

8    fair to the parties if you base your decision in any way on

9    information you acquire outside the courtroom.  For example,

10   the law often uses words and phrases in special ways, so it is

11   important that any definitions you hear come only from the

12   Court and not from any other source.  Only you jurors can

13   decide a verdict in this case.  The law sees you only as fair

14   and only you have promised to be fair.  No one else is so

15   qualified.

16           If you wish to take notes, you may take notes to help

17   you remember what witnesses said.  If you take notes, please do

18   not share them with anyone until you go to the jury room to

19   decide the case.  Also, don't let note taking distract you from

20   carefully listening to and observing witnesses.  When you leave

21   the courtroom you will have your notes turned face down on your

22   chairs.

23           Whether or not you take notes, you should rely on

24   your own memory of the testimony.  Your notes are only there to

25   help your memory, they are not entitled to greater weight than

1  your memory or impression about the testimony.

2        What's going to happen in the course of the trial?

3  First, each side will have an opportunity to make an opening

4  statement.  They don't have to, but they have that opportunity.

5  An opening statement, remember, is not evidence and it is not

6  supposed to be argumentative, it's just an outline of what the

7  party believes the evidence will show.

8        Next Ms. Moore will present her witnesses and ask

9  them questions.  After she questions her witnesses, Pooches of

10 Largo and Luis Marquez may ask witnesses questions.  This is

11 called cross-examining the witness.  Then Pooches of Largo and

12 Luis Marquez will present their closing witnesses, if any, and

13 Ms. Moore will have an opportunity to cross-examine them.

14       You should base your decision on all the evidence,

15 regardless of which party presented it.  After all the evidence

16 is in, the parties will have an opportunity then to make their

17 closing arguments to summarize and interpret in their mind what

18 the evidence has shown.  The Court will then instruct you on

19 the law, you will go to the jury room to deliberate.

20       During this trial you may submit questions to a

21 witness after the lawyers have finished their own questioning,

22 and in this case Ms. Moore as well.  Here is how that procedure

23 works.

24       After each witness has testified and the questions

25 have been asked, I will ask you if you have questions.  If you

have a question, write it down and give it to the Court staff.
You may submit a question for a witness only to clarify an
answer or help you understand the evidence.  Our experience
with jury questions indicates that jurors rarely have more than
a few questions for any one witness and there may be no
questions at all for some witnesses.

If you submit a question, the Court staff will give
it to me and I will share it with the lawyers and the party in
the case.  If the Rules of Evidence allow your question to be
asked, I will ask the question to the witness.  I may modify
the form or phrasing of a question so that it is allowed under
the Rules of Evidence.  Sometimes I may not allow the question
to be read to the witness, either because the law does not
allow it or because another witness is in a better position to
answer the question.  If I cannot allow the witness to answer
the question, you must not draw any conclusions or inferences
from that fact or speculate what the answer might have been.

Here are some important things to keep in mind about
your questions for the witnesses.  First, it must be a question
in writing.  Do not ask questions out loud.  Second, the Court
cannot re-call a witness to the stand to ask additional juror
questions.

If you have a question for a particular witness, you
must submit it when the Court asks for the question.  Finally,
because you must remain neutral and open-minded throughout the

1    trial, you should phrase your question in a way that does not

2    express an opinion about the case or about a witness.

3            You must keep an open mind until you've heard all the

4    evidence, the closing arguments and the Court's final

5    instructions on the law.

6            There are stipulations sometimes, the parties have

7    agreed that certain facts are true.  This agreement is called a

8    stipulation, and you must treat the facts as proven insofar as

9    this case is concerned.

10           I'm not going to allow interim statements because the

11   case is so short, so the parties will make their openings,

12   we'll take the questions, and then we will proceed in the

13   normal course.

14           We will typically go from 9:00 to 4:30 or 5:00,

15   depending on if a witness is on the stand, and we will be as

16   efficient as we can with your time.

17           There may be a need at times for me to have a sidebar

18   with the lawyers.  I know that's kind of disruptive and can be

19   kind of annoying, but it's important for the Court to hear some

20   things outside your hearing, so please be patient with us if

21   that has to happen.

22           Ms. Heard, may I see you one second?

23           Are the parties prepared at this time for their

24   opening arguments, opening statements?

25           MS. MOORE:  Yes, Your Honor.

1          MR. SARELSON:  Yes, Your Honor.

2          THE COURT:  The Court had anticipated about

3    15 minutes for opening.  Is that sufficient, Ms. Moore?

4          MS. MOORE:  Yes, Your Honor.

5          THE COURT:  Mr. Sarelson?

6          MR. SARELSON:  That's fine.

7          THE COURT:  All right.  Ms. Moore, you may proceed.

8          Give us one second, Ms. Moore.  Let's let the jury

9    get some notepads in case they want to take notes.

10         And, Ms. Moore, if you want to turn that podium, it

11   has a kickstand under the bottom, you can kick it out and then

12   you can turn it slightly toward the jury if you prefer.

13         MS. MOORE:  Thank you.

14         THE COURT:  You may proceed.

15         MS. MOORE:  Good morning, ladies and gentlemen of the

16   jury.

17         I obtained my employment for the defendant as a

18   veterinary technician in August of 2018 when I submitted my

19   resumé in response to the defendant's job post on indeed.com.

20   The job post was for a full-time certified veterinary

21   technician at the Petland Largo store and stated that it was

22   for an annual salary of $35,000.  But responding to that job

23   post turned out to be the biggest mistake of my life, because

24   the job post was a fraud.  The defendants never intended to pay

25   according to the terms in their post, or even a minimum wage

1    for that matter.  The defendants were only looking for free or

2    nearly free labor.  And they didn't want just any veterinary

3    technician, they wanted a credentialed veterinary technician, a

4    certified veterinary technician with at minimum an Associate's

5    degree in the field of veterinary technology.  The defendants

6    wanted the best but they didn't want to pay for it, and they

7    didn't pay for it.  The job post also said that the position

8    required working hands-on with the store's veterinarian who was

9    there four to five days a week, but that was another lie.

10           Before scheduling my interview at Petland, I visited

11   the defendant's Petland Florida website to learn more about the

12   company culture and read that Petland's mission is to eliminate

13   puppy mills and that they don't cut corners when it comes to

14   animal welfare and maintaining high standards of care, but

15   I soon learned that that couldn't be further from the truth.

16           I worked in my capacity as a veterinary technician,

17   caring for approximately 80 puppies a day, all of whom were in

18   varying stages of disease.  There was an isolation room in the

19   back of the kennel.

20           MR. SARELSON:  Objection, Your Honor.  This is a

21   referendum.

22           THE COURT:  Ms. Moore, you have to confine your

23   opening statements to the evidence and not argument.

24           MS. MOORE:  I understand.

25           So anyways, based on the defendants' terms in their

1    job post, I was deceived and I accepted employment at Petland,

2    which I never would have done had I known the truth.  Not only

3    did the defendants perpetrate a fraud when they posted a

4    misrepresented job on indeed.com, but they perpetuated that

5    fraud for the last five years by attempting to conceal their

6    initial fraud with additional fraudulent acts.  As this

7    proceeding moves forward, you'll see that the defendants'

8    actions over the last five years are compelling evidence of

9    fraud.

10            For example, the defendants changed my job title to

11   suit their needs at any given time.  I was a veterinary

12   technician with an annual salary of 35,000 when I was hired in

13   August 2018, but when it was time to pay me for my work,

14   somehow I had become a kennel technician for 8.45 an hour, but

15   when the defendants subsequently filed a malicious defamation

16   lawsuit against me in retaliation for my actions to recover my

17   wages, the defendants sought to injure my professional

18   reputation and therefore correctly stated that I was a

19   veterinary technician at Petland and then proceeded to accuse

20   me of attempting to extort the defendants for my actions to

21   recover my wages, but when I filed this lawsuit in this court

22   in September of 2020 I was back to being a kennel technician

23   for the first three years of this litigation, until just

24   two months ago, when the defendants changed my title once again

25   back to a veterinary technician.

1          This case is about the lengths to which the
2    defendants have gone over these last five years to avoid being
3    in this courtroom today.  The evidence will establish that the
4    defendants made misrepresentation after misrepresentation about
5    material facts pertaining to my position and title, dates and
6    hours of employment, agreed wage and wages paid, all to avoid
7    paying me my unpaid wages and avoid accountability for their
8    misconduct.
9          The evidence will also establish that rather than
10   correct the shortage in my wages and my paycheck, they
11   terminated my employment so they wouldn't have to pay me for
12   the work I had already performed for them.
13         The defendants acting in complete disregard for
14   whether I was paid correctly or whether they were in compliance
15   with the law when I complained to my supervisor upon
16   discovering the significant shortage of approximately $2,000
17   upon receiving my first paycheck just three weeks into my
18   employment.  The evidence will show that the defendants readily
19   admit that they never investigated my complaint because they
20   thought it was unnecessary.  It was unnecessary because the
21   defendants were well-aware that they had misrepresented the
22   terms set forth in their job post and knew that they never
23   intended to pay me according to their terms or even the law.
24         Fraud is the intentional use of deceit, a trick or
25   some dishonest means to deprive another of money, property or a

1    legal right.  Inherent in fraud is the unjust advantage over
2    another which injures that person or entity.  It includes
3    failing to point out a known mistake in a writing or not
4    revealing a fact which he has a duty to communicate.
5         Misrepresentation is a crime of misstating facts to
6    obtain money, goods or benefits of another to which the accused
7    is not entitled.
8         The evidence will establish that the defendants have
9    committed both fraud and misrepresentation.  So I ask you,
10   members of the jury, to show the defendants that wage theft is
11   unacceptable, that fraud is unacceptable, and that there are
12   consequences for such unlawful employment practices.  I'm
13   confident that at the conclusion of this trial, after you see
14   and hear all the evidence, you will easily reach a verdict in
15   my favor and against the defendants on all counts.
16        Thank you.
17        THE COURT:  Counsel?
18        MR. SARELSON:  Good morning, everyone.  Your Honor.
19   Ms. Moore.
20        In August of 2018 Ms. Moore worked for Pooches -- the
21   company is called Pooches of Largo -- for three weeks, around
22   August 13th to August 31st, 2018.  Three weeks.
23        Pooches of Largo is a franchise for Petland.  This is
24   why sometimes you see the Petland uniform.  My client is not
25   Petland.  My client is a franchise, just like you can franchise

1    McDonald's or a gas station.

2            And so for a three week period Ms. Moore was employed

3    by this local franchise as a kennel technician, making $8.45 an

4    hour.  Ms. Moore believes she was not supposed to be a kennel

5    technician, that she was supposed to to be a certified

6    veterinary technician, but you're not going to hear any actual

7    evidence about any of that other than what Ms. Moore actually

8    believes.

9            The supervisors/trainers, they're going to -- they're

10   going to testify today, one of them is Alison Nieves, the other

11   one is outside, her name is Yessi.  The only evidence you're

12   going to hear today is that Ms. Moore was onboarded as a kennel

13   technician, paying $8.45 an hour, she was trained as a kennel

14   technician, she performed the services of a kennel technician.

15           Her last day was August 31st.  On that day she

16   received her first paycheck, a live check.  The check was for

17   less money than she thought she was getting, which would make

18   sense if she was a certified vet tech making more than she

19   thought she was supposed to be making.

20           She sent a text message, which you'll see shortly

21   enough, to Ms. Nieves, who was the kennel manager at the time.

22   The kennel manager was her supervisor, who wasn't even making

23   as much as a certified vet tech does, and she said, if there's

24   a problem, you should call the corporate office, but you're a

25   kennel tech making 8.45 an hour, and if you think there's an

1  issue, call Corporate.

2          Ms. Moore doesn't call Corporate, that's it, that's

3  the last day of her job, and then eventually this lawsuit gets

4  filed.

5          You're not going to hear evidence today that she was

6  hired as a certified veterinary technician because there is no

7  evidence that she was a certified veterinary technician.

8  In fact, I don't believe you're going to hear evidence today

9  that she actually has a certification to be a veterinary

10 technician.

11         The difference between what she was paid, which was

12 8.45 an hour, and what she thought she was supposed to be paid,

13 which was around $16.50 an hour, I'm ballparking here, the

14 difference, the total difference between what she actually got

15 and what she thought she was supposed to get is around $1500.

16 We can do the math, but rough estimate, it's around $1500, and

17 that's what this lawsuit is about.  She thinks she's owed the

18 additional $1500 premised on a misunderstanding at best that

19 she will tell you about.

20         You may hear evidence about, you know, how many hours

21 she worked and what she did, but here is the thing, that was

22 five years ago, and in five years -- it was over five years

23 ago.  It's five years and three weeks.  Five years ago and

24 three weeks later Ms. Moore doesn't have a single witness to

25 show that she was working as a certified vet tech.  She doesn't

1    have a single witness.  None of the coworkers are here.  You're

2    not going to hear from any of the coworkers.  None of them are

3    going to say she was working extra hours that she was supposed

4    to be on the clock but she wasn't.  She clocked in, she clocked

5    out, and she got paid for every single dollar that she was

6    owed, and all this is about today is at best a

7    misunderstanding, an unfortunate misunderstanding, but that's

8    it.

9         The fraud that you're going to hear, the alleged

10   fraud that you're going to hear, is a job posting on

11   indeed.com.  Now, during voir dire you were asked questions

12   about indeed.com.  It's very common, people find jobs through

13   the internet all the time.  The job posting itself was never an

14   offer of employment.  We've all done this, this is a job

15   posting, she claims she applied for that particular job, you're

16   not going to hear any proof of it, but she claims she applied

17   for that particular job and that after she was interviewed she

18   was given that particular job, but she wasn't, and it's just

19   sort of unfortunate and it's a misunderstanding, but the

20   testimony you're going to hear, not some sympathies and not

21   conclusions, the actual evidence that you're going to hear,

22   it's very simple, she was hired as a kennel technician, she was

23   paid as a kennel technician, she was paid -- I'm sorry, she

24   never complained about doing the work of a kennel technician.

25   In fact, you'll hear that there's never been a certified

veterinary technician at that location in Largo.  And what's
left?  A dispute about $1500.  She thinks she should have got
paid roughly 2,000 and she ended up being paid roughly 600.
I'm ballparking, but roughly 600.

You may also hear that she did not receive one of
these paychecks, a direct deposit.  You know, the first check
is a live check and then you go on direct deposit.  Well, you
may hear that Ms. Moore claims she never got the direct
deposit, except there's a problem with that, in five years
Ms. Moore has never gone to PNC Bank, which is where the direct
deposit was, her account, five years and three weeks, Ms. Moore
has never gone to PNC Bank, it's just down the street, they're
all over town, to actually check her bank records to see, hey,
look, I'm missing a direct deposit.  Five years, three weeks,
never went online to check the bank records, never called to
check her own bank records, never walked into a store to check
her bank records.

The bottom line is simple, Ms. Moore was paid for
every single hour that she worked at the agreed-upon rate of
$8.45 an hour, and beyond that my clients, they owe her
nothing.

Mr. Marquez, who is sitting here, he'll testify
shortly, he doesn't know who Ms. Moore is, Ms. Moore never met
with him before he was -- before she was hired, he never made
any statements to her.  We don't really know how it is that

1    somebody who you've never talked with, who you've never met,

2    and by your own admission you've never communicated with, was

3    somehow involved in some kind of an elaborate fraud to hire

4    Ms. Moore for a job that --

5            THE COURT:  Counsel, are you testifying now or

6    argument or --

7            MR. SARELSON:  I'm just closing up, Your Honor.  I'll

8    be short.

9            THE COURT:  Yes, sir.

10            MR. SARELSON:  Bottom line here is -- I don't want to

11    take up more of your time than necessary.  You took time away.

12    Ms. Moore is not owed one penny, and you will hear zero

13    evidence to the contrary.

14            I look forward to talking to you guys soon.

15            THE COURT:  All right.  We'll take a brief recess

16    there and I'll call the jury back in about 15 minutes.

17                    *(Jury exits proceedings.)*

18            THE COURT:  Mr. Sarelson, I've very confused about

19    what you just said to this jury.  Your summary judgment papers

20    say defendants acknowledge that the plaintiff's correct rate of

21    pay was $35,000 hourly, and I assume you meant annually, but

22    somehow her payroll was accidentally entered as and she was

23    compensated as an $8.45 an hour employee, and then you say

24    there is evidence of a bookkeeping or administrative error for

25    which Pooches acknowledges, but there is no evidence that the

1    defendant acted with fraudulent intent; and you just told this

2    jury there is no evidence whatsoever that she was ever hired as

3    a vet tech, and I don't understand how you can flat-footed make

4    that statement to this jury with this concession in your

5    statements to the Court.

6              MR. SARELSON:  Your Honor, I believe what our motion

7    for summary judgment said is we're willing to concede for

8    purposes of summary judgment.

9              THE COURT:  That's not what you said in here.

10             MR. SARELSON:  I'd have to look it up.

11             THE COURT:  Look at it, because I want you to tell

12   me -- on page 8, I'm reading it, it doesn't say we're conceding

13   for purposes of summary judgment only, it says defendants

14   acknowledge that the plaintiff's correct rate of pay was

15   $35,000 hourly, but somehow her payroll was accidentally

16   entered as and she was compensated at $8.45 an hour, and then

17   you doubled down in your discussions and your attempted

18   explanation that says there is evidence of a bookkeeping or

19   administrative error for which Pooches acknowledges, but there

20   is no evidence that the defendant acted with fraudulent intent.

21             It's a matter of public record that Pooches offered

22   her the $1500 arising from this discrepancy.  Footnote.

23             That's judicial estoppel, Mr. Sarelson.

24             MR. SARELSON:  Your Honor -- can I sit, Your Honor?

25             I'm looking at the affidavit, Your Honor.  What it

1    says is -- what it says is that she was hired after applying

2    for a job through indeed.com, to the best of our knowledge.

3            THE COURT:  What affidavit are you referring to, what

4    page?

5            MR. SARELSON:  It's docket entry 66-1.  It's the

6    Marquez affidavit.

7            THE COURT:  Yes, sir.

8            MR. SARELSON:  So it says -- paragraph 3 says:

9    Ms. Moore was hired in early August after applying for a job

10   through indeed.com.  That's true to the best of our knowledge.

11   It was a full-time veterinary technician job paying $35,000

12   annually.  That's what the ad that she's -- this is the ad that

13   she responded to.  And then paragraph 4 says we cannot locate

14   records identifying the job she was actually offered.  It is

15   possible she was not offered a vet tech job but was instead

16   offered a kennel technician job which paid 8.45 an hour.  It's

17   also possible she was offered the vet tech job but she was

18   inadvertently onboarded as a kennel tech.

19           I think that's right.  That's consistent with our

20   belief that this is a -- that this is a misunderstanding.

21           THE COURT:  Mr. Sarelson, I can read as well as you

22   can read, and your first statement is she was offered the job

23   as a vet tech, whatever screwup happened internally at Pooches,

24   and in your summary judgment papers you flat-out say she was

25   offered this job as a vet tech and it was a mistake and we

1   acknowledge it was a mistake, you flat-out say it with no

2   qualification, and so you need to explain that to the jury.

3        Who is your first witness, Ms. Moore?

4        MS. MOORE:  First witness would be -- my first

5   witness would be Alison Nieves.

6        THE COURT:  All right.  So I'm just concerned because

7   no one has seen Mr. Celler and I told him he didn't have to be

8   here until 1:30, so we might be able to get through the lunch

9   and he should be here after that, if he's actually going to be

10  called.

11       So, Mr. Sarelson, how would you like to make that

12  correction to this jury?  Because that is not the statement

13  that the defendant made to the Court on the record in the

14  summary judgment papers and it's not consistent with the

15  affidavit that you just read from.

16       MR. SARELSON:  Your Honor, I mean, I have no problem

17  with the affidavit being read in.  The affidavit I think is

18  accurate.  It says -- what paragraph 4 says is we can't locate

19  the actual records identifying the job she was offered, which

20  is true.

21       THE COURT:  What your summary judgment says, the

22  representation you made to the Court is that she was hired as a

23  vet tech making $35,000 annually and you acknowledge that that

24  was what she was hired as but you don't think it was done with

25  fraudulent intent.  That's what your summary judgment paper

 1    says to the Court.

 2           MR. SARELSON:  Your Honor, I don't read it that way.

 3    It says Ms. Moore was hired -- this is quoting -- it says on

 4    page -- paragraph 1 in the motion for summary judgment, I think

 5    on page 1, it says:  Ms. Moore was hired in early August 2018

 6    after applying for a job through indeed.com.  It was a

 7    full-time veterinary technician job paying $35,000, as claimed

 8    by Ms. Moore.  That to me is an accurate reflection of the job

 9    that she claims she responded to.  I don't think that that --

10    I don't read that to say she was offered a vet tech job.

11    That's why paragraph --

12           THE COURT:  Defendant acknowledges that the

13    plaintiff's correct pay was $35,000 annually, but somehow her

14    payroll was accidentally entered and she was compensated at

15    $8.45 an hour.  That's your language.  There is evidence of a

16    bookkeeping or administrative error for which Pooches

17    acknowledges, but there is no evidence that either defendant

18    acted with fraudulent intent.  That's your statement.

19           MR. SARELSON:  Your Honor, I'm sorry, I'm just -- I'm

20    looking for that particular language.

21           THE COURT:  Page 10 of 11, the paragraph right before

22    Defendant Marquez should be dismissed entirely.  That's your

23    last sentence of the previous paragraph.

24           MR. SARELSON:  Right.  It's -- that may have just

25    been poor wording on my part, but what we are alleging

```
 1    is that --

 2            THE COURT:  Counsel, seriously.  Seriously.  We had

 3    this conversation during the pretrial conference and your

 4    response was, we'll just pay her then, we'll just pay her,

 5    because that's still just $1800, we'll just pay her, we

 6    acknowledge we made an error, and now you're sitting in front

 7    of this jury saying she's hallucinating.

 8            MR. SARELSON:  You're Honor, we're not saying we made

 9    an error.  We are saying at most --

10            THE COURT:  No, you didn't say "at most" --

11            MR. SARELSON:  -- it was an error.

12            THE COURT:  -- Mr. Sarelson.  Show me the "at most"

13    language.

14            MR. SARELSON:  I believe -- well, you're talking

15    about what I just said to the jury and said --

16            THE COURT:  I'm saying in your summary judgment

17    papers, which is your representation to this Court, that is

18    what you, Mr. Sarelson, said to this Court, she was hired as a

19    vet tech making $35,000 an hour and she was inadvertently

20    onboarded at 8.45.  We acknowledge we made an error but we

21    didn't do it with fraudulent intent.

22            MR. SARELSON:  Your Honor --

23            THE COURT:  That is what you said, Mr. Sarelson.

24            MR. SARELSON:  Your Honor, I don't -- I think what we

25    said is we acknowledge the potential for a bookkeeping error.
```

```
 1   I don't --

 2           THE COURT:  Oh, Mr. Sarelson.

 3           MR. SARELSON:  Your Honor, what I --

 4           THE COURT:  What I want you to do is I want you to

 5   take your summary judgment papers and I want you read them over

 6   this break and I want you to come back and show me where it

 7   says at most, perhaps, qualifying language.  This is an

 8   acknowledgment of an error which is the result of an onboarding

 9   error and you're just claiming it was not fraudulent, it wasn't

10   intended to do this, that's what you say in these papers, not

11   that it didn't happen.

12           MR. SARELSON:  I can -- I can review, Your Honor.

13   I --

14           THE COURT:  Mr. Marquez, did you review this summary

15   judgment paper before it was filed?

16           MR. MARQUEZ:  Not the summary judgment.  I did do the

17   affidavit, obviously, ma'am.

18           THE COURT:  And so you didn't see when your lawyer

19   represented to the Court that Ms. Moore had been hired as a

20   vet tech and that it was a bookkeeping error?

21           MR. MARQUEZ:  Your Honor, I'm not here to lie to you.

22   I don't even remember the summary judgment when it was done.

23   All I know is that we were trying to resolve the case and do

24   the right thing.  I mean, I don't remember that particular

25   thing, to be honest.
```

1          MR. SARELSON:  Your Honor, I'm reading from that same

2    paragraph.

3          THE COURT:  I have not seen anything like this in my

4    entire 26 years on the bench.

5          MR. SARELSON:  Your Honor, it says -- I can read it.

6    It says -- Your Honor, it says:  If the promised rate of pay

7    was higher than the rate of pay actually pled, the plaintiff

8    has at most a breach of contract claim for the difference

9    between -- for the difference, approximately $1500.

10          THE COURT:  I know what your upside of it is and your

11    upshot and your argument for why this is a pittance to you.

12    I am just talking about the underlying factual admission made

13    to the Court in your summary judgment papers:  Defendants

14    acknowledge that the plaintiff's correct rate of pay was

15    $35,000, and I'll give you annually because you didn't

16    proofread, but somehow her payroll was accidentally entered as

17    and she was compensated at 8.45 an hour, and then you go on

18    this long explanation.  There is evidence of a bookkeeping or

19    administrative error for which Pooches acknowledges, but there

20    is no evidence either defendant acted with fraudulent intent.

21    That's what you said.  I didn't make that up, I didn't

22    paraphrase it, I read it as it's printed in black and white on

23    this piece of paper, and that's what this jury is going to be

24    told when they come back, before the first witness is called.

25          So we'll take our break.  We'll come back at 11:15.

```
 1              MR. SARELSON:  Thank you, Your Honor.

 2                        - - - - -

 3              (Recess at 11:02 a.m. until 11:31 a.m.)

 4                        - - - - -

 5              THE COURT:  Mr. Sarelson, have you figured out a way

 6    to correct this misstatement to the jury?

 7              MR. SARELSON:  Your Honor, my suggestion, Your Honor,

 8    would be -- although I don't think what we said was entirely

 9    inaccurate, my suggestion to help the Court would be that we

10    say something along the lines of what we put, where it says

11    there's evidence of a bookkeeping or administrative error for

12    which Pooches acknowledges, which has sort of consistently been

13    our position, consistent with the affidavit, that somehow this

14    happened.  There was obviously a job advertisement.  She

15    obviously submitted a resumé in response to that job

16    advertisement.  That's true.  That job advertisement, but not

17    job offer, that job advertisement listed the salary as $35,000.

18    Fully acknowledge that.  The dispute is simply the job she was

19    actually offered, and it's the client's position that she was

20    offered and did the work only of a kennel technician.

21              THE COURT:  Your client didn't make that

22    representation.  Your client didn't make it in his affidavit,

23    he didn't make it in the motion for summary judgment, and he

24    didn't make it in his statement just now to the Court, and you

25    didn't make it to the Court in the pretrial statement.  That
```

1    never has been the representation of Pooches.

2            Pooches doesn't know how it is that they paid her

3    $8.45 an hour, that's the representation you made to me at the

4    pretrial conference, that's the representation your client just

5    made, and that's consistent with the affidavit.  And in the

6    summary judgment motion what you said to me was:  Defendant

7    acknowledges that the plaintiff's correct rate of pay was

8    $35,000 hourly, which you meant annually, but somehow her

9    payroll was accidentally entered as and she was compensated at

10    $8.45 an hour.  I didn't write that sentence, Mr. Sarelson.

11            MR. SARELSON:  I understand, Your Honor, and I --

12            THE COURT:  All right.  And that's the sentence I'm

13    going to read to the jury, or you can read it to the jury,

14    whichever you prefer, and if you would like to also read there

15    is evidence of a bookkeeping or administrative error for which

16    Pooches acknowledges but there is no evidence that the

17    defendant acted with fraudulent intent, you can say that, but

18    you cannot leave this jury with the impression that Ms. Moore

19    is making this whole thing up and that she was never hired as a

20    vet tech making $35,000 a year.  You're not going to do that.

21    That's not your representation in the affidavit, Mr. Marquez

22    signed this affidavit for both defendants, and that's not the

23    representation in the summary judgment papers and it's not the

24    representation you made at the pretrial conference.

25            If you want to be refreshed, at the pretrial

1    conference:  And, Mr. Sarelson, can you tell the Court why it

2    is that it wasn't until your summary judgment filings that the

3    defense admitted that it had goofed at least in the way it

4    hired Ms. Moore?

5            The answer is simple, Your Honor.  We actually don't

6    know.  We don't have -- we don't have the onboard -- you say,

7    I think, original onboarding materials, and so we don't -- it's

8    not like -- we actually tried to figure out how this happened

9    and we don't have a good answer.  We think -- this is

10   speculation, we think she actually did apply for the full-time

11   job but she was onboarded accidentally for the part-time job,

12   and that's about -- I mean, that's speculation on our part, but

13   that was it, she -- and, unfortunately, because of the time --

14   the time gap that the Court knows, she sent the text message on

15   August 31, 2018, Alison says call Corporate to get to the

16   bottom of it, she doesn't call Corporate, and then we didn't

17   hear from her.

18           That's what you said, and so you can't make up

19   answers today for answers you didn't have in the pretrial

20   conference and answers that are inconsistent with the statement

21   you made in your summary judgment motion and answers

22   inconsistent with what Mr. Marquez said in his affidavit, and

23   so you can read those two sentences to the jury or I'll read

24   them for you, whichever you prefer.

25           MR. SARELSON:  Your Honor, I would be okay with the

1  Court reading it.  That's fine.

2          THE COURT:  All right.

3          Please re-call the jury.

4              (Jury enters proceedings.)

5          THE COURT:  Ladies and gentlemen, thank you for your

6  patience.  The Court needs to read something to you so that you

7  have a clear understanding.

8          Defendants acknowledge that the plaintiff's correct

9  rate of pay was $35,000 annually, but somehow her payroll was

10  accidentally entered as and she was compensated at $8.45 an

11  hour.  There is evidence of a bookkeeping or administrative

12  error for which Pooches acknowledges, but defendant contends it

13  did not act with fraudulent intent.

14          Ms. Moore, you can call your first witness.

15          MS. MOORE:  Your Honor, I have some evidence I'd like

16  to show the jury first before calling my first witness, if

17  that's okay.

18          THE COURT:  You'll have to offer that evidence

19  without describing its content and identifying it for the

20  record, so you'll say Plaintiff's Exhibit so-and-so and

21  defendant will be able to follow along, because they have the

22  exhibit folder.  I may need you to hand it up to me before you

23  display it to the jury.

24          So what evidence would you like to admit?

25          MS. MOORE:  The first is document 1-A.  It's the

```
 1    employment posting on Indeed.

 2              THE COURT:  Any objection to the posting?

 3              MR. SARELSON:  Your Honor, we object to authenticity.

 4              THE COURT:  Overruled.

 5              MR. SARELSON:  To be clear, I don't have a copy right

 6    now.

 7              THE COURT:  It's not in your notebook?

 8              MR. SARELSON:  She grabbed my notebook back.

 9              THE COURT:  All right.  Overruled as to the posting,

10    it will be admitted.  You can show it to the jury.

11              MS. MOORE:  Thank you.

12              Do you want me to tell you what the rest of them are

13    now, or --

14              THE COURT:  Yes.

15              MS. MOORE:  There is 1-B and 1-C, the voicemails,

16    voicemail messages.

17              THE COURT:  These are voicemails from whom?

18              MS. MOORE:  One is from Leanne with Petland and the

19    other one is Lynette with Petland.

20              THE COURT:  By "Petland" you mean Pooches?

21              MS. MOORE:  Yes.  Yeah.

22              THE COURT:  Any objection?

23              MR. SARELSON:  Object to authenticity.  We have not

24    been produced the actual voicemails, Your Honor.

25              THE COURT:  Can you look at it?
```

```
 1              MR. SARELSON:  Your Honor, those are visualizations
 2    of the voicemail.  We continue to object to authenticity.
 3              THE COURT:  By "visualization" you mean this is a
 4    voicemail that you printed from your phone when you got the
 5    voicemail and it printed up on your phone?
 6              MS. MOORE:  Yes, Your Honor, because I have the
 7    visual --
 8              THE COURT:  It will be received.
 9              MS. MOORE:  Visual voicemail function.
10              Thank you.
11              THE COURT:  That's 1-A, 1-B and 1-C?
12              MS. MOORE:  Yes, Your Honor.
13              THE COURT:  All right.
14              MS. MOORE:  And then also 1-D through 1-K, and the
15    last one, Your Honor, is the screenshots that the defendants
16    filed in the case of their Indeed account showing the job post
17    and the date that I submitted my resumé.
18              THE COURT:  What's the document number?
19              MS. MOORE:  It is -- it should be -- I think it's
20    1 -- I think it's 1-I, and -- yeah, it's just 1-I.
21              THE COURT:  I don't see a 1-I in my materials.  May
22    I see it?
23              MS. MOORE:  Certainly.
24              THE COURT:  Is Petland Pembroke Pines the same thing
25    as Pooches?
```

1              MR. SARELSON:  No, Your Honor.

2              THE COURT:  You'll have to inquire as to I.  It is

3     not coming in on that opening basis.

4              And, Counsel, you have objections to the other --

5              MR. SARELSON:  We do, Your Honor.  With respect to

6     1-D and E, are those are incomplete, unauthenticated

7     text messages.  We have no objection to F to G or to H, and

8     then I, J and K we object to on authenticity grounds, and

9     I think that's everything that was just discussed.

10             THE COURT:  All right.  You'll have to authenticate

11    I, J and K through your witness.  The other ones will be

12    admitted, 1-A through H.  They'll be received.  If you would

13    like to publish them at this time, other than I, J and K, you

14    may do so.

15             MS. MOORE:  This is the job post on indeed.com.

16             MR. SARELSON:  Objection.  Shouldn't this come in

17    through testimony?

18             THE COURT:  It's been admitted into evidence.  She

19    can publish it if she wishes.

20             MR. SARELSON:  She's also talking about it,

21    Your Honor.

22             THE COURT:  She can read a document.  That's the only

23    way to publish it.

24             MS. MOORE:  It's actually two pages.  This is the

25    second page, where it shows here the salary was 35,000 a year.

```
 1            THE COURT:  You have to just read the document or any
 2   part of it.  Second page, second line --
 3            MS. MOORE:  Oh, okay.  So the job is posted --
 4            THE COURT:  Use the microphone.  Pull it toward you.
 5            MS. MOORE:  The job is posted as a certified
 6   veterinary technician, full-time, and the job description
 7   states:  This position entails a lot of responsibility in our
 8   kennels.  Our vet techs will be in charge of overseeing the
 9   daily cleaning and disinfecting as well as in charge of
10   socializing the pups and will be the main caretaker of the
11   puppies in our store.  It is essential that knowledge of all
12   medicines and close relationship with our veterinarian is
13   established.  We work on-hands with the vet, who is at the
14   store four to five times a week.  Taking weights, administering
15   vaccines, kennel cleanup, feeding, et cetera, will be some of
16   the tasks expected of you.  The presentation of the puppies and
17   their kennels is the duty of the kennel techs.  Looking for a
18   bright individual with a matching personality to take on this
19   positive role in our store.  Experience required.
20            And then the third line down on the second page,
21   where it says salary, it states 35,000 a year.
22            And this is just a different version of the same job
23   post.  That's just a screenshot.  The first one I showed you
24   was a printer -- or a print version, and this is just a
25   screenshot of the same post.
```

1          This is a visual voicemail I had received after

2     submitting my resumé on August 8th.  It says:  Hi, Melanie.

3     My name is Leanne and I'm calling from Petland in regards -- in

4     regards to the resumé you submitted through Indeed for the

5     veterinary technician position at Petland.  If you can, please

6     give me a call back.  My number is nine five four, four four

7     zero, two zero zero three one.  (sic)  And that was -- that was

8     on August 8th.

9          And then this is another one, this is from a

10    different person.  Hi, Melanie.  My name is Lynette.  I'm

11    calling from Petland Largo.  If you can please give me a call

12    back.  This is regarding the resumé you submitted for the

13    certified veteran technician position.  Please call me back so

14    we can go ahead and schedule you an interview, okay?  My number

15    is nine five four, four four two, three hundred, one zero six

16    zero.  (sic)  And, again, my name is Lynette.  Thank you.

17    Bye-bye.

18          So on August 30th --

19          THE COURT:  You have to call a witness.  You can't

20    testify.  Do you wish to call a witness?

21          MS. MOORE:  Yes.  Alison Nieves, please.

22          THE COURT:  Please come forward to be sworn.

23          You can testify if you call yourself as a witness,

24    but you cannot just stand at the podium and testify about

25    documents.

 1            COURTROOM DEPUTY:  Please raise your right hand for

 2    me.

 3            Do you solemnly swear or affirm, under penalties of

 4    perjury, that the statements you give in these proceedings will

 5    be the truth, the whole truth and nothing but the truth?

 6            THE WITNESS:  I do.

 7            COURTROOM DEPUTY:  Please state your name and spell

 8    your name for the record.

 9            THE WITNESS:  Alison Nieves, A-L-I-S-O-N, Nieves,

10    N-I-E-V-E-S.

11            COURTROOM DEPUTY:  Thank you.  You may be seated

12    right in the box.

13            THE COURT:  Ms. Nieves, you're under oath.  You have

14    to give truthful answers.  If you give false answers, you face

15    penalties of perjury and false statement.  Do you understand

16    that?

17            THE WITNESS:  Yes, ma'am.

18            THE COURT:  Wait until the question is completed

19    before you give your response, and if you see counsel stand to

20    object, wait until I rule on the objection before you answer.

21    Do you understand that?

22            THE WITNESS:  Yes, ma'am.

23            THE COURT:  Counsel.  I mean, Ms. Moore.

24

25

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 83 of 225 PageID
1589
ALISON NIEVES - SEPTEMBER 18, 2023                    83
Direct examination by Ms. Moore

1               **DIRECT EXAMINATION OF ALISON NIEVES**

2  **BY MS. MOORE:**

3  Q    So this was the direct deposit, my enrollment form that

4  you gave me on Thursday, the day before my last day, the day

5  before payday, and do you recall saying that you had just

6  gotten an e-mail from Corporate and that if we didn't have

7  direct deposit set up, that we wouldn't be getting paid the

8  next day?

9  A    I don't remember, five years ago.

10 Q    No.  It's been a while.

11        Okay.  Yeah.  So, anyways, so you gave me this form

12 and I filled it out with my banking information and I gave it

13 back to you.

14             THE COURT:  Is that a question?

15             MS. MOORE:  No, that is a statement.

16             THE COURT:  Do you recall that?

17             THE WITNESS:  No, ma'am.

18             THE COURT:  Is that document your payroll direct

19 deposit type document that you used before?

20             THE WITNESS:  Yes, it was.

21             THE COURT:  Is it the form that was in place at the

22 time she worked there?

23             THE WITNESS:  Yes, ma'am.

24 BY MS. MOORE:

25 Q    So the following day was payday, that was August 31st,

ALISON NIEVES - SEPTEMBER 18, 2023                    84
Direct examination by Ms. Moore

1  2018, and in the afternoon I received a text message from

2  Alison saying "Your check is here."

3          THE COURT:  Are you asking her if that's a text

4  message?

5  Q    Do you remember the --

6  A    Yes.

7  Q    You do.  Okay.

8          So she texted me that afternoon telling me that my

9  check was there.

10          THE COURT:  You have to ask questions, Ms. Moore.

11  You can say what did you say to me, what does this text message

12  say, and she can tell the jury.

13          MS. MOORE:  Sorry.

14  BY MS. MOORE:

15  Q    Okay.  Would you mind reading --

16  A    Yes.  I texted you to let you know that your check was

17  here at the store, and you responded with:  So much for not

18  getting paid today unless we had direct deposit.  I will come

19  and get it when it stops raining.  Thank you.

20          And you texted back again:  My check is not right

21  either.  Who would I talk to about that?

22          I asked you how it was wrong.

23          You said the pay rate.

24          I said, what was it?

25          You said 8.45.

ALISON NIEVES - SEPTEMBER 18, 2023                85
Direct examination by Ms. Moore

 1              If you can move it.  I can't see the rest.

 2              I said that's the right pay rate.

 3    Q    Do you remember when you were getting my paycheck you had

 4    said that -- you said that -- you said something like, you're

 5    lucky because my paycheck is all screwed up and I'm going to

 6    have them fix it?

 7    A    No.

 8    Q    So this is just a second page of the same text

 9    conversation.  If you could just please read that.

10    A    I'll start at the top where it says that the pay rate was

11    right, and then you sent me the veterinary technician Indeed

12    job post, and I said it's no longer available, because when

13    I clicked on it, it didn't show.  And I said but 8.45 is right,

14    and then you sent me screenshots of, I assume, the posting.

15    Q    Can you read that one.

16    A    Yes.  That is the position I applied for and that is the

17    position I was hired for.  Why would I leave my last job making

18    $16 an hour for a job that pays less than half of that?  I --

19    of what I was making.  Bait and switch is illegal as hell.

20              Sorry.  I don't know if I'm allowed to say that.

21              THE COURT:  You can read it as it's printed, yes,

22    ma'am.

23    A    Okay.  They can't offer a job at one pay rate and then

24    change the rate after someone has already put in the hours.

25    I know it's not your fault.  I'm not blaming you.  But that is

ALISON NIEVES - SEPTEMBER 18, 2023                    86
Direct examination by Ms. Moore

1   a total scam.

2           And I responded, I would call Corporate and figure it

3   out.

4           And you said, I will see about getting a lawyer and

5   have them call.  I think that would be the best way to handle

6   it.

7   Q    Thank you.

8           And this is a continuation of the same conversation.

9   A    You've got to move it up.

10  Q    I believe the top one is just a continuation.

11          THE COURT:  Just scroll all the way up to --

12  I'm sorry.  Push it up the other way.  Right there.

13          MS. MOORE:  Sorry.

14          THE COURT:  Right there is fine.

15  A    After you said the lawyer, I responded with:  I am sorry

16  to say but your employment at Petland is terminated immediately

17  and we will have our legal team look into the wage

18  disagreement.  It was a pleasure working with you.

19          MS. MOORE:  I didn't contact the corporate office

20  like she suggested because her text message said that --

21          MR. SARELSON:  Objection, Your Honor.  That's a

22  statement.

23          THE COURT:  Yes.

24          MS. MOORE:  They said that the legal team would look

25  into the wage disagreement, so I didn't think there was a

Case 8:20-cv-02184-MSS-SPF   Document 141   Filed 06/18/24   Page 87 of 225 PageID
1593
ALISON NIEVES - SEPTEMBER 18, 2023                87
Direct examination by Ms. Moore

1    reason to call Corporate.

2            THE COURT:  Ms. Nieves, how much time transpired

3    between her saying "I'll get a lawyer" and your responding back

4    saying "You're fired"?

5            THE WITNESS:  I do not remember.  It's in the

6    text messages, but I -- maybe a couple hours.  I'm not

7    100 percent sure.

8            THE COURT:  All right.

9            MS. MOORE:  Actually, Your Honor, it was about

10   30 minutes.

11           MR. SARELSON:  Objection, Your Honor.  She's

12   testifying.

13           THE COURT:  She's eventually going to testify,

14   Mr. Sarelson.

15   BY MS. MOORE:

16   Q    Why did you terminate me that day?

17   A    Um, I don't honestly remember.  I know that there was a

18   few times that I spoke to you and, you know, we had

19   disagreements and stuff like that, but honestly I do not

20   remember.

21   Q    Did the defendant, Luis Marquez, tell you to terminate me?

22   A    I do not remember.

23   Q    What was -- what disagreement was it that caused you to

24   terminate my employment?

25   A    Food in the kennel, I definitely remember that.

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 88 of 225 PageID 1594
ALISON NIEVES - SEPTEMBER 18, 2023                    88
Direct examination by Ms. Moore

1    Q    Food in the kennel.  Okay.

2            THE COURT:  What did you do in the two hours between

3    the time she said she would get a lawyer and you called back

4    and terminated her employment, and communicated that her

5    employment was terminated?

6            THE WITNESS:  I was probably working in the kennel,

7    to be honest with you.

8            THE COURT:  So you didn't call anybody before you

9    called her?

10            THE WITNESS:  I know I talked to the sales manager,

11    and I believe we talked to one of the people in Corporate, but

12    I don't remember who.

13            THE COURT:  Concerning Ms. Moore?

14            THE WITNESS:  Yes, concerning her pay and stuff like

15    that.

16            THE COURT:  And so were you the person who made the

17    decision to tell her her employment was terminated?

18            THE WITNESS:  No.

19            THE COURT:  Who did?

20            THE WITNESS:  I do not remember, ma'am.

21            THE COURT:  Somebody in Corporate or the sales

22    manager, you don't know who told you to tell her that?

23            THE WITNESS:  No, I don't remember.

24            THE COURT:  And you have a shirt that says Petland on

25    it.

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 89 of 225 PageID 1595
ALISON NIEVES - SEPTEMBER 18, 2023                    89
Direct examination by Ms. Moore

1              THE WITNESS:  Yes, ma'am.

2              THE COURT:  That's what you go by, Petland?

3              THE WITNESS:  Yes, ma'am.

4              THE COURT:  You don't go by Pooches on the sign

5    outside?

6              THE WITNESS:  No, ma'am.

7              THE COURT:  You may continue, Ms. Moore.

8              MS. MOORE:  This is just a copy of the paystub that

9    I received on August 31st.  It was for $183.12.  You can see

10   there at the top, on the top right -- you can see here it says

11   the pay period, starting was August 17, 2018, and ended on

12   August 30th, 2018.  So I started on August 13th, so basically

13   my first week wasn't compensated, and because the pay period

14   ended the day before --

15             THE COURT:  You have to ask her questions, Ms. Moore.

16   You can ask her what day was your first day and then you can

17   extrapolate in your closing, or you can testify from the stand

18   so that Mr. Sarelson can cross-examine you.

19             So do you want to ask her when your first day was?

20             MS. MOORE:  I'm not sure that she would -- it was

21   actually Ms. Tello that hired me, so I don't know if Alison

22   would know.

23             THE WITNESS:  I don't remember.

24             THE COURT:  All right.

25             MS. MOORE:  I'd be happy to take the stand.

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 90 of 225 PageID
1596
ALISON NIEVES - SEPTEMBER 18, 2023                    90
Cross-examination by Mr. Sarelson

```
 1              THE COURT:  After you finish with this witness.

 2              MS. MOORE:  Yeah.  I think that was actually all

 3     I had for this witness.

 4              Yeah, that was all I had for her.

 5              THE COURT:  Mr. Sarelson?

 6              You can have a seat, Ms. Moore.  He gets to examine

 7     her.

 8              CROSS-EXAMINATION OF ALISON NIEVES

 9     BY MR. SARELSON:

10     Q    Hi, Ms. Nieves.  How are you?

11     A    Good.  How are you?

12     Q    What is your current title?

13     A    Kennel manager.

14     Q    And who is your employer?

15     A    Luis Marquez.

16     Q    What's the name of the company?

17     A    Oh.  Pooches of Largo.

18     Q    About how long have you been kennel manager at Pooches of

19     Largo?

20     A    Five years.

21     Q    Where is the Pooches of Largo located?

22     A    Ulmerton Road.

23     Q    Do you remember Ms. Moore employed by the company?

24     A    Yes.

25     Q    Do you remember about how long she was employed with the
```

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 91 of 225 PageID
1597
ALISON NIEVES - SEPTEMBER 18, 2023                    91
Cross-examination by Mr. Sarelson

 1    company?

 2    A    Three weeks.

 3    Q    Were you her supervisor?

 4    A    Yes.

 5    Q    What was Ms. Moore's title?

 6    A    Kennel tech.

 7    Q    What was Ms. Moore's rate of pay?

 8    A    8.45.

 9    Q    Did Ms. Moore ever do the work of a certified veterinary

10    technician?

11    A    Not that I'm aware of, no.

12    Q    Did that store ever have a certified veterinary

13    technician?

14    A    No.

15    Q    To this day, does it have a certified veteran technician?

16    A    (Shaking head.)

17             THE COURT:  I can't hear you with a nod.

18             THE WITNESS:  I'm sorry.  No.

19    Q    Were you involved at all in the hiring of Ms. Moore?

20    A    No, I was not.

21    Q    Did Ms. Moore have to clock in and clock out --

22    A    Yes.

23    Q    -- when -- let me just -- hold on a second.  Let me finish

24    asking.

25             Did Ms. Moore have to clock in and clock out when she

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 92 of 225 PageID
1598
ALISON NIEVES - SEPTEMBER 18, 2023                    92
Cross-examination by Mr. Sarelson

```
 1   got there?
 2   A    Yes.
 3          THE COURT:  Take a step to your right so you're in
 4   front of that microphone.
 5          MR. SARELSON:  Sorry.  Is that better, Your Honor?
 6          THE COURT:  Yes.
 7          MR. SARELSON:  Sorry about that.
 8   BY MR. SARELSON:
 9   Q    So she had to clock in and clock out; is that right?
10   A    Yes, sir.
11   Q    Is that consistent with what the other kennel technicians
12   do?
13   A    Yes, sir.
14   Q    Did she report to you as kennel manager at the time?
15   A    Yes, sir.
16   Q    Are you aware that Ms. Moore is asserting that she was
17   supposed to be paid $35,000 a year?
18   A    Only -- well, not the amount, but when she told me that
19   there was a problem.
20   Q    Were you making more or less than $35,000 a year as her
21   supervisor at the time?
22   A    Less.
23   Q    So during that three week period that culminated on
24   August 31st, 2018, did Moore ever express to you that she was
25   supposed to be a certified vet tech?
```

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 93 of 225 PageID
1599
ALISON NIEVES - SEPTEMBER 18, 2023                    93
Cross-examination by Mr. Sarelson

1    A    No.

2    Q    Did she ever claim to you that -- I said that --

3    I apologize.

4         Did she ever complain to you about the actual work

5    that she was performing on a day-in and day-out basis?

6    A    No.

7    Q    As part of the termination process, you were showed a text

8    message earlier where you had suggested that she call Petland

9    Corporate to find out what was going on with her rate of pay;

10   is that right?

11   A    Yes, sir.

12   Q    To the best of your knowledge, has she ever once called

13   Corporate to find out, as suggested by you?

14   A    No, not that I'm aware of.

15   Q    I understand she was only there for three weeks, but was

16   Ms. Moore disciplined in any way during that short three weeks

17   of employment?

18   A    Yes.

19   Q    What was the disciplinary issue?

20   A    Food in the kennel.

21   Q    Are kennel techs allowed to have food in the kennel?

22   A    No, not at all.

23   Q    Was there a particular food that Ms. Moore was bringing

24   into the kennel?

25   A    Grapes.

Case 8:20-cv-02184-MSS-SPF   Document 141   Filed 06/18/24   Page 94 of 225 PageID
1600
ALISON NIEVES - SEPTEMBER 18, 2023                    94
Cross-examination by Mr. Sarelson

1    Q    Do grapes present a particular problem to dogs?

2    A    Yes.  It's very toxic.

3    Q    And after she was told to stop doing this, did she

4    continue to bring grapes into the kennel?

5    A    Yes.  She hid them.

6    Q    Was she -- was she upset that she was essentially being

7    disciplined for this grape issue?

8    A    I would assume.

9            THE COURT:  Do you know?

10           THE WITNESS:  I mean, when we spoke, yeah, she seemed

11   a little upset, so yes.

12   BY MR. SARELSON:

13   Q    While the time that you were Ms. Moore's supervisor, did

14   Ms. Moore ever work off the clock?

15   A    No.

16   Q    Does the company have policies that prohibit employees

17   from working off the clock?

18   A    Yes.  We're not allowed.

19   Q    Now, had she worked off the clock, would it have been

20   Ms. Moore's obligation to tell somebody that she had worked

21   more hours than her time records showed?

22   A    Yes.

23   Q    Did Ms. Moore ever complain to you about working off the

24   clock?

25   A    No, sir.

1  Q    Did you ever require her to work off the clock?

2  A    No, sir.

3          MR. SARELSON:  I have no further questions,

4  Your Honor.

5          THE COURT:  Any redirect?

6              **REDIRECT EXAMINATION OF ALISON NIEVES**

7  **BY MS. MOORE:**

8  Q    Ms. Nieves, do you recall the group chat conversation that

9  we had using the WhatsApp app between you and I and some of the

10 other members of staff that worked in the back, and also

11 Mr. Marquez, and that was when he had decided that we weren't

12 allowed --

13          THE COURT:  Do you recall the group chat on WhatsApp?

14          THE WITNESS:  Yes.  We still use WhatsApp, so yes.

15 BY MS. MOORE:

16 Q    And we had a conversation about having food in the kennel

17 because Mr. Marquez has just instituted that new rule, that he

18 didn't want any food, and I asked why because -- actually, he

19 said beverages, and I asked why because, you know, it's hot

20 back there in the kennel and we work hard and get thirsty, so

21 I was curious as to why we couldn't have beverages back there,

22 and he responded and said that it was for our health, our own

23 protection, because he didn't want containers back there where

24 we might, you know, get an infection or whatever from the

25 bacteria or the viruses that are back there from the animals.

1    Do you remember that text conversation?

2    A    I don't remember the text conversation, but it's been a

3    rule since the day that he took over our store.

4             MS. MOORE:  I have no further questions, Your Honor,

5    for this witness.

6             THE COURT:  Was this grape discipline documented

7    somewhere?

8             THE WITNESS:  No, it was just verbal.

9             THE COURT:  And when did it occur in reference to

10   when she called and complained about her pay?

11            THE WITNESS:  Prior to it.  Before.

12            THE COURT:  How many days before?

13            THE WITNESS:  It happened twice, so I would --

14   I would have to say at least like a week before, and then

15   before that, I don't remember what day it was.

16            THE COURT:  All right.  You may step down.

17            THE WITNESS:  Thank you.

18            THE COURT:  We're going to go ahead and break for

19   lunch now and plan to come back at 1:40.

20            Oh.  I'm sorry.  Wait a second.  I have another

21   hearing.

22            1:40.

23                  (Jury exits proceedings.)

24            THE COURT:  You can have a seat.

25            All right.  Before we take a break, who is going to

```
 1   be your next witness?

 2             MS. MOORE:  Ms. Tello.

 3             THE COURT:  All right.  And what exhibits do you

 4   anticipate addressing with her?

 5             MS. MOORE:  It would be 1-E and -- just one second,

 6   Your Honor.  It's just 1-E, Your Honor.

 7             THE COURT:  All right.  And that one has been

 8   admitted already?  Yes.  Okay.

 9             MS. MOORE:  Yes.

10             THE COURT:  Mr. Sarelson, what is the relationship of

11   Petland Pembroke Pines, Petland Largo?

12             MR. SARELSON:  They're different franchisees of

13   Petland owned by Pet Retailers, if I have that right,

14   Pet Retailers, Inc.

15             THE COURT:  And which one is Pooches?

16             MR. SARELSON:  So Pooches is a common name for his

17   franchises, so there's Pooches of Pembroke Pines, there's

18   Pooches of Kendall, there's Pooches of Largo.

19             THE COURT:  But she's wearing a Petland jersey shirt.

20             MR. SARELSON:  Right.

21             THE COURT:  So what is the interrelationship with his

22   Pooches?  I know that's their corporate name, but what is their

23   face name?

24             Mr. Marquez, what's the face name of your stores?

25   If I walk into one, what is it going to say?
```

```
 1                 MR. MARQUEZ:  Ma'am, I own multiple Petland

 2      franchises of, you know, the main entity, which is Petland.

 3      I own Pooches of Largo for the Largo Petland, so that's the

 4      DBA, that's the entity of that.  So Petland Pembroke Pines is

 5      another one of my franchise locations, which would be then

 6      Pooches of Pines.

 7                 THE COURT:  But for purposes of these records.

 8                 MR. MARQUEZ:  Yes.

 9                 THE COURT:  I'm trying to tie these records to

10      Pooches.  It would not be a surprise to you if your posting

11      said Petland of Pembroke Pines, because your behind-the-scene

12      name is Pooches, but your in-front-of-the-scene name is Petland

13      of Pembroke Pines?

14                 MR. MARQUEZ:  Well, in that particular location, yes.

15      Correct.  And then in Largo it would be Petland of Largo, yes,

16      ma'am.

17                 THE COURT:  I see.  Okay.

18                 All right.  We are in recess.  I have another hearing

19      in ten minutes, and then we'll come back, and then who is your

20      witness after that?  That's when Mr. Celler is going to be

21      called?

22                 MS. MOORE:  Yes, Your Honor.

23                 THE COURT:  Anyone else?

24                 MS. MOORE:  No, that's it.  Mr. Celler is my last.

25                 THE COURT:  Are you going to call yourself to
```

1    testify?

2            MS. MOORE:  Yes, Your Honor.

3            THE COURT:  All right.  So will you come before

4    Mr. Celler or after Mr. Celler?

5            MS. MOORE:  After.

6            THE COURT:  All right.  We're in recess until 1:40.

7            MR. SARELSON:  Thank you, Your Honor.

8            THE COURT:  Just so the record is clear, the rule has

9    been invoked, and that means no one is free to talk to

10   witnesses about anything that has been said in this courtroom.

11   If I find that happened then those witnesses are subject to

12   being excluded.

13           I'm assuming you don't represent this individual

14   personally; is that right?

15           MR. SARELSON:  No, Your Honor.  She's an employee.

16           THE COURT:  Ms. Tello.

17           MR. SARELSON:  Ms. Tello.  No.

18           THE COURT:  All right.

19           MR. SARELSON:  She's an employee of the company, but

20   I don't personally -- I don't represent her in a personal

21   capacity, just the corporation.

22           THE COURT:  All right.  Thank you.

23                        - - - - -

24           (Recess at 12:15 p.m. until 1:46 p.m.)

25                        - - - - -

```
1              THE COURT:  Ms. Moore, are you prepared to proceed at
2    this time?
3              MS. MOORE:  Yes, I am, Your Honor.
4              THE COURT:  Yes, sir?
5              MR. SARELSON:  Your Honor, just -- I think some of
6    our other witnesses are in the room, so I would just remind
7    everyone that the rule has been invoked.
8              THE COURT:  If they're your witness, you need to tell
9    them.
10             MR. SARELSON:  They may have stepped out, actually,
11   Your Honor.  He's not our witness.
12             COURTROOM DEPUTY:  He's aware of the rule.
13             MR. SARELSON:  Okay.
14             THE COURT:  I omitted to ask the jury if they had any
15   questions of Ms. Nieves, so if you would retake the stand,
16   ma'am.
17             MS. MOORE:  Your Honor, I had a couple more questions
18   for Ms. Nieves too.
19             THE COURT:  Too late.  She's been removed from the
20   witness stand other than to ask these follow-up questions if
21   there are any.
22             MS. MOORE:  Okay.
23             THE WITNESS:  Do I need to be sworn in again, or --
24             THE COURT:  No, you're still under oath.
25             Please re-call the jury.
```

```
 1              Is Mr. Celler's attorney in the courtroom?
 2              MR. STORCH:  Good afternoon, Your Honor.
 3    Noah Storch.
 4              THE COURT:  All right.  The rule has been invoked, so
 5    you cannot disclose to or indicate to Mr. Celler anything that
 6    occurs in these proceedings.  Do you understand that?
 7              MR. STORCH:  Absolutely, Judge.
 8              THE COURT:  All right.
 9                    (Jury enters proceedings.)
10              THE COURT:  Ladies and gentlemen of the jury,
11    I omitted to offer you an opportunity to ask any questions of
12    this witness if you had any.  Did anyone have any questions
13    they would like to ask of Ms. Nieves?
14              Can you please write it down and pass it up to me.
15              Any others besides this one?
16              May I see counsel and Ms. Moore at sidebar.
17             (The following bench conference was held.)
18              THE COURT:  The jury question is:  Was there a
19    written policy on do's and don'ts of the employers -- or
20    employees.  If so, did she sign them?
21              Any objection to asking that question?
22              MS. MOORE:  I was on the schedule for the upcoming
23    week after she fired me, so --
24              THE COURT:  That's what cross-examination is for.
25    You'll have a chance to testify.
```

```
1              MS. MOORE:  Okay.  Thank you.
2              THE COURT:  Any objection to this question?
3                (The following bench conference was held.)
4              THE COURT:  Ms. Nieves, was there a written policy on
5    do's and don'ts of employees?
6              THE WITNESS:  In their handbook that they first fill
7    out and they read -- or are supposed to read over, there is
8    kind of like a do's and don'ts.  It says like, you know, no
9    food, always be in uniform, stuff like that.
10             THE COURT:  And was she required to sign one?
11             THE WITNESS:  I believe so, yes.
12             THE COURT:  Do you know?
13             THE WITNESS:  I wasn't the one who hired her, so I'm
14   not aware.  I know in the pamphlet even when like he took over
15   the store, I know I had to fill one out, I'm assuming she did,
16   but I wasn't the one who hired her, so I'm not 100 percent.
17             THE COURT:  So you don't know?
18             THE WITNESS:  No, ma'am.
19             THE COURT:  All right.  Any other questions of this
20   witness?  Any follow-up with respect to that question from the
21   plaintiff as to that question?
22             MS. MOORE:  Yes, Your Honor.
23             Ms. Nieves' testimony seems a bit --
24             THE COURT:  I need you to ask only a question of the
25   witness, not a testimony, so if you have a question on this
```

1    point, you can ask that question.

2         MS. MOORE:  Okay.  As far as whether there was a

3    written handbook or whatever?  No, I don't have any questions

4    for that.  Thank you.

5         THE COURT:  All right.  Any question from the

6    defendants?

7         MR. SARELSON:  No, Your Honor.

8         THE COURT:  All right.  You may step down.

9         THE WITNESS:  Thank you.

10        THE COURT:  Please call your next witness, Ms. Moore.

11        MS. MOORE:  Is Mr. Celler not appearing?

12        THE COURT:  He is.

13        MS. MOORE:  Oh, he is?  Okay.

14        I'd like to call Yessi Tello.

15        THE COURT:  All right.  Please secure the witness.

16   She's your employee.  You can have her come in.

17             *(Yessica Tello enters proceedings.)*

18        THE COURT:  Please come forward to be sworn.

19        COURTROOM DEPUTY:  Please raise your right hand for

20   me.

21        Do you solemnly swear or affirm, under penalties of

22   perjury, that the statements you give in these proceedings will

23   be the truth, the whole truth and nothing but the truth?

24        THE WITNESS:  Yes.

25        COURTROOM DEPUTY:  Please state and spell your name

1    for the record.

2              THE WITNESS:  Yessica Tello, Y-E-S-S-I-C-A,

3    T-E-L-L-O.

4              THE COURT:  Ms. Tello, you're under oath.  You have

5    to give truthful answers.  If you give false answers, you face

6    penalties of perjury.  Do you understand that?

7              THE WITNESS:  Yes.

8              THE COURT:  Have you spoken to anyone about anything

9    that occurred in this trial this morning?

10             THE WITNESS:  No.

11             THE COURT:  Ms. Moore, you may proceed.

12             MS. MOORE:  Thank you, Your Honor.

13             Good morning.

14             THE WITNESS:  Good morning.

15             MS. MOORE:  Good afternoon, actually.

16             THE COURT:  You can't publish the document until

17   you -- unless it's been admitted.  Is that one of the admitted

18   documents?

19             MS. MOORE:  I thought it was from earlier this

20   morning.

21             THE COURT:  What's the document number?

22             MS. MOORE:  It's 1-E.

23             THE COURT:  Yes.  You may proceed.

24             MS. MOORE:  Okay.

25

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 105 of 225 PageID
1014
YESSICA TELLO - SEPTEMBER 18, 2023                105
Direct examination by Ms. Moore

1            **DIRECT EXAMINATION OF YESSICA TELLO**

2    **BY MS. MOORE:**

3    Q    Do you remember -- I know it's been a long time, but do

4    you remember -- do you remember my first week of employment?

5    A    Yes.

6    Q    And you had -- we had -- this was a text message exchange

7    that we had, because I wasn't able to clock in using the time

8    clock until you gave me a code, and so --

9            THE COURT:  Ms. Moore, I need you to talk into that

10   microphone.

11           MS. MOORE:  Sorry.

12   Q    And so you were entering my hours manually; is that

13   correct?

14   A    Yes.

15   Q    Okay.  Is there -- or -- well, I should say, when you

16   texted me and you offered me the position, do you remember

17   asking me to come in the next day for training?

18   A    Yes.

19   Q    And then I responded and I said, yes, I'll be there, and

20   what is the compensation for this position, and you didn't

21   respond, and then I saw you the next morning and I saw you

22   almost every day for the three weeks that I worked there and

23   you never said anything about the pay rate being any different

24   than what was stated in the job post.

25   A    Yeah, it was regular pay for you.

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 106 of 225 PageID
1612    106
YESSICA TELLO - SEPTEMBER 18, 2023
Direct examination by Ms. Moore

1    Q    What's regular pay?

2    A    It was whatever the techs were making as a kennel tech.

3    Q    But if the job post said 35,000 a year and then somehow,

4    you know, from the time that I applied until the time I had

5    worked it went from that to 8.45, why didn't you tell me that

6    there was a discrepancy in the pay amount?

7    A    You -- your training was as a kennel tech, and your

8    application -- like what you applied for was a kennel tech

9    position.

10   Q    That's incorrect, because I submitted my resumé for a

11   veterinary technician position.

12   A    But we interviewed you as a kennel tech.

13   Q    No, you interviewed me as a veterinary technician, because

14   you asked me about my skills --

15   A    I didn't, because we didn't have --

16        MR. SARELSON:  Objection.  This isn't questions, this

17   is argumentative.

18        THE COURT:  Overruled.

19   A    We didn't have a vet tech position, so we couldn't hire

20   you as a vet tech, just a kennel tech.

21   Q    What was the job post on Indeed then for a certified vet

22   tech?

23   A    I didn't do the Indeed.  That wasn't my post.

24   Q    But you're saying that position doesn't exist at Petland?

25   A    It didn't at the time.

1          MS. MOORE:  Okay.  I have no further questions,

2    Your Honor.

3          MR. SARELSON:  Good afternoon, Ms. Tello.  Just a few

4    quick questions.

5                **CROSS-EXAMINATION OF YESSICA TELLO**

6    **BY MR. SARELSON:**

7    Q    In August of 2018, who was your employer?

8    A    Luis Marquez.

9    Q    What was the name of the company, do you remember?

10   A    Petland.

11   Q    Was it Petland the franchise or Petland the corporate

12   entity?

13   A    It was corporate.

14   Q    Corporate --

15   A    Or franchise.

16   Q    And where were you based at the time?

17   A    Pembroke Pines.

18   Q    Is that in Broward County?

19   A    Yes.

20   Q    Do you still work for Luis or one of the companies?

21   A    Yes.

22   Q    Were you involved in the onboarding process for Ms. Moore?

23   A    Yes.

24   Q    Was she onboarded as a kennel technician or a vet

25   technician?

1   A    A kennel tech.

2   Q    Did you train Ms. Moore when she first got there?

3   A    Yes.

4   Q    What was the training for?

5   A    Kennel tech.

6   Q    What was your title at the time?

7   A    My title was kennel manager for Petland Pembroke Pines.

8   Q    As kennel manager, would you supervise the certified

9   veterinary technicians if there were one?

10  A    If there was one, but I didn't have a certification, so it

11  would have been through the vet, the training would have been

12  through the vet.

13  Q    The veterinarian?

14  A    Yes.

15  Q    Are you even qualified to train a certified veterinary

16  technician?

17  A    No.

18  Q    During the time that you were -- let me rephrase that.

19       Do you remember about how long you were working at

20  the store in Largo with Ms. Moore?

21  A    Probably like a week.

22  Q    During the time that you were working at the store here in

23  Largo with Ms. Moore, was Ms. Moore performing the work of a

24  certified vet tech or a kennel tech?

25  A    A kennel tech.

1   Q    During the training that you did for her, did Ms. Moore

2   ever complain to you that she was being trained as a kennel

3   tech when she was supposed to be a certified vet tech?

4   A    No.

5   Q    Did she ever complain to you that the work she was

6   actually performing was sort of beneath what she was

7   understanding that she was being hired for?

8   A    No.

9   Q    During the time that you were training her that first

10  week, did she ever in any way mention that she was supposed to

11  be or understood that she was there as a certified vet

12  technician?

13  A    No.

14          MR. SARELSON:  I have no further questions,

15  Your Honor.

16          THE COURT:  Any follow-up of this witness, Ms. Moore?

17          MS. MOORE:  I just have one question.

18          THE COURT:  Use the microphone, please.

19          **REDIRECT EXAMINATION OF YESSICA TELLO**

20  **BY MS. MOORE:**

21  Q    Do you recall when I approached you about a puppy that was

22  severely dehydrated and you instructed me to give subcutaneous

23  fluids?

24  A    I do not remember that.  If that was the case, it would

25  have been -- we would have called the vet.

YESSICA TELLO - SEPTEMBER 18, 2023                110
Redirect Examination by Ms. Moore

1              THE COURT:  If you don't remember, you can't explain

2      what would have happened.

3      Q    You don't remember?  Okay.

4              MS. MOORE:  That's all I have, Your Honor.

5              THE COURT:  What was your relationship to the hiring

6      process?

7              THE WITNESS:  I hired the kennel techs for the store.

8              THE COURT:  And who did the posting for jobs at the

9      store?

10             THE WITNESS:  It would be somebody at the office.

11             THE COURT:  The office?

12             THE WITNESS:  The corporate office.  It was in

13     Miami Lakes.

14             THE COURT:  And the store that you worked in was in

15     Pembroke Pines?

16             THE WITNESS:  Yes.

17             THE COURT:  And do you know why Pembroke Pines would

18     have been posting for a vet tech on Indeed?

19             THE WITNESS:  I'm not sure.

20             THE COURT:  Do you know if you all ever hired one, a

21     vet tech?

22             THE WITNESS:  Not while I was there.

23             THE COURT:  After you left did they ever hire a vet

24     tech?

25             THE WITNESS:  I'm not sure.

```
 1              THE COURT:  Do you work there now?
 2              THE WITNESS:  I work for Frenchy Life, a company that
 3    Luis owns.
 4              THE COURT:  When did you leave Pembroke Pines?
 5              THE WITNESS:  Probably two or three years ago.
 6              THE COURT:  How long after Ms. Moore was there did
 7    you leave?
 8              THE WITNESS:  It's been probably -- I would say it
 9    was like two years after, two or three years after.
10              THE COURT:  Did Ms. Nieves speak to you about
11    Ms. Moore complaining about her salary?
12              THE WITNESS:  No.
13              THE COURT:  Do you know what day she started to work
14    there?
15              THE WITNESS:  I don't remember what day exactly it
16    was.
17              THE COURT:  Does the jury have any follow-up
18    questions of this witness?  Please write it down and pass it up
19    to me.
20              Any others?
21              Let me see Ms. Moore and counsel at sidebar.
22                        (Bench conference held.)
23              COURT REPORTER:  Judge, I am unable to hear the
24    sidebar.
25              THE COURT:  No objection to either question.
```

```
 1              COURTROOM DEPUTY:  The system is frozen.

 2              THE COURT:  What's frozen?

 3              COURTROOM DEPUTY:  The whole system, like the whole

 4    screen is frozen, and this is the second time it's happened

 5    today.  We unplugged it the first time and got it to work, but

 6    that was only ten minutes ago.  It's frozen up again in the

 7    last ten minutes.

 8              THE COURT:  Ms. Tello, are you aware of any record of

 9    Ms. Moore's hire for which job?

10              THE WITNESS:  No.

11              COURTROOM DEPUTY:  We're back up and running.

12              THE COURT:  Was there a kennel tech Indeed job ad

13    online?

14              THE WITNESS:  I'm not sure if it was posted.

15              THE COURT:  Do you know if the vet tech position was

16    posted?

17              THE WITNESS:  I'm not sure about the postings because

18    I wasn't in charge of that, just the hiring.

19              THE COURT:  So how would you access the people who

20    had applied?  How would they come to you?

21              THE WITNESS:  They -- the people that would put the

22    Indeed and call -- they would call the people up and then they

23    would send that to me.

24              THE COURT:  And do you know who called you to alert

25    you that Ms. Moore would be coming in for an interview?
```

```
 1              THE WITNESS:  I'm not sure.  I don't remember.
 2              THE COURT:  And what is your relationship with
 3   Mr. Marquez?
 4              THE WITNESS:  He is my boss.
 5              THE COURT:  And which function do you serve now?
 6              THE WITNESS:  Frenchy Life Kennels.
 7              THE COURT:  Is that just another one of his kennels
 8   or is it something else?
 9              THE WITNESS:  It's something else.
10              THE COURT:  What is it?
11              THE WITNESS:  It's a -- we breed Frenchies.
12              THE COURT:  And where is that office?
13              THE WITNESS:  I work from home.
14              THE COURT:  You breed the dogs at home?
15              THE WITNESS:  No, I do not.  I do the paperwork.
16              THE COURT:  I see.  All right.
17              Any other questions?
18              Thank you.  You may step down.
19              THE WITNESS:  Thank you.
20              THE COURT:  Please call your next witness.
21              MS. MOORE:  Is Richard Celler present?
22              THE COURT:  Yes.
23              MS. MOORE:  I'd like to call him, please.
24              MR. SARELSON:  Your Honor, can she sit in the back
25   here?
```

```
 1                THE COURT:  Is she going to be re-called as a

 2    witness?

 3                MR. SARELSON:  She's not, Your Honor.

 4                THE COURT:  Ms. Moore, are you going to re-call

 5    Ms. Tello as a witness?

 6                MS. MOORE:  No I won't.

 7                THE COURT:  All right.  Yes, she can remain.

 8                    (Richard Celler enters proceedings.)

 9                THE COURT:  Please swear the witness.

10                COURTROOM DEPUTY:  Raise your right hand for me.

11                Do you solemnly swear or affirm, under penalties of

12    perjury, that the statements you give in these proceedings will

13    be the truth, the whole truth and nothing but the truth?

14                THE WITNESS:  I do.

15                COURTROOM DEPUTY:  Please state and spell your name

16    for the record.

17                THE WITNESS:  Richard Celler, C-E-L-L-E-R.

18                COURTROOM DEPUTY:  Thank you.  You may be seated.

19                THE COURT:  Mr. Celler, you're under oath.  You have

20    to give truthful answers.  If you give false answers, you face

21    penalties of perjury.  Do you understand that?

22                THE WITNESS:  Yes, Your Honor.

23                THE COURT:  Please speak clearly into the microphone

24    as you give your answer, and wait until the question is

25    completed, even if you think you can anticipate what is going
```

1    to be asked, and if you see opposing counsel stand to object,

2    wait until I rule on the objection before you begin your

3    answer.  Do you understand that?

4              THE WITNESS:  Yes, Your Honor.

5              THE COURT:  Ms. Moore, you're calling your former

6    counsel to testify.  If you ask him questions that require him

7    to disclose issues concerning the attorney-client privilege,

8    you may waive that privilege by doing so.  Do you understand

9    that?

10             MS. MOORE:  Yes, Your Honor, I do.

11             THE COURT:  And you're willing to take that risk and

12   have him testify; is that right?

13             MS. MOORE:  Yes, Your Honor.

14             THE COURT:  All right.  You may proceed.

15             THE WITNESS:  Your Honor, may I ask clarification

16   just on that issue, if possible?

17             THE COURT:  No.

18             THE WITNESS:  Okay.

19             MS. MOORE:  Your Honor, I'd like to publish document

20   3-A and 3-B.

21             THE COURT:  Any objection?

22             MR. SARELSON:  There is, Your Honor.  Rule 408,

23   Your Honor.  These are confidential.

24             THE COURT:  Overruled.

25             You may proceed.

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 116 of 225 PageID
1622
RICHARD CELLER - SEPTEMBER 18, 2023                    116
Direct examination by Ms. Moore

 1              MS. MOORE:  Thank you, Your Honor.

 2              Good afternoon.

 3              **DIRECT EXAMINATION OF RICHARD CELLER**

 4    **BY MS. MOORE:**

 5    Q    Mr. Celler, this is the demand letter that you sent on my

 6    behalf to the defendant.

 7              MS. MOORE:  Your Honor, should I read it, or --

 8              THE COURT:  You can have him look at it and answer

 9    your question.  This is Exhibit 3-A that you're publishing, and

10    the question is:  Is this the demand letter you sent to the

11    defendant, Mr. Celler?

12              THE WITNESS:  I can't answer that based on

13    attorney-client privilege, Your Honor.

14              THE COURT:  Ms. Moore, do you waive the privilege?

15              MS. MOORE:  Yes, I do.

16              THE COURT:  You may answer the question.

17              THE WITNESS:  Yes.

18              MS. MOORE:  May I read the letter, Your Honor?

19              THE COURT:  You can ask a question of the witness

20    concerning the letter.

21              MS. MOORE:  Okay.

22    BY MS. MOORE:

23    Q    Mr. Celler, you undertook my case on contingency, correct?

24    A    I can't answer that based on attorney-client privilege,

25    ma'am.

Case 8:20-cv-02184-MSS-SPF   Document 141   Filed 06/18/24   Page 117 of 225 PageID
1623
RICHARD CELLER - SEPTEMBER 18, 2023          117
Direct examination by Ms. Moore

1          THE COURT:  The privilege has been waived.

2          THE WITNESS:  I just wanted clarification,

3     Your Honor, if it was waived as to all questions or in

4     particular.

5          THE COURT:  As to any question she asks, she is

6     making the decision to waive the attorney-client privilege.

7          Is that correct, Ms. Moore?

8          MS. MOORE:  Yes, Your Honor.

9          THE COURT:  If you'll step one step to your right,

10    Ms. Moore.  Speak into that microphone.

11         So did you take the case on a contingency fee basis?

12         THE WITNESS:  Not exclusively, no, ma'am.

13         THE COURT:  What does that mean?

14         THE WITNESS:  So you -- Ms. Moore retained our firm

15    on what's called a contingency hybrid retainer, and the way it

16    works is there's either a percentage of recovery or the greater

17    of attorney's fees and costs billed on her behalf.

18    BY MS. MOORE:

19    Q    Mr. Celler, is it correct that you represented me from

20    October 10th through May 20th, 2019?

21    A    I don't recall the specific dates, but if that's what you

22    believe them to be, then yes.

23    Q    Okay.  It was approximately nine months.

24         During those nine months, you had said that you were

25    in the process of negotiating a settlement with the other side?

RICHARD CELLER - SEPTEMBER 18, 2023
Direct examination by Ms. Moore

1  A    My recollection is that we sent a demand letter on your

2  behalf, we received some correspondence back from the defendant

3  calling your claims in doubt, we attempted to negotiate a

4  resolution on your behalf.  When we no longer felt that we

5  could pursue your case in the best interests of our firm and

6  for yourself, we terminated our representation.

7  Q    Is it in the best interests of your firm and my own for

8  you to represent me for nine months and then withdraw without

9  notice while the clock ran on my claims?

10 A    That didn't happen, ma'am.

11 Q    You represented me for nine months and then you abandoned

12 my case.

13 A    We didn't end your case, we terminated our representation,

14 and we notified you with 15 months remaining on your statute of

15 limitations what you needed to do in order to preserve your

16 claims.  I don't know what happened after that.

17 Q    In your demand letter you stated that if there wasn't a

18 resolution by December 20th, 2018, that you intended to file my

19 case.  Why didn't you file it then?

20 A    Because we believed you to be lying.

21 Q    You believed me to be lying?

22 A    Yes, based on the information that the other side provided

23 to us, it appeared, in our opinion, that you were less than

24 truthful or possibly less than truthful with us, which is why

25 we decided to no longer pursue your claims.

                        RICHARD CELLER - SEPTEMBER 18, 2023
                           Direct examination by Ms. Moore

1    Q    After nine months?

2    A    Yes.  Lawyers typically get evidence and information in

3    during a case, like when they sent a letter back to us showing

4    that the contract that you claim was signed could have been

5    modified or altered in handwriting, that allowed us to cast

6    doubt on whether you were being accurate and truthful with us.

7    Q    But aren't you supposed to, you know, side with your own

8    client?

9    A    Not if we believe they're lying.  That would be considered

10   fraud, and as an officer of the Court I would never pursue a

11   case in court that I believed to be fraudulent or the client

12   has been less than truthful, as was the case with you.

13   Q    You had also in the week or two prior to your withdrawal

14   of the case -- you indicated that you were going to file on two

15   other dates.

16   A    No.  In fact, I advised you that we didn't think it was in

17   your best interests or ours to file your case and that we had

18   requested some additional time to see if we can negotiate some

19   sort of resolution on your behalf, which you ultimately decided

20   not to take.

21   Q    But the defendants were adamant about not having any

22   interest in settlement from the beginning, correct?

23   A    I'm sorry.  I didn't understand your question.  Would you

24   mind standing a little closer to the microphone?

25   Q    Sure.  The defendants were adamant about not having any

Case 8:20-cv-02184-MSS-SPF     Document 141     Filed 06/18/24     Page 120 of 225 PageID
1626
RICHARD CELLER - SEPTEMBER 18, 2023                    120
Direct examination by Ms. Moore

1  interest in settlement, right, from the outset?

2  A    No, they made you an offer.

3  Q    But their offer was less than what I was owed in wages?

4          THE COURT:  You all can't discuss the number of the

5  offer.

6          MS. MOORE:  Right.

7  A    What you believe you were owed --

8          THE COURT:  Mr. Celler, just don't answer the

9  question --

10         THE WITNESS:  You got it, Your Honor.

11         THE COURT:  -- about numbers.

12 BY MS. MOORE:

13 Q    So you're saying that according to what the defendants

14 told you, that there was a possibility that I tampered with a

15 wage agreement?

16 A    Ma'am, I can't hear you.

17         THE COURT:  Mr. Celler, I'll control the courtroom.

18 Just answer the question as best you can.

19 A    I didn't hear your question.

20 Q    So you had said that you believed that, based on what the

21 defendants told you, that I had tampered with a wage agreement;

22 is that correct?

23 A    That was based on the evidence that they provided, we felt

24 less comfortable proceeding on your claim.

25         THE COURT:  The question is did they tell you that

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 121 of 225 PageID
1627
RICHARD CELLER - SEPTEMBER 18, 2023                    121
Direct examination by Ms. Moore

1    she had tampered with a wage agreement.

2          THE WITNESS:  I believe that's what they put in

3    writing.  It's been four years.  I don't recall the specifics.

4          MS. MOORE:  Your Honor, may I read the defendant's

5    response to the demand letter?  It's already been admitted.

6          THE COURT:  You may.

7          MS. MOORE:  This was written by Mr. Sarelson on

8    behalf of the defendants in response to the demand letter.

9    This was on December 11th, 2018.

10          It says:  I am counsel to Pooches of Largo,

11    Incorporated.  I have reviewed your December 6, 2018 letter

12    regarding Ms. Melanie Moore.  Some background information is

13    necessary concerning her claims.

14          Ms. Moore was hired with a start date of August 17,

15    2018.  Her last date was approximately September 13th, 2018.

16    She worked for the company for about three weeks.  She got the

17    job by applying for a position via indeed.com.  The job posting

18    for a kennel tech, technician, identifies a salary range

19    between 8.25 and $11.00 an hour.  The agreed-upon rate is 8.45

20    an hour.  Furthermore, she worked part-time, approximately

21    22 hours a week, during each of the three weeks of her

22    employment.  She was not a full-time employee compensated at

23    $35,000 annually.  In fact, she never worked full-time at all,

24    regardless of her compensation.  No kennel technician is paid a

25    full-time salary.  All are paid hourly.

Case 8:20-cv-02184-MSS-SPF   Document 141   Filed 06/18/24   Page 122 of 225 PageID
1628
RICHARD CELLER - SEPTEMBER 18, 2023                    122
Direct examination by Ms. Moore

1          We are in receipt of the Petland Wages Agreement for

2     kennel you sent over that indicates a compensation package of

3     35,000 a year.  You'll note that the word "hour" is struck out

4     and the word "year" is handwritten in.  Also note that the

5     form, including replacing the word "hour" with "year" was all

6     done by your client, Melanie Moore.  The form was not completed

7     or edited by anyone at Petland.  The signature line -- the

8     signature above the line for manager is indecipherable chicken

9     scratch and does not match the signature of either of the two

10    managers, Alison or Mike, who would have potentially signed

11    this form.

12          It would be helpful if your client could explain who

13    signed the alleged contract and the circumstances of it being

14    signed.  Frankly, we do not believe that this is a valid,

15    authentic contract executed by anyone at Petland, and certainly

16    no one at Petland who had any authority to change the

17    compensation amount and structure for kennel technician.

18          Assuming arguendo that the Petland Wages Agreement

19    for kennel was authentic, valid and binding, your client would

20    at most have a claim for breach of contract with the measure of

21    damages being -- I'm not going to, you know, state the amount.

22    This is a small claims matter that does not even meet the

23    threshold for County Court, but, again, we do not believe that

24    there is any merit to this claim.

25          So basically the defendants are saying that you sent

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 123 of 225 PageID
1629
RICHARD CELLER - SEPTEMBER 18, 2023                    123
Direct examination by Ms. Moore

1   over this wage agreement to them, correct?

2   A    I think the letter speaks for itself.

3   Q    Yes, and it says that you sent them the wage agreement.

4   It says --

5            THE COURT:  You can answer the question, Mr. Celler.

6   Did you send them -- did they say you sent the wage agreement?

7            THE WITNESS:  I don't recall whether we did or

8   didn't.  The letter says that.  I don't know whether that was

9   provided to me by you.  I don't know what document they're

10  referring to, as I sit here today.

11  BY MS. MOORE:

12  Q    Do you recognize this --

13  A    No.

14  Q    -- letter as their response?

15  A    May I see the rest of the document, please?

16  Q    Sure.

17  A    I need to see the bottom of the first page.

18        Okay.

19  Q    And then there's one more page.

20  A    I need to see the top of the page, please.

21        Thank you.

22        And, I'm sorry, ma'am, please repeat your question.

23  Q    Do you recognize this letter as a response from the

24  defendants?

25  A    I believe so, yes.

RICHARD CELLER - SEPTEMBER 18, 2023
Direct examination by Ms. Moore

1  Q    Okay.  The letter says:  We are in receipt of the Petland

2  Wages Agreement for kennel you sent over that indicates a

3  compensation package of 35,000 a year.

4         You sent them the wage agreement?

5  A    I don't recall as I sit here today.

6  Q    But when I asked you what wage agreement they were talking

7  about, you didn't answer me or deny it.

8  A    Is there a question, ma'am?

9  Q    So why didn't you respond when they said that you sent the

10  wage agreement to them?  You're saying that the wage agreement

11  was possibly tampered with by me, but I didn't have that

12  agreement.  I didn't give it to you.  How did you get it to

13  send to them?

14  A    I have no idea.  Whatever you provided to me during the

15  scope of the representation is what I assume we attached to our

16  demand letter.  I didn't make up a document from somewhere.

17  Q    Right.  And I didn't provide you with that, because I

18  didn't have it.

19  A    Okay.  Is there a question, ma'am?

20  Q    Yes.  Why are they saying that you sent it to them?

21  A    You would have to ask them that.  I can't speak to their

22  state of mind.

23  Q    But you didn't dispute it or deny it.

24  A    I'm not a party, ma'am, I'm an attorney.

25  Q    At the time you withdrew from my case, I requested that

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 125 of 225 PageID
1631                                                                              125
                    RICHARD CELLER - SEPTEMBER 18, 2023
                        Direct examination by Ms. Moore

1   you send me my case file; do you remember that?

2   A    I don't.

3   Q    Well, I did, and you did, and it consisted of only six

4   e-mails between you and defense counsel, all taking place

5   within two weeks of your withdrawal.  If you say that you

6   attempted to negotiate a settlement for those nine months, why

7   wasn't there any record of it?

8   A    A lot of settlement negotiations are done by telephone in

9   the practice of law.

10  Q    When you said -- when you withdrawed from my case, you

11  said that -- you said that the more you looked at it, the more

12  you thought that my case wasn't a good fit for your firm to

13  file.  What does that mean, a good fit?

14  A    We didn't believe you.  We don't want to perpetrate a

15  fraud on the Court, so we don't file cases that we believe to

16  be not credible or fraudulent.

17  Q    Then why did you wait nine months to withdraw?

18  A    I can't answer that as I sit here four years later.

19            MS. MOORE:  Your Honor, may I publish the wage

20  agreement in question?

21            THE COURT:  If you have it.  Is it an attachment to

22  that document?

23            MS. MOORE:  It's on the exhibit list as a separate

24  exhibit.  I think it's under tab 11.

25            THE COURT:  Hold on one second.

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 126 of 225 PageID
1632
RICHARD CELLER - SEPTEMBER 18, 2023                    126
Direct examination by Ms. Moore

1              Do you have an objection?

2              MR. SARELSON:  I do, Your Honor.  That wage agreement

3    is not authentic.

4              MS. MOORE:  I got it from the defendant.

5              THE COURT:  One second.  One second.

6              THE WITNESS:  Your Honor, may I stand and just grab a

7    cup of water, please?

8              THE COURT:  Let me see counsel and Ms. Moore at

9    sidebar.

10             *(The following bench conference was held.)*

11             THE COURT:  What's your objection?

12             MR. SARELSON:  This is not an authentic wage

13   agreement.  This is a wage agreement Mr. Celler attached to the

14   demand letter that was provided by Ms. Moore.

15             THE COURT:  Well, it is at least that?

16             MR. SARELSON:  To that extent, yes.

17             THE COURT:  Are you going to ask Mr. Celler if this

18   is the document he sent over to the defendant?

19             MS. MOORE:  I did ask him that.

20             THE COURT:  No, you didn't ask him that, because you

21   have never shown him that.  Are you going to ask him if that's

22   the document that he sent over to them?

23             MS. MOORE:  Yes.

24             THE COURT:  And then he's going to say yes, and then

25   what's going to be the next question?

Case 8:20-cv-02184-MSS-SPF   Document 141   Filed 06/18/24   Page 127 of 225 PageID
1633
RICHARD CELLER - SEPTEMBER 18, 2023                    127
Direct examination by Ms. Moore

1          MS. MOORE:  Well, the response to the demand letter

2    made it sound like I tampered with something.  This document

3    was blank when they gave it to me.  It was in a packet of new

4    hire paperwork.

5          THE COURT:  You can't testify to any of that, all you

6    can ask him is is this the document that he sent over to the

7    defendant.  That's the only thing you can ask him.

8          MS. MOORE:  Okay.

9          THE COURT:  And then if the opposing counsel says

10   what made you think that document wasn't real, you'll open

11   yourself up to all of those questions, so is that what you

12   intend to do?

13         MS. MOORE:  Uh-huh.

14         THE COURT:  Yes?

15         MR. SARELSON:  Your Honor, can we -- I think

16   Ms. Tello might have some information about this, because she

17   filled out the blank ones.  Can we ask for leave --

18         THE COURT:  No.  It's too late for that.

19    *(End of bench conference; proceedings resume in open court.)*

20         THE COURT:  You may inquire of this witness.

21         You show it to him before you publish it, please.

22         MS. MOORE:  Okay.

23   BY MS. MOORE:

24   Q    Mr. Celler, is that the wage agreement that you sent over

25   with your demand letter?

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 128 of 225 PageID
1634
RICHARD CELLER - SEPTEMBER 18, 2023                          128
Direct examination by Ms. Moore

```
 1   A    I don't recall.  I don't recall.
 2          THE COURT:  You can't publish it if you can't
 3   authenticate it in that way.
 4          MS. MOORE:  Well, this was obtained from the
 5   defendant.
 6          THE COURT:  You can ask a defendant about it.
 7          MS. MOORE:  Okay.
 8   BY MS. MOORE:
 9   Q    Do you remember, Mr. Celler, when they responded to your
10   demand letter and you had me write a rebuttal?
11   A    It's our normal course of practice in our --
12          THE COURT:  The answer is yes or no.
13   A    I don't recall.
14   Q    Do you remember asking me several months later if you
15   could send the rebuttal over to the other side?
16   A    I don't recall, ma'am.
17          THE COURT:  If you have a document that might refresh
18   his recollection, you would show it to him and then ask him if
19   it refreshes his recollection.
20          MS. MOORE:  Yes, Your Honor.  Thank you.
21          THE COURT:  Counsel, are you using your cell phone in
22   the courtroom?
23          MR. STONER:  Me?
24          THE COURT:  Yes, sir.
25          MR. STONER:  I'm just checking e-mail.
```

RICHARD CELLER - SEPTEMBER 18, 2023            129
Direct examination by Ms. Moore

1           THE COURT:  Turn it to the off position or you can

2    leave the courtroom.

3           MR. STONER:  No problem.

4           THE COURT:  Is that "Yes, Your Honor"?

5           MR. STONER:  Yes, Judge.  I already put it down.

6           THE COURT:  Thank you.

7           Do you have the document there?

8           MS. MOORE:  Yes, I do.

9           THE COURT:  All right.  If you want to show it to the

10   witness to see if it refreshes his recollection as to whether

11   he asked you to prepare a response.

12          Do you have a question of the witness in that regard,

13   Ms. Moore?

14          MS. MOORE:  I do.  I was just -- I need one more

15   document.

16          Actually, Your Honor, if I could backtrack.

17   BY MS. MOORE:

18   Q    Do you remember, Mr. Celler, an e-mail that you sent the

19   defendants on May 6, 2019 that says:  I hope all is well --

20          THE COURT:  You can't read the letter or e-mail.

21   You can ask him if he recalls such an e-mail.

22          And is it an exhibit, in your exhibit folder?

23          MS. MOORE:  It's under "Moore/Celler e-mails."

24          THE COURT:  In the exhibit folder?

25          MS. MOORE:  In the exhibit list, yeah.

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 130 of 225 PageID
1636
RICHARD CELLER - SEPTEMBER 18, 2023                    130
Direct examination by Ms. Moore

 1              THE COURT:  Which one?

 2              MS. MOORE:  It is in Section 3.

 3              THE COURT:  Does it have a 3 something in the right

 4   margin, 3-E, 3-F?

 5              MS. MOORE:  I don't -- I don't think that this one is

 6   labeled separately, it's just under -- it's under a collection

 7   of e-mails between defense counsel and Mr. Celler.

 8              THE COURT:  May I see it?

 9              MS. MOORE:  Yes, Your Honor.

10              THE COURT:  One second, Ms. Moore.  I need to find it

11   in your documents.

12              What's the date of it?

13              MS. MOORE:  May 6, 2019.

14              THE COURT:  You can ask him if that's his letter.

15   You can't publish it until we get a foundation for it.

16              MS. MOORE:  Okay.

17              THE COURT:  And can you give it to opposing counsel

18   so he can see which one you're referring to.

19              So you can ask him if he sent this e-mail.

20   BY MS. MOORE:

21   Q    Did you send this e-mail?

22   A    I believe so.

23   Q    And in the e-mail you stated that -- it says -- it says:

24   Al, bump me to file suit for next Monday so Matthew has a

25   chance to catch up on this.

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 131 of 225 PageID
1637
RICHARD CELLER - SEPTEMBER 18, 2023          131
Cross-examination by Mr. Sarelson

1          Matthew, if we don't hear back, my instructions are

2     to file.

3          And this was about a week before you withdrew from my

4     case.  I mean, what happened in that week from -- that you were

5     going to file, to withdrawing?

6     A    Oftentimes when an attorney is negotiating a severance or

7     a settlement, they puff or they attempt to make the other side

8     act more quickly.  It's a negotiation tactic that's commonly

9     used.  That was the case here.

10    Q    And so you did that for the whole nine months that you

11    represented me?

12    A    No.

13    Q    No?

14         Let me ask you one -- I don't remember what your

15    answer was.  Where did you get this wage agreement to send?

16    A    I have no recollection.

17         MS. MOORE:  I have no further questions for

18    Mr. Celler, Your Honor.

19         MR. SARELSON:  Your Honor, just very briefly.

20         Hi, Mr. Celler.  How are you?

21         THE WITNESS:  How are you?

22              **CROSS-EXAMINATION OF RICHARD CELLER**

23    **BY MR. SARELSON:**

24    Q    Let me show you what was previously admitted into evidence

25    as Exhibit, I believe it was, 3-A.  Can you see that okay?

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 132 of 225 PageID
1638
RICHARD CELLER - SEPTEMBER 18, 2023                    132
Cross-examination by Mr. Sarelson

1   A     Yes.

2   Q     This is the initial demand letter you sent to my client,

3   correct?

4   A     Yes.

5   Q     I've highlighted some language here that says

6   "per Ms. Moore's compensation agreement, Petland" -- and then

7   you identify it as the agreement, "Petland was obligated to pay

8   Ms. Moore a salary of $35,000 per year."  Do you see that?

9   A     Yes.

10  Q     That is the agreement that you would later have doubts

11  about whether it was authentic and accurate; is that right?

12  A     Yes.

13  Q     If the agreement is referenced in your initial demand

14  letter, is it safe to say that the only way you could possibly

15  have the agreement is if Ms. Moore provided it to you?

16          THE COURT:  He can't answer that question because he

17  just said he doesn't know where it came from.  We have seen it

18  and he said he doesn't know where it came from.

19          MR. SARELSON:  I can rephrase that, Mr. Celler.

20          THE COURT:  Do you know where it came from?

21          THE WITNESS:  No.

22  BY MR. SARELSON:

23  Q     Prior to sending the initial demand letter, did you have

24  any prior communications with either my client or me about

25  Ms. Moore?

Case 8:20-cv-02184-MSS-SPF   Document 141   Filed 06/18/24   Page 133 of 225 PageID
1639
RICHARD CELLER - SEPTEMBER 18, 2023          133
Cross-examination by Mr. Sarelson

 1   A     No.

 2   Q     One of the documents --

 3             MR. SARELSON:  May I show her real fast?  Your Honor,

 4   can I hand him a copy of this document real fast, Your Honor,

 5   just so --

 6             THE COURT:  I don't know what document this is.

 7             MR. SARELSON:  This is one of the e-mails that's

 8   contained in the e-mail -- Ms. Moore's e-mail packet, 3 --

 9             THE COURT:  Is it one that has been published?

10             MR. SARELSON:  Not yet.  That's why I was going to

11   show him first.

12             THE COURT:  You may.  Which one is it, so I can see

13   it?

14             MR. SARELSON:  It would be part of 3 -- it would be

15   part of 3-E, Your Honor, "Celler/Moore e-mails," part of 3-E.

16             THE COURT:  What's the date of it?

17             MR. SARELSON:  I need my glasses for that.  That's a

18   good question, Your Honor.

19             May 14th, 2019.

20             THE COURT:  At 3:47?

21             MR. SARELSON:  At 3:47.

22             THE COURT:  Yes, sir.

23             One second.  Let me look at it.

24             You may inquire as to whether he sent the e-mail.

25

 1   BY MR. SARELSON:

 2   Q    Let me show you what's been marked --

 3   A    You can put it there, please.  Thank you.

 4   Q    Having looked at the document, Mr. Celler, does that

 5   appear to be an e-mail you sent?

 6   A    To my client, yes, at the time.

 7        MR. SARELSON:  Your Honor, I'd ask what's been

 8   previously marked as 3-E, or at least one page of 3-E, to be

 9   admitted into evidence.

10        THE COURT:  Any objection, Ms. Moore?

11        MS. MOORE:  No objection, Your Honor.

12        MR. SARELSON:  May I publish, Your Honor?

13        THE COURT:  You may.

14   BY MR. SARELSON:

15   Q    Mr. Celler, this is -- is that okay?  Can you see it

16   all right?

17   A    If you could make it a little bigger, I would appreciate

18   it.  Thank you.

19        That's good.  Thank you.

20   Q    Okay.  So, Mr. Celler, this is an e-mail -- what's been

21   admitted now --

22        THE COURT:  Use the microphone.

23        MR. SARELSON:  Sorry about that.

24   Q    This is an e-mail, Mr. Celler -- this is one of the last

25   e-mails you would have sent to Ms. Moore as part of the

RICHARD CELLER - SEPTEMBER 18, 2023
Cross-examination by Mr. Sarelson

1   termination of her as your client; is that right?

2   A     Yes.

3   Q     I just want to read through the highlighted parts.

4         In the middle of the paragraph there it says:

5   Even if we win, Melanie, your damages are at best a few

6   thousand dollars, based on the timing of your employment.

7         And then if you go on to the next paragraph where

8   we've highlighted, it says:  If you understand that your

9   damages, on your best day, are a few thousand dollars in this

10  case (based on the law) I think we can proceed.

11        And then you ended that paragraph by saying:  But

12  based on your three week employment, the truth is that your

13  damages are limited.

14        Do you see that?

15  A     I do.

16  Q     And then even though you wrote this e-mail indicating that

17  her damages are a few thousand dollars at most on her best day,

18  the truth is you couldn't continue to represent her ethically

19  because of concerns that she was fabricating some of her

20  claims; isn't that correct?

21  A     I think it's both.

22  Q     It's both that her claims weren't worth much and that part

23  of her claims were fabricated?

24  A     Yeah.  As you know, oftentimes a lawyer has got to make --

25              THE COURT:  That was the only question that's

```
 1   pending.  The answer is yes.
 2              Do you have another question?
 3              MR. SARELSON:  Nothing from us, Your Honor.
 4              THE COURT:  Any follow-up from this witness,
 5   Ms. Moore?
 6              MS. MOORE:  No, Your Honor.
 7              THE COURT:  Any follow-up from the jury of this
 8   witness?
 9              Yes, sir.
10              Let me see the parties at sidebar.
11               (The following bench conference was held.)
12              MR. SARELSON:  We have no objection.
13              MS. MOORE:  That's fine.
14      (End of bench conference; proceedings resume in open court.)
15              THE COURT:  The question is:  What specifically led
16   you, Mr. Celler, to conclude the case was fraudulent, and what
17   specifically was Ms. Moore, the plaintiff, not honest about in
18   regard to this case?
19              THE WITNESS:  The allegation or concern regarding the
20   alteration of the document was what led us to that conclusion,
21   plus, as referenced in the e-mail that was just shown, it was
22   also a concern that we had about the reasonableness of the
23   demands and claims that Ms. Moore was making.
24              THE COURT:  If you knew that Ms. Moore had been hired
25   at $35,000 annually and the defendant made a mistake in its
```

1  onboarding to onboard her at 8.45 an hour, would that have

2  mattered to you?  In regard to the allegations that her

3  employment agreement was somehow fraudulent.

4      THE WITNESS:  I'm sorry, Your Honor, can you ask that

5  one more time?  I'm just trying to get my mind around it as you

6  were asking it.

7      THE COURT:  If you knew that she had been hired at

8  $35,000 annually under an Indeed post and that she had been

9  mistakenly onboarded at $8.45 an hour, would that have made a

10  difference to you in your assessment of whether her allegations

11  were fraudulent?

12      THE WITNESS:  If it was a mistake, yes, it would have

13  made a difference.

14      THE COURT:  All right.

15      Let's take the afternoon break.

16      Mr. Celler, if you would please stay for a minute.

17      THE WITNESS:  Sure.

18      THE COURT:  You can step out.  Take the jury out for

19  15 minutes.

20              *(Jury exits proceedings.)*

21      THE COURT:  I want to ask the witness this question

22  outside the presence of the jury and then ascertain whether to

23  ask the question in the presence of the jury, and that is

24  whether you, Mr. Celler, were threatened with a Bar grievance

25  by the defense if you pursued the claim that she was paid

```
 1   $35,000 an hour.
 2           THE WITNESS:  I don't recall whether that threat was
 3   made, Your Honor, but I presume that if it was, it would have
 4   been in writing.  I just don't want to misspeak as to the
 5   contents of any of the writings.
 6           THE COURT:  You don't have a recollection as you sit
 7   here today?
 8           THE WITNESS:  I don't.
 9           THE COURT:  Do you have any writing to that effect in
10   any of these e-mails, Ms. Moore?
11           MS. MOORE:  No, I don't.
12           THE COURT:  All right.  All right, sir.  You may step
13   down and we will take our break until 3:10.
14           Is it expected that Mr. Celler will be re-called for
15   any reason?
16           MS. MOORE:  Not from me, Your Honor.
17           MR. SARELSON:  Not from the defense, Your Honor.
18           THE COURT:  You're free to go, sir.
19           THE WITNESS:  Thank you, Your Honor.
20           THE COURT:  Court is in recess.  I'm going to stay
21   here.
22                         - - - - -
23           (Recess at 2:51 p.m. until 3:06 p.m.)
24                         - - - - -
25           THE COURT:  Are the parties ready to proceed?
```

```
 1              Who is your next witness?
 2              MS. MOORE:  May I say something?  When I went to go
 3    on break just now and I came around the corner, Mr. Celler was
 4    there waiting for the elevator and he looked at me and he said,
 5    "This was the biggest fucking waste of my life ever."
 6              THE COURT:  Mr. Celler told you that?
 7              MS. MOORE:  Yeah.
 8              THE COURT:  He's entitled to his opinion, I suppose.
 9              If you want to grieve him or raise that with the Bar,
10    that's left up to you, but I don't know that that has anything
11    to do with these proceedings.  If you'd like to lodge a formal
12    complaint about his professionalism, you can do it with this
13    Court or you can do it with the Florida Bar.
14              MS. MOORE:  I'd like to do it with this Court.  I've
15    already tried with the Bar and it didn't do me any good, they
16    didn't do anything, so --
17              THE COURT:  All right.  Post this proceeding you'll
18    have to file something in writing for me to be able to address
19    it.
20              MS. MOORE:  All right.  Thank you.
21              THE COURT:  Do you have another witness?
22              MS. MOORE:  Actually, I would just like to call
23    myself as a witness.
24              THE COURT:  All right.  It's a little complicated
25    when you call yourself as a witness.  There is a way in which
```

```
 1   you can just tell your story, we call it testifying by prose,

 2   and there is another way in which you would essentially ask

 3   yourself questions and then answer those questions as they're

 4   asked, which gives the defense a little bit more headway to

 5   know when to make an objection.

 6          At least one thing I know of that you cannot discuss

 7   in your testimony if you testify in narrative is you cannot

 8   mention any settlement proposal that was made to you by the

 9   defense and any settlement demand that you made to the defense.

10   You can tell the jury what you think your case is worth if you

11   choose to give them a number, but you can't talk of it in terms

12   of any offers and exchange of offers.  Do you understand that?

13          MS. MOORE:  I understand.

14          THE COURT:  Is there any other area of testimony in

15   the way of a narrative that you would request that the witness

16   not go into?

17          MR. SARELSON:  Your Honor -- yes, Your Honor, we

18   would, in light of the fact that Ms. Moore has a tendency to

19   sort of say things that are tangential at best, and so there's

20   a whole host of things that we believe are completely

21   irrelevant.  Anything that occurred post August 31st, 2018.

22          THE COURT:  That's not true though.  If your client

23   makes inconsistent decisions and explanations about termination

24   post her termination, that's relevant to this case.  That's one

25   of the indicia of fraud, and it's a reason to disbelieve them.
```

```
 1   If there is a specific thing that you do not want her to
 2   mention, you need to tell me, I need to evaluate whether it's
 3   something she can or cannot say, and then we will move from
 4   there.
 5            MR. SARELSON:  Sorry.  I have a few specific things,
 6   Your Honor.  There was a lawsuit that we filed in, I believe,
 7   2019 that's completely irrelevant.  It was a def --
 8            THE COURT:  It's not irrelevant, so overruled as to
 9   irrelevant.  Next?
10            MR. SARELSON:  Okay.  To the extent she's going to
11   indicate that she has some kind of medical damages, there's no
12   authenticated records about medical records and there's no
13   doctors to testify, so that would be essentially improper
14   expert testimony, and I don't think it's --
15            THE COURT:  Medical specifically, not just general
16   emotional distress?
17            MR. SARELSON:  Right.  Well, I mean, I don't mind if
18   she says this is a disheartening experience for her, but
19   specific medical stuff beyond --
20            THE COURT:  Medical like what do you mean?
21            MR. SARELSON:  Well, she has a whole host of medical
22   records and medications and whatnot that she has provided to
23   us.
24            THE COURT:  You can't mention any medical records
25   that would require any sort of diagnosis or prognosis.  You can
```

```
1    tell them how it made you feel, you can tell them it made you
2    stressed, you can tell them it caused you lots of stress, but
3    you're not able to tell them that you suffer from any physical
4    illness for which you are medicated or for which you have seen
5    a doctor, because there's no expert here to testify as to a
6    diagnosis that would cause such an outcome.  Do you understand
7    that?
8            MS. MOORE:  If it was -- if it was a physical illness
9    that resulted from the stress?
10           THE COURT:  You can't testify to that because you're
11   not a doctor.
12           MS. MOORE:  I have the doctor's diagnosis.
13           THE COURT:  You don't have the doctor though, and
14   that's hearsay.
15           MS. MOORE:  Okay.
16           THE COURT:  You can say you were stressed and it
17   caused you emotional distress and it caused you to feel bad,
18   but you're not allowed to testify that it caused you any
19   physical illness for which there is a medical diagnosis and for
20   which you are seeking or have sought medical attention.
21           Anything else?
22           MR. SARELSON:  Your Honor, the third very specific
23   one is to the extent she's trying to claim some kind of
24   post-termination lost future income, there's no testimony on --
25   there's no claim for retaliation in this lawsuit, so she
```

 1   shouldn't be able to testify to anything about how she suffered

 2   a financial issue post her separation from the company.

 3           THE COURT:  So what are her fraud damages?

 4           MR. SARELSON:  My understanding, Your Honor, is she's

 5   claiming the difference between the amount of money she thinks

 6   she was entitled to during that period of time and the money

 7   she actually received.

 8           THE COURT:  All right.  Well, I'll let her tell them

 9   what she thinks her damages are.  Anything else?

10           MR. SARELSON:  Not -- not specific that I think we

11   need to address in advance.

12           THE COURT:  All right.  Do you understand all of

13   those limitations, Ms. Moore?

14           MS. MOORE:  Yes, Your Honor.

15           THE COURT:  Then the Court will allow you to testify

16   in prose or by narrative, and if you start to move far afield

17   of the case or far afield of this, then you will be required to

18   ask yourself questions and then answer those questions so that

19   counsel has an opportunity fairly to interpose an objection.

20   Do you understand that?

21           MS. MOORE:  I do.

22           THE COURT:  And we've also already covered this

23   notion that you wanted to suggest that they ran a pill mill --

24   I mean, a puppy mill.  Do you understand that?  You can't

25   testify to your belief that they ran a puppy mill or that they

```
 1   were hurting the animals.  Do you understand that?

 2            MS. MOORE:  Yes, Your Honor.

 3            THE COURT:  Anything else before we re-call the jury?

 4            MS. MOORE:  No, Your Honor.

 5            THE COURT:  And, Ms. Moore, you also have to speak

 6   clearly into the microphone so that the jury can hear you.

 7            Now, are you intending to use exhibits with the jury,

 8   or are you only going to just testify?

 9            MS. MOORE:  I have some exhibits that support my

10   testimony.

11            THE COURT:  What are those exhibits that you'd like

12   to introduce?

13            MS. MOORE:  It would be 1-I -- I, J and K, 1.  It's

14   the three work schedules.

15            THE COURT:  My memory is that those did not get

16   admitted.  Am I wrong about that?

17            MS. MOORE:  Those have not been admitted yet, no.

18            THE COURT:  And what are they?

19            MS. MOORE:  They are the work schedule for the week

20   of 8-20-2018, the week of 8-27-2018 and the week of 9-3-2018.

21            THE COURT:  And I know you brought me I up before.

22   I don't have it because you took it back.  Do you have it there

23   still?

24            MS. MOORE:  I'm sorry.  Which document?

25            THE COURT:  I.  1-I.
```

```
 1              MS. MOORE:  The schedule for August 20th?
 2              THE COURT:  I don't know what it is.  I have 1-J and
 3    1-K.
 4              MS. MOORE:  Yes.  There's three schedules, actually.
 5    It's I, J and K.
 6              THE COURT:  Is there an objection to these documents?
 7              MR. SARELSON:  We object on authenticity grounds,
 8    Your Honor.
 9              THE COURT:  You were going to try to lay a foundation
10    for these documents through some witness, and you didn't, so
11    I'm not sure how you're going to be able to offer these up into
12    evidence, unless you have a witness.
13              MS. MOORE:  These were the schedules that were
14    created and posted by the defendants.
15              THE COURT:  Well, you haven't called a defense
16    witness to say that and you've called two so far.  Is there a
17    defense witness you believe who hasn't testified who is going
18    to authenticate these records?
19              MS. MOORE:  Mr. Marquez.
20              THE COURT:  All right.  You're going to have to call
21    him before you can offer up these documents.
22              MS. MOORE:  Okay.  Yes.  I'd like to call Mr. Marquez
23    then.
24              THE COURT:  Okay.  Re-call the jury.
25              We'll have that authentication effort and then we
```

```
 1  will let you testify.
 2                  (Jury enters proceedings.)
 3          THE COURT:  Mr. Marquez, if you would come up to be
 4  sworn.
 5          COURTROOM DEPUTY:  Please raise your right hand for
 6  me.
 7          Do you solemnly swear or affirm, under penalties of
 8  perjury, that the testimony you are about to give in this cause
 9  will be the truth, the whole truth and nothing but the truth?
10          THE WITNESS:  Yes, ma'am.
11          COURTROOM DEPUTY:  Please state your name for the
12  record.
13          THE WITNESS:  Luis Marquez.
14          COURTROOM DEPUTY:  Thank you.  Please spell your last
15  name.
16          THE WITNESS:  M-A-R-Q-U-E-Z.
17          COURTROOM DEPUTY:  Thank you.  You may be seated.
18          THE COURT:  Mr. Marquez, you're under oath, sir.
19  You have to give truthful answers.  If you give false answers,
20  you face penalties of perjury.  Do you understand that?
21          THE WITNESS:  Yes, ma'am.
22          THE COURT:  You've heard my instructions to the other
23  witnesses.  They apply equally to you.
24          THE WITNESS:  Yes, ma'am.
25          THE COURT:  Ms. Moore.
```

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 147 of 225 PageID
1653
LUIS MARQUEZ - SEPTEMBER 18, 2023                        147
Direct examination by Ms. Moore

1           MS. MOORE:  Yes, Your Honor.

2           THE COURT:  You may inquire.

3           MS. MOORE:  Mr. Marquez, I would like --

4           THE COURT:  Wait until you get to the microphone.

5           MS. MOORE:  Is it okay to publish them once he sees

6    them?

7           THE COURT:  You need to give them to him and ask

8    questions to establish that they are records of his company.

9           THE WITNESS:  They look like something that my team

10   would use.

11          THE COURT:  I'm sorry.  She has to answer the

12   question first.

13                **DIRECT EXAMINATION OF LUIS MARQUEZ**

14   **BY MS. MOORE:**

15   Q    Do you recognize those as the schedules that you post for

16   your kennel staff in back?

17   A    This looks like something that my staff would post.

18   I don't do schedules, but, yes, it looks like something they

19   would use.

20   Q    Okay.  You recognize the names of the other employees then

21   on there?

22   A    I notice Alison.  I notice your name at the bottom.

23   Q    Yes.

24          MS. MOORE:  Those are the only questions that I have

25   for Mr. Marquez, Your Honor.  I would like to refer to the

```
 1   schedules when I give my testimony.
 2              THE COURT:  Are these documents the types of
 3   documents you keep in the ordinary course of business?
 4              THE WITNESS:  Ma'am, so we have 11 different kennel
 5   managers across the stores, they would all use some form of
 6   that type of a work schedule document, so I guess the answer is
 7   yes, and that would be something that they use, something
 8   similar to that.
 9              THE COURT:  And have you ever seen this document
10   before?
11              THE WITNESS:  No, ma'am.
12              THE COURT:  Not even in preparation for trial, you
13   didn't look at this document?
14              THE WITNESS:  I did not, ma'am.
15              THE COURT:  And do you know any other of the
16   employees referenced here than Ms. Moore and Alison?
17              THE WITNESS:  No, ma'am.
18              THE COURT:  You don't recognize these names?
19              THE WITNESS:  No, ma'am.
20              THE COURT:  And did you look at all of the sheets or
21   just the top one?
22              THE WITNESS:  No, I looked at all three sheets.
23              THE COURT:  So you don't know a Wendy or a Ladislaus,
24   Jesús Hernandez?
25              THE WITNESS:  No.  This was five years ago, and we do
```

```
 1   have turnover in the kennel, ma'am.
 2           THE COURT:  Do you know what system this is pulled
 3   from, like what sort of recordkeeping system this is pulled
 4   from?
 5           THE WITNESS:  I do not whatsoever.
 6           THE COURT:  All right.  Are you moving its admission?
 7           MS. MOORE:  Yes, Your Honor.
 8           THE COURT:  Counsel?
 9           MR. SARELSON:  Same objection as to authenticity,
10   Your Honor.
11           THE COURT:  The Court sustains the objection.  This
12   document cannot be authenticated by this witness so it can't be
13   introduced.
14           MS. MOORE:  Okay.
15           THE COURT:  Any other questions of this witness while
16   he's on the stand?
17           MS. MOORE:  No, Your Honor.
18           THE COURT:  All right.  You may -- any questions from
19   the jury as to this line of questioning?  Not all types of
20   questions, but as to this line of question.
21           Yes, sir.
22           What is your title, Mr. Marquez?
23           THE WITNESS:  I am President of Pet Retailers that
24   owns the locations.
25           THE COURT:  And you were in that capacity when
```

```
 1   Ms. Moore worked at your store in Pembroke Pines?

 2           THE WITNESS:  Yes, ma'am.  In Largo, you mean, right,

 3   ma'am?

 4           THE COURT:  In Largo.

 5           THE WITNESS:  Yes.

 6           THE COURT:  Let me see Counsel at sidebar.

 7       (The following bench conference was held.)

 8           THE COURT:  This is the question I asked him and then

 9   these are the other two questions.  You can take them.

10           MR. SARELSON:  We have no objections to these

11   questions.

12           THE COURT:  Any objection?

13           MS. MOORE:  No.

14   (End of bench conference; proceedings resume in open court.)

15           THE COURT:  Is there any document for a job posting

16   that shows vet tech or kennel tech proof of job?

17           THE WITNESS:  Can you specify the question

18   a little -- you mean currently, before?

19           THE COURT:  At the time she was hired, was there a

20   document that showed her job posting?  Did it show that it was

21   for a vet tech or a kennel tech, or is there something that

22   shows the proof of her job?

23           THE WITNESS:  Ma'am, at that point in time, just like

24   currently, we have posted in certain stores a need for a vet

25   tech.
```

```
 1              THE COURT:  And did you post that on Indeed as well?
 2              THE WITNESS:  I don't post.  I don't post.  That
 3    would be handled by someone that we would have in the office.
 4              THE COURT:  Well, when you say you don't post, you
 5    mean that's not your job?
 6              THE WITNESS:  Personally I don't, I would not post
 7    that.  That would be posted -- like, for example, today we have
 8    an HR Department that would post those types of ads, you know,
 9    on Indeed, Zip Recruiter, et cetera.
10              THE COURT:  Who was responsible for it in 2018?
11              THE WITNESS:  At that point in time either Yeline,
12    who was the office manager, or one of the assistants at the
13    time, which I'm not sure who they would have been at that
14    point.
15              THE COURT:  But they would have posted a vet tech
16    type job?
17              THE WITNESS:  They would have posted all jobs.
18              THE COURT:  You testified previously by affidavit
19    that according to your business records Ms. Moore was hired in
20    early August 2018 after applying for a job through indeed.com.
21    To the best of our knowledge it was a full-time veterinary tech
22    job paying $35,000 annually, as claimed by Ms. Moore.  Is that
23    accurate?
24              THE WITNESS:  From my understanding, that what I put
25    in that affidavit is that we had a job.
```

```
 1              THE COURT:  Was that statement accurate?
 2              THE WITNESS:  Yes, on the affidavit.  Yes.
 3              THE COURT:  And then you say:  We cannot locate
 4    records identifying the job she was actually offered.  It is
 5    possible she was not offered a vet tech job but was instead
 6    offered a kennel tech job, which paid 8.45 an hour at the time.
 7    It is also possible she was offered the vet tech job but she
 8    was inadvertently onboarded as a kennel tech.
 9              Is that also your testimony?
10              THE WITNESS:  Yes, ma'am.
11              THE COURT:  What is the normal paperwork process for
12    hiring, at that time?
13              THE WITNESS:  It's five years ago.  It was a very
14    different company at the time, honestly.
15              THE COURT:  At that time, that's what I want you to
16    tell me about.
17              THE WITNESS:  Yes.  So what I explained, the job
18    would have been posted by someone in -- you know, assistant at
19    the office, then they would have received the resumés and they
20    would have sent it to the like of Yessi or Alison to get a
21    group of people at the store for them to interview in person,
22    as a group interview.
23              THE COURT:  And was there paperwork is the question.
24              THE WITNESS:  Oh.  If they decided to move forward
25    with, you know, some of the candidates, then at that point in
```

1    time they would have, you know, sent -- you know, gathered all

2    of -- the required documents at the time was -- the payroll

3    company was ADP, so whatever was needed as an onboarding at

4    that particular time would have been sent back by Yessi or the

5    kennel manager, which in this case was Alison, back to the

6    office, you know, to onboard.

7         THE COURT:  During the course of discovery in this

8    case did you produce any such paperwork for the plaintiff?

9         THE WITNESS:  We produced whatever we had.  Somewhere

10   along the line we went from --

11        THE COURT:  Did you produce paperwork concerning what

12   she was hired for, do you know?

13        THE WITNESS:  I do not know.

14        THE COURT:  Any follow-up questions from the

15   plaintiff of this witness from those questions?

16        MS. MOORE:  No, Your Honor.

17        THE COURT:  Any follow-up questions from the defense

18   of this witness?

19        MR. SARELSON:  No, Your Honor.

20        THE COURT:  Do you intend to re-call him in your

21   case-in-chief?

22        MR. SARELSON:  Possibly, Your Honor.  I don't know

23   for sure right now.

24        THE COURT:  All right.  Thank you, sir.  You may step

25   down.

LUIS MARQUEZ - SEPTEMBER 18, 2023                    154
Direct examination by Ms. Moore

 1              THE WITNESS:  Thank you, Your Honor.

 2              THE COURT:  Ms. Moore, who is your next witness?

 3              MS. MOORE:  I am prepared to take the stand.

 4              THE COURT:  All right.  Please come forward to be

 5      sworn.

 6              You have papers with you, Ms. Moore.  I inquired

 7      whether you had any other exhibits you wanted to display and

 8      you told me which ones you have.  Now do you have others?

 9              MS. MOORE:  Well, some of them have already been

10      admitted, and then, yes, I do have a couple others.

11              THE COURT:  What are their numbers?

12              MS. MOORE:  Sorry, Your Honor, I misplaced my exhibit

13      list.  Give me one second.

14              It's all of the documents that are under tab 2, the

15      unlawful detainer, it's A, B, C -- actually, it's just A, B, C,

16      and then all of the documents under tab 4.

17              THE COURT:  As to tab 2, is there an objection?

18              MR. SARELSON:  There is, Your Honor.  Those are --

19      I have not seen those, but those are --

20              THE COURT:  Don't tell me what they are.  Do you

21      object to them as irrelevant?

22              MR. SARELSON:  We do.  They're not authentic and

23      they're not relevant, Your Honor, and they probably contain

24      hearsay.

25              THE COURT:  And the other one is 4?

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 155 of 225 PageID
1661
LUIS MARQUEZ - SEPTEMBER 18, 2023                    155
Direct examination by Ms. Moore

```
 1              MS. MOORE:  Yes, Your Honor, all of the documents

 2     under 4.

 3              THE COURT:  Let me have the jury step out, please.

 4                     (Jury exits proceedings.)

 5              THE COURT:  So, Ms. Moore, I'm not sure what you

 6     believe the relevance is of the writ of possession that's the

 7     first document 2-A, and it's got attachments that run to 2-D.

 8     What is your contention?

 9              MS. MOORE:  The writ of possession and the other

10     documents under that tab speak to the damages that resulted

11     from the defendant's failure to properly pay me on time.

12              THE COURT:  All right.  Those are not relevant.

13              And then you have your transcript at

14     St. Pete College.  What is that relevant to?

15              MS. MOORE:  I wasn't going to use that one,

16     Your Honor.

17              THE COURT:  All right.  2-D is excluded.

18              And then you have 2-E through -- all the way up

19     through the public storage document, and I assume this 2-E

20     section is to show your efforts to mitigate your damages; is

21     that right?

22              MS. MOORE:  Correct.

23              THE COURT:  You tried to get other jobs?

24              MS. MOORE:  Correct.

25              THE COURT:  Any objection to her trying to show that
```

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 156 of 225 PageID
1662
                    LUIS MARQUEZ - SEPTEMBER 18, 2023                    156
                     Direct examination by Ms. Moore

1    she tried to get other jobs?

2            MR. SARELSON:  We do, Your Honor.  They're not

3    authentic documents.

4            THE COURT:  All right.  I will allow you to show that

5    you attempted to get another job through the documents 2-E all

6    the way up through your storage unit, and I'm not sure what the

7    relevance of the storage unit document is.  It says you've been

8    loitering in your storage unit.

9            MS. MOORE:  Yes, Your Honor, because when the

10   defendants failed to pay me and terminated my employment, the

11   money that they took from me was my rent money, and --

12           THE COURT:  You can't get all consequential damages.

13   Your claim is that they didn't pay you what they owed you and

14   your claim is they defrauded you in the sense that you never

15   would have taken this job had you known the truth of it, and

16   therefore, I presume, you wouldn't have left your other job,

17   and so you can get economic damages associated with that and

18   any sort of general damages that you can identify, but you

19   can't get all your consequential damages, they didn't allow me

20   to work and therefore everything that happened to me from that

21   day forward is their fault.  And so no as to the homelessness,

22   the loss of your property and so forth, but you can try to show

23   that you tried to work since you were fired, if that becomes an

24   issue with the defense.  I'll let you talk about that.

25           So that just leaves in this set of documents the 2-E

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 157 of 225 PageID
1663
LUIS MARQUEZ - SEPTEMBER 18, 2023                    157
Direct examination by Ms. Moore

1    segment up through the public storage unit material.

2              And then 4 is more of Mr. Sarelson telling you to

3    take down Facebook information and then the lawsuit that was

4    filed against you in Miami, and then there's some more material

5    about Mr. Celler not wanting to come to a deposition.  What's

6    the relevance of these materials?

7              MS. MOORE:  The documents under tab 4 pertaining to

8    the defamation lawsuit, that's something that the defendants

9    did to, I guess, retaliate against me or deter me from pursuing

10   my wages further.

11             THE COURT:  All right.  I'll allow you to introduce

12   that document, but I don't know if this Celler letter at the

13   end of it is part of the lawsuit.  Is this an exhibit to the

14   lawsuit?

15             MS. MOORE:  Which document are you --

16             THE COURT:  There's a document at the end that says:

17   It's not my obligation to be more specific or guide you through

18   the process.  I don't want to be a witness.

19             This is all February of 2023.  I don't know how that

20   has anything to do --

21             MS. MOORE:  Yeah, that's not -- no, that wasn't

22   something I was going to address.

23             THE COURT:  All right.  So 4-A up through the -- is

24   4-T part of the -- 4-I part of the lawsuit?

25             MS. MOORE:  It's -- 4-I is -- it's a picture -- it's

1    a picture that the lawsuit pertains to.

2              THE COURT:  Was it filed on a court record?

3              MS. MOORE:  Yes.

4              THE COURT:  By the defense?

5              MS. MOORE:  Was the picture filed?

6              THE COURT:  Yes, ma'am.

7              MS. MOORE:  No.

8              THE COURT:  And so 4-H wasn't filed either?

9              MS. MOORE:  The case -- the case never went beyond

10   the filing of the Complaint, it was never served.

11             THE COURT:  Well, sometimes documents are attached to

12   a Complaint, and so my question is where does the court record

13   stop at.  4-F?

14             MS. MOORE:  Yes, 4-F.

15             THE COURT:  All right.  That's the end of this

16   exhibit.  4-A through F and 2-E may be introduced in your

17   testimony.

18             MR. SARELSON:  Your Honor, can we just make sure that

19   the -- I think there was some concern with whether the

20   Complaint that she has sent back and forth is a certified court

21   record and/or is a complete copy of the lawsuit, because

22   there's some attachments to the Complaint --

23             THE COURT:  I just removed those attachments from the

24   Complaint.

25             MR. SARELSON:  No, there are attachments to the

Case 8:20-cv-02184-MSS-SPF   Document 141   Filed 06/18/24   Page 159 of 225 PageID
1665
LUIS MARQUEZ - SEPTEMBER 18, 2023          159
Direct examination by Ms. Moore

1   Complaint.  There are -- H and I -- I don't know what H and I

2   are.  I've never seen them.

3           THE COURT:  If you want to augment the attachments to

4   the Complaint in cross-examination, you can do that.

5           MR. SARELSON:  I just want her to submit -- if she's

6   going to submit the Complaint, she should submit the entire --

7           THE COURT:  You can do that.  If you want to add

8   anything more to the Complaint other than what you sued, then

9   you can attach it.

10          MR. SARELSON:  That is what we sued -- that's what

11  I'm saying, Your Honor.

12          THE COURT:  So if you have the other pages and you

13  want to add them to her testimony on Cross, you can add them.

14          MR. SARELSON:  I don't know that I have a printed

15  copy of that, a certified copy of the Complaint, Your Honor.

16          THE COURT:  All right.  You can introduce the

17  Complaint to the extent that you want to at page 4-A --

18  document 4-A up through 4-F.  G, H and I and the rest of it

19  cannot come in.

20          MS. MOORE:  Okay.

21          THE COURT:  And you can introduce 2-E as a composite

22  exhibit of your attempts to get other work, and that's it of

23  these two records or sets of records.

24          MS. MOORE:  Okay.  Your Honor, mitigation, is that a

25  factor?  I mean, is that something that's even worth --

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 160 of 225 PageID
1666
LUIS MARQUEZ - SEPTEMBER 18, 2023                    160
Direct examination by Ms. Moore

1          THE COURT:  It's left up to you.  I'm not your

2     attorney.

3          MS. MOORE:  Okay.  I'm just not sure if that's

4     something that was relevant to anything else.  I mean, I don't

5     know if it would make a difference or not.

6          THE COURT:  You're offering it up for some purpose.

7     What are you offering it for?

8          MS. MOORE:  Well, just to show -- in case the

9     defendants thought that I didn't try to mitigate the losses,

10    I just made record of it.

11         THE COURT:  Then you can offer it if you want to.

12         MS. MOORE:  I mean, they haven't made that claim,

13    so --

14         THE COURT:  Are you claiming she didn't attempt to

15    mitigate her damages associated with her fraud in her pay?

16         MR. SARELSON:  We are, Your Honor.  We --

17         THE COURT:  All right.  Then she'll introduce it.

18         Thank you.

19         Re-call the jury.

20              (Jury enters proceedings.)

21         THE COURT:  You may take the stand after being sworn,

22    Ms. Moore.  Right here by this microphone.

23         Please swear the witness.

24         COURTROOM DEPUTY:  Raise your right hand for me.

25         Do you solemnly swear or affirm, under penalties of

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 161 of 225 PageID
1667
                    MELANIE MOORE - SEPTEMBER 18, 2023          161
                         Direct testimony by Ms. Moore

1    perjury, that the testimony you are about to give in this cause

2    will be the truth, the whole truth and nothing but the truth?

3              MS. MOORE:  I do.

4              COURTROOM DEPUTY:  Please state your name.

5              MS. MOORE:  Melanie Moore.

6              COURTROOM DEPUTY:  Thank you.  You may be seated.

7              THE COURT:  Ms. Moore, you're under oath.  You have

8    to make truthful statements.  If you make false statements, you

9    face penalties of perjury.  Do you understand that?

10             MS. MOORE:  I do, Your Honor.

11             THE COURT:  You need to speak clearly into the

12   microphone, slowly enough for the court reporter and all of us

13   to hear you, and if you see Mr. Sarelson stand to object, wait

14   until I rule on the objection before you continue your

15   discussion.  Do you understand that?

16             MS. MOORE:  Yes, Your Honor.

17             THE COURT:  And you're to stay away from the areas

18   that we discussed you could not testify about.  Do you

19   understand that?

20             MS. MOORE:  Yes, Your Honor.

21             THE COURT:  You may proceed.

22             **DIRECT TESTIMONY OF MELANIE MOORE**

23             MS. MOORE:  One of the first things I wanted to

24   address was this wage agreement.  It's already been admitted as

25   document 11 (sic).

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 162 of 225 PageID
1668
162
MELANIE MOORE - SEPTEMBER 18, 2023
Direct testimony by Ms. Moore

 1              MR. SARELSON:  Object, Your Honor.  I don't believe
 2    it was admitted.
 3              THE COURT:  Is this that one page document that you
 4    showed to Mr. Celler?
 5              MS. MOORE:  Yes.
 6              THE COURT:  It was not admitted and it may not be
 7    discussed.
 8              You may proceed.
 9              You may testify whether or not you altered any
10    document that you gave to Mr. Celler, you may discuss that, or
11    whether you gave him a document at all.
12              MS. MOORE:  Okay.  I forgot my notes.  Can I grab
13    them?
14              THE COURT:  Yes.
15              MS. MOORE:  Your Honor, it's unfortunate that this
16    case has been before the Court for so long, because after
17    three years -- nearly like five years that I've been trying to
18    get paid, but three years in this court, nobody seems to
19    remember anything.
20              THE COURT:  Are you testifying?
21              MS. MOORE:  I'm just saying that --
22              THE COURT:  You need to just testify, Ms. Moore.
23              MS. MOORE:  Okay.
24              THE COURT:  Tell your story to the jury to the extent
25    that you have something you want them to know.

MELANIE MOORE - SEPTEMBER 18, 2023                    163
Direct testimony by Ms. Moore

 1          MS. MOORE:  All right.  When I was terminated from my
 2   employment, I was unable to pay my rent and so I anticipated
 3   having to move from my residence, and I put all my belongings
 4   in storage.
 5          THE COURT:  You can't talk about your storage losses.
 6   You can talk about you were hired and you were fired and what
 7   money you were supposed to make there and what money you didn't
 8   make wherever you came from.  You cannot talk about your
 9   consequential injuries that you believe were caused.
10          MS. MOORE:  May I discuss my termination, the grounds
11   for my termination?
12          THE COURT:  You may.
13          MS. MOORE:  When Alison testified, she said that
14   I was terminated for bringing grapes into the kennel.
15          THE COURT:  Can you take the gum out of your mouth
16   while you're testifying.
17          MS. MOORE:  I'm sorry.
18          She had testified that I was terminated for bringing
19   grapes into the kennel, but that was not true, I never brought
20   grapes into the kennel.
21          The defendants have readily admitted that they
22   terminated me for complaining about the wage -- about the
23   shortage in my paycheck.  In their response to discovery they
24   said that I was terminated because I made a baseless and
25   unprofessional complaint.  They didn't say anything about

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 164 of 225 PageID
1670                                                                                              164
               MELANIE MOORE - SEPTEMBER 18, 2023
                   Direct testimony by Ms. Moore

1    grapes.  I never brought grapes into the kennel.

2             And I was scheduled to work for the following week

3    after my termination, which had just been posted earlier, the

4    date that I was terminated, so -- and I was also terminated on

5    my day off.  So unfortunately Ms. Nieves misrepresented the

6    grounds for my termination.

7             And also defense counsel had mentioned that there's

8    no retaliation claim in this case, but there was originally a

9    claim for retaliation for terminating me for complaining about

10   the defendant's unlawful conduct, but I was threatened and

11   forced to omit it from my Complaint, and also for the

12   whistleblower, I was threatened that this case would be

13   dismissed in its entirety, wages and all, if I didn't omit the

14   retaliation count from my Complaint, and I omitted it not

15   because they didn't retaliate against me but because this is a

16   wage dispute and I wanted to get paid for my work.

17            As to this lawsuit, defamation lawsuit about the

18   Facebook picture, after Mr. Celler had withdrawn from my case

19   and I decided to contact Mr. Sarelson to ask him about this

20   wage agreement that I didn't know anything about, and instead

21   of answering -- I asked him to send me a copy of it, but

22   instead of answering my question or sending me a copy, he

23   responded with a Complaint and a Summons attached suing me for

24   defamation for $15,000 over an allegedly defamatory picture on

25   Facebook that I didn't post.

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 165 of 225 PageID
1671
MELANIE MOORE - SEPTEMBER 18, 2023                    165
Direct testimony by Ms. Moore

1          The Complaint -- let's see.  In the defamation

2    Complaint the defendants state that -- it says defendant was

3    employed by the plaintiff for a few weeks in summer of 2018.

4    Defendant -- which is me, I was the defendant in that case.

5    Defendant was a veterinary technician for the store.  It says,

6    her separation from -- her separation from the plaintiff

7    occurred when she realized she had misunderstood her

8    compensation.  She believed wrongly that her compensation was

9    significantly high -- significantly higher than it actually

10   was.

11         It says the plaintiff viewed the demand letters from

12   her attorney as an attempt to extort a large sum of money from

13   the plaintiffs stemming from her own misunderstanding about her

14   rate of compensation.

15         There was never any attempt to serve the Complaint.

16   It was filed, it remained open in the court records for over a

17   year, until it was administratively dismissed for lack of

18   prosecution.

19         During discovery I asked -- I asked Mr. Sarelson to

20   produce records, because he says that there was an attempt made

21   to serve but they couldn't find me to serve the Complaint.

22   I asked him for the records of the receipt of service or who

23   was assigned to serve the Complaint and he was unable to

24   produce it.

25         Document --

MELANIE MOORE - SEPTEMBER 18, 2023
Direct testimony by Ms. Moore

1          THE COURT:  Are you moving to introduce the Complaint

2    into the record?

3          MS. MOORE:  Actually the Facebook page roles, it was

4    document -- it was under tab 4.

5          THE COURT:  My question is are you moving to

6    introduce the Complaint into evidence.  You just published from

7    it.

8          MS. MOORE:  Yes.

9          THE COURT:  It will be received.

10          MS. MOORE:  Thank you.

11          THE COURT:  That's Exhibits 4-A through 4-F,

12    Ms. Heard, just so that you have the relevant portions.

13          MS. MOORE:  Also, prior to filing the defamation

14    Complaint against me, the cease and desist letter that

15    I received a week after Mr. Celler withdrew from my case, it's

16    document 4-A, it states:  As you know, I represent your former

17    employer Pooches of Largo.  I have been advised that Richard

18    Celler no longer represents you.  Please forward this letter to

19    your attorney, if you have one.

20          You are ordered to immediately remove and delete the

21    Facebook page entitled "Why You Shouldn't Buy Pets from

22    Petland."  It's readily apparent that you are the page's author

23    and administrator.  The page already has 131 likes and 135

24    followers.  The allegations contained on this page are totally

25    false and defamatory.

                    MELANIE MOORE - SEPTEMBER 18, 2023
                         Direct testimony by Ms. Moore

 1          We have been -- we have already been in touch with

 2     Facebook to confirm the computer used to create the page,

 3     et cetera.  Printouts of the relevant pages are attached to

 4     this letter.  We are contemplating suing you for defamation.

 5     In the meantime, you must minimize the damage by removing and

 6     deleting the Facebook page.

 7          I was not the administrator of the Facebook page, so

 8     I didn't have the ability to do that.

 9          The defamation Complaint really didn't have much in

10     the way of an actual defamation claim.  It seemed like it was

11     more directed towards the facts of this case.  It says -- the

12     Complaint says:  In December of 2018, and in response to her

13     separation from the plaintiff, the defendant through an

14     attorney served a meritless demand letter seeking nearly --

15     I can't say -- can I not say the amount?  Okay.

16          Seeking a specified amount in compensation for some

17     mysterious, unidentified and unsupported cause of action.  The

18     plaintiff viewed the demand letters from her attorney as an

19     attempt to extort a large sum of money from the plaintiff

20     stemming from her own misunderstanding about her rate of

21     compensation.  During late April and early May, 2019, the

22     plaintiff made it clear it would not comply with the

23     defendant's demands and instead suggested she would need to sue

24     and prevail in court.  Shortly thereafter the defendant's

25     retention of her counsel ended.  The precise circumstances of

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 168 of 225 PageID
1674
MELANIE MOORE - SEPTEMBER 18, 2023                  168
Direct testimony by Ms. Moore

1    the separation with her counsel are unknown.  Plaintiff

2    believes, given the circumstantial evidence, the defendant was

3    unable to find another attorney to prosecute a meritless

4    lawsuit.

5            Then it goes on to say that by process of elimination

6    and due to the timing and creation of the Facebook page, it is

7    readily apparent that the defendant created and administrates

8    the page.

9            The Complaint also accused me of saying that Petland

10   was a puppy mill, which I never said.

11           This is an e-mail that I sent to Mr. Sarelson about a

12   month after Mr. Celler withdrew from my case.  It says:

13   Good morning, Mr. Sarelson.  In your correspondence to

14   Ms. Pereyra of Celler Legal on December 11, 2018 you stated

15   that you received a "Petland Wages Agreement for Kennel" from

16   Ms. Pereyra.  However, this alleged document was not submitted

17   with your response, nor was it sent to you by Ms. Pereyra or

18   Mr. Celler.  Furthermore, I have no prior knowledge of the

19   existence of the alleged document.  Please e-mail a copy of the

20   document to which you referred for review and my records.

21           And in response I received the Complaint and Summons

22   for defamation for $15,000 in damages.

23           Document 4-G, page roles, demonstrates that it has

24   the name of the moderator and the page administrator that was

25   the subject of the defamation.

Case 8:20-cv-02184-MSS-SPF   Document 141   Filed 06/18/24   Page 169 of 225 PageID
1675
MELANIE MOORE - SEPTEMBER 18, 2023                    169
Direct testimony by Ms. Moore

```
 1              THE COURT:  Yes, sir?

 2              MR. SARELSON:  Your Honor, 4-G was not admitted.  You

 3    omitted 4-G.

 4              THE COURT:  Was it attached to the Complaint?

 5              MR. SARELSON:  I don't know.  I haven't seen the

 6    Complaint today.

 7              THE COURT:  You filed the Complaint.  Did you attach

 8    it to the Complaint?

 9              MR. SARELSON:  Oh, I don't have any independent

10    memory of seeing it, without looking at the copy of the

11    Complaint.

12              THE COURT:  Was this attached to the Complaint?

13              MS. MOORE:  No, Your Honor.

14              THE COURT:  All right.  It's not admitted.

15              MS. MOORE:  This was --

16              THE COURT:  It's not admitted.  Was it attached to

17    plaintiff's defamation -- I mean, defendant's defamation

18    Complaint?  Yes or no?

19              MS. MOORE:  No.  I'm sorry.  No, it wasn't.

20              THE COURT:  All right.  It's not admitted.

21              MS. MOORE:  I obtained that in --

22              THE COURT:  It is not admitted, so you can't publish

23    it.

24              MS. MOORE:  Okay.

25              I have multiple communications here from different
```

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 170 of 225 PageID
1676                                    170
      MELANIE MOORE - SEPTEMBER 18, 2023
            Direct testimony by Ms. Moore

1  veterinary clinics that I applied for trying to mitigate the

2  losses after my employment ended at Petland.  I tried,

3  you know, applying for other veterinary technician positions.

4  I have some responses here to some Craigslist posts, people

5  were looking for somebody to clean, I have a few of those.

6  I was pretty much trying to do anything that I could to try to

7  make some money to fix my financial situation after I lost my

8  job.  Unfortunately, I was unsuccessful.

9            THE COURT:  And are you moving that set of documents,

10  the 2-E set, into evidence?

11            MS. MOORE:  Yes.  I don't need to admit -- you know,

12  I mean, there's probably like 20 pages here.

13            THE COURT:  Are you moving to admit them into

14  evidence?

15            MS. MOORE:  No, I'm just saying that I made an

16  attempt to mitigate the losses.

17            THE COURT:  All right.

18            MS. MOORE:  Actually, Your Honor, yes, I would like

19  to admit it into evidence.

20            THE COURT:  Any objection?

21            MR. SARELSON:  Object on relevancy and authentication

22  grounds.

23            THE COURT:  They'll be received.  That is the 2-E

24  segment of documents that begins 2-E dated September 12th,

25  2018, we will skip the page on St. Pete College, and the rest

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 171 of 225 PageID
1677
MELANIE MOORE - SEPTEMBER 18, 2023                    171
Direct testimony by Ms. Moore

 1  will be admitted through April 2023 at 2:30 by Vet Assistant

 2  Emergency Department at Tampa Bay Veterinary Specialists and

 3  Emergency Care Center.

 4          Just so you can keep track of it, Ms. Heard, this is

 5  the subset of the 2 segments.

 6          Thank you.

 7          And this is the page I took out that's somehow stuck

 8  in the middle of that, so you can take it out of the jury copy.

 9          Yes, ma'am.  Anything else you'd like to add?

10          MS. MOORE:  I just am going back to the defamation

11  lawsuit.  I would just like to admit document 4-E, the docket

12  sheet, which demonstrates that there was no attempt to serve

13  the Complaint, there's no receipt of process or a receipt

14  showing that service was unable to be effectuated.

15          THE COURT:  4-E has already been admitted.

16          MS. MOORE:  Okay.  Thank you.

17          That's all I have, Your Honor.

18          THE COURT:  And are you seeking damages, and if so,

19  what are you asking this jury to do?

20          MS. MOORE:  It's kind of hard to discuss damages if

21  I can't discuss the injuries that I suffered because of what

22  the defendants did.  I'm leaving it up to the jury.  I trust

23  them that they'll be fair.

24          THE COURT:  And what do your damages consist of?

25          MS. MOORE:  Well, if I can't -- I mean, you didn't

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 172 of 225 PageID 1678
MELANIE MOORE - SEPTEMBER 18, 2023                    172
Direct testimony by Ms. Moore

1  let me discuss any of the things, so, I mean, I can't say what

2  the damages are without saying what the injury was.

3          THE COURT:  I told you the things you could discuss,

4  and if you want to discuss them, you can, but you're not

5  required to.

6          MS. MOORE:  I mean, I don't think I can discuss the

7  damages without saying what caused the damage, you know what

8  I'm saying?  I don't -- if I can't discuss the injuries that I

9  suffered then I can't discuss the damages that I'm seeking as a

10  result of these injuries.

11          THE COURT:  Did you lose any money from the

12  unemployment and the wages that you claim you were supposed to

13  make?

14          MS. MOORE:  In addition to the wages?  You mean

15  additional money?

16          THE COURT:  The wages themselves.  I haven't heard

17  any testimony about the wages.

18          MS. MOORE:  Yeah.  I mean, I was shorted $2,000 from

19  my paycheck.

20          THE COURT:  All right.  Any other damages you want

21  the jury to consider?

22          MS. MOORE:  Liquidated damages.

23          THE COURT:  Any other damages?

24          MS. MOORE:  And any other compensatory damages that

25  the jury feels are fair.  It's -- because it's my -- my

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 173 of 225 PageID
1679
MELANIE MOORE - SEPTEMBER 18, 2023                    173
Cross-examination by Mr. Sarelson

```
 1  situation, it's difficult for me to quantify everything that's
 2  happened, and I can't discuss some of the things that have
 3  happened with you, so I just couldn't -- I couldn't put a price
 4  on it because, I mean, the things that I've been through
 5  because of this, I mean, if I was going to put a price on there
 6  it would be like $1 million, you know, but I couldn't do it,
 7  and I'm leaving it in the hands of the jury to decide what's
 8  fair.  I trust them to be fair.
 9          THE COURT:  All right.  Is there a cross-examination
10  of this witness?
11          MR. SARELSON:  There is, Your Honor.  Very briefly
12  though.
13          Ms. Moore, I just have a few questions for you.  It's
14  kind of late.  I don't want to take up too much of everyone's
15  time.
16          **CROSS-EXAMINATION OF MELANIE MOORE**
17  **BY MR. SARELSON:**
18  Q    You talked a lot about the defamation lawsuit that was
19  filed, right?
20  A    Uh-huh.
21          THE COURT:  You have to say yes or no.
22          THE WITNESS:  I'm sorry.
23  A    Yes.
24  Q    Shortly after Mr. Celler terminated his representation of
25  you, you started a Facebook page called "Why You Should Not Buy
```

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 174 of 225 PageID
1680                                                                          174
                    MELANIE MOORE - SEPTEMBER 18, 2023
                      Cross-examination by Mr. Sarelson

```
 1    Puppies from Petland."  Is that true?

 2    A    No.

 3    Q    You were not the administrator of that account?

 4    A    No.

 5    Q    You did not post anything to that page?

 6    A    I posted to the page, but I wasn't -- I didn't

 7    administrate the page.  I posted like the same way any Facebook

 8    user could post on any page.

 9    Q    How did you post to the page if you were not the

10    administrator?

11    A    The same way anybody posts on Facebook.  Anybody can post

12    on any page on Facebook without being the administrator of the

13    page they're posting on.  I mean, I -- when I received the

14    cease and desist letter threatening to sue me or whatever,

15    I posted the letter on the page because I was hoping that by

16    publicizing the fact that I was being, you know, falsely

17    accused and being threatened and harassed, I was hoping that it

18    would stop by --

19    Q    Ms. Moore, do you have a copy of the Complaint in front of

20    you?

21    A    I have part of it.  I don't have the whole thing.

22    Q    Okay.  You don't have a complete copy?

23    A    I don't.

24    Q    Do you have the part of the Complaint where it says --

25    there's an About Me page and the contact info is M dot E, M-E.
```

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 175 of 225 PageID
1681
MELANIE MOORE - SEPTEMBER 18, 2023                    175
Cross-examination by Mr. Sarelson

1    Isn't that the website you run and that you use your e-mail

2    from?

3    A    Do you have -- can you show me what you're talking about?

4    I don't --

5    Q    I can show --

6            MR. SARELSON:  May I approach, Your Honor?

7            THE COURT:  I don't know what you're showing her,

8    so --

9            MR. SARELSON:  The Complaint.  The full Complaint,

10   Your Honor, not the partial Complaint.

11           THE COURT:  Is this the allegation or is this

12   document -- this is your allegation of what?

13           MR. SARELSON:  This is an attachment to the Complaint

14   filed.

15           THE COURT:  Then do you have a copy of it?  It has to

16   be --

17           MR. SARELSON:  As I indicated earlier, I only have a

18   complete copy on my computer.  I didn't --

19           THE COURT:  You can't introduce a document you don't

20   have, Mr. Sarelson, and the jury can't receive it because you

21   don't have it.

22           MR. SARELSON:  Your Honor, she had it on her witness

23   list.  I assumed she had the complete Complaint on her witness

24   list.

25           THE COURT:  You can't introduce a document that you

MELANIE MOORE - SEPTEMBER 18, 2023
Cross-examination by Mr. Sarelson

```
 1   don't have a copy of, Mr. Sarelson.  You can ask her a
 2   question, but --
 3            MR. SARELSON:  Sure.
 4            THE COURT:  -- you can't introduce a document.
 5   BY MR. SARELSON:
 6   Q    Ms. Moore, the Complaint has an attachment -- has an info
 7   page, and it says:  This page is written by a veterinary
 8   technician and a former employee of Petland.  Do you remember
 9   that?
10   A    Not off the top of my head, no.
11   Q    Do you know who it is, who you believe it to be, if not
12   you, the administrator of this Facebook page?
13   A    I do.  I do.  Well, I'm -- when I received the cease and
14   desist letter, I reached out to the page administrator.
15   Q    Who is the administrator, if it's not you?
16   A    Well, I mean, I'm not going to disclose that person's name
17   so that you can start harassing them.  I mean, that's why
18   I have this page roles here, I have it, it's redacted, the last
19   name, but you can clearly see that that's not my name on there
20   as the administrator.
21   Q    The cease and desist letter that I sent to you, you posted
22   it on this page --
23   A    Yes.
24   Q    -- didn't you?
25   A    Uh-huh.
```

MELANIE MOORE - SEPTEMBER 18, 2023
Cross-examination by Mr. Sarelson

```
 1   Q    And the fact that you posted this onto your page, or onto
 2   this page, on the Facebook website, that ended up being an
 3   attachment to the lawsuit that was filed against you, correct?
 4   A    I'm sorry.  What -- what was the question again?
 5   I'm sorry.
 6   Q    One of the attachments to the Complaint was the very
 7   Facebook page that you claim you didn't have anything to do
 8   with, right?
 9           MS. MOORE:  Objection.
10           THE COURT:  That wasn't her testimony, Mr. Sarelson.
11   A    Um, I mean, there was --
12           THE COURT:  One second.
13           Can you rephrase the question?
14           MR. SARELSON:  Absolutely, Your Honor.
15   BY MR. SARELSON:
16   Q    The Facebook page "Why You Shouldn't Buy Pets from
17   Petland," that was attached to the Complaint that was filed,
18   correct?
19   A    I think there were screenshots of the page.
20   Q    And that included a cease and desist letter that was sent
21   to you and you then published it?
22   A    Right.
23   Q    That Facebook page included pictures of dogs in kennels
24   being prepared for human consumption; isn't that right?
25   A    I'm not aware of that, no.
```

MELANIE MOORE - SEPTEMBER 18, 2023
Cross-examination by Mr. Sarelson

1  Q    The pictures that were posted were not pictures of

2  Petland, were they?

3  A    I don't know.  I know that the pictures are on -- in

4  several places on the internet associated with Petland.  I know

5  no lawsuit was filed against them.

6  Q    You testified -- I'm sorry.  You said in the opening

7  statement, what seems like hours ago, you said that the company

8  specifically didn't want to just hire any veterinary technician

9  but that they wanted a credentialed veterinary technician; is

10 that right?

11 A    Yes.

12 Q    Are you or have you ever been a credentialed veterinary

13 technician?

14 A    I'm not certified.  I have an Associate's, an Associate of

15 Applied Science degree in veterinary technology.  I never

16 represented myself to be certified, and Yessi asked me about

17 that at my interview and I told her that I was not.

18 Q    So just to be clear then, you are claiming that the

19 company posted for a certified vet technician and they wanted

20 someone credentialed, and you applied for that job even though

21 you did not actually -- you were not actually a certified

22 veterinary technician as you claim?

23 A    Correct.  I mean, the difference between being

24 credentialed and not is -- well, I mean, you'd have to have at

25 minimum an Associate degree in veterinary technology and then

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 179 of 225 PageID
1985
MELANIE MOORE - SEPTEMBER 18, 2023                         179
Cross-examination by Mr. Sarelson

1    the credentialing comes in when you take the exam to get your

2    license or whatever, but the exam is pretty much the only

3    difference between the credentialing and being -- and not, but

4    I do have a degree in veterinary technology.

5    Q    You testified a few moments ago that you were somehow

6    prohibited from bringing a wrongful termination lawsuit.

7    Is that right?

8    A    Well, yes, originally I was going for -- you mean for

9    retaliation for termination?

10   Q    Yes, ma'am.

11   A    Yes, I was going to, but I was threatened and told that

12   the whole case would be dismissed with prejudice if I didn't

13   omit that claim from my Complaint.

14   Q    Who made that threat?

15   A    The Court.

16   Q    The Court threatened you --

17   A    She did.

18   Q    -- is what your testimony is?

19   A    Yes, she did.

20   Q    Okay.  So your testimony under oath today is that the

21   Court threatened you to withdraw your termination claim?

22   A    Yes.  It's in the order.  It's in the record.  In bold

23   print.

24   Q    Isn't it true, ma'am, that you tried to bring a claim for

25   termination and it was dismissed by the Court because you

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 180 of 225 PageID 1686
MELANIE MOORE - SEPTEMBER 18, 2023                    180
Cross-examination by Mr. Sarelson

1  couldn't make out a claim for termination?  Isn't that more

2  accurate?

3  A    I did make out a claim for retaliation.  I satisfied every

4  element.  I mean, I was terminated 30 minutes after

5  I complained that my paycheck was short, on my day off, when

6  I wasn't even there, and I was scheduled to work the following

7  week, which was just posted earlier that day, so the window of

8  opportunity there of what could have caused my termination is

9  very small.

10  Q    So it was -- so it wasn't so much that the Court dismissed

11  the termination claim as that you were threatened into

12  withdrawing it; is that basically right?

13  A    Yes.  Well, when I amended my Complaint, I put retaliation

14  under the Fair Labor Standards Act as one of my claims, and

15  then in response the Court said that I had to omit the

16  retaliation count and the Florida whistleblower count and that

17  if I didn't then the entire case would be dismissed with

18  prejudice, wages and all.

19  Q    Ms. Moore, one of the things -- well, I want to just

20  address a couple of other quick issues.

21          In the text -- you had a text exchange with Alison,

22  who is sitting over here to my left, Ms. Nieves.  I call her

23  Alison.  You had a text exchange with her on the date of

24  termination, right?

25  A    Yes.

MELANIE MOORE - SEPTEMBER 18, 2023
Cross-examination by Mr. Sarelson

1    Q    It is true that you did not at the time raise this issue

2    with Corporate, as your supervisor suggested, yes or no?

3    A    There was no reason to.

4    Q    So the answer is yes, correct?

5    A    The answer is no, I didn't raise an issue with Corporate,

6    because she said the legal department would look into it

7    already, so there was no need to contact Corporate.

8    Q    You -- and in that termination, in that e-mail exchange

9    that we were looking at earlier -- I'm sorry, it was a text

10   exchange.  I apologize.  In that text exchange that we were

11   talking about earlier, one of the things that you appeared to

12   be upset about was that you had left a job making roughly the

13   same amount of money to come to Petland, or to come to Pooches

14   of Largo store in Largo; is that right?

15   A    I -- my previous jobs were making money that was

16   comparable to the salary that was stated in the job post.

17   Q    I just want to be clear.  You put in the text message that

18   you would not have left your job for the new job, for the

19   Petland job, if you knew that you would be paid 8.45 an hour

20   and not roughly $16 an hour, right?

21   A    I didn't say that I left the other job for the Petland

22   job, simply that my last job paid like $16 an hour or something

23   like that.  I was actually looking for somewhere -- because

24   I don't drive, have a vehicle, so I was looking for a job where

25   I could get to it, you know, on foot or on my bicycle, so

MELANIE MOORE - SEPTEMBER 18, 2023
Cross-examination by Mr. Sarelson

1    that's why I decided to apply at Petland.

2    Q    I'm going to just show you -- it's already been admitted

3    into evidence.  This is the text exchange.  I'll show you the

4    top real fast.

5              MR. SARELSON:  Is this on?

6              Oh.  There it is.  Sorry about that.

7    Q    This is the text exchange that you had admitted into

8    evidence earlier.  Does that look familiar?

9              MR. SARELSON:  I can make this --

10             THE COURT:  Mr. Sarelson, pull the microphone toward

11   you.

12   BY MR. SARELSON:

13   Q    Can you see that better, ma'am?

14   A    Yes.

15   Q    Okay.  So this is the text exchange, right?

16   A    Yes.  That's part of it.

17   Q    I want to turn to -- this is the third page of the

18   document.  You write:  That's the position I applied for and

19   that's the position I was hired for.  And then it goes on to

20   say:  Why would I leave my last job, making almost $16 an hour,

21   for a job that pays less than half of what I was making?

22   Do you see that?

23   A    Yes.

24   Q    Just to be clear, you did not leave a job to go to

25   Petland; isn't that true?

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 183 of 225 PageID
1689                                                              183
                    MELANIE MOORE - SEPTEMBER 18, 2023
                       Cross-examination by Mr. Sarelson

1   A    I left a job to find comparable employment closer to where

2   I lived, so that I could get there on foot or by bicycle.

3   Q    In fact, when you worked for Petland, for the Pooches

4   store of Petland, in August of 2018, your last job prior to

5   that was actually January of 2018, right?

6   A    Um, I really couldn't say.  I don't remember.  It's been

7   too long.

8   Q    Is there something that might refresh your recollection?

9   A    I mean, if you have something.

10              MR. SARELSON:  May I approach, Your Honor?

11              THE COURT:  You may.

12  BY MR. SARELSON:

13  Q    Ms. Moore, if you could turn to page 2, that might help,

14  on the bottom.

15  A    That's the last job that's on my resumé, but that's not

16  the last job that I held.

17  Q    So let me just clarify.  Let me just break that down real

18  fast.

19              At least according to the resumé, the last job prior

20  to Pooches of Largo ended -- it was with a company called

21  Hays Towne Veterinary Hospital, and it ended in January 2018;

22  is that correct?

23  A    Yes, but I had a job in between there, between there and

24  Petland.

25  Q    You had a job that's -- is there a reason it's not on your

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 184 of 225 PageID
1690                                                                      184
                    MELANIE MOORE - SEPTEMBER 18, 2023
                       Cross-examination by Mr. Sarelson

1    resumé?

2    A    Because I was only there for two months.

3    Q    Well, you were only at Petland for three weeks.  You put

4    that on your resumé, didn't you?

5    A    No, I wouldn't put Petland on my resumé.

6    Q    Why not?  Why wouldn't you put that on your resumé?

7    A    Because I wouldn't want anyone to know that I worked

8    there.

9    Q    Well --

10             MR. SARELSON:  May I approach, Your Honor?

11             THE COURT:  You may.

12   BY MR. SARELSON:

13   Q    We are looking at a more current resumé for you; isn't

14   that right?  Isn't that correct?

15   A    Apparently, yeah.  I guess I must have put it on there.

16   I don't remember doing it.

17   Q    Okay.  So, Ms. Moore, the more current resumé -- we just

18   looked at an earlier resumé, a pre-Petland resumé, and now

19   we're looking at a post-Petland resumé.  You testified maybe

20   90 seconds ago that you would never put your employment with

21   Petland Largo on your resumé.  It's on your resumé, isn't it?

22   A    Yeah.  I'm surprised that I did.  I mean, I don't know why

23   I would have done that.

24   Q    And you also testified a moment ago that you had other

25   jobs between Petland, in August of 2018, and Hays Towne

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 185 of 225 PageID
1691
                    MELANIE MOORE - SEPTEMBER 18, 2023                    185
                        Cross-examination by Mr. Sarelson

1    Veterinary Hospital, in January of 2018, didn't you?

2    A    Correct.  Yes.  I worked at the emergency --

3    Q    And that was not on your -- that was only two months?

4    A    Yeah, I was working at the emergency veterinary clinic in

5    St. Pete.

6    Q    And you omitted that from your resumé?

7    A    I mean, I didn't put it on there because I wasn't there

8    that long.

9    Q    You didn't -- you didn't put on your resumé the two month

10   job you had working in a veterinary ER facility, but you did

11   put on your resumé, now that you've seen it, the three weeks

12   you worked at Petland?

13   A    What is your point?  I mean, it also says here -- where it

14   says that I worked at Petland, it says I was a veterinary

15   technician.

16   Q    You put that on there though, didn't you?  It's your

17   resumé.

18   A    Well, yeah, and I was a veterinary technician at Petland.

19   That's what I was hired for.  I mean, you -- your documents --

20   you know, your defamation lawsuit against me and your motion

21   for summary judgment confirm that I was a vet tech at Petland.

22   You keep flipping back and forth.  One day I'm a kennel tech,

23   another day I'm a vet tech.

24   Q    Ma'am, one of the claims that you've raised in this

25   lawsuit is that you weren't paid for a direct deposit.  Does

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 186 of 225 PageID
1692                                                                      186
               MELANIE MOORE - SEPTEMBER 18, 2023
                   Cross-examination by Mr. Sarelson

 1  that sound familiar to you?

 2  A    Correct.

 3  Q    That bank would have been PNC Bank; is that correct?

 4  A    Yes.

 5  Q    In the five years and three months since that direct

 6  deposit was owed to you, have you ever once gone to PNC Bank to

 7  look at your own records to see if you have a direct deposit?

 8  A    I don't have that account anymore.  It was closed.

 9  Q    So the answer then under oath is that in five years you've

10  never actually gone to PNC Bank to see if that money was

11  actually deposited into your account; isn't that true?

12  A    Oh, I would know if I had an extra $300 or whatever it is.

13  You know, veterinary technicians, we don't make a whole lot of

14  money, you know, we live pretty much paycheck to paycheck.

15  Q    Is the answer to my question yes?

16  A    I'm sorry.  What was the question?

17  Q    You have never checked your PNC Bank records to see if you

18  were paid that money, since this lawsuit was filed, right?

19  A    I didn't need to because I would have known.

20  Q    Do you have a copy, as we sit here today, of any

21  August 2018 or September 2018 tax -- I mean bank records for

22  PNC at all?

23  A    No, I don't.  Do you have documentation showing that you

24  made a direct deposit?

25  Q    I'm not permitted to answer these questions, but bottom

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 187 of 225 PageID
1693
MELANIE MOORE - SEPTEMBER 18, 2023                        187
Cross-examination by Mr. Sarelson

1  line is you don't have any records to show that as you sit here

2  today, correct?

3  A    I don't have any records of something that didn't happen,

4  no.  But, you know, even if -- you know, given the number of

5  hours that I worked, even if -- you know, giving the benefit of

6  the doubt, even if that direct deposit had been made, I think

7  it was like $320 or something like that, the $320 with the $184

8  that was for the check that I got, $500 for about 100 hours of

9  work, that doesn't come out to minimum wage, that comes out to

10  less than three dollars an hour.

11  Q    According to some of the documents you filed in this case,

12  you claim that the amount of unpaid wages you're due is $1815.

13  Do you remember that?

14  A    I don't remember where I said that, but that sounds about

15  right, yes.

16  Q    Can you tell us how you calculate -- well, let me

17  rephrase.

18            The number that you're claiming is $1815; is that

19  right?

20  A    It sounds about right.  I don't remember the exact amount,

21  but, yeah, it was 1800, is what I --

22  Q    And the fraud -- just to be clear again, Ms. Moore, then

23  I'm going to wrap this up, what you believe to be the fraud

24  that my clients engaged in was what they put on that indeed.com

25  job posting, correct?

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 188 of 225 PageID
1694                                                              188
MELANIE MOORE - SEPTEMBER 18, 2023
Cross-examination by Mr. Sarelson

1  A    It was -- that was the initial fraud, but then they've

2  committed multiple fraudulent acts since that time to conceal

3  the first fraud and to try to make it look like I'm not owed

4  any money.

5  Q    So just to clarify this so there's no misunderstanding,

6  the initial fraud, the fraud that forms the initial impetus for

7  your lawsuit is the indeed.com job posting asking people to

8  apply for this certified vet tech job, that's correct?

9  A    Correct, because I never would have applied for the job

10 were it not for the salary, because the $35,000 was at the high

11 end of the range of salary for veterinary technicians in that

12 area during the relevant time, it was actually a little bit

13 higher, so, I mean, it would have been enticing to any

14 veterinary technician looking for employment, because,

15 you know, it paid well.  I would not -- if it weren't for that,

16 I wouldn't have applied for the job.

17 Q    And then just yes or no, do you have any kind of an offer

18 letter from my client saying, Ms. Moore, congratulations, we're

19 here to offer you the job of X or whatever, anything of the

20 sort?  Is the answer no?

21 A    Are you asking if -- an offer letter for a veterinary

22 technician position?

23 Q    Well, an offer letter from my client.  I don't really care

24 what it says.

25 A    Well, I have the image of the text message that I got from

Case 8:20-cv-02184-MSS-SPF    Document 141    Filed 06/18/24    Page 189 of 225 PageID
1995
MELANIE MOORE - SEPTEMBER 18, 2023                           189
Cross-examination by Mr. Sarelson

1   Yessi offering -- asking me to come in so I could start my

2   training the next day.

3   Q    The text message from Yessi asks you to come in for

4   training, correct?

5   A    Right.  The next morning.

6   Q    The text message from Yessi doesn't say what the job is,

7   correct?

8   A    Well, it doesn't say that it's any other than the job

9   I applied for.

10  Q    Ma'am, very simple.  I'm not trying to trick you,

11  I promise.  The text message from Yessi, who I think is still

12  sitting in the back, the text message from Yessi asked you to

13  come in for training, but it did not say what the job you were

14  training for was; isn't that correct?

15  A    Right.

16            MR. SARELSON:  I have nothing further.

17            MS. MOORE:  I'm finished as well, Your Honor.

18            THE COURT:  You don't have any follow-up to his

19  cross-examination of you?

20            MS. MOORE:  No.

21            THE COURT:  All right.  You may step down.

22            MS. MOORE:  Thank you.

23            THE COURT:  I'm sorry.  Were there any questions the

24  jury had of this witness?

25            Take the stand back, Ms. Moore.

```
 1              Do you -- I'm sorry.
 2              Did you work more than the 24.27 hours shown on the
 3    paystub?
 4              MS. MOORE:  Yes, I did.  I -- my first --
 5              THE COURT:  How many hours?
 6              MS. MOORE:  Approximately 100 over the course of the
 7    three weeks.
 8              THE COURT:  And do we have a copy in the record of
 9    plaintiff's pre and post-Petland resumé?
10              MS. MOORE:  In the record of this case?  I don't
11    think so.
12              THE COURT:  Did you get paid?  And if so, how much?
13              MS. MOORE:  I received -- it was -- after tax it was
14    $184, I believe.  I think gross it was like 220 or something
15    like that.
16              THE COURT:  And so what do you claim wasn't paid to
17    you for the hours that you claim you worked?
18              MS. MOORE:  Well, I mean, given the 100 hours or so
19    that I worked, $204 or whatever it was, it does not even amount
20    to minimum wage, much less the amount that I agreed to work for
21    that was stated.  The defendants -- those were the defendants'
22    terms.  I mean, when you --
23              THE COURT:  What number do you believe you were owed
24    from the time that you worked, based upon whatever rate you
25    claim you were entitled to?
```

```
1              MS. MOORE:  I was shorted 1800.

2              THE COURT:  All right.  Any other questions?

3              MS. MOORE:  I mean, can I just say one more thing?

4  In order to post a job on indeed.com, they don't require you to

5  put what the salary is that you're offering or the pay or

6  whatever.  It's optional.  It takes a minimum of five

7  additional steps to include compensation in a job post on

8  Indeed, and the defendants took those five steps when they put

9  the $35,000 in there, and Indeed is a platform that its sole

10 purpose is to connect job seekers with employers seeking to

11 fill positions, so I had no reason to think that it was any

12 other than what the defendant stated it was, because, I mean,

13 who starts out an employment relationship based on lies,

14 you know?  So I relied on the defendants' statement to be true.

15             THE COURT:  Any follow-up questions from the defense?

16             MR. SARELSON:  Nothing from us, Your Honor.

17             THE COURT:  All right, ma'am.  You may step down.

18             MS. MOORE:  Thank you.

19             THE COURT:  Any further witnesses and any further

20 testimony from the plaintiff?

21             MS. MOORE:  No, Your Honor.  Thank you.

22             THE COURT:  Does the plaintiff rest?

23             MS. MOORE:  Yes, Your Honor.

24             THE COURT:  Do you have any evidence in the way of

25 documents that you meant to introduce that you didn't remember
```

1    to introduce?  Because once you rest, you've rested.

2            MS. MOORE:  No, that was everything, Your Honor.

3    Thank you.

4            THE COURT:  All right.  Let me ask the jury to step

5    out for a couple minutes and then I'll be able to tell you how

6    we'll proceed once I hear from the parties.

7                    *(Jury exits proceedings.)*

8            THE COURT:  The plaintiff has rested her case.  Is

9    there any response from the defendant?

10           MR. SARELSON:  Your Honor, we would ask for Rule 50

11   motion for judgment as a matter of law.

12           THE COURT:  You all may be seated.

13           Yes, sir?

14           MR. SARELSON:  May I approach the podium?

15           THE COURT:  You may.

16           MR. SARELSON:  Your Honor, obviously being mindful of

17   the fact that some of the -- some of the documents that we

18   wanted to get in were precluded by the Court, I'm going to work

19   around that issue, but there's two counts at issue.

20           Count One is a Fair Labor Standards Act case, and the

21   FLSA issue is interesting because what she's claiming, what

22   she's testified to, at the very last minute, was that she

23   worked in excess of the twenty-something hours that are

24   reflected in that paystub, and the problem -- the problem with

25   that is -- with the evidentiary rulings we're dealing with, the

```
 1    problem with that is there's no evidence of willful violation
 2    under the FLSA.  What she has presented testimony on was that
 3    there was a shortage.  However, the law is very clear that the
 4    mere fact that there was shortage under the FLSA, whether it's
 5    one dollar or five dollars, is subject to a two year statute of
 6    limitations, so in order for her -- there's no question that
 7    this lawsuit was filed outside the two year statute of
 8    limitations, so what's left is do we have evidence of a willful
 9    violation, and there's been no evidence presented of any kind,
10    candidly, of a willful or a reckless violation.
11          Candidly, frankly, it's the opposite, that she had --
12    she sent a text message saying, I'm supposed to get paid more,
13    but that text message doesn't say anything about not being paid
14    for all hours, it just says I was supposed to be paid a
15    different rate of compensation.
16          Even Mr. Celler's demand letter that was placed into
17    the record doesn't actually even reference any kind of an FLSA
18    violation, it simply references a potential wage agreement.
19          So the question is is there any evidence of
20    willfulness under the statute, and the simple answer to that
21    question, Your Honor, is no.  And if the answer is no, if
22    there's no -- there's no jury -- there's no evidence for a jury
23    to conclude that this was a willful or reckless violation, then
24    the two year statute of limitations would govern, in which case
25    as a matter of law we would be entitled to judgment on the FLSA
```

1    count.

2            That is the crux of our motion for judgment of law as

3    to Count One.  Again, you know, we acknowledge we've been -- we

4    believe we have records that show otherwise, we obviously were

5    not able to use those, but subject to that issue, the only

6    question left with respect to the FLSA is is there evidence to

7    support a finding of willfulness, and there's been no evidence

8    of any kind; and as I indicated, frankly, it's to the contrary.

9            She never raised -- until the lawsuit was filed,

10   which was 25 months after this incident arose, until this

11   lawsuit was filed there was no indication of any kind of an

12   FLSA claim.  There was -- it wasn't in the -- it wasn't in the

13   demand letter, it never came up in any of the communications,

14   there was no pre-suit -- Your Honor dismissed the State claim

15   because there was no pre-suit claim, and so the first time my

16   client -- it would have even have been brought to their

17   attention that there was a potential FLSA violation, that she

18   somehow worked off the clock and wasn't paid for it, was in

19   September of 2020, which is 25 months after.

20           And I would just add that with respect to the direct

21   deposit issue, there was no evidence, there was no claim -- let

22   me rephrase that.  There was no claim until two years and

23   one month later that, hey, I didn't get paid direct deposit.

24   Now, this might be a different situation if a few weeks after

25   this incident she called the company and says, hey, I never got

1    my direct deposit, but that never happened, by her own
2    admission.  Frankly, by her own admission she never checked her
3    own bank records to see if she got the direct deposit.  So in
4    September of 2020, 25 months after the employment, the company
5    gets wind for the first time that there is a potential FLSA
6    violation, and so there's nothing that would trigger
7    willfulness under the Act.

8        And it's just important to remember that not all FLSA
9    violations are automatically willful.  The mere fact that
10   somebody was shorted money doesn't mean that there's an FLSA --
11   doesn't mean that there's a willful violation.  That is a
12   separate standard of proof which a plaintiff has to put on
13   evidence for, and, frankly, I didn't hear any -- I didn't hear
14   even argument, frankly, I don't think the word "reckless" or
15   "intentional" or anything of the sort even came up as a matter
16   of argument, but certainly not as a matter of evidence, and so
17   we think Count One is time barred, first and foremost,
18   Your Honor.

19       Turning to the fraud count, there's two issues
20   that -- well, there's a couple of issues.  The first issue is
21   dispositive entirely, which is Ms. Moore reiterated her
22   deposition -- I'm sorry, Ms. Moore reiterated her trial
23   testimony today exactly what she pled in the Complaint, which
24   is that the fraud, the fraudulent statement that was made to
25   her, there's no allegation it was made by Mr. Marquez, and

```
 1   in fact in the pretrial stipulation one of the stipulated facts
 2   is that there were no pre-employment communications with
 3   Mr. Marquez.  So at a bare minimum I have no idea how
 4   Mr. Marquez is potentially still in the lawsuit.  The mere fact
 5   that he is one of the owners, albeit indirectly, that is not
 6   enough for fraud, it just doesn't -- that's just not the basis
 7   for fraud.
 8            She is claiming that the indeed.com job advertisement
 9   was the fraud, full stop.  That is what she pled repeatedly,
10   that is how we defended the case, that's what she said in
11   various motion practice, that's what she said in her
12   interrogatories and that's what she testified today
13   unequivocally.
14            A job posting is not actionable as fraud, under
15   Florida law it is not actionable as fraud, it has to be a job
16   offer.  If a job posting -- I could apply for certified vet
17   technician.  The mere fact that she applied -- in order for it
18   to be fraud, the mere fact that she applied would have had to
19   create the contract.
20            THE COURT:  But what did you all hire her for?  What
21   did Pooches hire her for?
22            MR. SARELSON:  The only evidence that we're aware of
23   in terms of -- when you say "hire her for," I'm not trying to
24   be short and I'm not trying to be difficult, but it's a
25   complicated question and we've been dealing with this for
```

1  years.  The job that she started on and trained on was a kennel

2  technician job.

3          THE COURT:  So why did you tell the State Court you

4  hired her as a vet tech?

5          MR. SARELSON:  I don't recall how or what our

6  thinking was at the time.  I believe it was because her --

7  because her Facebook post refers to her as a veterinary

8  technician.

9          THE COURT:  You don't make allegations in a State

10  Court Complaint against someone who you say is defaming you

11  based upon their allegations.

12          MR. SARELSON:  No, but my point is, Your Honor --

13          THE COURT:  You said in your Complaint you hired her

14  as a vet tech, Mr. Marquez said in his affidavit he hired her

15  as a vet tech, and now the contention is we didn't hire her as

16  a vet tech, we hired her as a kennel tech, and we didn't let

17  her go because she complained about her salary, we let her go

18  because she brought grapes in the kennel.  So, I mean, the

19  allegation that she was hired as a vet tech and then bait and

20  switched to a kennel tech is not a job posting allegation.  She

21  says, I went in, I was interviewed, they told me to come in to

22  work, and your own documents, at least some of them, establish

23  that she was hired as a vet tech, but then she was treated like

24  a kennel tech and then paid like a kennel tech, I assume, until

25  even today, even though you acknowledge that this was probably

1    an administrative error.

2         MR. SARELSON:  So, Your Honor, I share the Court's

3    concern, because it's a fair question to ask how is there a job

4    posting for one job and she apparently was offered a different

5    job.

6         THE COURT:  That's not my concern.

7         MR. SARELSON:  No, I'm acknowledging the issue,

8    I fully acknowledge the issue, and we heard testimony from

9    various people and none of them had a specific answer, but the

10   fraud in this case is that -- the alleged fraud isn't just that

11   she was a certified vet tech.  The issue that she's claiming is

12   a discrepancy about her salary, that I was hired -- I applied

13   for a job as a certified vet tech, I was interviewed, and then

14   she starts the job, and no one knows, because we don't have

15   like an offer letter, which we fully acknowledge, we don't have

16   like an offer letter that says we'd like to offer you the job

17   of X.  In retrospect, I wish we did, candidly, but we don't,

18   but if she's -- if she is offered the job of a kennel tech --

19   she can apply for a certified vet tech, submit a resumé for

20   certified vet tech, and then the company say, well, we're not

21   interested in a certified vet tech position, this is actually a

22   kennel tech technician that pays $8.45 an hour.

23        THE COURT:  There's a factual dispute about whether

24   she was offered a job as a vet tech and whether it was

25   fraudulent to have made such an offer and then switch her over

1  to being a kennel tech that the Court cannot resolve on

2  a Rule 50 motion.  The jury will have to decide whether she was

3  defrauded and what the job offer was and what she actually got.

4  It wasn't just a job posing, it was a posting followed by the

5  hiring, which everyone -- well, not everyone.  I don't --

6  I can't remember what Yessi's last -- Yessica's last name is,

7  but she doesn't seem to think so, but Mr. Marquez's affidavit

8  says so and his testimony says so and your Complaint against

9  her in State Court says so and your summary judgment motion

10  says so, so the jury will have to decide the fraud issue and

11  I will have to research the willfulness issue and the timing of

12  it.

13          So you contend on the willfulness piece that she did

14  not advise that she was underpaid until 21 months --

15          MR. SARELSON:  25 months, Your Honor.

16          THE COURT:  25 months after she was not paid.

17          MR. SARELSON:  That's right.  There was no

18  indication -- and I don't think this is subject to any dispute,

19  there was no indication of any potential FLSA violation, no

20  indication that the direct deposit didn't go through, until she

21  filed the lawsuit 25 months earlier.

22          And I would just add, Richard Celler --

23          THE COURT:  25 months earlier or 25 months later?

24          MR. SARELSON:  The lawsuit was filed 25 months later.

25  So 25 months later she filed a lawsuit for things that's not --

```
 1    was not brought to our attention prior to the lawsuit.

 2              And I would just add, Your Honor, just to really

 3    crystalize this, I don't normally have lawyers take the stand,

 4    it doesn't come up very often, I'm sure it doesn't come up for

 5    the Court very often.  Mr. Celler's demand letter -- Mr. Celler

 6    is a well-known FLSA lawyer in the state.  Mr. Celler's demand

 7    letter doesn't say anything about an FLSA issue and it doesn't

 8    say anything about hours being shorted and it doesn't say

 9    anything about a direct deposit.  What it says is she was

10    supposed to be paid $35,000 for those three weeks and she

11    wasn't, and that would never in --

12              THE COURT:  What's the document number?  Can you pull

13    it up?

14              MR. SARELSON:  The document number for?

15              THE COURT:  For his demand letter.

16              MR. SARELSON:  I believe it was -- I have it

17    somewhere.  I know we filed it.

18              THE COURT:  Do you know which exhibit it is,

19    Ms. Moore?

20              MS. MOORE:  I believe it's under tab 2.  I think it's

21    the first -- the first listed --

22              THE COURT:  I have it.

23              MS. MOORE:  -- under tab 2.

24              MR. SARELSON:  I'm just looking through it, through

25    the original Complaint.
```

 1              I apologize, Your Honor.  It's docket entry 1-1,

 2    page 16.

 3              THE COURT:  This is a document dated December 6,

 4    2018?

 5              MR. SARELSON:  It was.

 6              THE COURT:  I have it here.  One second.

 7              The footnote in the letter on the first page says --

 8    well, it says, however, immediately upon receipt of her first

 9    paycheck, Ms. Moore discovered a significant discrepancy.

10    Footnote 1.  Specifically, Petland failed to pay Ms. Moore the

11    agreed-upon salary, i.e. $35,000, and also improperly reported

12    the number of hours Ms. Moore worked.  December 2018.

13              MR. SARELSON:  Right, and then the next -- the next

14    sentence goes on to say:  Our firm is in possession of the

15    agreement.  The allegation of the -- the allegations in the

16    Complaint allege a violation of the Pinellas County wage theft

17    ordinance, which is not the FLSA, and, frankly, constitutes any

18    kind of discrepancy in pay, and then Private Whistleblower Act.

19              THE COURT:  How many witnesses do you intend to call?

20              MR. SARELSON:  Candidly, I'm not sure we're going to

21    call any.

22              THE COURT:  Okay.  Well, if you're not going to call

23    any what we'll do is we'll call the jury back, the Court will

24    hold your motion in abeyance, I will -- if you intend to rest,

25    then I'll let you rest.

```
 1              We are still in court.  I don't know why you all are

 2    laying around like you're at home in your recliners.

 3              MR. MARQUEZ:  Who is?  Me?

 4              THE COURT:  If you intend to rest, I'll see if we can

 5    then resolve your motions post the release of the jury and then

 6    we'll have them come back tomorrow and take up closing, if

 7    there's going to be closing, or if the Court resolves the

 8    matter on the motions, the Court resolves the matter on the

 9    motions.

10              MR. SARELSON:  And then can I just add one thing to

11    our Rule 50?

12              THE COURT:  You may.

13              MR. SARELSON:  This is why I said it's sort of

14    complicated with respect to the fraud claim.

15              We otherwise would move for Rule 50 as a limitation

16    on damages.  There has been no damage model presented to the

17    Court that would warrant -- that would support a damage verdict

18    above the $1800 that she has repeatedly claimed in this lawsuit

19    that she is owed, so we would think at bare minimum that any

20    claim for damages above $18,000 (sic) should be stricken.

21    Anything else is just far too speculative and consequential.

22    She did not provide any financial records, she did not provide

23    any tax returns, nothing that would warrant any kind of future

24    lost compensation, nor were there any medical records,

25    obviously, so the jury should be limited by what she's claiming
```

```
1    in the lawsuit, which is a loss of approximately $1800, the
2    difference between what she thinks she was supposed to be paid
3    and what she acknowledges she was paid.
4             THE COURT:  All right.  Ms. Moore, did you have
5    anything you wanted to add quickly to any of that?
6             MS. MOORE:  Yes.
7             THE COURT:  And I can hear you more broadly after the
8    jury is released.
9             MS. MOORE:  Okay.  Yes.  I just had a couple things
10   in response.
11            As far as defendant Marquez, I believe that he's
12   liable under the doctrine of vicarious liability, and,
13   you know, the defendants have said, you know --
14            THE COURT:  Go back over to the microphone.
15            MS. MOORE:  I'm sorry.  For the last three years,
16   you know, that, you know, it was inadvertence, a mistake, a
17   misunderstanding, an accident, but, I mean, a mistake or an
18   inadvertence doesn't last for five years, you know?  I mean,
19   I've been trying to get paid for five years.  I mean, if that's
20   not willful then I don't know what is.
21            You know, I complained that I was shorted.  Money,
22   I hired an attorney.  You know, I filed this lawsuit.
23   Defendants have had five years to pay me my money and still
24   haven't done so.
25            I -- you know, when all this happened I -- this has
```

 1    never happened to me before, you know, so after some

 2    due diligence, I thought that the best course of action was to

 3    retain counsel in this situation, so that's what I did, I hired

 4    an attorney.  I trusted him.

 5         THE COURT:  Well, this is not a malpractice suit, so

 6    whatever Mr. Celler did or didn't do for you isn't pertinent.

 7         MS. MOORE:  I understand.  I'm just saying that I

 8    trusted him, and so when he abandoned my case, I was left with

 9    the choice between either eating the loss of $2,000 and my job,

10    because Mr. Celler didn't do what he was supposed to do, or

11    proceeding myself.  I didn't see why I should lose my pay

12    because of what these other people had done, and I didn't want

13    to appear, you know, in this Court ignorant and, you know,

14    uninformed, like I'm sure a lot of pro se litigants are, and

15    I spent over six months researching and learning the laws that

16    applied to this case and how to draft a Complaint, you know,

17    and that's what took -- that's what the delay was between,

18    you know, when Mr. Celler withdrew from my case and when I

19    filed this case.  I -- but I only -- I could only file in this

20    Court, because by that time the deadline for --

21         THE COURT:  Did you raise the failure to pay your

22    hours in your first check anyplace other than the footnote in

23    the demand letter before 25 months from the violation?

24         MS. MOORE:  You mean between the time that the

25    violation occurred and the time that I filed this case?

1          THE COURT:  Yes.

2          MS. MOORE:  Um, no, just what Mr. Celler did.

3    I pretty much just left it in his hands.  I thought he was

4    handling it.

5          THE COURT:  Do you have any letter he sent raising it

6    again besides in this footnote, that's in this record?

7          MS. MOORE:  No, Your Honor.  And the other thing

8    I wanted to say is that, you know, when somebody applies for a

9    job, you interview and everything, and then they say come in to

10   start working, I mean, by default you're going to assume that

11   they're offering you the job that you applied for and that you

12   interviewed for.  There's no reason to think -- you know, by

13   default you're going to think that it's the job that

14   I interviewed for, not default to it could be some other job,

15   you know, because you would think that they would tell you if

16   it's a different job and a different pay, otherwise you're just

17   going to assume that whatever the job is and what the pay is is

18   what -- is in accordance with the terms that the employer told

19   you.

20         THE COURT:  All right.  Thank you for that much

21   argument.  I will hear the rest of it once we release the jury.

22         What we are going to do, I'm going to take the motion

23   under advisement, hold it in abeyance, I'll hear any more

24   argument after we release the jury, and I will -- and that

25   assumes that the defense rests.

```
 1              So let me have you have a seat and I'll call back the

 2    jury.

 3              MS. MOORE:  Thank you, Your Honor.

 4              THE COURT:  Is that your intent?

 5              MR. SARELSON:  Can I just have 30 seconds,

 6    Your Honor?

 7              THE COURT:  You may.

 8              MR. SARELSON:  Your Honor, we're going to rest.

 9              THE COURT:  All right.  Please re-call the jury.

10                        (Jury enters proceedings.)

11              THE COURT:  Mr. Sarelson, the defense has an

12    opportunity at this point to call any witnesses or introduce

13    any evidence you would wish to introduce.

14              MR. SARELSON:  No, Your Honor, the defense rests.

15              THE COURT:  That last word was "rests"?

16              MR. SARELSON:  I'm sorry.  Long day, Your Honor.

17              The defense rests.  Sorry.

18              THE COURT:  All right.  As the defense has rested,

19    there's no basis for the plaintiff to call any evidence in

20    rebuttal, and so at this point what we are going to do is have

21    the jury recess for the evening, come back tomorrow, and we

22    will instruct the jury and give you an opportunity to

23    deliberate in the case starting tomorrow morning.  So if you'll

24    come back and be prepared to be in your seats by 9:30 tomorrow,

25    not nine o'clock, if you're here by 9:30 tomorrow we will put
```

1    on the balance of the case, and if anything should change

2    between now and tomorrow, we will let you know.  But I'll see

3    you all back here -- I am reminding you that you cannot discuss

4    the case among yourselves.  Don't discuss it with anyone.

5    You've heard the evidence, you kind of have a sense of what's

6    going on, but you shouldn't discuss this case with your family

7    members or your friends or do any research or anything.  Just

8    leave the case here in the courtroom, go home, get some rest,

9    and come back tomorrow morning at 9:30.

10              Thank you for your attention.  I'll see you then.

11                   *(Jury exits proceedings.)*

12              THE COURT:  Anything else you want to add to the

13    discussion on the motion, Ms. Moore?

14              MS. MOORE:  No, Your Honor.

15              THE COURT:  Well, one of the questions raised --

16    Counsel, you may have a seat.

17              One of the questions raised, Ms. Moore, is what is

18    the evidence of damages in regard to your fraud claim.  The

19    Court, as much as it ethically could, attempted to elicit from

20    you any testimony and argument you wanted to make on the

21    question of damages, and the only thing you said was I'll leave

22    it to the jury to decide what the jury believes is fair.  The

23    jury has to make fairness decisions based on evidence.  They

24    can't make fairness decisions based upon compassion for you or

25    sympathy for you, they have to have some basis, and I told you

```
1   before we started your part of the testimony that you could

2   talk generally about your distress and your emotional distress,

3   you just couldn't talk about anything having to do with any

4   diagnosis or medical findings, because you didn't have a

5   medical doctor who could present any evidence of any sort of

6   prognosis or diagnosis, and even then you never even once told

7   the jury it made you feel sad or made you feel lost or hopeless

8   or anything, you just said I'll leave it to the good graces of

9   the jury to do what is fair.  So on what basis for the fraud

10  claim would the jury be able to calculate or assess any sort of

11  damages?

12          MS. MOORE:  Well, Your Honor, some of the evidence

13  that I wanted to present was excluded.

14          THE COURT:  What evidence?

15          MS. MOORE:  Well, I mean, you know, I became --

16  I lost my home, I was -- the police came and evicted me

17  three weeks after I was fired because the money that they took

18  from me was my rent money, and so the police came and they made

19  me leave my house and I didn't have anywhere to go.  I --

20  you know, during those three weeks, between losing my job and

21  when the police came to evict me, I was doing everything I

22  could to try to, you know, either find another job quickly or

23  figure out a way to get some fast cash or, you know, if worse

24  came to worse, figure out where I could go, if I had to leave,

25  but I don't have any family or anything like that here and
```

```
 1   I didn't have anywhere I could go, so I didn't make a --
 2   I didn't make a payment, and so that's why the police came and
 3   served the unlawful detainer and made me leave, and I had to
 4   leave on foot and walk down the road, you know, and during
 5   those three weeks I didn't want my landlord to think that I was
 6   trying to stay without paying rent, so I took everything
 7   I owned and I put it in a storage unit so that he would at
 8   least see that I'm trying to vacate, and -- you know, to make
 9   for a swift departure when I figured out what to do, so I put
10   everything in a storage unit, and, you know, when I -- when the
11   police came and evicted me, I didn't have anywhere to go, and
12   I guess I felt drawn to my storage unit because that's where
13   all my stuff was, and so I started staying the night there
14   until the management found out and they evicted me, and I came
15   back and I found a note on my storage unit door that said I had
16   24 hours to vacate or they would throw away whatever was in my
17   unit that wasn't removed.  So I had to pay somebody to help me
18   move and rent a truck, you know, on the fly, and I took all my
19   stuff to a different storage unit, and then when it came time
20   to pay the bill, I didn't have any money because I was living
21   on the street, you know, I didn't have any income, I had
22   nothing, I was living on the street with nothing but the
23   clothes on my back and my dog, because when my bill was late at
24   the second storage place they locked me out of it and so
25   I didn't have access to my stuff, and then I was trying to
```

```
 1   gather money together to make a payment on it, and I made a

 2   payment one week and then I went to make another payment the

 3   following week and the balance was lower than what I thought it

 4   was supposed to be, so I messaged the storage place and I said

 5   I think --

 6           THE COURT:  Ms. Moore, your financial ails for

 7   everything that happened to you after you lost your job do not

 8   track back to the fraud of the defendant that you have alleged

 9   here, and so that's the reason you can't talk about the fact

10   that you got evicted and the landlord was going to put your

11   stuff out and you put your stuff in storage and then you moved

12   storage units and couldn't pay the second storage unit.  Those

13   types of claims are far afield of the allegations of fraud that

14   you have made here, and the only damage claim that I have seen

15   on this record is a damage claim associated with the loss of

16   approximately $1800, which I presume would be also the

17   differential between what you claim you were supposed to be

18   paid and what you were paid, which the jury can figure out, but

19   any damages beyond that I don't think you have put on the

20   record in this case, so I have to address the damages piece as

21   well.

22           MS. MOORE:  I'm not sure that I understand how the

23   wage -- the wages that I was shorted, how does that come into

24   play with the fraud?  I mean, it's two different things, the

25   wages that I was shorted, and then the fraud is a complete
```

1   separate thing.

2              THE COURT:  Well, I was giving you the benefit of the

3   doubt.  I thought that your claim on the fraud is at least a

4   financial claim that they told you you got a job making $35,000

5   a year and they only gave you a job making $8 an hour, and

6   whatever the differential in the pay was for those hours is the

7   fraud damages you would have sustained on that limited basis,

8   but if that's not part of your claim, I'm not trying to make it

9   part of your claim, but that's the only damage I think the jury

10  could discern from this record if called upon to discern some

11  fraud damages.

12             MS. MOORE:  Are there -- is there not damages

13  available for the injuries that were set in motion by the

14  defendant's fraud?

15             THE COURT:  No.

16             MS. MOORE:  I mean, I lost everything I owned.

17  I mean --

18             THE COURT:  I understand.

19             MS. MOORE:  -- I'm still homeless.

20             THE COURT:  And that's why this claim has been so

21  complicated for you to accept as a limitation on what the law

22  affords you in the way of a remedy, but that's the limitation

23  of the law.  For every wrong there is not always a remedy.

24             MS. MOORE:  It's just hard -- it's hard for me to

25  believe that somebody could do this to somebody and that

1  there's no legal recourse whatsoever.

2          THE COURT:  There sometimes is legal recourse if the

3  case is pled and prosecuted properly, but it's very hard for a

4  pro se litigant to do all that needs to be done, and there are

5  limitations of what the law affords in the way of remedies in

6  cases like this.

7          MS. MOORE:  That's why I --

8          THE COURT:  But I understand your contention.

9          MS. MOORE:  That's why I hired an attorney.  I mean,

10  I thought that's what I was supposed to do.

11          THE COURT:  And that's not the defendant's burden to

12  bear, that you believe your lawyer didn't do everything he was

13  supposed to do.

14          Yes, sir.

15          MR. SARELSON:  Your Honor, would the Court -- I'm

16  just hesitant to bring this up.  Would the Court entertain

17  engaging in off the record settlement discussions facilitated

18  by the Court?  We can end the case.  We can end this right now.

19  I'm fully authorized, so to speak.  I think the Court

20  understands what I'm getting at.

21          THE COURT:  I don't do anything off the record

22  because that's just not how I operate.  I am willing to

23  consider on the record the notion that -- Ms. Moore?

24          If Ms. Moore is willing to listen, and she doesn't

25  have to if she doesn't want to, but there is a limitation to

what the law can afford, and we can go through this whole
litigation, the Court can rule on these motions that are now
pending, but if the Court rules against you on these motions
then the case is over.  If the Court rules in favor of you on
these motions then you just bought yourself another ticket to
some more litigation, which is called an appeal.  And I don't
know what the defense is going to do, I don't know what the
jury is going to do, all I know is that the parties have the
ability to make a proposal to one another to try to come to
some resolution that make sense for everybody.

          You know, frankly, the defendant didn't do right by
you.  The defendant knows they offered you an opportunity to
apply for a vet tech job, they kept calling it a vet tech job,
and then when it came to where the rubber meets the road they
paid you like a kennel tech, and they even went as far as to
say it on an affidavit in this Court and on a Complaint in a
State Court, so they're not going to get away with saying you
were hired as a vet tech and pretending that didn't happen, but
what remedy the Court can afford and what remedy the jury will
afford is limited, and so what I can do for you all is give you
an opportunity to make a proposal in the conference room and
see if you can't come to a resolution of this case.

          It's time for this case to be resolved by the parties
and not by a jury, but I can't make you do that, and I will let
you do your closing arguments, if I don't have to summary some

```
1   part of this case tonight, tomorrow morning, but there is a
2   substantial risk in this case, Ms. Moore, and there is a risk
3   in the case for the defendant as well.
4           MR. SARELSON:  Your Honor, can we talk for
5   five minutes before the Court officially closes down?  We'd
6   really like to resolve this.
7           THE COURT:  Yes, you may.
8           Ms. Moore, are you amenable to talking with them?
9           MS. MOORE:  Yes, Your Honor.  Yes.
10          THE COURT:  Court stands in recess until they return.
11                          - - - - -
12              (Recess at 5:10 p.m. until 5:15 p.m.)
13                          - - - - -
14          THE COURT:  Is there a resolution?
15          MR. SARELSON:  There is not, Your Honor.
16          THE COURT:  Ms. Moore, you've had a chance to
17  consider the proposal?
18          MS. MOORE:  Yes, Your Honor.
19          THE COURT:  And is there a resolution?
20          MS. MOORE:  No.
21          THE COURT:  All right.  Mr. Sarelson, what is your
22  legal authority for the notion that willfulness cannot be
23  established where there's a reckless disregard to the amount of
24  pay owed to an employee?  Because that's where we were at the
25  end of summary judgment, as you may recall.
```

```
 1        MR. SARELSON:  Right.  I believe the standard is

 2   reck -- did I suggest the standard was not recklessness?

 3        THE COURT:  You said it was willful as defined by

 4   some higher standard, it seemed, than willful.  There's been no

 5   evidence on this record of willfulness, is what your statement

 6   was, and in the absence of willfulness her claim would fail

 7   because she didn't give you notice until 25 months after the

 8   violation.

 9        MR. SARELSON:  So I'm just going to pull up the -- so

10   the standard, Your Honor, comes from -- so the case we're

11   relying on is the Davila case, the Menendez case, which is

12   cited all the time that's sort of the standard Eleventh Circuit

13   case that we cited, and so willfulness under the -- this is how

14   the Court describes --

15        THE COURT:  What's the cite, for the record?

16        MR. SARELSON:  717 F.3d 1179.

17        THE COURT:  All right.

18        MR. SARELSON:  And so the key language from that case

19   and the key language that gets cited all the time is:  An

20   employer willfully violates the Act if he should inquire as to

21   whether his actions violate the Act but he fails to do so.

22   A willful violation of the Act occurs when an employer either

23   knows that his conduct is prohibited by or shows reckless

24   disregard for the minimum wage laws.  An employer knowingly

25   violates the Act if he disregards the minimum wage laws
```

1    deliberately or intentionally, such as by ignoring advice from

2    a reasonable -- responsible official that the conduct in

3    question is not lawful.

4         Then it goes on to say:  An employer acts with

5    reckless disregard for the Act if the employer's conduct is

6    more than, quote, merely negligent, and is blameworthy, quote,

7    if the employer should have inquired further into whether his

8    conduct was in compliance with the Act and failed to make an

9    adequate further inquiry.  In other words, an employer does not

10   commit a willful violation if he acts unreasonably, but not

11   recklessly, in determining his legal obligation under the Act.

12   The burden rests with the employee to prove by a preponderance

13   of the evidence -- that's the rest of the quote, but that

14   I think is sort of the key language, "An employer does not

15   commit a willful violation if he acts unreasonably but not

16   recklessly."  And arguably they acted unreasonably, but

17   unreasonableness doesn't do it, there needs to be more than

18   that, and from my client's perspective, my client's perspective

19   is why -- she was paid everything that we owe her, so what is

20   the potential issue.

21        It's not like there was a claim that said, well, she

22   was required to work off the clock or she was required to come

23   in on Saturday but she was told not to pay for it.  And where

24   this normally comes up, as Your Honor is very familiar with,

25   because these cases come up all the time in Florida, is in the

1    context of overtime, where somebody says, well, we don't pay

2    overtime, you can work more than 40 hours but we don't pay time

3    and a half, or something like that.

4         This is a situation where the company said she's got

5    a paystub, she's got -- money looks right, there's no

6    allegation that she was, you know, working off the clock or

7    anything of the sort, and so the question is if the Court says,

8    well, perhaps they acted unreasonably, that's fine, but that

9    doesn't do it, it has to be more than that, and there's simply

10   no evidence to go beyond unreasonableness.

11        And so the question is -- and, more importantly, it's

12   unreasonable at the time.  It's not about what occurred today

13   or what occurred last week.  The question is what occurred in

14   August of 2018 and what occurred in September of 2018.  Was it

15   unreasonable for the kennel manager to say, no, 8.45 an hour,

16   that's the job you applied for?  And she even forwarded the

17   link saying, there it is, this is the 8.45 an hour.

18        So at best, or at worst, I should say at worst, that

19   might have been unreasonable.  I don't think there is any --

20   there's no suggestion that Ms. Nieves was somehow unreasonable

21   in that text message, but that doesn't get you anywhere.  It

22   has to be beyond that.  It has to go above that.  There has to

23   be some standard above a mere FLSA violation.  And so even if

24   there's evidence that she worked more hours than her paystub

25   reflects, the question becomes did they withhold money from her

1  or undercut -- did not comply with the FLSA, and if so, was it

2  reckless.

3          And these issues come up, somebody says, you know --

4  we're inundated, frankly, with cases where an employer says,

5  you have to work off the clock, like -- or you have to work

6  ten hours on Saturday but we're only going to pay you for six.

7  I've dealt with those cases.  Your Honor has dealt with those

8  cases.

9          THE COURT:  What if the lawyer tells the defendant,

10  you didn't pay my client for all the hours that she worked, and

11  the defendant says, in its own head or subsequently to the

12  Court, we're not going to do a deep dive and a detailed

13  investigation because we don't think this case is worth

14  anything and it's never going to go to trial, and they never

15  then subsequently, with three years of lead time, five years of

16  lead time, go try to find what hours the plaintiff actually

17  worked versus how much they paid her for at the time?

18          MR. SARELSON:  I think, Your Honor, where this is a

19  little bit different of a situation is there's a -- there is

20  what is supposed to be a confidential demand letter that comes

21  in and then there's a confidential response to that letter.

22          THE COURT:  Well, you relied on it in your motion for

23  a Rule 50.  You said the letter --

24          MR. SARELSON:  Yes, Your Honor.

25          THE COURT:  His demand letter didn't say anything

1    about it.  And I'm telling you his demand letter did say

2    something about it.

3           MR. SARELSON:  There's a one -- there's sort of one

4    stray remark in footnote 1 that says something about that, but

5    it doesn't -- but it just -- but it's in the generic context

6    of, you know, you were supposed to pay her $35,000 and I don't

7    think you paid her everything that she worked.

8           But it's important to remember in the context of the

9    response.  So we keep hearing about the demand.  The response

10   though has always been -- we've made this abundantly clear,

11   we've always -- the response letter says, we'll give you the

12   difference, which is way more above the FL -- the FLSA

13   violation.  If there's an FLSA violation, we're talking about a

14   couple of hundred dollars, we're not talking about even four

15   figures, we're talking about a few hundred dollars, and the

16   response to that demand was we think this is a misunderstanding

17   and that there's a discrepancy, and that discrepancy comes out

18   to fourteen hundred -- I think it was $1441.60, because I was

19   able to do the math specifically, and says this is a

20   discrepancy of fourteen hundred something dollars, we'll give

21   you $1500 for it.

22          So if they make a demand saying you shorted me some

23   hours, and we responded by saying we'll pay you way more than

24   that, like there's a discrepancy but we'll pay you way more

25   than that, I don't know how we could have acted unreasonably,

```
 1    if we said, okay, for -- we'll pay you a multiple of any -- the
 2    letter doesn't say an FLSA violation, but let's assume it said
 3    a FLSA violation hypothetically.  The response was to offer an
 4    amount of money that is a multiple of what the FLSA claim could
 5    potentially have been, and that I think is where we're missing
 6    it, because we keep hearing from the plaintiff in this case
 7    that we waited to get paid and that we waited to get paid, and
 8    it's at this point a matter of public record, we've been
 9    offering -- since that demand letter came in from Mr. Celler,
10    we've been begging her -- like we've acknowledged that this may
11    be a mess-up, and we're a good company, so here is the money,
12    and she says no, or Mr. Celler says no, or I don't know how,
13    but for some reason she has been offered -- if somebody says,
14    I have an -- I think I have an FLSA violation for $500, and we
15    say, no, you don't, but here's $1500 --
16          THE COURT:  Does that end the inquiry about whether
17    the violation was willful to begin with?
18          MR. SARELSON:  I think it does, because the issue --
19    because one of the claims that occasionally come up with
20    is that the -- that the defendant doesn't inquire when somebody
21    says you've shorted us -- you've been in FLSA violation, and
22    then the company moves to correct it in response.
23          THE COURT:  And if the company doesn't move to
24    correct it, it just says, you're a nuisance, here is $1500, go
25    away --
```

1          MR. SARELSON:  Except, Your Honor, we didn't

2     specifically say that.  What we said in that letter was that

3     the discrepancy that's been raised -- it was not like we just

4     said, here is $1500, go away.  What we said is -- we had a

5     number to a penny, this is the amount of the discrepancy if

6     this is a discrepancy, that discrepancy is fourteen hundred --

7     and we have the exact number, it's fourteen hundred -- I think

8     it's $1441.60, and so we said to Mr. Celler, in no uncertain

9     terms, that all this comes down to is potentially a

10    discrepancy, she thought she was supposed to get paid $35,000,

11    we thought she was supposed to get paid 8.45 an hour, our

12    records indicate that she was paid not the amount she claimed,

13    because our records indicate that she was paid the direct

14    deposit, and so we just did the math and said the difference

15    between what she's claiming and the difference between what our

16    records say she was paid is $1441.60 an hour, which is a

17    multiple of whatever an FLSA violation -- and we didn't even

18    just offer the 14, we actually offered -- we just made it a

19    nice round number and we offered the $1500, and that was

20    rejected.

21          And I would just add -- and I hate doing this and

22    I apologize if this comes out a little petty, and I don't know

23    a better way of saying it, Mr. Celler sends us a demand letter

24    for $70,000.  That is as made up as any demand I've ever made.

25    It's like me making a demand on that chair for $4 million.  It

 1    is a made-up number, while simultaneously rejecting our $1500

 2    offer and simultaneously telling his own client -- I'm not sure

 3    he did right by his own client, by telling his own client your

 4    case is only worth -- even if you're right on all of this, your

 5    case is only worth a few thousand dollars.  And so why did he

 6    say no, or why did he go around making this ridiculous demand?

 7    And so now we're stuck where if we don't respond to his demand

 8    that is so removed from reality, that $70,000 based on nothing,

 9    just a totally made-up number -- he called it puffing.  I call

10    it making it up.  Okay.  His testimony was "we puffed."  Fine.

11    I'm aware of Mr. Celler.

12         But if we're making an offer to settle the case above

13    and beyond what it is that she's realistically claiming is the

14    issue, which we've always said, you know, including recently,

15    we've always said that, fine, but he's telling us -- and this

16    is one of the documents that came up, is he's demanding

17    $70,000, and we had to write him that e-mail saying "See you in

18    court," I wrote him that e-mail saying "See you in court."

19    Why?  Because you don't get to just make a demand for nothing

20    and expect us to just write you a check.

21         And that's the problem, is from the start she was

22    offered an amount of money that is well in excess of what her

23    FLSA claim is.  I don't know how much more investigation or

24    what else -- what else do we need to do if it's like, look --

25    because always remember, her fraud claim is more valuable than

1    the FLSA claim, so if we look at it and say -- or at the time

2    it was really a breach of contract claim.  So if the breach of

3    contract claim --

4           THE COURT:  If I don't say anything, you'll just keep

5    talking?

6           MR. SARELSON:  Yeah.  I mean, I'm a lawyer.  I'm on

7    the clock.  I apologize.

8           THE COURT:  I have heard your argument.  I will take

9    it under advisement.  I will see you all tomorrow morning.

10   I need the parties here at 9:00.  I've told the jury 9:30.

11   I hope to issue a ruling at 9:00-ish, and then if the case goes

12   to the jury, the parties should be prepared to do their closing

13   arguments.

14          How long will you need for closing arguments,

15   Ms. Moore?

16          MS. MOORE:  Probably no more than 15 minutes.

17          THE COURT:  And how long will the defense need?

18          MR. SARELSON:  That's fine, Your Honor.  15 minutes.

19   I can be fast.

20          THE COURT:  All right.  And then we'll give the case

21   to the jury.

22          Do we have any major issues with the jury

23   instructions?

24          All right.  We'll take care of the charge conference

25   when we meet at 9:00 tomorrow.  So it's rulings and then the

```
1   closing arguments.

2              MR. SARELSON:  Okay, Your Honor.

3              THE COURT:  There's still time for you all to resolve

4   the case, and if I hear tomorrow morning that you've come to

5   some resolution, then we will be done, and if not, we will move

6   forward.

7              Thank you.  We're dismissed.

8              MR. SARELSON:  Thank you, Your Honor.

9                         - - - - -

10             (Proceedings adjourned at 5:31 p.m.)

11                        - - - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript of

4    proceedings taken in a jury trial in the United States District

5    Court is a true and accurate transcript of the proceedings

6    taken by me in machine shorthand and transcribed by computer

7    under my supervision, this the 14th day of June, 2024.

8

9

10                                  /S/ DAVID J. COLLIER

11

12                                  DAVID J. COLLIER

13                                  OFFICIAL COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25