1          IN THE UNITED STATES DISTRICT COURT
2              MIDDLE DISTRICT OF FLORIDA
                    TAMPA DIVISION
3

4   MELANIE NICOLE MOORE,            )
                                     )
5                 Plaintiff,         )
                                     )
6                                    ) Case No.
          vs.                        ) 8:20-CV-02184-MSS-SPF
7                                    )
                                     )
8   POOCHES OF LARGO, INC., et al., )
                                     )
9                 Defendants.        )

10

11

12  _____

13              JURY TRIAL - DAY 2
        BEFORE THE HONORABLE MARY S. SCRIVEN
14          UNITED STATES DISTRICT JUDGE

            SEPTEMBER 19, 2023
15               9:59 A.M.
              TAMPA, FLORIDA
16  _____

17

18

19

20

21        Proceedings recorded by mechanical stenography,
    transcript produced using computer-aided transcription.
22  _____

23            DAVID J. COLLIER, RMR, CRR
             FEDERAL OFFICIAL COURT REPORTER
24         801 NORTH FLORIDA AVENUE, 7TH FLOOR
                TAMPA, FLORIDA  33602
25

1   **APPEARANCES:**

2

3   **FOR THE PLAINTIFF:**

4

5           *Melanie Nicole Moore, Pro Se*

6           15519 Darien Way

7           Clearwater, Florida  33764

8           (727) 241-9199

9

10

11  **FOR THE DEFENDANTS:**

12          *Matthew Seth Sarelson*

13          *Zachary Allen Stoner*

14          Dhillon Law Group, Inc.

15          1601 Forum Place, Suite 403

16          West Palm Beach, Florida  33401

17          (305) 773-1952

18

19

20

21

22

23

24

25

1                                  **I N D E X**

2

3                                                                        **PAGE**

4    Closing argument by Ms. Moore                            25

5    Closing argument by Mr. Sarelson                         30

6    Rebuttal closing by Ms. Moore                            38

7    Court's final instructions to the jury                   43

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  P R O C E E D I N G S

 2                    - - - o0o - - -

 3          MS. MOORE:  Good morning, Your Honor.  I apologize.

 4          THE COURT:  I'm sorry?

 5          MS. MOORE:  I said I apologize for the delay,

 6   Your Honor.  We had problems with the vehicle this morning.

 7          THE COURT:  All right.  Well, you're an hour late;

 8   you understand that?

 9          MS. MOORE:  I do, Your Honor.  I apologize.  I don't

10   drive, so I had to rely on my ride.

11          THE COURT:  Please call the case.

12          COURTROOM DEPUTY:  The Court calls Case Number

13   8:20-CV-2184-MSS-SPF, Moore versus Pooches of Largo, Inc.

14   et al.

15          Please state your name for the record, beginning with

16   the plaintiff.

17          MS. MOORE:  Melanie Moore.

18          COURTROOM DEPUTY:  Thank you.

19          MR. SARELSON:  Good morning, Your Honor.

20   Matthew Sarelson here for the defense.

21          THE COURT:  And your client representatives are

22   present with you?

23          MR. SARELSON:  They are, Your Honor.

24          THE COURT:  All right.  The Court has taken under

25   advisement the defendant's motion for judgment as a matter of
```

```
 1    law at the conclusion of the plaintiff's case, and at this
 2    point the Court intends to grant the motion in part, deny the
 3    motion in part, granting the motion as it relates to the
 4    fraudulent misrepresentation claim against Mr. Marquez
 5    personally, as there's no evidence of Mr. Marquez making any
 6    statement to Ms. Moore in any capacity other than as principal
 7    of the defendant, and so as it relates to the Marquez claim for
 8    his personal liability for fraudulent misrepresentation, the
 9    motion is granted.
10            The motion is otherwise denied with sufficient
11    evidence to go to the jury on the FLSA claim, including on the
12    question of willfulness and on the fraudulent misrepresentation
13    claim by Pooches of Largo in regard to the offer posted on
14    Indeed and the communications concerning the job offer that was
15    made to the defendant -- I'm sorry, to the plaintiff at the
16    time of her onboarding and the subsequent payment of the
17    plaintiff and categorization of the plaintiff at a different
18    level.  The matter is still in dispute in the case and will go
19    to the jury.
20            Any questions about the Court's ruling from the
21    plaintiff?
22            MS. MOORE:  No, thank you, Your Honor.
23            THE COURT:  You don't have to handle the microphone.
24    Just speak into it.
25            Any questions from the plaintiff?
```

```
 1              MS. MOORE:  Not for the jury, no, Your Honor.

 2              THE COURT:  Any questions from the defense?

 3              MR. SARELSON:  No, Your Honor.

 4              THE COURT:  All right.  We have to look at the jury

 5    instructions.  Do you have copies?

 6              So if you'll turn to the jury instructions, number 1,

 7    this is a pattern instruction.

 8              Any objection from the plaintiff?

 9              You can remain seated.

10              MS. MOORE:  No, Your Honor.

11              THE COURT:  From the defense?

12              MR. SARELSON:  No, Your Honor.

13              THE COURT:  As to number 2, also a pattern.

14              Any objection from the plaintiff?

15              It's page 2, Ms. Moore.  Any objection to page 2?

16              MS. MOORE:  No, Your Honor.

17              THE COURT:  From the defense?

18              MR. SARELSON:  No, Your Honor.

19              THE COURT:  Page 3, also a pattern instruction.

20              Any objection from the plaintiff?

21              MS. MOORE:  No, Your Honor.

22              THE COURT:  From the defense?

23              MR. SARELSON:  No, Your Honor.

24              THE COURT:  4, pattern instruction.

25              Any objection from the plaintiff?
```

```
 1              MS. MOORE:  No, Your Honor.

 2              THE COURT:  From the defense?

 3              MR. SARELSON:  No, Your Honor.

 4              THE COURT:  Pattern 5, impeachment of witnesses.

 5              Any objection from the plaintiff?

 6              MS. MOORE:  No, Your Honor.

 7              THE COURT:  From the defense?

 8              MR. SARELSON:  No, Your Honor.

 9              THE COURT:  Pattern 6, burden of proof.

10              Any objection from the plaintiff?

11              I'm going to delete greater weight of the evidence,

12    I know that's the Florida standard, but I think it's confusing

13    in this case and they mean the same thing.  Any objection to

14    deleting the reference to greater weight of the evidence from

15    the defense?

16              MR. SARELSON:  No, Your Honor.

17              THE COURT:  Because it was already deleted in the

18    second sentence, I just omitted to --

19              MR. SARELSON:  At the bottom, yeah.

20              THE COURT:  Any objection?

21              MR. SARELSON:  Not from defense.

22              THE COURT:  From the plaintiff?

23              MS. MOORE:  No.  No, Your Honor.

24              THE COURT:  It's in there twice, Mr. Jackson.  It

25    should come out both places, the first paragraph and next to
```

1    the last paragraph.

2              MR. SARELSON:  Your Honor, it's actually -- there's a

3    third part, where it says in deciding whether in fact, it's in

4    there as well.  I think it's in here three times, Your Honor.

5              THE COURT:  All right.

6              Paragraph 7 is the FLSA instruction.  Any objection

7    from the defense?

8              MR. SARELSON:  Not from the defense, Your Honor.

9              THE COURT:  From the plaintiff?

10             MS. MOORE:  No, Your Honor.

11             THE COURT:  Instruction Fraudulent Misrepresentation

12   Claim has been edited to delete a reference to Mr. Marquez

13   based upon the Court's ruling, and so it only relates to false

14   statement made by Pooches of Largo as alleged, and so that's

15   the principal change, and it's pulled from the Florida Pattern

16   Instruction.

17             Any objection from the defense?

18             MR. SARELSON:  No, Your Honor.

19             THE COURT:  From the plaintiff?

20             MS. MOORE:  No, Your Honor.

21             THE COURT:  Material facts is on 9.

22             Objection from the defense?

23             MR. SARELSON:  No, Your Honor.

24             THE COURT:  From the plaintiff?

25             MS. MOORE:  No, Your Honor.

```
 1              THE COURT:  Paragraph -- I mean, instruction 10,
 2    legal cause, there is a reference to intervening cause and
 3    I don't recall any evidence of an intervening cause, and so
 4    I pulled it out of concurring cause and set it aside as its own
 5    thing, and so I'm not sure we should be giving an intervening
 6    cause instruction.
 7              Counsel?
 8              MR. SARELSON:  Your Honor, I think the termination is
 9    an intervening cause.  She doesn't have a claim for wrongful
10    termination.
11              THE COURT:  I'm sorry?
12              MR. SARELSON:  She doesn't have a claim for wrongful
13    termination.  The fact that she was terminated is an
14    intervening cause of damages.
15              THE COURT:  Well, it would be an interesting concept
16    that the defendant could make a false statement to induce a
17    person to take a job and then fire them when they complained
18    about not being paid for the job and then cut off their damages
19    because they fired them because they complained about not being
20    paid what they were owed.
21              MR. SARELSON:  Well, she was terminated because of
22    the way in which -- because of what she said in the text
23    message, referring to the company as essentially engaged in a
24    scam or fraud, I forget what the precise word was.
25              THE COURT:  That's not the testimony.  The testimony
```

1  was she was fired because she brought grapes into the kennel,

2  if that can be believed, but if the jury disbelieves that

3  statement then the remaining reason for her being terminated

4  I don't know that anyone testified about.  No one said she

5  called them a scam and that's why she got terminated.  The only

6  person who said why she got terminated was Ms. Nieves, and

7  Ms. Nieves testified she was terminated because she brought

8  grapes into the kennel.

9          MR. SARELSON:  I believe Ms. Moore testified that she

10  got terminated for her complaint.

11          THE COURT:  And her complaint was the fraud, and you

12  can't double over on the fraud by saying, well, we fired her

13  because she complained about our bad behavior and therefore her

14  damages were caused by our wrongful termination.

15          MR. SARELSON:  I think there's separation from the

16  company, Your Honor, as an intervening cause.

17          THE COURT:  If she was terminated for the fraud that

18  she complained about, you can't benefit yourself by doubling

19  down on your fraud.

20          MR. SARELSON:  But we should be able to assert that

21  she wasn't terminated --

22          THE COURT:  She wasn't terminated.

23          MR. SARELSON:  -- for -- that she wasn't terminated

24  for the fraud, that, as Ms. Nieves said, one of the issues

25  involved was the grape issue.  If she lost her job for an

```
 1   independent reason, then she lost her job for an independent

 2   reason, but the termination is a naturally occurring

 3   consequence --

 4           THE COURT:  Okay.  I'm going to take out the

 5   intervening cause part of the instruction and you can make your

 6   argument if you want to that she was fired because she brought

 7   grapes into the kennel and the jury can decide it.

 8           Any objection otherwise from the plaintiff regarding

 9   the legal cause instruction?

10           MS. MOORE:  Your Honor, I just -- Ms. Nieves'

11   testimony yesterday about the reason for why I was terminated

12   was untrue and conflicts with the defendant's admission that

13   they terminated me for complaining about their illegal pay

14   practices.  It says in their discovery responses that I was

15   terminated for making a complaint that is baseless and

16   unprofessional.

17           THE COURT:  Well, I've taken out the intervening

18   cause instruction and I'm leaving in the legal cause generally

19   and concurring cause as well and I'm taking out intervening

20   cause because there's no evidence of an intervening cause, and

21   so you're free to make any argument you'd like to make at the

22   time of trial -- at the time of closing argument.

23           Do you have an objection to the instruction?

24           MS. MOORE:  No, I don't.

25           THE COURT:  Any objection to the damages instruction
```

1    from the defense?

2           MR. SARELSON:  Your Honor, with respect to paragraph

3    11 -- I'm sorry, with respect to instruction 11?

4           THE COURT:  Yes.

5           MR. SARELSON:  We do, Your Honor.  We object to the

6    language advising the jury of the statute of limitations issue

7    that's referenced.  They've got September 16th.  The jury

8    should not be instructed about the statute of limitations, the

9    jury should just be instructed about the fact.

10          THE COURT:  I thought you drafted this.  No?

11          MR. SARELSON:  I don't believe so.  I think -- I

12   don't believe these are our versions.  It doesn't look like our

13   versions.

14          THE COURT:  Let me see.

15          MR. SARELSON:  We had a joint -- there was a joint

16   version that was filed and then there was -- plaintiff's

17   attorney made some edits and filed it as a new version.

18          When I look at docket entry 96, Your Honor, we did

19   not.  This isn't ours.

20          THE COURT:  Which of the instructions in your draft,

21   Mr. Sarelson?

22          MR. SARELSON:  I'm sorry, Your Honor?  I didn't hear

23   the first part of --

24          THE COURT:  Which of the instructions in your draft?

25          MR. SARELSON:  The instruction on this is docket

```
1   entry 96, page 23.  It's taken from the -- it's a modified

2   version of the model instruction 4.1 -- 4.14 on the Fair Labor

3   Standards Act, and we've modified it to include a definition of

4   willfulness and to remove any reference to the potential

5   statute of limitations issue.  That's for the Court to decide,

6   not for the jury.

7            THE COURT:  You said page 23?

8            MR. SARELSON:  Should be page 23 and 24 of docket

9   entry 96, Your Honor.

10           THE COURT:  Do you have the Pattern, or can you tell

11  me how you modified it?

12           MR. SARELSON:  For 4.14 we took out a reference to

13  the statute, statute of limitations, and then we added -- at

14  the top of page 24 we added the paragraph that starts with

15  "an employer" and it ends with "acted willfully," and that is a

16  quote from the Eleventh Circuit's *Davila* case, that's how the

17  Eleventh Circuit defines willfulness.

18           THE COURT:  All right.  I'll have to come back to

19  that one.

20           Any objection to the damages instruction from the

21  defense, number 12?

22           MR. SARELSON:  No objection, Your Honor.

23           THE COURT:  Any objection from the plaintiff?

24  Number 12, page 14.

25           MS. MOORE:  No, Your Honor.
```

1          THE COURT:  13?

2          MR. SARELSON:  We object, Your Honor.  There's no

3    evidence to support punitive damages, and in neither the agreed

4    jury instructions nor the plaintiff's proposed jury

5    instructions was there an instruction for punitive damages.

6          THE COURT:  The parties omitted to include a punitive

7    damages instruction even though punitive damages is a claim in

8    the case.  Is there a reason for that?

9          MR. SARELSON:  Because there's no evidence -- you

10   still have to put on evidence to support a punitive damages

11   claim.  You have to put on evidence.  You have to put on

12   evidence of ability to pay, financial net worth issues.  None

13   of that came up in this case.  And so I would just point out

14   that the parties haven't requested it in their jury

15   instructions, neither party, including for the part of this

16   that the plaintiff has counsel for.

17         THE COURT:  Right.  Any objection to the content of

18   the instruction as an accurate statement of the law?

19         MR. SARELSON:  No, Your Honor.

20         THE COURT:  All right.  Any objection from the

21   plaintiff?

22         MS. MOORE:  Your Honor, are these the instructions

23   from the Pattern Jury Instructions?

24         THE COURT:  They are.

25         MS. MOORE:  Then no objections, Your Honor.

```
1              THE COURT:  They are different from the Pattern in

2    that the Court has taken out the paragraph that speaks to

3    evidence of the net worth of the defendant, because that wasn't

4    presented in the case.  It's an option that can be considered

5    but it wasn't -- it's not a required part of the Pattern.

6              Number 14, I don't think the sub 2 should be given

7    because there's been no evidence to harm caused to others.

8              Any objection to number 14, with that modification?

9              MR. SARELSON:  Well, the defendant continues to

10   object to any instruction on punitive damages.

11             THE COURT:  Well, the prevailing authority,

12   Mr. Sarelson, is that if the allegation of punitive damages was

13   in the Complaint and if the jury could discern from the

14   evidence that has been offered at trial that deterrence is

15   appropriate or punishment is appropriate, the jury is free to

16   consider the matter of punitive damages.  It was not moved to

17   be excluded at any point in the case, there was no summary

18   judgment motion that eliminated the punitive damages claim from

19   the case, and so the parties allowed the case to go all the way

20   through with no challenge to punitive damages, including on the

21   motion for judgment as a matter of law, so it's still in the

22   case, it's not been removed, and so the Court has to instruct,

23   and that is the law.  The Court has to instruct unless it has

24   been removed from the case, and duty to deliberate is a

25   standard instruction and election is a standard instruction.
```

```
 1   Any objection to those two?

 2           MS. MOORE:  No, Your Honor.

 3           MR. SARELSON:  No objection to 15.  No objection to

 4   16.

 5           THE COURT:  And you reserve on 14 and 13, and the

 6   Court needs look at 12, and I will -- I'm sorry, at 11, and

 7   I will be back.

 8           MR. SARELSON:  And then, Your Honor, we have

 9   additional instructions that we requested that need to be

10   given.

11           THE COURT:  What additional instructions?

12           MR. SARELSON:  So with respect to --

13           THE COURT:  I'm not going to go through all the cases

14   in the law to make your closing arguments for you, so if these

15   aren't pattern instructions that you're proposing, I'm not

16   going to give them.  If they are arguments you'd like to make

17   consistent with the law, you may make those in closing.

18           MR. SARELSON:  Well, so just -- Your Honor, just to

19   be clear, we requested a -- two instructions toward the end

20   that are in ours.

21           THE COURT:  Can you turn me to the page?  I have it

22   pulled up.

23           MR. SARELSON:  It is docket entry 96, and it's page

24   35 and 36.  These are instructions concerning good faith.

25   These were instructions that were originally agreed upon by the
```

1  parties and then there was apparently a change in the

2  plaintiff's position on that when she received an attorney.

3  Both of these instructions are an accurate reflection of

4  Florida law.

5      THE COURT:  Hold on.  Let me catch up to you.  I've

6  kind of pulled out of my document somehow.

7      This is 5B, Mr. Jackson?

8      MR. JACKSON:  5B, yes, Your Honor.

9      THE COURT:  And, I'm sorry, what page, Mr. Sarelson?

10     MR. SARELSON:  It's pages 35 and 36 of docket entry

11  96.

12     THE COURT:  Well, is that a pattern instruction?

13     MR. SARELSON:  No, Your Honor, these are two

14  instructions we're requesting.  They're accurate reflections of

15  law and they're relevant to the case.

16     THE COURT:  I will not give that instruction or the

17  second one.

18     Any other instructions?

19     MR. SARELSON:  Nothing from the defense, Your Honor.

20     THE COURT:  Anything further from the plaintiff?

21     MS. MOORE:  No, Your Honor.

22     THE COURT:  Any other issues to address before

23  closing arguments, from the plaintiff or the defendant?

24     MS. MOORE:  Yes, Your Honor.  I just had a question

25  real quick about the validity of Ms. Nieves' testimony

```
1  yesterday because she was coached by defense counsel and

2  defense counsel doesn't represent Ms. Nieves.

3          THE COURT:  What is the evidence that he coached her?

4          MS. MOORE:  He said -- he stated as much.  He said

5  that he prepped her for this trial in his -- in his -- his

6  motion where he was seeking to admit the records that they had

7  found at the last minute.  He said that he realized that they

8  could be recovered after a prep session with Ms. Nieves.

9          THE COURT:  Are you moving to strike her testimony

10 for improper coaching?

11         MS. MOORE:  Yes.

12         THE COURT:  That motion is denied.  Anything else?

13         MS. MOORE:  No, Your Honor.

14         THE COURT:  Anything from the defense?

15         MR. SARELSON:  Subject to our earlier objections

16 concerning the instructions, no, Your Honor.

17         THE COURT:  I don't know what that means.  You've

18 lodged your objections to the instructions, the Court has ruled

19 on those objections, there's a record of that.  Do you have any

20 other matters to address to the Court before we go to closing

21 other than as to what to do with instruction 11?

22         MR. SARELSON:  No.  No, Your Honor.  My only concern,

23 and I just point this out very quickly, is that we just ask

24 that -- that the plaintiff limit her closing argument to the

25 actual evidence and not sort of the other things that have come
```

1  up when the jury wasn't present or during these kinds of

2  discussions, and so the Court has previously --

3          THE COURT:  I can't rule on objections that are not

4  contemporaneous.  If she raises something or starts to raise

5  something, then you can make your objection in closing.

6          MR. SARELSON:  Very well.

7          THE COURT:  Let me take a recess on instruction 11

8  and I'll be back and then we will call in the jury, and each of

9  you has said you need about 15 minutes for closing, and then

10  closing arguments will happen.

11         Ms. Moore, you have the right to rebuttal closing, so

12  you make your closing, they make their closing, and then you

13  have the right to come back on follow-up closing.  Would you

14  like to reserve some time from your 15 minutes?  Do you wish

15  for the Court to give you a warning at some minutes within your

16  closing to let you know how much time you have left?  How do

17  you wish to proceed?

18         MS. MOORE:  So if I understand correctly, then

19  I would split up the 15 minutes that are designated for closing

20  between the rebuttal and -- yes.  Ten minutes initially and

21  then five for the rebuttal.

22         THE COURT:  All right.  So at some point during your

23  closing I'm going to say softly "you have two minutes left" and

24  that means you have two minutes on your ten, and so then at the

25  end of those two minutes I'll say "ten minutes."

```
 1            MS. MOORE:  Okay.

 2            THE COURT:  And then you'll know you will have

 3    five minutes for your rebuttal.  If you stop before I give you

 4    warning, you'll be able to carry over your leftover minutes to

 5    the rebuttal.

 6            MS. MOORE:  Understood.  Thank you.

 7            THE COURT:  Mr. Sarelson, would you like a warning

 8    before the close of your 15 minutes?

 9            MR. SARELSON:  A two minute warning would be fine,

10    Your Honor.

11            THE COURT:  All right.  I'll say "two minutes

12    remaining" and then you'll know you have two minutes remaining.

13            MR. SARELSON:  Thank you.

14            THE COURT:  All right.  Give me two seconds.

15            MR. SARELSON:  Your Honor, do we have time to take a

16    quick comfort break?

17            THE COURT:  You do.

18            MR. SARELSON:  Thank you.

19                         - - - - -

20            (Recess at 10:34 a.m. until 11:07 a.m.)

21                         - - - - -

22            THE COURT:  All right.  I've looked back at the

23    instruction proposed by the defendant at 4.14, page 23 of 36,

24    and I believe it's largely accurate, it's a combination of the

25    instruction 7 and the willfulness piece, and so the Court is
```

```
 1   going to give most of the defendant's proposed.  I'm not going
 2   to read the whole segments of Davila, but I will give
 3   essentially the defendant's proposed instruction.  The part
 4   that I'm cutting out is -- well, it's easier to say what I'm
 5   giving.
 6            On page 24, the first two sentences I will give.  The
 7   second discussion where there's just full-on page/line quotes
 8   of Davila I'm not going to give.  So it's going to say:
 9   An employer willfully violates the Act if it should inquire as
10   to whether its actions violate the Act but fails to do so.
11   A willful violation of the Act occurs when an employer either
12   knows that its conduct is prohibited or shows reckless
13   disregard for the minimum wage laws.  And then the rest you can
14   give as argument, and then it will pick up with "inadequate
15   records."
16            And I assume by this draft, Mr. Sarelson, that there
17   isn't any dispute about whether the plaintiff was employed and
18   whether the defendant is operating in commerce, because those
19   two were removed by you.
20            MR. SARELSON:  No, Your Honor, we took those out.  We
21   acknowledge that.
22            THE COURT:  All right.
23            MS. MOORE:  Your Honor?
24            THE COURT:  Yes.
25            MS. MOORE:  I don't think -- my copy of the jury
```

1    instructions only goes up to page 19.

2            THE COURT:  I was reading from the defendant's

3    original proposed jury instructions.  You'll have a full copy

4    of it in a second.

5            MS. MOORE:  Okay.

6            THE COURT:  We're printing it.

7            MS. MOORE:  Okay.  Thank you.

8            THE COURT:  So if you look at instruction 7 on

9    page 7, that's where we eliminated the old instruction 7 and

10   inserted 11 and blended the two to make one full instruction.

11           Any objection from the defense?

12           MR. SARELSON:  Oh.  Obviously we've stated our

13   objections, but to the extent that we agree that this is an

14   accurate reflection of what the Court is instructing -- does

15   that make sense?

16           THE COURT:  Yes.

17           MR. SARELSON:  I just don't want to waive our prior

18   objections.

19           THE COURT:  Your prior objection being that you want

20   the Court to quote most of *Davila* in the instructions and not

21   use the pattern instruction?

22           MR. SARELSON:  Correct.  Particularly the part about

23   negligence.  I think that's the most important part of that

24   sentence.

25           THE COURT:  What part about negligence?

```
 1         MR. SARELSON:  So, for example, if -- so I'm -- if a
 2   company acts merely negligent or they act unreasonably, that's
 3   not willful.
 4         THE COURT:  Willfulness is defined as what
 5   willfulness is, and you don't have to define what willfulness
 6   isn't, and you can make your argument about that when you talk
 7   to the jury.
 8         MR. SARELSON:  So noted.  Thank you, Your Honor.
 9         THE COURT:  All right.  And, Ms. Moore, any
10   objection?
11         MS. MOORE:  Yes.  Actually, on page 8, in the third
12   paragraph, it talks about maintaining time and pay records.
13   I know that I had produced my work schedules, and I don't
14   remember if those were admitted or not, but I know Mr. Marquez
15   acknowledged that they looked like the schedules that they use.
16         THE COURT:  They were not admitted because he was not
17   able to authenticate them, and you'll just have to make your
18   argument with respect to what your time was based on your
19   testimony.
20         MS. MOORE:  So just like without evidence, just
21   saying -- so basically it would just be my word against theirs?
22         THE COURT:  That is correct.
23         And I didn't go over the verdict form.  I don't think
24   it was objected to by either party, but I just want to make
25   sure.  I think it was given to you this morning in this
```

```
 1   package.
 2              Any objection to the verdict form from the defense?
 3              MR. SARELSON:  No, Your Honor.
 4              THE COURT:  Any objection to the verdict form from
 5   the plaintiff?
 6              MS. MOORE:  No, Your Honor.
 7              THE COURT:  All right.  We are prepared then to call
 8   in the jury, I believe, to do closing arguments.
 9              Agreed, Ms. Moore?
10              MS. MOORE:  Yes, Your Honor.
11              THE COURT:  Mr. Sarelson?
12              MR. SARELSON:  Yes, Your Honor.
13                    (Jury enters proceedings.)
14              THE COURT:  May I see Counsel and Ms. Moore at
15   sidebar, please.
16              (The following bench conference was held.)
17              THE COURT:  I just didn't know if you knew that your
18   bra is showing on your right side, and I didn't want you to be
19   in front of -- the bottom of it.
20              MS. MOORE:  Oh.  Thank you.
21              THE COURT:  Right here.
22              Thank you.
23              MS. MOORE:  Thanks.
24     (End of bench conference; proceedings resume in open court.)
25              THE COURT:  Ladies and gentlemen, thank you for your
```

1    patience.  We know we've taxed you this morning, but we had to

2    take care of some matters outside of your hearing and to

3    address the presentation, for example, of the jury instructions

4    to make sure they were accurate and consistent with where the

5    case now stands, and so at this time we will proceed to closing

6    arguments.

7            Each party has asked for 15 minutes.  Ms. Moore will

8    use up some of her minutes as her opening part of her closing

9    and then she's reserved some time for rebuttal after the

10   defendant gives the defendant's closing.

11           So we'll begin at this time with the plaintiff,

12   Ms. Moore.

13           MS. MOORE:  Thank you, Your Honor.

14           Good morning.  I'm going to try to keep this short

15   because I believe that the evidence and the testimony that

16   you've heard speaks for itself.

17           I've demonstrated to you that the defendants lied

18   about my position to avoid paying me and to avoid

19   accountability for violating the law.  I was a vet tech when I

20   was hired, a kennel tech when it was time to pay me, a vet tech

21   when they sued me for defamation, a kennel tech when responding

22   to this lawsuit.  I was a vet tech when they moved for summary

23   judgment a few months ago, and now I'm back to being a kennel

24   tech according the defendants for purposes of this trial.

25           Ask yourselves, why all the lies, if they have

1   nothing to hide, if they didn't do anything wrong.  You would

2   think that an employer would be able to know what a person's

3   title is, and it's been five years, they should know by now

4   what it was.  So when you ask yourself why all the lies, it's

5   because they know they acted unlawfully and they have things to

6   hide.

7            I'd also like to address the testimony from Alison

8   yesterday, the reason why she said I was terminated.  I never

9   brought any grapes to work.  That was false.  I was scheduled

10  for the upcoming week after she fired me, so obviously,

11  you know, it wasn't for grapes, and I was fired on my day off,

12  and defendants have no records to support the fact that I was

13  terminated for bringing in grapes.  I don't even eat grapes,

14  so -- the defendants have admitted themselves in their

15  discovery that Ms. Moore was terminated for making baseless and

16  unprofessional accusations against the company.  Clearly my

17  claims were not baseless or unprofessional because we've

18  already established I was shorted pay.

19           It's been five years since this happened, for many

20  reasons, because the defendants didn't take this seriously,

21  because they readily admit that they didn't investigate my

22  complaint because they said it was unnecessary.  They didn't

23  investigate my complaint about the pay shortage until the week

24  before trial was originally scheduled six weeks ago.  There's

25  just no excuse for waiting five years to investigate when

```
 1   somebody complains that they haven't been paid, and they
 2   willfully violated the Fair Labor Standards Act by not
 3   investigating whether they were in compliance with the law when
 4   I complained, but they had no concern for whether or not I was
 5   properly paid.
 6           I'm not here trying to get something for nothing.
 7   I'm trying to enforce my worker rights, because I was legally
 8   wronged.  I would not subject myself to, you know, five years
 9   of problems if, you know, I wasn't owed wages, and I certainly
10   wouldn't subject myself to three years of trying to navigate
11   the Federal Court system without an attorney if I was trying to
12   get something for nothing.
13           I did what I was supposed to do, I hired an attorney,
14   but he didn't do what he was supposed to do, and unfortunately
15   I trusted him too much when I shouldn't have, because he wasn't
16   acting in my interests.  I think that was pretty obvious from
17   his testimony yesterday.
18           So I'm not asking you to make a quantum leap here.
19   I'm just asking for you to use your common sense and apply
20   logic and reason when you deliberate the claims.  This case has
21   implications beyond just how they affect me, because if you
22   don't find -- if you don't find against the defendants, you'd
23   be sending the message to employers everywhere that says it's
24   okay not to pay workers for their work or not to pay them for
25   five years and that there's no consequences for not doing so.
```

1   You'd be saying that there's no consequences for not even

2   investigating when somebody complains when their paycheck is

3   short.

4           And I know all of you are working people or,

5   you know, retired, but you have experience in the workforce, so

6   I'm sure you can understand the damage that would happen when

7   you miss one paycheck, especially when you live paycheck to

8   paycheck, like most people in the veterinary profession do.

9   It's not a job that you make a lot of money, and you won't see

10  too many wealthy people in that profession, but, you know,

11  we're okay with that because we know that going into it and we

12  are compensated in other ways, not in monetary ways, and we're

13  okay with that, but at the same time, we live paycheck to

14  paycheck, it's not a job that you're going to get rich from.

15          Also, if you don't find against the defendants,

16  you'll also be sending the message to workers everywhere saying

17  that if you don't get paid properly, keep your mouth shut or

18  you're going to lose your job, or you can speak up when you're

19  shorted wages and subject yourself to five years of basically

20  hell trying to get paid by an employer who readily admits that

21  they never bothered to investigate my complaint and they fired

22  me instead of -- instead of taking the necessary steps to find

23  out if I was properly paid or not.  They acted with complete

24  disregard for the law and for my rights as an employee.

25          They have not shown you any evidence to show that

1    I was a kennel technician or that I was supposed to be paid

2    8.45 an hour, but I've shown you substantial evidence.

3    I showed you the job post.  I showed you the two voicemail

4    messages from Petland saying to schedule an interview for the

5    veterinary technician position.  The job post showed that the

6    pay was 35,000 a year, they never told me that it was anything

7    other than that, and by default if you apply for a job, you

8    interview for a job and then you get hired, by default you're

9    going to assume that you're being hired for the position that

10   you applied for and that you interviewed for, because you

11   weren't told otherwise.  It's not the other way around, that

12   you apply for a specific job, you apply for -- or you interview

13   for that job and you just figure that you're just getting a

14   different job than what you applied for.

15           I mean, I -- you know, I've been working since I was

16   16 years old, and I know I would not take a job and just not

17   know what I'm getting paid, what my title is, what my job is,

18   what I'm supposed to do, you know.  And I showed you the text

19   message where I asked Ms. Tello what the compensation was for

20   the pay, or for the position, and she never answered me and she

21   never told me any other time during the three weeks that

22   I worked there that it was any other than what the defendants

23   stated that it was in their job post.

24           MS. HEARD:  Ms. Moore, you have two minutes.

25           MS. MOORE:  Thank you.  I'm about done.

1            So I just ask that you use your common sense and

2     apply reason when you deliberate, and find in my favor and

3     against the defendants on all counts.

4            Thank you.

5            THE COURT:  So you'll have seven minutes for

6     rebuttal.

7            Counsel.

8            MR. SARELSON:  May it please the Court, Ms. Moore,

9     members of the jury.

10           I'm going to try to do this in an orderly fashion,

11    but this is a court of law, it's not a giant referendum on

12    either Ms. Moore, or my clients, for that matter.  You'll be

13    instructed to follow the law and only follow the law and not

14    any kind of sympathies or passions or emotions.

15           One of the claims in this case is for a violation of

16    the Fair Labor Standards Act that requires a minimum wage.

17    Ms. Moore says she was paid for about 25 hours, roughly, but

18    she worked for about 100 hours.  So she's claiming she worked

19    about 75 hours during a three week period where she wasn't paid

20    anything, but Ms. Moore has no witnesses telling her that she

21    worked, "Hey, I was with you, you were working these hours."

22    There's no e-mails or text messages to either of her managers

23    saying, "Hey, I worked yesterday but I didn't get paid for it,"

24    or "You made me work yesterday without clocking in and clocking

25    out."  You didn't hear any of that from Ms. Moore today, and so

her allegations about how many hours she worked is simply too speculative given the evidence that she's presented.

You're going to be asked a question about something called willfulness, did my clients willfully violate the Fair Labor Standards Act, and you're going to be instructed about this, and if you conclude that my client acted unreasonably or was negligent in how they handled it, that's not willful. That doesn't come close to being what a willful violation is. There is no evidence -- and the burden of proof rests entirely with Ms. Moore. There is no evidence that my client intentionally or recklessly did anything wrong, where they just went, "oh, we're not going to pay you," nothing of the sort.

And I'd ask you to look at that text message between Yessi and Ms. Moore where she says, "I'm supposed to be paid this," and Ms. Moore said -- I'm sorry, Ms. Nieves says, "No, it's 8.45, here is the job posting." Now, if you conclude that that's an action, that's inadvertent, that that was wrong, that's still not willful violation. You have to find some evidence that they affirmatively said either we're not going to pay you or we don't really care about whether we're supposed to pay you minimum wage or not. And we all know 8.45 is above minimum wage, you'll be instructed that the minimum wage at the time was 8.25 an hour, so her rate of pay was in excess of minimum wage.

1          Finally, you'll be asked a question about Luis

2    personally, you'll be asked a question about whether he is

3    personally responsible, but in order for you to find him

4    personally responsible this is the language that you'll be

5    read:  Melanie Moore must prove that Luis Marquez had

6    operational control over Pooches.  In other words, Luis Marquez

7    must have controlled significant aspects of Pooches of Largo's

8    day-to-day functions, including employee compensation, or had

9    direct responsibility for the supervision of Melanie Moore.

10         Now, Mr. Marquez wasn't asked any question about what

11    he does at Pooches, and there's no dispute that Ms. Nieves and

12    Ms. Tello, who is not in the room right now, they were the

13    kennel managers during her three weeks of employment, and so

14    there's simply no evidence presented that Mr. Moore --

15    I'm sorry, that Mr. Marquez was directly responsible for

16    Ms. Moore at all.  There's no evidence they've even met, that

17    they've communicated.  There's no evidence Mr. Marquez knows

18    who she is or that she's seen him before or anything of the

19    sort.  Nothing.

20         I want to turn to the fraud claim.

21         The fraud claim in this case comes down to an

22    indeed.com job posting, but that's just it, it's a job posting,

23    it's an encouragement for people to apply for the job.

24         Now, you can be frustrated by the fact that no one

25    seems to know how exactly it is that she ended up being hired

1    as a -- sort of as a kennel technician when she applied for the
2    certified vet tech, and I think that's a fair question for you
3    all to answer, but here's what we're talking about here.
4    Ms. Nieves and Ms. Tello testified that Ms. Moore was onboarded
5    as a kennel technician, she performed the services as a kennel
6    technician, she was paid as a kennel technician, she was
7    trained as a kennel technician, and during that three weeks of
8    time that she was doing the services of a kennel technician she
9    never once said, "Hey, wait a minute, why am I doing kennel
10   technician stuff, I'm supposed to be a certified vet tech," not
11   once.  That only came up when she got her paycheck, when she
12   noticed the discrepancy, that's it.  In three weeks she's doing
13   a different job than she thinks she's supposed to be doing and
14   she never once complains and says, "Hey, what am I doing here,
15   I'm supposed to be doing this, why am I doing that."
16          But fraud isn't concerned with accidents, it's not
17   concerned with inadvertence, it's not concerned with a business
18   error.  Fraud is intent.  There has to be some evidence that
19   Pooches of Largo said, we are going to intentionally deceive
20   you.  Now, you've not heard evidence about that.  You've heard
21   evidence of a discrepancy, for sure, job posting says one
22   thing, job paid something else, but the question is why.
23          Ms. Moore is asking you to speculate, just wholesale
24   speculation that there was some intent behind any of this, and
25   when this occurred, Alison texted Ms. Moore to take the issue

up with Corporate, but she doesn't do it, she just -- no, I'm
just not going to go to Corporate.  Now, is that evidence of
somebody intentionally trying to steal money from somebody or
is that evidence that a manager said, "I don't know if there's
an issue, go call Corporate"?

So there's simply no evidence to support any kind of
a verdict for fraud, for intentional misconduct on the part of
our clients.

I want to turn to damages.

Ms. Moore has testified that the difference between
the $35,000 she thought she was being paid and the two hundred
and something dollars that she actually was paid is around
$1800.  She hasn't given a precise figure, but it's
approximately $1800.  If you do find that my clients
intentionally defrauded her out of money, the only amount of
money at issue here is $1800, not 1801, not 1850, not more than
that, because she hasn't presented any evidence that it was
anything other than the $1800 discrepancy between the job
posting and what she was actually paid.

Finally though, I want to talk to you a little bit
about credibility.  Ms. Moore is many things, but there's
credibility issues here.  She applied for a certified vet tech
job.  She started out yesterday morning saying the company
wanted a credentialed vet tech, not just any old vet tech, she
testified yesterday under oath that she actually wasn't a

1  certified vet tech.  Right off the start, I'm not actually a

2  certified vet tech, I know you really want one, but I'm not

3  one, but I'm going to submit my resumé anyway.

4       She claimed that she left her old job to come work

5  for Petland and there is a discrepancy in the pay and that's

6  why it was so problematic to her, but her own resumé says she

7  had been unemployed at the time since January.  She was hired

8  in August.  Her own resumé says January.  So that's just not

9  true.

10       She also claims she would never put Petland on her

11  resumé.  She put Petland on her resumé.  She acknowledges she

12  put Petland on her resumé.

13       She claimed to have a two month long job between

14  January and August, but for some reason it's not -- not showing

15  up on her resumé.  There's no actual proof of it.

16       And then finally, y'all heard from Mr. Celler, kind

17  of slickitty-slick lawyer yesterday guy.  She blames a lot of

18  things on Mr. Celler, and that's fine.  I'm not Mr. Celler.  We

19  are not Mr. Celler and nobody from my side of the table here is

20  defending whatever he did or did not do, but here is what

21  matters.  Why ultimately did Mr. Celler not take the very

22  lawsuit that we're here for today?  Because by his own

23  admission he believed that she was committing a fraud, that her

24  allegations about what she was supposed to be making were

25  simply not true, and he would not file a frivolous lawsuit.

1    Her own lawyer had these credibility issues with his own

2    client, that's why Mr. Celler isn't here today, and he even

3    admits when he fired her as a client, he says, "I have to be

4    honest," he says it twice in that e-mail, "I have to be honest,

5    your case is only worth a few thousand dollars even on your

6    best day," which is sort of consistent with the $1800 that she

7    claims she was shorted.

8            Another credibility thing that I wanted to bring up,

9    she's not suing for wrongful termination in this lawsuit.  She

10   had a claim for wrongful termination, it was dismissed, but she

11   took the stand yesterday and she didn't say it was dismissed,

12   what she said repeatedly was that she was threatened by this

13   Judge, she says "I was threatened by this Judge to withdraw my

14   claims for wrongful termination."  Is anybody going to believe

15   that, that she was threatened by the Judge who is presiding

16   over the case right now?

17           There are things in life that don't feel right.

18   There are things in life that don't make sense.  There are

19   questions for which there are no good answers, and it's fair to

20   have those questions, but we assume that the -- the law

21   assumes, society assumes that people act in good faith.

22   Something happens, don't assume the worst.  You're going to

23   send out that text, maybe delete it before you send it.  You

24   write out that e-mail, maybe delete that e-mail before you send

25   it.  It's okay.  There is a presumption in the law that people

1    act with good faith, they act in good faith, and a business
2    decision, a business screw-up -- and pardon the local language,
3    but like a business screw-up is not fraud, it's not bad faith,
4    and so at best what you have, after listening to the testimony
5    yesterday, at best what you have is a situation where there was
6    an inadvertent shortage of around $1800 to Ms. Moore, but to
7    get there you'd have to first find that there was fraud, that
8    there was intentional misconduct, that this company said we're
9    going to post an ad, we want people to apply, but then we're
10   secretly going to hire them for something else, and then when
11   they find out about it on their paycheck, "haha."

12          Don't check your common sense at the door.  We all
13   live in the real world.  Is there any evidence that this
14   business did that?  Is there any evidence that any rational
15   business would do that, that they would post an ad, say
16   something, an ad that Mr. Marquez admits wasn't approved,
17   wasn't posted by him, somebody at the company posted it, that
18   they would post an ad for a job and then secretly steal that
19   person out of 50 percent of their salary?  What company would
20   do that?  All their employees would quit after they got their
21   first paycheck.

22          So if you find that there was an error, if you're
23   super unhappy with what Pooches of Largo did, no one is going
24   to blame you.

25          COURTROOM DEPUTY:  You have two minutes,

1    Mr. Sarelson.

2             MR. SARELSON:   Thank you.

3             No one is going to blame you, but you have to go the

4    extra mile and you have to not just say, I don't like what they

5    did, this was a mishandling for sure, there should have been

6    more documentation, how come there's no formal offer letter.

7    You have to conclude by a preponderance of the evidence that

8    the Judge will instruct you on, by a preponderance of the

9    evidence that they intentionally did engage in this conduct

10   with the intent to harm her, and if there's no evidence and

11   there is no evidence that was presented yesterday that they

12   acted in bad faith or that they acted with intent or that they

13   acted with malice, you have to return a verdict for the defense

14   that there was no fraud.

15            I appreciate your time.  Thank you all.

16            THE COURT:  Ms. Moore, you have seven minutes for

17   rebuttal.

18            MS. MOORE:  Thank you, Your Honor.

19            With regards to willfulness, I'd like to redo the

20   defendant's words verbatim.  When they were asked in discovery

21   in their interrogatories, I said:  "Please describe with

22   particularity the events of August 31st, 2018 leading up to and

23   including plaintiff's termination, and state the grounds for

24   termination."

25            Defendant's answer was:  "The defendant's entire

1    knowledge of the events of August 31st, 2018 leading up to

2    plaintiff's termination is what's contained in the text message

3    exchange between plaintiff and Alison Nieves.  Plaintiff was

4    terminated for making baseless, unprofessional accusations

5    against the defendant."

6         So not grapes, they readily admit that they fired me

7    for complaining, and obviously it wasn't baseless or

8    unprofessional because we all can understand that they owe me

9    wages.

10        The fact that we're here today is compelling evidence

11    of willfulness.  They -- defendants repeatedly refer to this

12    discrepancy in pay as a misunderstanding or an inadvertence or

13    an accident, but a misunderstanding doesn't last for

14    five years.  I retained counsel two months after I was

15    terminated, and he sent the demand letter, so they've known

16    basically for five years.  They could have paid me at any time

17    during those five years but still they didn't and I had to make

18    a Federal case out of it just to get paid.

19        As far as liability for Mr. Marquez, he is liable

20    under vicarious liability because the law says that an employer

21    is responsible for the actions of his employees acting in the

22    scope of their duties as their employee.  It's his money in the

23    end, he's the owner of the company, and it's his -- the money

24    comes out in his payroll, so he is responsible for the failure

25    to pay, whether that was directly or indirectly.

1          And also I did work as a veterinary technician.

2    I applied -- or I administered subcutaneous fluids to animals

3    that were dehydrated, and that's where you insert a needle and

4    there's like a bag of fluids that you give fluids underneath

5    the skin to rehydrate them.  I also gave them nebulizer

6    treatments, because a lot of the animals there were in

7    respiratory distress and they would get breathing treatments

8    daily to help with their ability to breathe comfortably.

9    I also administered medications and performed examinations of

10   the animals there, and there was one time when I did a fecal

11   examination because I noticed some blood in one of the -- in

12   the stool of one of the puppies.  All of those things would be

13   the duties of a vet tech, not a kennel tech.

14         A kennel tech handles cleaning, doing the laundry,

15   mopping the floors, things like that.  Those were not --

16   I mean, I assisted with those things when I worked there, but

17   those were not what my primary responsibilities were.

18   I believed that I was a vet tech because that's what I was

19   hired for and that's what I applied for, and when I went to

20   work I did what I was told to do.  If they said, you know, give

21   this puppy this medicine, I did it.  If they said, clean that

22   window over there, I did it.  You know, I did whatever I was

23   told.  I mean, I only worked there for three weeks, you know,

24   I'm just -- I'm new, I'm just learning the job, I did what

25   I was told.  I would never say that's not within my purview as

1   a vet tech, I'm not doing that.  I just did whatever it was

2   that they told me to do.

3            As far as liability for Mr. Marquez, when they were

4   asked -- I said, "Please explain the scope of Alison Nieves'

5   authority to make decisions regarding termination of an

6   employee and whether she's required to consult with any other

7   person or persons prior to terminating an employee," and the

8   defendant's answer was:  "Ms. Nieves did not terminate the

9   plaintiff.  She conveyed to the plaintiff that she was

10  terminated."

11           The defendant, Mr. Marquez, was Ms. Nieves' immediate

12  supervisor, so obviously she conveyed to me from him that I was

13  fired.  If he's able to indicate -- if he was able to tell her

14  to fire me because I complained about not being properly paid,

15  then I would say that constitutes operational control of the

16  store and he should be liable for that.

17           COURTROOM DEPUTY:  You have two minutes, Ms. Moore.

18           MS. MOORE:  Thank you.

19           Mr. Sarelson raised the issue about my credentials as

20  a certified vet tech.  Like I mentioned yesterday, I have an

21  Associate's degree in veterinary technology.  I went to school,

22  I was 40 years old when I went back to college, it took me that

23  long to figure out what I wanted to do in life, and it wasn't

24  easy, but I went back to school at 40 years old and I was going

25  part time and working full time, so it took me a few years to

1  complete a two year program, to get my Associate's degree, and

2  I graduated in 2016, and the events in this case occurred in

3  2018, so it was only a two year difference between when

4  I graduated and when I worked at Petland.  The difference

5  between a credentialed veterinary technician and one that isn't

6  is that you take the test, but the test is like $400 and

7  I didn't have the money to take the test, so I didn't take it,

8  but when I was employed at Petland I was in the process of

9  completing my last two semesters to earn a Bachelor's degree in

10  applied science for veterinary technology, so I was more

11  than -- more than capable of working in the capacity as a

12  vet tech.  And Ms. Tello asked me if I was credentialed at my

13  interview and I told her that I wasn't.  You know, the

14  credentialing is just a piece of paper that you get after you

15  take the test.  I didn't have that, but I had all the education

16  and the experience and the skills to perform in the same way

17  that a credentialed vet tech was, and I never misrepresented

18  that.

19          The last thing I wanted to say was that Mr. Sarelson

20  brought up when I said yesterday that I was threatened to

21  dismiss my retaliation count.  I would just like to read

22  directly from the order.  It says:  The Court cautions the

23  plaintiff that if she does not cull her Amended Complaint as

24  directed and instead attempts to re-plead claims not otherwise

25  permitted, the Court will dismiss this matter with prejudice

```
 1    for failure to comply with this order.

 2            I was instructed to omit the wrongful termination

 3    claim from my Complaint, and, you know, you can see it here in

 4    bold print the order where it says that my case would be

 5    dismissed in its entirety if I attempted to replead that claim,

 6    and that's why I omitted it from my Amended Complaint, which is

 7    the operative Complaint at this time, not because the

 8    defendants didn't retaliate against me, but because this is a

 9    wage case and I need to be paid and I didn't want -- I didn't

10    want to disobey the order and then risk losing my wages and

11    everything from work, so that's why I omitted it, but not

12    because it wasn't retaliation.

13            THE COURT:  Thank you, Ms. Moore.

14            MS. MOORE:  Thank you.

15            THE COURT:  All right.  Ladies and gentlemen, that

16    concludes the presentation of the case and the closing

17    arguments to you, and now I am going to instruct you on the law

18    that you must follow.

19            I am going to read this.  I apologize.  I think this

20    process started when maybe not everybody could read, that the

21    Courts read the instructions to the jury.  You don't have to

22    take copious notes because I will send back a couple of extra

23    copies for you to refer to in your deliberations.  So if you

24    could just please be patient with us as we read these.

25            The other reason we do this is to make sure that you
```

1    are aware of the law and you don't just go back and start

2    deliberating based upon your own sort of view, layperson's view

3    of what you should be deciding, and so we're going to present

4    it to you and have Ms. Heard put it on the overhead so you can

5    follow along, and then, like I say, you'll get a copy of this

6    brought back to the jury room for your deliberations.

7           Mr. Sarelson, while we're doing this, there are a

8    couple of exhibits that need to be redacted for information in

9    the bad faith, and so I need you to take a look at those and

10   make sure what areas need to be redacted just maybe by putting

11   a sticky note or something on them and then we will do the

12   actual physical job of redacting once we are ready to take the

13   exhibits back to the jury, which then you will show those to

14   Ms. Moore and we'll have them ready by the time we finish

15   reading the instructions.

16          Final Jury Instructions.

17          Members of the jury, it's my duty to instruct you on

18   the rules of law that you must use in deciding this case.  When

19   I have finished, you will go to the jury room and begin your

20   discussions, sometimes called deliberations.

21          Your decision must be based only on the evidence

22   presented here.  You must not be influenced in any way by

23   either sympathy or prejudice for or against anyone.

24          You must follow the law as I explain it, even if you

25   do not agree with the law, and you must follow all of my

1    instructions as a whole.  You must not single out or disregard

2    any of the instructions on the law.

3            The fact that a corporation is involved as a party

4    must not affect your decision in any way.  A corporation and

5    all other persons stand equal before the law and must be dealt

6    with as equals in a court of justice.  When a corporation is

7    involved, of course, it may act only through people as its

8    employees, and, in general, a corporation is responsible under

9    the law for the acts and statements of its employees that are

10   made within the scope of their duties as employees of the

11   company.

12           Ms. Carreon, would you give those exhibits to

13   Mr. Sarelson.  Just the whole set.

14           COURTROOM DEPUTY:  Yes, Your Honor.

15           THE COURT:  As I said before, you must consider only

16   the evidence I have admitted in the case.  Evidence includes

17   the testimony of witnesses and the exhibits admitted, but

18   anything the lawyers say is not evidence and is not binding on

19   you.

20           You should not assume from anything that I have said

21   that I have any opinion about any factual issue in the case.

22   Except for my instructions to you on the law, you should

23   disregard anything I may have said during the trial in arriving

24   at your own decision about the facts.  Your own recollection

25   and interpretation of the evidence is what matters.

1      In considering the evidence, you may use reasoning

2  and common sense to make deductions and reach conclusions.  You

3  should not be concerned about whether the evidence is direct or

4  circumstantial.

5      Direct evidence is the testimony of a person who

6  asserts that he or she has actual knowledge of a fact, such as

7  an eyewitness.  Circumstantial evidence is proof of a chain of

8  facts and circumstances that tend to prove or disprove a fact.

9  There is no legal difference in the weight you may give to

10  either direct or circumstantial evidence.

11      When I say that you must consider all the evidence,

12  I do not mean that you must accept all the evidence as true or

13  accurate.  You should decide whether you believe what each

14  witness had to say and how important that testimony was.

15  In making that decision, you may believe or disbelieve any

16  witness, in whole or in part.  The number of witnesses

17  testifying concerning a particular point does not necessarily

18  matter.

19      To decide whether you believe any witness, I suggest

20  you ask yourself a few questions:

21      Did the witness impress you as one who was telling

22  the truth?

23      Did the witness have any particular reason not to

24  tell the truth?

25      Did the witness have a personal interest in the

1   outcome of the case?

2           Did the witness seem to have a good memory?

3           Did the witness have the opportunity and ability to
4   accurately observe the things he or she testified about?

5           Did the witness appear to understand the questions
6   clearly and answer them directly?

7           Did the witness's testimony differ from other
8   testimony or other evidence?

9           You should also ask yourself whether there was
10  evidence that a witness testified falsely about an important
11  fact, and ask whether there was evidence that at some other
12  time a witness said or did something, or didn't say or do
13  something, that was different from the testimony the witness
14  gave during this trial.

15          But keep in mind that a simple mistake does not mean
16  a witness was not telling the truth as he or she remembers it.
17  People naturally tend to forget some things or remember them
18  inaccurately, so if a witness misstated something, you must
19  decide whether it was because of an innocent lapse in memory or
20  an intentional deception.  The significance of your decision
21  may depend on whether the misstatement is about an important
22  fact or about an unimportant detail.

23          In this case it is the responsibility of
24  Melanie Moore to prove every essential part of each of her
25  claims by a preponderance of the evidence.  This is sometimes

1    called the burden of proof or the burden of persuasion.

2            A preponderance of the evidence simply means an

3    amount of evidence that is enough to persuade you that

4    Melanie Moore's claims are more likely true than not true.

5            When more than one claim is resolved, you should

6    consider each claim separately.

7            In deciding whether any fact has been proved by a

8    preponderance of the evidence, you may consider the testimony

9    of all the witnesses, regardless of what may have called them,

10   and all the exhibits received in evidence, regardless of who

11   may have produced them.

12           If the proof fails to establish any essential part of

13   Melanie Moore's claim by a preponderance of the evidence, you

14   must decide for the defendants as to that claim.

15           I will now define some of the terms you will use in

16   deciding the case.

17           As her first claim, Melanie Moore claims that her

18   former employer, Pooches of Largo, did not pay her the minimum

19   wage required by the Federal Fair Labor Standards Act, also

20   known as the FLSA.

21           To succeed on her claim against Pooches of Largo,

22   Melanie Moore must prove the following facts by a preponderance

23   of the evidence:  That Pooches of Largo, Inc. failed to pay

24   Melanie Moore the minimum wage required by law.

25           In the verdict form that I will explain in a moment,

1  you will be asked to answer questions about these factual

2  claims, these factual issues.

3       Minimum wage claim:  The minimum wage required by the

4  FLSA during the period involved in this case was $8.25 per

5  hour.

6       The employee's regular rate for one week is the basis

7  for calculating any overtime pay due to the employee.  The

8  regular rate for a week is determined by dividing the total

9  wages paid for the week by 40, the total number of hours

10 Ms. Moore's weekly salary was intended to compensate.

11       Let me see counsel at sidebar.

12       *(The following bench conference was held.)*

13       THE COURT:  I think I need to edit that, instead of

14 saying overtime pay, "regular pay," because this case is not

15 about overtime pay.

16       MR. SARELSON:  I don't think I caught the overtime

17 language.

18  *(End of bench conference; proceedings resume in open court.)*

19       THE COURT:  I'm going to go back and read that,

20 because there is a typographical error there.  It says:  The

21 employee's regular rate for one week is the basis for

22 calculating any regular pay due to employee.

23       The employee's regular rate for one week is the basis

24 for calculating any regular pay due to the employee.  The

25 regular rate for a week is determined by dividing the total

1  wages paid for the week by 40, the total number of hours

2  Melanie Moore's weekly salary was intended to compensate.

3        Pooches of Largo failed to pay Melanie Moore the

4  required pay if it paid her less than that amount.

5        The amount of damages is the difference between the

6  amount Melanie Moore should have been paid and the amount she

7  was actually paid.

8        An employer willfully violates the Act if it should

9  inquire as to whether its actions violate the Act but fails to

10  do so.  A willful violation of the Act occurs when an employer

11  either knows that its conduct is prohibited by or shows

12  reckless disregard for the minimum wage laws.

13        Inadequate records:  The law requires an employer to

14  keep records of how many hours their employees work and the

15  amount they are paid.  In this case Melanie Moore claims that

16  Pooches of Largo failed to keep and maintain adequate records

17  of her hours and pay.  Melanie Moore also claims that Pooches

18  of Largo's failure to keep and maintain adequate records has

19  made it difficult for Melanie Moore to prove the exact amount

20  of her claim.

21        If you find that Pooches of Largo failed to keep

22  adequate time and pay records for Melanie Moore and that

23  Melanie Moore performed work for which she should have been

24  paid, Melanie Moore may recover a reasonable estimation of the

25  amount of her damages, but to recover this amount Melanie Moore

1    must prove by a preponderance of the evidence a reasonable

2    estimation of the amount and extent of the work for which she

3    seeks pay.

4            Individual liability:  An individual can also be

5    liable for plaintiff's damages under the FLSA if the individual

6    played a substantial role in causing the FLSA violation.  To

7    determine whether the individual is liable, you must consider

8    all the relevant circumstances rather than any one technical

9    factor.

10           Melanie Moore must prove that Luis Marquez had

11   operational control over Pooches of Largo.  In other words,

12   Luis Marquez must have controlled significant aspects of

13   Pooches of Largo's day-to-day functions, including employee

14   compensation, or had direct responsibility for the supervision

15   of Melanie Moore.

16           As her second claim, the issues for you to decide

17   are, first, whether Pooches of Largo made a false statement

18   concerning a material fact; second, whether Pooches of Largo

19   knew the statement was false when Pooches of Largo made it or

20   made the statement knowing it did not know whether it was true

21   or false; third, whether Pooches of Largo intended that another

22   would rely on the false statement; fourth, whether Melanie

23   Moore relied on the false statement; and, if so, fifth, whether

24   the reliance on the false statement was a legal cause of loss

25   to Melanie Moore.

1     On this claim for fraudulent misrepresentation,

2  Melanie Moore may rely on a false statement even though its

3  falsity could have been discovered if Melanie Moore had made an

4  investigation.  However, Melanie Moore may not rely on a false

5  statement if she knew it was false or if its falsity was

6  obvious to her.

7     A material fact is one that is of such importance

8  that Melanie Moore would not have acted but for the false

9  statement.

10    Misrepresentation of a material fact is a legal cause

11 of loss if it directly and in natural and continuous sequence

12 produces or contributes substantially to producing such loss,

13 so that it can reasonably be said that but for the

14 misrepresentation the loss would not have occurred.

15    In order to be regarded as a legal cause,

16 misrepresentation of a material fact need not be the only

17 cause.  Misrepresentation of a material fact may be a legal

18 cause of loss even though it operates in combination with some

19 other cause if the misrepresentation contributes substantially

20 to producing such loss.

21    If you find for Pooches of Largo, you will not

22 consider the matter of damages, but if you find for

23 Melanie Moore, you should award Melanie Moore an amount of

24 money that the greater weight of the evidence shows will fairly

25 and adequately compensate her for her injuries.

1        There is an additional claim in this case that you

2   must decide.  If you find for Melanie Moore and against Pooches

3   of Largo, you must decide whether, in addition to compensatory

4   damages, punitive damages are warranted as punishment to

5   Pooches of Largo as a deterrent to others.  Punitive damages

6   are warranted if you find by clear and convincing evidence that

7   the conduct causing loss to Melanie Moore was so gross and

8   flagrant as to show a reckless disregard of human life or the

9   safety of persons exposed to the effects of such conduct, or

10  the conduct showed such a lack of care that Pooches of Largo

11  must have consciously been indifferent to the consequences, or

12  the conduct showed such an entire lack of care that Pooches of

13  Largo must have wantonly or recklessly disregarded the safety

14  and welfare of the public or the conduct showed such reckless

15  indifference to the rights of others as to be equivalent to an

16  intentional violation of those rights.

17        Clear and convincing evidence differs from the

18  preponderance of the evidence, or what we have been calling the

19  greater weight of the evidence, in that it is much more

20  compelling and persuasive.  As I've already instructed you --

21  and I'm going to change this to preponderance of the evidence

22  throughout -- preponderance of the evidence means the more

23  persuasive and convincing force and effect of the entire

24  evidence in the case.  In contrast, clear and convincing

25  evidence is evidence that is precise, explicit, lacking

1    confusion and of such weight that it produces a firm belief or

2    conviction without hesitation about the matter in issue.

3         If you decide that punitive damages are warranted

4    against Pooches of Largo, you must decide the amount of

5    punitive damages, if any, to be assessed as punishment and as a

6    deterrent to others.  This amount would be in addition to the

7    compensatory damages you have previously awarded.  In making

8    this determination you should consider the following:  The

9    nature, extent and degree of misconduct and the related

10   circumstances.

11        You may in your discretion decline to assess punitive

12   damages.

13        The fact that I have given you instructions

14   concerning the issue of Melanie Moore's damages should not be

15   interpreted in any way as an indication that I believe

16   Melanie Moore should, or should not, prevail in the case.

17        Your verdict must be unanimous.  In other words, you

18   must all agree.  Your deliberations are secret, and you will

19   never have to explain your verdict to anyone.

20        Each of you must decide the case for yourself, but

21   only after fully considering the evidence with the other

22   jurors.  So you must discuss the case with one another to try

23   to reach an agreement.  While you're discussing the case, do

24   not hesitate to re-examine your own opinion and change your

25   mind if you become convinced that you were wrong, but do not

1    give up your honest beliefs just because the others think

2    differently or because you simply want to get the case over

3    with.  Remember that in a real way, you are the judges, judges

4    of the facts.  Your only interest is to seek the truth from the

5    evidence in the case.

6            Now, when you go to the jury room, you will choose

7    one of your members to act as a foreperson.  Your foreperson

8    will direct your deliberations and speak for you in court,

9    if necessary.

10           If you'll pull up the verdict form now, Ms. Heard,

11   and just save that last piece, I'll come back to it.

12           This is what the verdict form looks like.  You'll be

13   given a couple of scratch copies and an official copy to use to

14   work on this case.

15           The verdict form says Count One, Minimum Wage.

16           Do you find from a preponderance of the evidence, 1,

17   that Pooches of Largo failed to pay Melanie Moore the minimum

18   wage required by law?  You will answer yes or no.  If your

19   answer is no, this ends your deliberations as to Count One and

20   you would proceed over to Count Two.

21           If your answer is yes, then you'll go to the next

22   question.  That next question asks that Pooches of Largo knew

23   or showed reckless disregard for whether FLSA prohibited its

24   conduct, and you'll answer yes or no, and then if you answer

25   yes, that Melanie Moore should be awarded damages, you will

1    answer yes or no.  If your answer is yes then you'll state the

2    amount.  If your answer is no, this ends your deliberations as

3    to Count One and you will proceed in any event to Count Two.

4          If you answer yes, you'll go to the next question,

5    and the next question asks that Luis Marquez personally played

6    a substantial role in causing the FLSA violation, and you'll

7    answer yes or no.

8          And then you'll be called to go to Count Two:  Do you

9    find from a preponderance of the evidence that Pooches of Largo

10   made a false statement concerning a material fact?  You will

11   answer yes or no, that Pooches knew the statement was false

12   when made, or made the statement knowing it did not know

13   whether it was true or false.  You will answer yes or no.  That

14   Pooches of Largo intended for another to rely on the false

15   statement, yes or no.  That Melanie Moore relied on the false

16   statement, yes or no.  That as a result of Melanie Moore's

17   reliance she was damaged, yes or no.

18         If the answer to all five questions was yes, then

19   you'll go to the next question.  If the answer was no to any of

20   the five questions, you will not answer the final question.

21         So if you answered yes to everything, you would

22   answer question 6, that Melanie Moore is entitled to damages,

23   yes or no.  If yes, in what amount, and you'll put the amount,

24   and you'll go back to the original page.

25         So you'll take this verdict form with you to the

1  jury room.  When you have all agreed on a verdict, your

2  foreperson will fill out the form, sign it and date it, then

3  you'll return it to the courtroom.

4          If you wish to communicate with me at any time,

5  please write down your message or question and give it to the

6  courtroom security officer.  He will then bring it to me and

7  I will respond as promptly as possible, either in writing or by

8  talking to you in the courtroom.  Please understand that

9  I might have to talk to the parties before I respond to your

10  question or message, so you should be patient as you await my

11  response.  But I caution you, do not tell me how many jurors

12  have voted one way or another at that time.  That type of

13  information should remain in the jury room and not be shared

14  with anyone, including me, in your note or your question.

15          Mr. Jackson, if you'll make those changes on page 12

16  and on page 7.

17          All right.  Ladies and gentlemen, that concludes the

18  reading of the instructions and the explanation of the verdict

19  form, and so now the case is turned over to you.  The Court has

20  ordered lunch for you, and you don't have to work and eat at

21  the same time, you can take a break, or you can go directly

22  into your deliberations at this point, the process is left up

23  to you.

24          And if you need to communicate with me, just speak

25  with Mr. Anderson by written question and he will get it to me.

1    Once you've reached a verdict, you'll just notify us that

2    you've reached a verdict by a written statement as well, and

3    we'll bring you back in the courtroom.

4            We'll bring in the exhibits shortly for your

5    consideration as well.

6            Thank you.  Take your notes with you this time.

7                    *(Jury exits proceedings.)*

8            THE COURT:  You've tabbed all these documents.  The

9    only thing I was asking you to do was to redact the number

10   exchanges between the parties, and so I don't see any

11   identification of those number exchanges in these records.

12           MR. SARELSON:  So what I did, Your Honor --

13   I'm sorry.  What we did, Your Honor, was we put a tab on any

14   document that contained confidential settlement communications.

15   I don't know.

16           THE COURT:  I want you to tell me which numbers need

17   to be redacted.  These documents have come into evidence and

18   they're going to go back to the jury, so the only question is

19   if there is a specific number.  So if you said 70 and they said

20   10, or they said 10 and you said 70, that's not going to go

21   back to the jury.  That was the only thing that I excluded from

22   the reading of the exhibits to the jury.  But the settlement

23   negotiations are in the record and they're going back to the

24   jury, so --

25           MR. SARELSON:  Right.  I understand.  I just want to

1    be clear we've objected to that, and so it's difficult --

2         THE COURT:  You've already lodged your objection and

3    I've ruled.

4         MR. SARELSON:  I understand that, but now -- but it

5    wasn't -- it wasn't offered into evidence like partially, the

6    entire documents were offered into evidence.

7         THE COURT:  And we've declined to allow anyone to

8    read any portion that related to the number exchanges, and I'm

9    just trying to ensure that those number exchanges don't go back

10   to the jury, unless you agree that they should.

11        MR. SARELSON:  No, our position is they should be out

12   entirely.

13        THE COURT:  Okay.  So you want me to just redact them

14   myself?

15        MR. SARELSON:  Well, I mean, if we're literally just

16   redacting the numbers --

17        THE COURT:  Yes.

18        MR. SARELSON:  I can redact just the numbers.  If

19   that's what the Court wants me to do, I'll do it.  Do you want

20   us to actually use a Sharpie or something?  Normally I wouldn't

21   actually touch an exhibit.

22        THE COURT:  And that's why I asked you to do it on a

23   Post-it note.

24        MR. SARELSON:  Oh, I thought the Post-it note was to

25   identify where they are.

1            THE COURT:  One second.  I'll just go through them.

2            So on Exhibit 3-B there is a reference to the

3    hypothetical damages for breach contract are $1,441.53,

4    the contract amount minus the amount paid, and then there is

5    another statement that says "We do not believe your client has

6    any potential legal remedies except perhaps a claim for breach

7    of contract for $1400," and so the Court would be intending to

8    delete both of those sentences as redacted to go back to the

9    jury.

10           Any objection to those redactions, setting aside the

11   request for the whole document to be redacted?

12           MR. SARELSON:  Your Honor, I think the whole --

13   Your Honor, I'm torn because my concern is that if the

14   documents are going to come in --

15           THE COURT:  You've preserved your objection to the

16   whole document, and now the question is do you have an

17   objection to excluding the reference to the exact amount that

18   you proposed was the calculation?

19           MR. SARELSON:  I think I would object to -- I think

20   I would agree, given the Court's prior ruling, that at a bare

21   minimum the number should be rejected, should be redacted out.

22           THE COURT:  All right.

23           MR. SARELSON:  And, candidly, Your Honor, I'm not

24   trying to be, you know, difficult on the issue, but our point

25   is if we've -- if we've tried to offer the amount of money that

```
 1    she's potentially owed, that it just looks weird taking that

 2    information out, and so that's sort of why -- I guess that's

 3    sort of why we're sort of concerned.

 4              THE COURT:  And that's why I asked you the question.

 5    Do you want all of it out or -- I mean, do you want that

 6    sentence out or do you want none of it out?

 7              MR. SARELSON:  I will take that sentence out if we

 8    can't have all of it out, if that makes sense.

 9              THE COURT:  Yes, and you can't have it all out, so

10    you'll take that modification.

11              MR. SARELSON:  So, for example, in the original

12    demand letter Mr. Celler makes reference to the wage agreement.

13    The wage agreement was not entered into evidence.  For example,

14    I don't -- you know, if he --

15              THE COURT:  I'm not asking you any questions.

16              MR. SARELSON:  I understand, Your Honor.

17              THE COURT:  All right.  I've highlighted with yellow

18    Post-Its those that I believe should be redacted, and the

19    parties should look at them together, and then we will operate

20    from there.

21              Just give them to them.

22              Any objection to those changes?

23              MS. MOORE:  No, Your Honor.

24              THE COURT:  Any objections from the defense?

25              MR. SARELSON:  No, Your Honor.
```

```
 1              THE COURT:  All right.  We'll make those
 2    modifications.  Those exhibits will go back.  We'll keep a
 3    clean copy so that there will be a record of what was redacted,
 4    and it will just be a Sharpie through them in the normal
 5    course.
 6              So the Court stands in recess until we hear from the
 7    jury.
 8              Oh.  I'm sorry.  One of the jurors asked a question
 9    that I do not intend to answer, but I'm happy to hear from the
10    parties.
11              In closing argument plaintiff -- there's an X mark,
12    I don't know what that means -- said she was treating pets with
13    drugs for the first time.  Why now talk about degrees and this
14    yesterday or treating pets with drugs?  Did they know she was
15    treating pets with drugs?
16              Typically no one gets to ask questions during closing
17    arguments and that's why I would not respond to this question,
18    but if someone has a different view, I would like to hear it,
19    from the plaintiff or the defense.
20              MS. MOORE:  I'm fine with not answering.
21              MR. SARELSON:  Your Honor, no, I don't -- I'm reading
22    into the question a little bit, but what -- there are
23    aspects -- a lot of aspects of Ms. Moore's closing argument
24    that was not actual testimony from yesterday.
25              THE COURT:  To which no objection was drawn, and
```

1    I told you if she did it, to make an objection, you didn't make

2    an objection, so now closing is closed.

3          MR. SARELSON:  So I think that's simply what -- as I

4    understand the question, that's what the question is, and so I

5    don't think it needs to be answered.

6          THE COURT:  All right.  Well, the question will not

7    be answered.  The other answer I could give is to answer and

8    say the Court does not accept jury questions during closing

9    argument, so they won't just think we're ignoring them.  So

10   it's left up to the parties.

11         MR. SARELSON:  I defer to the Court on whatever the

12   Court wants to do on that one.

13         MS. MOORE:  I would be fine with telling them that

14   the Court doesn't answer questions about closing arguments.

15         THE COURT:  Yeah, bring the jury back in, if they are

16   gathered.  If they are not gathered, then we'll wait.

17                    *(Jury enters proceedings.)*

18         THE COURT:  I hate to bring you all back in here, but

19   I have to communicate in front of everyone.  One of the jurors

20   asked a question about something that was said in closing

21   argument.  The Court does not allow questions during closing

22   argument, so this question will not be answered.

23         Thank you.

24                    *(Jury exits proceedings.)*

25         THE COURT:  You all are free to go to lunch or

1  whatever.  My experience is that jurors tend to ask questions

2  in sort of rapid fire form in the first few minutes and then we

3  don't hear from them for a while, so you might not want to go

4  far, but otherwise just kind of stay in the general vicinity,

5  and if I need to pull you back in for any questions, I can do

6  so.

7          And of course there's nothing to keep the parties

8  from settling while the jury is deliberating.  If that were to

9  happen, please let me know before they come back.

10         Any questions?

11         MR. SARELSON:  No, Your Honor.

12         MS. MOORE:  No, Your Honor.

13         THE COURT:  Ms. Moore, please don't go far so that

14  we're not delayed in answering the jury questions.

15         We are in recess.  Thank you.

16                 - - - - -

17         (Recess at 12:31 p.m. until 1:05 p.m.)

18                 - - - - -

19         THE COURT:  Court is back in session.  The jury has

20  submitted another question.

21         Did the company admit she should be paid at vet tech?

22  That is the question.  Did the company admit she should be paid

23  at vet tech?

24         MR. SARELSON:  As I understand the question,

25  Your Honor, the answer would be no, but I'm not sure we should

1  provide that answer.  They should -- they should just limit it

2  to their memory of the testimony.

3          MS. MOORE:  Your Honor, the defendants admitted in

4  their motion for summary judgment that I was hired as a vet

5  tech for $35,000 a year.

6          THE COURT:  Typically what the Court would do in

7  response to a question from the jury to tell them what the

8  testimony was or what the evidence was is the Court would

9  respond to the jury, "You must rely on your own memory of what

10 the evidence was," and that's -- I don't tell them yes or no

11 one way or the other, I just tell them they have to rely on

12 their own memory of what the evidence was.

13          Is there any objection to that from the plaintiff?

14          MS. MOORE:  No, that's fine, Your Honor.

15          THE COURT:  Any objection from the defense?

16          MR. SARELSON:  No, Your Honor.

17          THE COURT:  All right.  And for your edification,

18 juror number 1, Mr. Ritzke, is the foreperson.

19                    (Jury enters proceedings.)

20          THE COURT:  One question has been presented.

21          And, Mr. Ritzke, I understand that you are the jury

22 foreperson?

23          JUROR 1:  Yes.

24          THE COURT:  Is this question a question of the jury

25 that was submitted to Mr. Anderson for submission to me?

1              JUROR 1:  Yes.

2              THE COURT:  All right.  The question is:  Did the

3    company admit she should be paid at vet tech?

4              The answer is:  You must rely on the evidence and

5    your own memory of the testimony in your deliberations.  You

6    must rely on the evidence and your own memory of the testimony

7    in your deliberations.

8              Thank you.

9                     *(Jury exits proceedings.)*

10             THE COURT:  All right.  You are all are free to be in

11   recess until we hear from them again.  I don't know when that

12   will be, but we'll stand in recess.

13             MR. SARELSON:  Your Honor, can I ask a quick

14   housekeeping matter?

15             THE COURT:  You may.

16             MR. SARELSON:  Would the Court have any issue if

17   Mr. Marquez were to be released for the rest of the day?  He's

18   trying to catch a flight for tonight.  Ms. Nieves is still

19   here, she's our corporate rep, and he understands not being

20   here, so I'm just asking if that would be permissible.

21             THE COURT:  When is his flight?

22             MR. MARQUEZ:  3:52 p.m.

23             THE COURT:  And are you amenable to having the case

24   completed in terms of the reading of any verdict without your

25   presence?

```
1              MR. MARQUEZ:  Yes.

2              THE COURT:  And if any issue needs to be resolved in

3    the way of a question that has to be answered by the jury, are

4    you satisfied that Mr. Sarelson can answer it on your behalf,

5    with the assistance of Ms. Nieves?

6              MR. MARQUEZ:  Yes, Your Honor.

7              THE COURT:  And you're willing to abide by whatever

8    decision they make with respect to any answer to any inquiry of

9    that type?

10             MR. MARQUEZ:  Yes, Your Honor.

11             THE COURT:  Any objection from the plaintiff?

12             MS. MOORE:  No, Your Honor.

13             THE COURT:  All right.  You're excused, sir, but

14   Ms. Nieves needs to be here.  She's going to be here?

15             MR. MARQUEZ:  Yes.

16             THE COURT:  Where is she now?

17             MR. MARQUEZ:  She went down to get lunch.  I came

18   over, but she will be here, yes, ma'am.  Thank you.

19             THE COURT:  Thank you.

20                        - - - - -

21             (Recess at 1:11 p.m. until 1:41 p.m.)

22                        - - - - -

23             THE COURT:  Where is Ms. Nieves?

24             MR. SARELSON:  She's on her way, she confirmed, so

25   she should just be a couple minutes, but if the Court doesn't
```

```
 1    want to wait, I'm all right without her.  She's on her way
 2    across.
 3              THE COURT:  We'll just wait a minute.
 4              MR. SARELSON:  I just received a text that she's on
 5    her way up, which I assume, Your Honor, means she's in the
 6    elevator.
 7              THE COURT:  All right.
 8                        - - - - -
 9              (Recess at 1:41 p.m. until 1:43 p.m.)
10                        - - - - -
11              THE COURT:  All right.  Court is back in session.
12    The jury advises that we have a verdict, signed by the
13    foreperson and dated and timed, 1:33.
14              Are you prepared to receive the verdict, from the
15    plaintiff?
16              MS. MOORE:  Yes, Your Honor.
17              THE COURT:  From the defense?
18              MR. SARELSON:  Yes, Your Honor.
19              THE COURT:  And Ms. Nieves is here representing
20    Pooches of Largo; is that right?
21              MS. NIEVES:  Yes, ma'am.
22              THE COURT:  Thank you.
23              Please re-call the jury.
24                        (Jury enters proceedings.)
25              THE COURT:  Mr. Foreperson, Ritzke, I understand the
```

```
 1    jury has reached a verdict.  Is that true?
 2              JUROR 1:  Yes, that's true, Your Honor.
 3              THE COURT:  Would you please pass it forward.
 4              The verdict appears to be in order.  The Court will
 5    publish it at this time.
 6              In the matter of United States District Court,
 7    Melanie Nicole Moore, plaintiff, versus Pooches of Largo, Inc.
 8    and Luis Marquez, Case Number 20-CV-2184-MSS-SPF.
 9              Verdict Form.
10              Do you find, from a preponderance of the evidence,
11    that Pooches of Largo failed to pay Melanie Moore the minimum
12    wage required by law?
13              The answer is yes.
14              2, that Pooches knew or showed reckless disregard for
15    whether the FLSA prohibited its conduct?
16              The answer is no.
17              That Melanie Moore should be awarded damages?
18              The answer is yes.
19              If your answer is yes, in what amount?
20              $1,548.80.
21              That Luis Marquez personally played a substantial
22    role in causing the FLSA violation?
23              The answer is no.
24              And for the fraudulent misrepresentation, do you find
25    from a preponderance of the evidence that Pooches of Largo made
```

```
1    a false statement concerning a material fact?
2           The answer is no.
3           That pooches knew the statement was false?
4           The answer is no.
5           That Pooches intended for another to rely on the
6    statement?
7           The answer is no.
8           That Melanie Moore relied on the statement?
9           No.
10          That as a result Melanie Moore's reliance -- of her
11   reliance she was damaged?
12          The answer is no.
13          That Melanie Moore is entitled to damages.
14          Actual damages, the answer is no.
15          If, yes, in what amount, and there is a blank.
16          And that is the verdict of this jury.
17          Does anyone wish for the jury to be polled?
18          The plaintiff?
19          MS. MOORE:  No.  Thank you.
20          THE COURT:  Defense?
21          MR. SARELSON:  No, Your Honor.
22          THE COURT:  Thank you, ladies and gentlemen.  That
23   concludes your work in this case.  The Court appreciates all of
24   your attention that you paid to the case and your diligence in
25   listening to the evidence and considering the parties'
```

 1  positions.

 2          I would like to step back and shake your hand

 3  personally, if you have a minute, and so if you would just stay

 4  a few minutes, I have to release the parties and then I'll step

 5  back.  And obviously you don't have to stay.  If you want to

 6  go, feel free to do so.  And we do have a little bit of an

 7  appreciation to give you from the Court.

 8          Ms. Heard, would you just pass it to the jury now.

 9          COURTROOM DEPUTY:  Yes, Your Honor.

10          THE COURT:  These aren't anything, they're just

11  Challenge Coins that are just a reminder of the service in the

12  case that we give to all our jurors who participate in these

13  types of cases, just as a token of our appreciation to you.

14          But I'll see you back in a few minutes.

15          If you'll have the jury step back.

16          Please rise for the jury.

17                  *(Jury exits proceedings.)*

18          THE COURT:  Be seated.

19          Is there anything anyone needs to say, any motion

20  anyone needs to make with respect to the verdict?  From the

21  plaintiff?

22          MS. MOORE:  No, Your Honor, not with respect to the

23  verdict, but I did have a couple of administrative questions

24  after.

25          THE COURT:  All right.  Anything from the defense?

```
 1              MR. SARELSON:  No, Your Honor.  Thank you.
 2              THE COURT:  All right.  As I understand the import of
 3     this verdict, the Court would enter judgment in favor of
 4     Pooches of Largo because the Complaint was filed more than
 5     24 months from the date on which Ms. Moore was aware of her
 6     alleged violation of the FLSA, which the jury found was
 7     violated, and the only way to get damages beyond the 24 months
 8     is for there to be a finding of willfulness, and the jury did
 9     not find willfulness, and so this will be a complete judgment
10     in favor of Pooches of Largo, Inc. and Luis Marquez, and that
11     would be the Court's judgment, and I'll direct the clerk to
12     enter judgment in accordance therewith in the ordinary course.
13              Yes, ma'am.  Your administrative questions?
14              MS. MOORE:  Yes, Your Honor.  First I wanted to ask,
15     how long would I have access to the case for the purpose of
16     filing an appeal or filing any subsequent motions or anything?
17              THE COURT:  What do you mean, how long will you
18     have --
19              MS. MOORE:  On PACER.
20              THE COURT:  You'll have access to PACER as long as
21     you need access to PACER.  It won't be withdrawn.
22              MS. MOORE:  Okay.  And then also there was an issue,
23     I guess, when the process server served the subpoena for
24     Mr. Marquez and Mr. Sarelson accepted the subpoena, but then --
25     and the witness fees, but then I guess he returned the subpoena
```

1   but kept the witness fees, so I think they've been paid like at

2   least three times.

3          MR. SARELSON:  I can address that.  That's easy,

4   Your Honor.  There were two witness fees that were paid.

5   The original one when the process server came to my door,

6   I still -- that's a check from Legal Aid Society, I still have

7   that check on my desk, I'll do whatever the Court wants.  It's

8   literally just sitting on my desk.  Whatever the Court wants.

9   I can send it back to her, send it back to Legal Aid, whatever

10  the Court wants to do, but I know what she's getting at.

11         THE COURT:  And then another check to Mr. Marquez?

12         MR. SARELSON:  So Mr. Marquez was paid the second

13  time.  The first time, that check is still on my desk.  That

14  check I can give to whoever wants it.  I don't have an opinion

15  on that.

16         THE COURT:  All right.  If you would return that

17  check to the Court, and the Court will dispose of it in the way

18  that it's supposed to be disposed of.

19         MR. SARELSON:  That's fine, Your Honor.  Perfect.

20         MS. MOORE:  And then I guess when I initially

21  attempted to subpoena the defendants I sent these money orders

22  to cover the witness fees, and they've already been written out

23  to Luis Marquez and Richard Celler and I can't -- there's no

24  way to cash it, because it's written out to them, so, I mean,

25  they'll be paid multiple times for the same subpoena.

1          THE COURT:  So you have the check to Marquez and to

2    Celler?

3          MS. MOORE:  Yes.

4          THE COURT:  And that was your money?

5          MS. MOORE:  Yes, Your Honor.

6          THE COURT:  And I suppose then if there's a third

7    check paid to Marquez, Mr. Sarelson can take that check and

8    either negotiate it and then return that money to Ms. Moore,

9    that will be the way to handle that.  And with respect to the

10   Celler check, based upon his behavior in the Court, it's

11   probably best for you to give me that check, give it to the

12   Court, and the Court will negotiate a means by which Mr. Celler

13   would return or execute those funds so that you can retrieve

14   those funds from the account.

15         MS. MOORE:  Okay.  And then the last thing I wanted

16   to ask about was you had mentioned yesterday about filing a

17   Complaint about Mr. Celler through the Court.  How would I go

18   about doing that?

19         THE COURT:  You would just write a letter to the

20   Court asking the Court to take into consideration his conduct,

21   and I will take a look at it and decide what to do with it.

22         MS. MOORE:  Okay.  Thank you.

23         THE COURT:  All right.  If you'll just -- rather than

24   file it -- well, I'll give you permission to file it under seal

25   and on the record so that there is at least a repository for

```
 1    it.  I don't want to just get it in the mail, but I also don't
 2    want it published on the open record, so you have permission to
 3    file it under seal, and the clerk is directed to accept it
 4    under seal, and the Court will address it.  And since it's just
 5    a grievance, it does not need to be copied to the defense, only
 6    ex parte to the Court under seal, so only I will have it.
 7              MS. MOORE:  Understood.
 8              THE COURT:  All right.
 9              MS. MOORE:  Thank you.
10              THE COURT:  Anything further from the plaintiff or
11    the defense?
12              MS. MOORE:  No, Your Honor.
13              MR. SARELSON:  No, Your Honor.
14              THE COURT:  Good luck to you both.
15              We are dismissed.
16              MR. SARELSON:  Thank you, ma'am.
17                        - - - - -
18              (Proceedings concluded at 1:55 p.m.)
19                        - - - - -
20
21
22
23
24
25
```

1                    C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript of

4    proceedings taken in a jury trial in the United States District

5    Court is a true and accurate transcript of the proceedings

6    taken by me in machine shorthand and transcribed by computer

7    under my supervision, this the 14th day of June, 2024.

8

9

10                                   /S/ DAVID J. COLLIER

11

12                              DAVID J. COLLIER

13                              OFFICIAL COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25